UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------x

UNITED STATES OF AMERICA

    -against-

                                      12 Cr. 661 (SLT)

ALI YASIN AHMED,

           Defendant.

-----------------------------------------------------x


**DEFENDANT ALI YASIN AHMED's MEMORANDUM OF LAW IN SUPPORT OF
HIS MOTION TO DISMISS COUNT THREE OF THE INDICTMENT**


SUSAN G. KELLMAN, Esq.
SARAH KUNSTLER, Esq.
EZRA SPILKE, Esq.
Counsel for
ALI YASIN AHMED
25 Eighth Avenue
Brooklyn, NY 11217
(718) 783-8200

TO:   CLERK OF THE COURT
       United States District Court
       Eastern District of New York
       225 Cadman Plaza East
       Brooklyn, NY 11201

       AUSA SETH DUCHARME
       AUSA SHREVE ARIAIL
       AUSA RICHARD TUCKER
       Office of the United States Attorney
       Eastern District of New York
       271 Cadman Plaza East
       Brooklyn, NY 11201

## TABLE OF AUTHORITIES

**CASES**

*Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989)……..………………9

*Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975)…………………………………14

*EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244 (1991)……………………………………4, 7, 8, 9, 14

*Kiobel v. Royal Dutch Petroleum*, 133 S. Ct. 1659 (2013)……………………….....13, 14, 15

*Kollias v. D & G Marine Maint.*, 29 F.3d 67 (2d Cir. 1994)…………………..……………………12

*IIT v. Vencap, Ltd.*, 519 F.2d 1001 (2d Cir. 1975)……………………………………………14

*Leasco Data Processing Equip. Co. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972)………………..14

*Small v. United States*, 544 U.S. 385 (2005)………………………………………………...…..9

*United States v. Bowman*, 260 U.S. 94 (1922)…………………………………...…10, 11, 12

*United States v. Flores*, 289 U.S. 137 (1933)……………………………………………………12

*United States v. Gatlin*, 216 F.3d 207 (2d Cir. 2000)……………………………………………4

*United States v. Palmer*, 16 U.S. (3 Wheat.) (1818)……………………………………………10

*United States. v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012)……………………………………15

*United States v. Yakou*, 393 F. 3d 231 (D.C. Cir. 2005)………………………………………4, 5

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013)………………………………………………15

*N.Y. Cent. R.R. Co. v. Chisholm*, 268 U.S. 29 (1925)……………………………….……………7

*McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963)……...............7

*Morrison v. National Australia Bank Ltd.*, 130 S. Ct 2869, 2886 (2010)………………13, 14, 15

*Schoenbaum v. Firstbrook*, 405 F.2d 200 (2d Cir. 1968)…………………………………………14

*Skiriotes v. Florida* , 313 U.S. 69 (1941)………………………………………………………...12

**STATUTES**

18 U.S.C. § 922……………………………………………………………………8, 9

18 U.S.C. § 924……………………………………………………………… passim

18 U.S.C. § 927…………………………………………………………………………8

21 U.S.C. § 960a…………………………………………………………………………9

28 U.S.C. § 1350………………………………………………………………………14

82 Stat 1213, 1224 (1968)……………………………………………...……………5, 6

**OTHER AUTHORITIES**

H.R. Conf. Rep. No. 1956, 1968 U.S.S.C.A.N. 4410, 4426………………………………………5

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------x


UNITED STATES OF AMERICA


    -against-

                                             12 Cr. 661 (SLT)


ALI YASIN AHMED,

           Defendant.


----------------------------------------------------x


### DEFENDANT ALI YASIN AHMED's MEMORANDUM OF LAW IN SUPPORT OF PRETRIAL MOTIONS


### <u>ARGUMENT</u>

### THE INDICTMENT MUST BE DISMISSED IN ITS ENTIRETY

We join in the arguments made by co-defendant Yusuf that the Superseding Indictment ("Indictment") must be dismissed in its entirety for the reasons articulated in Mr. Yusuf's memorandum of law supporting his pretrial motions.


### COUNT THREE MUST BE DISMISSED BECAUES THE STATUTE DOES NOT APPLY EXTRATERRITORIALLY

Count Three of the Indictment alleges Mr. Ahmed used or carried one or more firearms during and relation to the crimes of violence alleged in Counts One and Two of the Indictment, which describe a conspiracy to provide material support and resources to a foreign terrorist organization (Count One) and the provision of that support (Count Two). Count Three further alleges that Mr. Ahmed knowingly and intentionally possessed such firearms in furtherance of

these crimes, that one or more of the firearms was brandished and discharged, and that one or

more of the firearms was a machine gun, in violation of 18 U.S.C. §§ 924(c)(1)(a)(ii),

924(c)(1)(a)(iii), 924(c) (1) (B) (ii), 2 and 3551. None of the conduct alleged in Counts One

through Three, however, took place in, affected, or impacted, the United States. As explained

below, this flaw is fatal; Count Three of the Indictment must be dismissed because 18 U.S.C. §

924(c) does not apply extraterritorially.

**The plain text of § 924**

In interpreting legislation, courts should consider whether the statute at issue "gives any

indication of a congressional purpose to extend its coverage beyond places over which the

United States has sovereignty or has some measure of legislative control." *EEOC v. Arabian Am.

Oil. Co.*, 499 U.S. 244, 248 (1991) (citation and internal quotation marks omitted.) In doing so,

courts may "consider all available evidence about the meaning of the statute, including its text,

structure, and legislative history." *United States v. Gatlin*, 216 F.3d 207, 212, (2d Cir. 2000).

However, the courts must also remain mindful that "[f]ederal laws are deemed to apply only to

the territorial jurisdiction of the United States unless Congress provides affirmative evidence to

the contrary which is clearly expressed." *United States v. Yakou*, 393 F.3d 231, 243 (D.C. Cir.

2005). Here, a review of the text and legislative history confirms that 18 U.S.C. § 924(c) does

not apply, and was not meant to apply, extraterritorially.

18 U.S.C. § 924(c) provides, in relevant part:

> "[A]ny person who, during and in relation to a crime of violence or drug
> trafficking crime (including a crime of violence or drug trafficking crime that
> provides for an enhanced punishment if committed by the use of a deadly or
> dangerous weapon or device) for which the person may be prosecuted in a court of
> the United States, uses or carries a firearm, or who in furtherance of any such
> crime, possesses a firearm, shall…"

Notably, the statute does not include a provision conferring extraterritorial jurisdiction.

**The legislative history of §924**

Likewise, the legislative history of § 924 does not include or demonstrate any intention –

much less a "clearly expressed" intention (*Yakou*, 393 F.3d. at 243) – on the part of Congress to

apply the statute extraterritorially. Quite the contrary, § 924 was passed as part of the Gun

Control Act of 1968, a statute that unquestionably sought to deal with the purely domestic issue

of rising gun violence in American cities. *See* 82 Stat. 1213, 1224 (1968), Pub. L. No. 90-618.

According to the report of the House conference committee, Congress's primary purpose in

passing the Act was to "respond[] to widespread national concern that existing Federal control

over the sale and shipment of firearms [across] State lines [was] grossly inadequate." H.R. REP.

NO. 90-1577, at 1047 (1968) (Conf. Rep.) (brackets in original), reprinted in 1968 U.S.C.C.A.N.

4410, 4413. To this end, the title of the Act was "An act to amend title 18, United States Code, to

provide for better control of the interstate traffic in firearms" and section 1 specifically provided

for "State Firearms Control Assistance." Pub. L. No. 90-618, 82 Stat. 1213 (1968).

The Senate Report offers further confirmation of domestic gun violence as the object of

the statute.  The report noted that, "[i]n 1967, 7,700 citizens were murdered by gunmen in the

United States, and 71,000 Americans were victims of armed robberies and 55,000 persons were

assaulted by means of firearms. Thus, in 1967, 134,000 *American citizens* were victimized by

gun violence *in the United States.*" S. REP. NO. 90-1501, at 22 (1968) (emphasis added).  The

Senate report did not include any mention of Americans harmed overseas. Even the sponsor of

the most recent amendment to § 924(c), enacted in 1998, boasted that the amendment's passage

represented "an important step in the battle against firearm violence *in America.*" 229.144

CONG. REC. 1715 (1998) (statement of Rep. Bill McCollum) (emphasis added).

The language of § 924(c) as originally enacted applied to an even broader category of

criminal activity than it does today. Rather than prohibiting the use of weapons in connection with certain kinds of felonies, i.e. enumerated drug offenses and crimes of violence, the statute simply punished whoever "use[d] a firearm to commit *any felony which may be prosecuted in a court of the United States*." Gun Control Act of 1968, Pub. L. No. 90-618, § 102, 82 Stat. 1224 (1968) (emphasis added).

To understand why Congress adopted this particular statutory formulation, some historical context is necessary. Section 924(c) was not included in the original Gun Control bill, but was instead introduced as an amendment on the House floor by Representative Robert Casey of Texas. Casey's original amendment would have punished "whoever during the commission of any robbery, assault, murder, rape, burglary, kidnapping, or homicide (other than involuntary manslaughter), uses or carries any firearm which has been transported in interstate or foreign commerce . . . ." H.R. 18298, 90th Cong. (1968). Had it passed, Casey's amendment would have dramatically expanded the federal government's intrusion into matters traditionally entrusted to states as part of their general police power. That concern is what prompted Representative Richard Poff of Virginia to suggest a much narrower alternative amendment, which became the eventual language of the statute, limiting its application to "whoever uses a firearm to commit any felony which may be prosecuted in a court of the United States." Pub. L. No. 90-618, § 102, 82 Stat. 1213, 1224 (Oct. 22, 1968).   As Poff explained when introducing his revised language:

> [A]s a matter of policy, I do not think it would be wise to convert State crimes into Federal crimes on such a massive scale. The Constitution reserves the police powers to the several States. What is at issue is the proper function of the federal system. What is at stake is the concept of dual sovereignties. What is involved is the danger of centralized police powers.

114 CONG. REC. 22, 231–32 (1968) (statement of Rep. Richard Poff).

Consequently, the phrase "may be prosecuted in a court of the United States" was

inserted in order to differentiate federal from state crimes. The ensuing debate makes clear that other members shared Poff's concern. *See Id*. at 22, 231. In contrast, there is absolutely no hint in the legislative record that Congress even considered § 924(c)'s potential extraterritorial application, nor is there any likelihood that they would have thought to since the number of federal crimes that had been applied extraterritorially at the time was miniscule.

The point can be put slightly differently: suppose Representative Casey's original amendment had passed, making it a crime to use a firearm during one of the enumerated felonies so long as that firearm had been transported in interstate or foreign commerce. Such a statute clearly would not apply to the use of a firearm extraterritorially. That is because the Supreme Court has "repeatedly held that even statutes that contain broad language in their definitions of 'commerce' that expressly refer to '*foreign* commerce' do not apply abroad." *EEOC v. Arabian Am. Oil Co*., 499 U.S. 244, 251 (1991) (emphasis in original) (*citing N.Y. Cent. R.R. Co. v. Chisholm*, 268 U.S. 29 (1925)); *McCulloch v. Sociedad Nacional de Marineros de Honduras*, 372 U.S. 10 (1963). If this is correct, it would require a leap of logic to infer that Representative Hoff's substitute amendment, introduced for the sole purpose of cabining the statute's scope by differentiating federal from state crimes, in fact expanded the substantive reach of the statute to encompass acts committed abroad.

Finally, the conclusion that Congress did not intend § 924(c) to apply extraterritorially is buttressed by a general review of the statute's overall structure. As the Court found in *EEOC v. Arabian American Oil* with respect to Title VII, "[t]he statute as a whole indicates a concern that it not unduly interfere with the sovereignty and laws of the States." *Arabian Am. Oil Co*., 499 U.S. at 255. Other provisions make clear that Congress was primarily concerned with firearms transportation to and between States.

For example, while the Gun Control Act reflects congressional concern over potential conflicts between federal and state law, the statute is silent as to the relationship between federal and foreign law. Section 924(i) penalizes violations of § 922(u), which prohibits thefts from the inventory of gun dealers, manufacturers, and importers. Section 924(i)(2) notes that

> [n]othing contained in this subsection shall be construed as indicating an intent on the part of Congress to occupy the field in which provisions of this subsection operate to the exclusion of State laws on the same subject matter, nor shall any provision of this subsection be construed as invalidating any provision of State law unless such provision is inconsistent with any of the purposes of this subsection.

18 U.S.C. § 924(i)(2). Congress presumably would have at least mentioned potential conflicts with the laws of foreign countries had it considered § 924(c)'s potential extraterritorial application. In fact, there is an entire section of the Act, 18 U.S.C. § 927, devoted to its "Effect on State Law." Id. § 927. The *Arabian American Oil* Court made a similar point, noting that "[i]t is . . . reasonable to conclude that had Congress intended Title VII to apply overseas, it would have addressed the subject of conflicts with foreign laws and procedures." *Arabian Am. Oil Co.*, 499 U.S. at 256.

Many of the penalty provisions of § 924 were drafted in such a way as to foreclose the possibility of extraterritorial application. Section 924(g), for instance, prohibits the act of acquiring a weapon for use in a crime of violence. Significantly, however, the statute's literal terms do not authorize conviction for someone who travels for the purpose of acquiring a weapon outside of the United States. It reads:

> Whoever, with the intent to engage in conduct which . . . (4) constitutes a crime of violence . . . travels from any State or foreign country *into any other State* and acquires . . . a firearm in such other State in furtherance of such purpose, shall be imprisoned not more than 10 years, fined in accordance with this title, or both.

18 U.S.C. § 924(g) (emphasis added).

If Congress had intended § 924 to apply extraterritorially, presumably it would have

Page 8 of 16

eliminated the locus language altogether or substituted "into any other foreign country" for "into any other State." Instead, Congress was sensibly focused on violence in the United States. Section 924(k) similarly penalizes the act of smuggling a weapon into the United States for the purpose of committing a crime of violence; it does not criminalize smuggling a weapon out of the U.S. for the purpose of committing a crime of violence abroad. *See Id.* § 924(k). Finally, § 922 describes several "unlawful acts" under the Gun Control Act—importation, exportation, unlicensed disposal, and possession—with no mention of extraterritorial application. *See generally id.* § 922.

Congress clearly knows how to give extraterritorial effect to its statutes when it desires to do so. *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 440 (1989). Had Congress intended § 924(c)(1)(A) to apply extraterritorially, it would have included the appropriate language. The narcoterrorism statute, for example, makes explicit provision for extraterritorial application. See 21 U.S.C. § 960a(b) ("There is jurisdiction over an offense under this section if …")'  The 924 statute does not.

**United States v. Bowman and the presumption against extraterritoriality**

It is a basic canon of statutory construction that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Arabian Am. Oil. Co.*, 499 U.S. at 248 (citation and internal quotation marks omitted). This basic canon is based on the recognition that "Congress generally legislates with domestic concerns in mind." *Small v. United States*, 544 U.S. 385, 388 (2005). Limited extraterritorial reach of U.S. law serves a prudent purpose, namely, to "protect against the unintended clashes between our laws and those of other nations which could result in international discord." *Arabian Am. Oil. Co.*, 499 U.S. at 248.

There is, however, an exception to the presumption against extraterritorial application of criminal statutes. This exception was articulated in a 1922 Supreme Court case, *United States v. Bowman*, 260 U.S. 94 (1922). The four defendants in *Bowman*, three of whom were American citizens, stood accused of attempting to defraud a U.S.-owned corporation on a shipment of oil destined for Rio de Janeiro. None of the alleged criminal activity took place within the territorial boundaries of the United States and the statute itself was silent as to its extraterritorial effect.[1] Still, the Court found the defendants' conduct fell within the statute's reach. In so holding, the Court began by acknowledging the general principle that Congress ordinarily legislates with domestic concerns in mind:

> Crimes against private individuals or their property . . . must of course be committed within the territorial jurisdiction of the government where it may properly exercise it. If punishment of them is to be extended outside the strict territorial jurisdiction, it is natural for Congress to say so in the statute, and failure to do so will negative the purpose of Congress.

*Bowman, 260 U.S. at 98.* This statement was consistent with more than one hundred years of precedent; as early as 1818, the Court had invoked the presumption in holding that the 1790 Crimes Act did not reach a robbery committed by foreign nationals aboard a foreign ship while on the high seas. *United States v. Palmer*, 16 U.S. (3 Wheat.) 610, 631 (1818) ("[Although] 'any person or persons,' are broad enough to comprehend every human being," such "general words must . . . be limited to cases within the jurisdiction of the state.").

Where *Bowman* broke new ground, was in holding that certain statutes, like those making it a crime to defraud a U.S.-owned entity, ought to be given extraterritorial effect to avoid

---

[1]    The provision at issue, section 35 of the U.S. Criminal Code, read in relevant part:

Whoever shall . . . cause to be presented, for payment or approval, to or by any . . . corporation in which the United States of America is a stockholder, any claim upon or against the government of the United States, or any department or officer thereof, or any corporation in which the United States of America is a stockholder, knowing such claim to be false, fictitious, or fraudulent . . . shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

undermining Congress's "purpose" *in enacting the statute at issue. See Bowman*, 260 U.S. at 97.

The Court held that the ordinary presumption

> should not be applied to criminal statutes which are, as a class, not logically
> dependent on their locality for the government's jurisdiction, but are enacted
> because of the right of the government to defend itself against obstruction, or fraud
> wherever perpetrated, especially if committed by its own citizens, officers, or
> agents. Some such offenses can only be committed within the territorial
> jurisdiction of the government because of the local acts required to constitute
> them. Others are such that to limit their locus to the strictly territorial jurisdiction
> would be greatly to curtail the scope and usefulness of the statute and leave open a
> large immunity for frauds as easily committed by citizens on the high seas and in
> foreign countries as at home. In such cases, Congress has not thought it necessary
> to make specific provision in the law that the locus shall include the high seas and
> foreign countries, but allows it to be inferred from the nature of the offense.

*Id.* at 98.

The Court did not make clear whether it intended to create a broad exception to the

ordinary presumption for certain types of statutes or, alternatively, indicate a narrow set of

circumstances under which the presumption could be overcome. But by its terms, *Bowman*

appears to cover only a narrow subset of cases, namely those where the "nature of the offense"

implicates the government's right "to defend itself against obstruction, or fraud wherever

perpetrated." *Id.*  In fact, the *Bowman* Court was quite specific about the kinds of statutes that

would permit a court to infer extraterritorial intent. Among those it listed as examples were laws

that punished "knowingly certify[ing] a false invoice [while acting as a U.S. consul]," "forging

or altering a ship's papers," "enticing desertions from the naval service," "bribing a United States

officer of the civil, military or naval service," and "steal[ing] . . . property of the United States . .

. to be used for military or naval service." *Id.* at 99.

All of the aforementioned crimes share two common features. First, they are all directed

at the federal government itself. Second, each is likely to occur outside the territorial jurisdiction

of the United States. Accordingly, *Bowman* is properly read as fashioning a statutory

interpretation test consisting of two operative conditions, both of which must be satisfied before

a court can infer extraterritoriality from "the nature of the offense." *Bowman*, 260 U.S. at 98.

      This is precisely how the Supreme Court characterized Bowman in a subsequent decision,

*Skiriotes v. Florida*, where it cited the case for the proposition that "a criminal statute dealing

with acts that are *directly injurious to the government, and are capable of perpetration without*

*regard to particular locality* is to be construed as applicable to citizens of the United States upon

the high seas or in a foreign country, though there be no express declaration to that effect." 313

U.S. 69, 73–74 (1941) (emphasis added).   Otherwise, as the Court recognized in another case

postdating *Bowman*, "criminal statutes of the United States are not by implication given an

extraterritorial effect." *United States v. Flores*, 289 U.S. 137, 155 (1933) (*citing Bowman*, 260

U.S. at 98). What is more, as the Second Circuit has recognized, the Court's frequent

pronouncements on the presumption in recent years, "none of which mention[] *Bowman*, seem to

require that all statutes, without exception, be construed to apply within the United States only,

unless a contrary intent appears." *Kollias v. D & G Marine Maint.*, 29 F.3d 67, 71 (2d Cir. 1994)

(concluding that "*Bowman* should be read narrowly" and that "[r]eading *Bowman* as limited to

its facts, only criminal statutes, and perhaps only those relating to the government's power to

prosecute wrongs committed against it, are exempt from the presumption").]

      Under this analysis, 924(c), which was enacted to combat domestic gun violence and

protect American citizens in the United States, is not part of the class of crimes contemplated by

*Bowman*. It is not a crime directed at the federal government itself, and is not a crime, by

definition, that is likely to be committed outside of the territorial jurisdiction of the United

States. Further, unlike the *Bowman* defendants, Mr. Ahmed is not a United States citizen, so that

one of the primary concerns articulated by the Court in its holding – the authority of the federal

courts over crimes committed by its citizens in other countries – is not implicated here. To apply *Bowman* in this case, to create an exception to the presumption against extraterritoriality for a violation of 18 U.S.C. § 924(c) allegedly committed by a foreign national in another country is to render the presumption meaningless; if the "exception" applies here, one would be hard pressed to find a case where it did not apply.

**The impact of *Morrison* and *Kiobel* on statutes that do not explicitly authorize extraterritorial application**

However broadly one reads the exception created by *Bowman*, two recent Supreme Court decisions have dramatically changed the landscape of extraterritorial application of domestic laws. In *Morrison v. National Australia Bank*, 130 S. Ct. 2869 (2010), and *Kiobel v. Royal Dutch Petroleum*, 133 S. Ct. 1659 (2013), the Supreme Court emphatically reaffirmed the longstanding presumption that federal statutes do not apply outside the territorial United States absent a "clear indication" to the contrary. Although *Morrison* and *Kiobel* involved civil suits under section 10(b) of the Securities Exchange Act and the Alien Tort Statute respectively, the Court's holdings in both cases instruct courts on how they should interpret the reach of statutes generally—not just civil ones like section 10(b) and the ATS. Consequently, a host of criminal laws, including 18 U.S.C. § 924(c), that prosecutors have routinely applied extraterritorially in the past, but whose geographic scope is facially ambiguous, must be reinterpreted as reaching domestic conduct only.

In *Morrison,* the Supreme Court, in a majority decision authored by Justice Scalia, applied the "longstanding" presumption against extraterritoriality to hold that section 10(b) of the Securities Exchange Act of 1934 does not reach securities transactions that occur outside of the territorial United States. *Morrison*, 130 S. Ct. at 2877 ("It is a 'longstanding principle of American law that legislation of Congress, unless a contrary intent appears, is meant to apply

only within the territorial jurisdiction of the United States.'" (*quoting EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991))). By doing so, the Court—in one fell swoop—overturned decades of lower court precedent that had permitted such suits so long as plaintiffs adequately alleged deceptive conduct that either occurred in, or had substantial effects upon, the United States. The so-called "conducts and effects test" was the product of several Second Circuit decisions in the late 1960s and early 70s, the most famous of which is *Leasco Data Processing Equip. Co. v. Maxwell*, 468 F.2d 1326 (2d Cir. 1972); *see also IIT v. Vencap, Ltd.*, 519 F.2d 1001, 1017 (2d Cir. 1975); *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974, 991 (2d Cir. 1975); *Schoenbaum v. Firstbrook*, 405 F.2d 200, 206–08 (2d Cir. 1968), *modified on other grounds en banc*, 405 F.2d 215 (2d Cir. 1968).

In *Kiobel*, the Court went one step further.  It relied on *Morrison* to hold that the Alien Tort Statute ("ATS"), 28 U.S.C. § 1350 (2012), does not permit federal courts to recognize a cause of action for torts committed by aliens abroad. *Kiobel* makes clear the Court intended *Morrison* to do more than simply define the substantive reach of U.S. securities laws. Although neither party raised the issue below, the Justices ordered post-argument supplemental briefing as to whether the ATS encompasses extraterritorial conduct. *See Kiobel v. Royal Dutch Petrol. Co.*, 132 S. Ct. 1738 (2012) (directing parties to submit supplemental briefing).   Ultimately, they held that it did not, even though the ATS is merely a jurisdictional statute that "does not directly regulate conduct or afford relief" itself. *Kiobel*, 133 S. Ct. at 1664. The Court reasoned that ATS litigation implicated the principles underlying the presumption, particularly the desire to avoid "unwarranted judicial interference in the conduct of foreign policy." *Id.*

The holdings of *Morrison* and *Kiobel* cannot be limited to civil cases. To the contrary, in *Morrison*, the Supreme Court made clear that the presumption against extraterritoriality applies

in "all cases."  *Morrison*, 130 S. Ct. at 2881. Recently, in *United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013), the Second Circuit echoed this principle, explaining that "the general rule is that the presumption against extraterritoriality applies to criminal statutes, and section 10(b) is no exception." *Vilar*, 729 F.3d at 74.  In *Vilar*, the Circuit further explained that the *Bowman* exception is limited to situations in which "the law at issue is aimed at protecting the right of the government to defend itself." *Id*. at 73. Thus, it is clear, under *Morrison*, *Kiobel*, and *Vilar*, that the *Bowman* exception does not reach 924(c), and that the presumption against extraterritoriality applies.

Before *Vilar*, the Second Circuit was one of two courts of appeals that gave 924(c) extraterritorial application. In *United States. v. Siddiqui*, 699 F.3d 690 (2d Cir. 2012), the Circuit held that "where…the underlying substantive criminal statutes apply extraterritorially," 924(c) has extraterritorial application. This holding appears to require no inquiry into the lawfulness of the extraterritorial jurisdiction of 924(c) or any other "ancillary" statute, so long as the offense is bootstrapped onto another crime with extraterritorial application.  *See Siddiqui, 699 F.3d at* However, in *Siddiqui*, the Circuit's reasoning is premised on the erroneous notion that "[t]he ordinary presumption that laws do not apply extraterritorially has no application to criminal statutes" *Id.* at 700, a proposition now clearly  rejected by the Circuit in *Vilar*.

In light of *Morrison*, *Kiobel* and *Vilar*, the Second Circuit's holding in *Siddiqui* cannot stand; 924(c) cannot be applied extraterritorially simply by being bootstrapped onto another statute.  A host of criminal statutes – including 18 U.S.C. § 924(c) – that prosecutors routinely applied extraterritorially in the past, but whose geographic scope is facially ambiguous, must be reinterpreted as reaching domestic conduct only.

## **CONCLUSION**

For the reasons outlined above, Mr. Ahmed respectfully requests dismissal of Count

Three of the Indictment.

Dated: Brooklyn, New York
       November 21, 2014

Respectfully submitted,

SUSAN G. KELLMAN, Esq.
SARAH KUNSTLER, Esq.
EZRA SPILKE, Esq.
Counsel for ALI YASIN AHMED
25 Eighth Avenue
Brooklyn, NY 11217
(718) 783-8200