UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------x
UNITED STATES OF AMERICA

               - against -

ALI YASIN AHMED, *et al.*,

                    Defendants.
----------------------------------------------------------x

**<u>MEMORANDUM AND ORDER</u>**

12-CR-661 (SLT) (S-2)

**TOWNES, United States District Judge,**

      In a second superseding indictment filed on December 1, 2014, Ali Yasin Ahmed, Madhi

Hashi, and Mohamed Yusuf ("Defendants") have been charged with crimes relating to their

alleged support of a foreign terrorist organization. Defendants are charged with conspiring to

provide, providing, and attempting to provide "material support or resources to" and "receiving

military-type training from" al-Shabaab, a "designated foreign terrorist organization," in

violation of 18 U.S.C. §§ 2339B and 2339D, and using, carrying, or possessing, including

brandishing and discharging, firearms, including a machine gun, in relation to and in furtherance

of a crime of violence in violation of 18 U.S.C. § 924(c). Trial in this case is scheduled to

commence on May 18, 2015. Currently before the Court are Defendants' omnibus motions to

dismiss the indictment and for other relief. (ECF Nos. 99, 100, 101, 103, 129, 130, 131, 147.)

*LEGAL STANDARD FOR MOTIONS TO DISMISS INDICTMENT*

      Federal Rule of Criminal Procedure 12(b) provides that "[a] party may raise by pretrial

motion any defense, objection, or request that the court can determine without a trial on the

merits." Fed. R. Crim. P. 12(b)(1). In other words, Rule 12 authorizes defendants to challenge

the lawfulness of a prosecution on purely legal, as opposed to factual, grounds. *See United*

*States v. Aleynikov*, 676 F.3d 71, 75–76 (2d Cir. 2012) ("[A] federal indictment can be

challenged on the ground that it fails to allege a crime within the terms of the applicable

statute.").  "The sufficiency of an indictment and the interpretation of a federal statute are both matters of law" reviewable on a motion to dismiss an indictment.  *Id*. at 76.  However, "[u]nless the government has made what can fairly be described as a full proffer of the evidence it intends to present at trial[,] ... the sufficiency of the evidence is not appropriately addressed on a pretrial motion to dismiss an indictment."  *United States v. Alfonso*, 143 F.3d 772, 777-78 (2d Cir. 1998). In considering the sufficiency of an indictment, the indictment "must be read to include facts which are necessarily implied by the specific allegations made," *United States v. LaSpina*, 299 F.3d 165, 177 (2d Cir. 2002) (citation and internal quotation marks omitted), and the Court must accept all pertinent allegations in the indictment as true, *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952).  *See also United States v. Heicklen*, 858 F. Supp. 2d 256, 261-63 (S.D.N.Y. 2012).

## FACTUAL BACKGROUND

### Arrest and Indictment

On August 5, 2012 Defendants were arrested by Djiboutian authorities after illegally crossing the border from Somalia into Djibouti on their way to Yemen, allegedly to join another designated foreign terrorist organization: al-Qaeda in the Arabian Peninsula.  (ECF No. 153 at 17).  Djiboutian authorities detained Defendants and Defendants allege that they were tortured by Djiboutian officials and subsequently questioned, while still in Djiboutian custody, by two separate FBI teams.  (ECF Nos. 99-2, 100-1, 101-1.)

On October 18, 2012, a grand jury empaneled in the Eastern District of New York returned an indictment charging the defendants with crimes related to their provision of material assistance to al-Shabaab.  (ECF No. 153 at 19.)  In November 2012, Djiboutian officials turned Defendants over to the United States government, at which point they were brought to the United States for prosecution.  (*Id.* at 17).  On November 15, 2012, a grand jury returned a first

superseding indictment.  (ECF No. 15.)  On December 1, 2014, a grand jury returned a five-count second superseding indictment against Defendants.  (ECF No. 138.)  Count One charges Defendants with conspiring to provide material support to a foreign terrorist organization, to wit: al-Shabaab, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2339B(d).  Count Two charges that Defendants, together with others, provided material support to al-Shabaab, in violation of 18 U.S.C. §§ 2339B(a)(1) and  2339B(d).  Count Three charges that Defendants, together with others, attempted to provide material support to al-Shabaab, in violation of 18 U.S.C. §§ 2339B(a)(1) and 2339B(d).  Count Four charges that Defendants Ahmed and Yusuf, together with others, received military-type training from al-Shabaab, in violation of 18 U.S.C. §§ 2339D(a) and 2339D(b).  Finally, Count Five charges that Defendants, together with others, unlawfully used, carried, and possessed one or more firearms, including a machinegun, in relation to and in furtherance of the crimes of violence charged in Counts One through Four, in violation of 18 U.S.C. §§ 924(c)(1)(A)(i)-(iii) and 924(c)(1)(B)(ii).  The Government alleges that Defendants brandished and discharged one or more of these firearms.

### Current Motions

Defendants filed the instant motions to dismiss the indictment, raising various constitutional challenges and challenging the sufficiency and timeliness of the operative indictment.  Defendants also (1) move for a bill of particulars, (2) move *in limine* for an order directing the government not to use the terms: "terrorist," "terrorist activity," or "terrorism," and (3) move for notice pursuant to Fed. R. Evid. 404(b)(2) of uncharged crimes about which the Government intends to offer evidence at trial.  (ECF Nos. 129, 130, 131.)[1]  Defendants also renew their motions to suppress, for all purposes, statements made to FBI agents while in Djiboutian custody and related relief. (ECF Nos. 99, 100, 101, 103.)

---

[1] Defendants' motions to join motions filed by co-defendants are granted.

While Defendants' motions were pending, the Government filed a superseding indictment.  In response, Defendant Yusuf filed a supplemental motion to dismiss, addressing the counts added in the superseding indictment, moving: (1) to dismiss Count Three, which charges Defendants with attempting to provide material support to al-Shabbab on multiplicity grounds, or in the alternative, for an order requiring the Government to "elect between" Count Two, the substantive count, and Count Three, the attempt count, and (2) to strike aliases recited in the indictment.  (ECF No. 147.)

## *DISCUSSION*

### *Statutory Framework*

On April 24, 1996, the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") was signed into law.  On December 17, 2004, Congress passed the Intelligence Reform and Terrorism Prevention Act ("IRTPA") which amended AEDPA.  Three sections of these anti-terrorism statutes are at issue in Defendants' motions.  Section 219 of the Immigration and Nationality Act, as amended by AEDPA, codified at 8 U.S.C. § 1189, empowers the Secretary of State to designate an organization as a "foreign terrorist organization" ("FTO").  8 U.S.C. § 1189; P.L. 104-132, Apr. 24, 1996, 110 Stat 1214, Sec. 302.  Section 2339B of Title 18, enacted by AEDPA, makes it a crime to provide "material support" and resources to an FTO. 18 U.S.C. § 2339B; P.L. 104-132, Apr. 24, 1996, 110 Stat 1214, Sec. 303.  Section 2339D of Title 18, which was enacted by the IRTPA, makes it a crime to knowingly receive "military-type training" from or on behalf of an FTO.  18 U.S.C. § 2339D; PL 108–458, Dec. 17, 2004, 118 Stat 3761, Sec. 6602.

Under § 1189, the Secretary of State may designate an organization as an FTO if the Secretary finds: (1) that the organization is a foreign organization; (2) that the organization engages in terrorist activity; and (3) that the terrorist activity or terrorism of the organization

threatens the security of United States nationals or the national security of the United States. 8 U.S.C. § 1189(a)(1)(A)-(C).

As amended, § 2339B imposes criminal liability, up to life in prison, upon "[w]hoever knowingly provides material support or resources to [an FTO], or attempts or conspires to do so." 18 U.S.C. § 2339B(a)(1). The term "material support or resources" includes, *inter alia*, "personnel (1 or more individuals who may be or include oneself)." 18 U.S.C. § 2339A(b)(1). As amended, § 2339D imposes criminal liability, up to 10 years imprisonment, upon "[w]hoever knowingly receives military-type training from or on behalf of any organization designated at the time of the training [as an FTO]." Both statutes include an identical *mens rea* requirement, which requires that a person who "knowingly provides material support or resources" to an FTO or "knowingly receives military-type training from or on behalf of" an FTO must also know that (1) "the organization is a designated [FTO] terrorist organization," (2) "the organization has engaged or engages in terrorist activity" as defined in 8 U.S.C. § 1182(a)(3)(B), or (3) "the organization has engaged or engages in terrorism" as defined in § 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989.[2] 18 U.S.C. §§ 2339B(a)(1), D(a). Both statutes also include an identical "extraterritorial jurisdiction" element, which provides a disjunctive list of circumstances under which the statute has extraterritorial reach, specifically, if:

> **(A)** an offender is a national [or lawful permanent resident] of the United States…;
>
> **(B)** an offender is a stateless person whose habitual residence is in the United States;

---

[2] Section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989 defines "the term 'terrorism' [to] mean[] premeditated, politically motivated violence perpetrated against noncombatant targets by subnational groups or clandestine agents." PL 100–204 (HR 1777), PL 100–204, December 22, 1987, 101 Stat 1331.

**(C)** after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

**(D)** the offense occurs in whole or in part within the United States;

**(E)** the offense occurs in or affects interstate or foreign commerce; or

**(F)** an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

18 U.S.C. §§ 2339B(d)(1) and D(b).  A defendant in a criminal action under §§ 2339B and

2339D is precluded from challenging the validity of the organization's designation as an FTO

during his or her criminal proceedings.  8 U.S.C. § 1189(a)(8).

Defendants are also charged with violating 18 U.S.C. § 924(c), which is entitled

"Penalties," and provides, in relevant part:

**(c)(1)(A)** … [A]ny person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime—

**(i)** be sentenced to a term of imprisonment of not less than 5 years;

**(ii)** if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and

**(iii)** if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

**(B)** If the firearm possessed by a person convicted of a violation of this subsection--

**…**

**(ii)** is a machinegun …, the person shall be sentenced to a term of imprisonment of not less than 30 years.

18 U.S.C. § 924(c)(A)-(B).

**I.** **_Motion to Dismiss the Indictment_**

   **A. _Defendants' Constitutional Challenges_**

Defendants raise numerous as-applied and facial challenges to their prosecution. They argue their prosecution in the United States offends due process. They also argue that the material support and receipt of military-type training statutes, as written, are unconstitutional because they: (1) are not tied to an enumerated power of Congress, (2) are vague and standardless, in that they leave to the executive's "whim" the decision of who to bring into the United States for prosecution, and (3) violate Defendants' right to have every element of each offense proven beyond a reasonable doubt because Defendants are not permitted to challenge the Secretary of State's designation of al-Shabaab as an FTO. However, the statute is clear, and there is no constitutional infirmity with its clear meaning.

   **1. _Defendants Do Not Challenge the Jurisdiction of this Court_**

As a threshold matter, to the extent that the Defendants have framed their arguments regarding the extraterritorial reach of the statutes at issue as questions of "jurisdiction," such a reading has been definitively rejected by the United States Supreme Court. In _Morrison v. Nat'l Australia Bank Ltd._, the United States Supreme Court explained that the extraterritorial reach of a statute does not "raise a question of subject-matter jurisdiction," which "refers to a tribunal's power to hear a case," but rather, "is a merits question." 561 U.S. 247, 253-54 (2010) (citations and internal quotation marks omitted); _see also United States v. Yousef_, 750 F.3d 254, 262 (2d Cir. 2014) ("_Jamal Yousef_") (clarifying that "whether [a statute] is intended to reach overseas conduct … is a merits question that does not implicate the power of the district court to hear and decide the case."). Indeed, "[i]n the criminal context, 18 U.S.C. § 3231 is all that is necessary to establish a court's power to hear a case involving a federal offense," regardless of "whether or

not the conduct charged proves beyond the scope of Congress' concern or authority in enacting

the statute at issue." *Jamal Yousef*, 750 F.3d at 262.  18 U.S.C. § 3231 provides that "[t]he

district courts of the United States shall have original jurisdiction, exclusive of the courts of the

States, of all offenses against the laws of the United States."  18 U.S.C. § 3231.

### 2.  *Due Process Limits on Extraterritorial Application of United States Criminal Laws*

Defendants argue that it is a violation of the Due Process Clause of the Fifth Amendment

of the United States Constitution to prosecute them in the United States under any United States

statute for conduct they allegedly committed entirely outside of the United States, as Somalis by

birth and non-United States nationals.  Defendants assert that any United States prosecution of

them is unconstitutional because "nothing that the government has provided to date shows that

the defendant[s] had any notice or reason to believe that [they were] subjecting [themselves] to

U.S. law and could be hauled into a U.S. court for [their] conduct."  (ECF No. 129-1, Yusuf Br.

at 4.)  However, Defendants overstate the extent of the Fifth Amendment Due Process Clause's

protections.

The Due Process Clause of the Fifth Amendment imposes limits on the United States'

authority to enforce its laws beyond the territorial boundaries of the United States.  *See*, *e.g.*,

*United States v. Yousef*, 327 F.3d 56, 86 (2d Cir. 2003) ("*Ramzi Yousef*").  It requires "that a

territorial nexus underlie the extraterritorial application of a criminal statute," in order to

"protect[] criminal defendants from prosecutions that are arbitrary or fundamentally unfair."

*Jamal Yousef*, 750 F.3d at 262 (citation and internal quotation marks and omitted).  "The absence

of the required nexus … [is] grounds for dismissing [an] indictment before the district court[.]"

*Id*.  However, all that is required by the Due Process Clause is "a sufficient nexus between the

defendant and the United States, so that such application would not be arbitrary or fundamentally

8

unfair." *Id.* at 258 (quoting *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011)

(quoting *Ramzi Yousef*, 327 F.3d at 111)). In cases involving "non-citizens acting entirely

abroad, [such a] nexus exists when the aim of that activity is to cause harm inside the United

States or to U.S. citizens or interests." *Al Kassar*, 660 F.3d at 118; *see also Jamal Yousef*, 750

F.3d at 262 (disavowing the term "jurisdictional nexus," but explaining that due process requires

a "territorial nexus").

In *Al Kassar*, the Second Circuit expressly rejected the argument that due process

requires that a defendant understand that his conduct exposes him to criminal prosecution *in the*

*United States*, explaining that:

> "The idea of fair warning is that 'no man shall be held criminally responsible for
> conduct which he could not reasonably understand to be proscribed.' Fair warning
> does not require that the defendants understand that they could be subject to
> criminal prosecution *in the United States* so long as they would reasonably
> understand that their conduct was criminal and would subject them to prosecution
> somewhere.

*Al Kassar*, 660 F.3d at 119 (emphasis in original) (quoting *Bouie v. City of Columbia*, 378 U.S.

347, 351 (1964) (internal quotation marks omitted in *Al Kassar*).

Here, Due Process is not violated by prosecution on United States soil because the

Defendants allegedly engaged in clearly unlawful conduct that was intended to "cause harm

inside the United States or to U.S. citizens or interests." *Al Kassar*, 660 F.3d at 118. The

Government has represented to the Court that it intends to prove the following at trial:

(1) Defendants allegedly traveled from Europe to Somalia in order to materially assist

and receive military-type training from al-Shabaab.[3]

---

[3] Defendants allegedly traveled to join the "*mujahideen*, (singular: "*mujahid*")," which
has been defined as "Muslim guerilla warriors engaged in *jihad*." *United States v. Mehanna*, 735
F.3d 32, 46 n.5 (1st Cir. 2013) (citing The American Heritage Dictionary of the English
Language 1153 (4th ed. 2000)). The term *jihad*, in turn, "has been defined as 'a religious war of
Muslims against unbelievers in Islam, inculcated as a duty by the Koran and traditions.'" *United*

(2) At the time when Defendants allegedly traveled to join and assist al-Shabaab, al-Shabaab had made public threats directed towards the United States and United States interests, for example, publicly declaring:

> [W]e say to the patron and protector of the cross, America: the wager that you made on the Ethiopians, Ugandans, and Burundians in Somalia was a failure, and history has proven it.  Allah willing, we will attack them, roam [through their ranks], cut off every path they will take, chase away those who follow them, and fight them as insects and wolves.  [We] will give them a taste of the heat of flame, and throw them into hell.

(ECF No. 153 at 3.)

(3) Defendants allegedly knew that al-Shabaab was engaged in terrorism.  The statute requires the Government to prove that Defendants knew "that [al-Shabaab] is a designated terrorist organization ..., that [al-Shabaab] has engaged or engages in terrorist activity ..., or that [al-Shabaab] has engaged or engages in terrorism ...." 18 U.S.C. §§ 2339B(a)(1) & 2339D(a). The Government intends to prove, *inter alia*, that Defendants Yusuf and Ahmed served under Saleh Nahban, an al-Qaeda-linked Kenyan *mujahid* and leader of al-Shabaab's foreign *mujahideen* fighters, who allegedly sent a *mujahid* who had trained alongside Ahmed and Yusuf to assess the viability of a suicide bomb attack on, among other locations, the U.S. Embassy located in Kampala, Uganda.  (ECF No. 153 at 9.)

Thus, the Government intends to proffer evidence, which it contends will show that Defendants had "fair warning" that they might be held criminally liable *somewhere* for their alleged conduct because their conduct was "self-evidently criminal," and they should have

---

*States v. Abu-Jihaad*, 630 F.3d 102, 109 n.1 (2d Cir. 2010) (quoting 8 *Oxford English Dictionary* 238 (2d ed. 1989)).  Although *jihad* may encompass both violent and non-violent conduct, "it is in the former sense that the concept has been invoked to support terrorist acts against the United States."  *Id*. (noting that "*jihad* is also understood to denote 'the struggle against one's evil inclinations or efforts toward the moral uplift of society'") (quoting 7 Encyclopedia of Religion 4917 (Lindsay Jones ed., 2d ed. 2005)); *Mehanna*, 735 F.3d 32, 41 n.3 ("'jihad' is a linguistically protean term that may encompass both violent and nonviolent acts," but explaining that the defendant "used the term to refer to violent *jihad*").

"reasonably underst[oo]d that their conduct … would subject them to prosecution somewhere." *Al Kassar*, 660 F.3d at 119.  Additionally, Defendants allegedly joined and assisted al-Shabaab, "a known terrorist organization," in order to engage in violent *jihad* "with the understanding that [al-Shabaab intends] to kill U.S. citizens and destroy U.S. property."  *Id*; *see also United States v. Ahmed*, No. 10 CR 131 PKC, 2011 WL 5041456, at *2 (S.D.N.Y. Oct. 21, 2011) (finding prosecution of a defendant under the same statutes as are at issue in this case was "neither arbitrary nor fundamentally unfair" because "[t]aken together, the designation and knowledge requirements ensure that there is a nexus to American interests").  Thus, because "the [alleged] aim of [their] activity[, in materially assisting al-Shabaab carry out its mission, wa]s to cause harm inside the United States or to U.S. citizens or interests," there is a sufficient "territorial nexus" with the United States.  *Al Kassar*, 660 F.3d at 119.  Accordingly, it does not offend due process to prosecute Defendants in the United States for their conduct abroad.  If at the close of the Government's case, the Government has failed to prove the required jurisdictional nexus, Defendants may renew their as-applied due process challenge at that time.

### 3.  Is the Material Assistance Statute Unconstitutionally "Boundless"?

Defendants also raise what appears to be a facial due process challenge, without citations or clarification, asserting that § 2339B violates due process because it purportedly has limitless extraterritorial reach and leaves to the executive's "whim" the decision of who to bring into the United States for prosecution.[4]  As a threshold matter, that a criminal statute could potentially be

---

[4] Yusuf argues in his supplemental motion to dismiss that all of the same arguments made about 18 U.S.C. § 2339B in the omnibus motion apply with equal force to Count Four, which charges defendants Ahmed and Yusuf with receiving military-type training from al-Shabaab, in violation of 18 U.S.C. § 2339D.  The receipt of military-type training and the material support statutes have substantially identical knowledge and extraterritoriality provisions.  Accordingly, the Court's analysis of the material support statute applies equally to the military-type training statute.  For ease of reference, for the purposes of this Order, the Court will analyze Defendants' arguments under § 2339B.

invoked to reach a large number of offenders and leaves the decision about who to investigate

and prosecute to law enforcement and prosecutors does not render the statute unconstitutional,

particularly where the statute concerns national security.  As the Supreme Court stated in *Bond v.*

*United States*, "prosecutorial discretion [i]s a valuable feature of our constitutional system"

which "involves carefully weighing the benefits of a prosecution against the evidence needed to

convict, the resources of the public fisc, and the public policy of the [prosecuting sovereign]."

134 S. Ct. 2077, 2092-93 (2014).  This is the norm in our constitutional system and is not

grounds for striking down a statute.  *See also Doherty v. Meese*, 808 F.2d 938, 943 (2d Cir.

1986) (where petitioner challenged discretionary determinations of the Attorney General, the

Court explained that "[t]he requisite judgment requires an essentially political determination [as

it] … inevitably affects United States relations with other nations … [as well as] the complicated

multilateral negotiations concerning efforts to halt international terrorism") (citing *Harisiades v.*

*Shaughnessy*, 342 U.S. 580, 588–89 (1952) ("[M]atters [relating to foreign relations] are so

exclusively entrusted to the political branches of government as to be largely immune from

judicial inquiry or interference.").

Moreover, Defendants are mistaken that the statute has "boundless" extraterritorial reach

for two reasons.  First, the statute includes an "extraterritorial jurisdiction" element, which

provides a disjunctive list of circumstances under which the statute has extraterritorial reach,

specifically, if:

(**A**) an offender is a national [or lawful permanent resident] of the United
States…;

(**B**) an offender is a stateless person whose habitual residence is in the United
States;

12

**(C)** after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

**(D)** the offense occurs in whole or in part within the United States;

**(E)** the offense occurs in or affects interstate or foreign commerce; or

**(F)** an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

18 U.S.C. § 2339B(d)(1). Thus, any extraterritorial application of the statute is limited by this list. Defendants assert that the list provides no limiting principle because subsection (d)(1)(C) is "all encompassing" and would cover anyone brought from abroad for the purposes of prosecution. However, as the Government explains, "extraterritorial jurisdiction must exist at the time of charging. In a case like this, w[h]ere the defendants were abroad when they were first indicted, Section 2339B(d)(1)(C) would not apply." (ECF No. 153, Gov't Br. at 35 n.29.)

Second, as discussed above, the statute's extraterritorial application is limited by the requirements of due process. Due process requires, at a minimum, "that a territorial nexus underlie the extraterritorial application of a criminal statute …." *Jamal Yousef*, 750 F.3d at 262. Thus, there is no merit to Defendants' contention that § 2339B could be invoked to reach conduct entirely unrelated to the United States.

### 4. *Does the Firearms Statute Have Extraterritorial Application?*

Defendants argue that Count Five, the firearms count, must be dismissed because Congress did not intend 18 U.S.C. § 924(c) to have extraterritorial reach. This argument was considered and rejected by the Second Circuit in *United States v. Siddiqui*, 699 F.3d 690, 700-01 (2d Cir. 2012). Defendants argue that the Supreme Court's recent decisions in *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247 (2010), and *Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct.

1659 (2013), radically changed the way courts think about the presumption against extraterritoriality, and reversed the doctrine that the *Siddiqui* court relied on in reaching its holding – that the presumption has no application in criminal cases.

In *Morrison*, the Supreme Court stated that the presumption against extraterritoriality applies "in all cases, preserving a stable background against which Congress can legislate with predictable effects." *Morrison*, 561 U.S. at 261. Nevertheless, in *Siddiqui*, which the Circuit decided after *Morrison*, the Circuit stated that "[t]he ordinary presumption that laws do not apply extraterritorially has no application to criminal statutes," before holding that the jurisdiction of § 924(c) is coextensive with the underlying crime of violence or drug trafficking offense to which it refers. *Siddiqui*, 699 F.3d at 700. As Defendants point out, after the Supreme Court decided *Kiobel* the following year, reiterating the broad scope of the presumption against extraterritoriality, the Circuit followed suit and held, in *United States v. Vilar*, that the presumption applies with equal force to civil *and* criminal statutes, "except in situations where the law at issue is aimed at protecting 'the right of the government to defend itself.'" *United States v. Vilar*, 729 F.3d 62, 72 (2d Cir. 2013) (quoting *United States v. Bowman*, 260 U.S. 94, 98-100 (1922)).

Although Defendants are correct that one line in *Siddiqui*, if taken out of context, is no longer good law, there is no reason to believe that the Circuit would reach a different conclusion if asked to interpret § 924(c) after *Kiobel* and *Vilar*.[5] This is because the Circuit's holding in

---

[5] *See Vilar*, 729 F.3d at 73-74 (explaining that "[h]owever broadly worded, [the statement in *Siddiqui*] must be understood in … context" because in *Siddiqui*, the Circuit was construing *several* statutes, including ones designed to protect the United States, which fall within the exception to the presumption against extraterritoriality recognized in *Bowman*, 260 U.S. at 98)). In *Bowman*, the Supreme Court held that "to limit the[] locus [of criminal statutes designed to defend the United States] ... would be greatly to curtail the scope and usefulness of the statute[s] and leave open a large immunity for [crimes] as easily committed by citizens on the high seas and in foreign countries as at home." *Bowman*, 260 U.S. at 98. Rather than apply the

14

*Siddiqui*, that § 924(c) could have extraterritorial application depending on the predicate

underlying criminal offense, was not premised on a mistaken non-application of the presumption

against extraterritoriality.  Rather, the Circuit's analysis was based on the structure of § 924(c), a

statute that, in essence, provides sentencing enhancements for certain categories of predicate

crimes if firearms are involved.  *See Siddiqui*, 699 F.3d at 701; *see also United States v. Shibin*,

722 F.3d 233, 247 (4th Cir. 2013) ("[A]s an ancillary crime to underlying [piracy] crimes that

apply extraterritorially, § 924(c) applies coextensively with the underlying crimes."); *United*

*States v. Viglakis*, No. 12 CR 585 KBF, 2013 WL 4477023, at *7 (S.D.N.Y. Aug. 14, 2013)

(citing *Siddiqui*, finding § 924(c) applies extraterritorially because, *inter alia*, § 2339B applies

extraterritorially); *United States v. Naseer*, No. 10 CR 19 S-4, 2014 WL 3871350, at *1

(E.D.N.Y. Aug. 6, 2014) (same).

The *Siddiqui* court's reasoning is entirely consistent with *Morrison* and *Kiobel*.  Neither

*Morrison* nor *Kiobel* requires Congress to employ some talismanic language to rebut the

presumption against extraterritoriality.  Rather, the Court may look to the structure of the statute

and with it, its incorporated predicate statutes, to determine whether the presumption against

extraterritoriality has been rebutted.  *See Ofori-Tenkorang v. Am. Int'l Grp., Inc.*, 460 F.3d 296,

301 (2d Cir. 2006) ("If necessary to ascertain Congress's intent [about the extraterritorial

application of a statute], we may also consider 'all available evidence about the meaning of the

statute, including its ... structure[ ] and legislative history.'") (citation omitted).  In reaching this

conclusion, this Court finds the Circuit's post-*Kiobel* decision in *European Cmty. v. RJR*

---

presumption against extraterritoriality, "[i]n such cases, Congress ... allows [the territorial limits
of the statute] to be inferred from the nature of the offense."  *Id.*  Even after *Morrison* and
*Kiobel*, the *Bowman* exception remains good law.  *Vilar*, 729 F.3d at 73-74 (To have
extraterritorial application, statutes must "either contain a clear indication of Congress's intent to
provide for extraterritorial application *or relate to crimes against the United States*
*government*.").  Thus, the language in *Siddiqui* was correct, as it applied to the other statutes at
issue in that case.

*Nabisco, Inc.*, 764 F.3d 129 (2d Cir. 2014), instructive.  In *RJR*, the Circuit reversed a district court which applied the presumption against extraterritoriality to hold that the RICO statute, 18 U.S.C. § 1961 *et seq.*, which is silent as to its extraterritorial application, could not have extraterritorial effect.  *Id*. at 135.  The Circuit explained that Congress "incorporate[d] by reference numerous specifically identified federal criminal statutes, as well as a number of generically described state criminal offenses (known in RICO jurisprudence as 'predicates[,]'" without limiting the predicates to the domestic realm.  *Id.*  Indeed, several of the predicates "unambiguously and necessarily involve extraterritorial conduct."  *Id*. at 136.  In light of the structure of the RICO statute, which bases liability on the nature of predicate offenses, the Circuit looked to the predicate offenses to determine Congress's intent.  *Id*. (holding that "when a RICO claim depends on violations of a predicate statute that manifests an unmistakable congressional intent to apply extraterritorially, RICO will apply to extraterritorial conduct, too, but only to the extent that the predicate would.").

Here, like the RICO statute, 18 U.S.C. § 924(c) is silent as to its extraterritorial application and, like the RICO statute, violations of 18 U.S.C. § 924(c) are based on predicate offenses.  The predicate offenses are defined as "any crime of violence or drug trafficking crime ... for which the person may be prosecuted in a court of the United States."  18 U.S.C. § 924(c)(1)(A).  Thus, guided by *Siddiqui* and *RJR*, this Court looks to the predicate offenses to determine the extraterritorial reach of § 924(c).  Here, the predicate crimes of violence relate to international terrorism, and, as already explained, Congress clearly and explicitly gave those statutes extraterritorial effect.  Accordingly, contrary to Defendants' contentions, *Morrison* and *Kiobel* do not require this Court to decline to follow the Circuit's clear holding in *Siddiqui*.

### 5.   Is the Material Support Statute Untethered to Congressional Authority?

It is well established that "[e]very law enacted by Congress must be based on one *or more* of its powers enumerated in the Constitution."  *United States v. Morrison*, 529 U.S. 598, 607 (2000) (emphasis added).  Defendants argue that *unless* subdivisions (D) and (E) of § 2339B(d)(1) – which provide, respectively, that "the offense occurs in whole or in part within the United States" and "the offense occurs in or affects interstate or foreign commerce" – are construed as elements of an offense under § 2339B, the material support statute is unconstitutional because it is not tethered to any of Congress's enumerated powers.  This argument fails because the material support statute is tethered to several of Congress's enumerated powers.

Section 2339B criminalizes the provision of material assistance to FTOs – defined as organizations that, *inter alia*, "threaten[] the security of United States nationals or the national security of the United States."  8 U.S.C. § 1189(a)(1)(C).  Congress may regulate conduct affecting the United States' national security by invoking, *inter alia*, its power to provide for national security.  *See United States v. Farhane*, 634 F.3d 127, 137 (2d Cir. 2011) (observing that § 2339B was passed pursuant to, *inter alia*, "the power of Congress to make laws necessary and proper to the nation's defense") (citations and internal quotation marks omitted); *Aptheker v. Sec'y of State*, 378 U.S. 500, 509 (1964) ("That Congress under the Constitution has power to safeguard our Nation's security is obvious and unarguable.").[6]

---

[6]   Defendants assert that the Government cannot rely on the FTO status of the organization to tether the prosecution to Congress's national security powers because (1) "the Secretary's designation criteria are not confined to the enumerated powers of Congress, and there is, therefore, no insurance that the Secretary's designation works to limit the activity regulated … to the kind of activity that Congress is empowered to regulate," and (2) "a criminal defendant in a criminal action is **not** 'permitted to [challenge the] designation as a defense…'"  Defendants' unsupported arguments are without merit.  Congress participates in the designation process and ensures that the organizations designated actually pose a threat to national security.  Seven days

Further, the United States is party or signatory to numerous international conventions and treaties relating to terrorism,[7] and Congress may draw authority from its power to pass laws "necessary and proper" to carry out the nation's treaty obligations.  U.S. Const. art. I, cl. 18; U.S. Const. art. II, § 2; *United States v. Lue*, 134 F.3d 79, 82 (2d Cir. 1998) ("Congress's authority

before designating an organization as an FTO, the Secretary submits to Congressional leaders and committee members a "classified communication" detailing the Secretary's findings supporting designation, 8 U.S.C. § 1189(a)(2)(A)(i), and publishes the designation in the Federal Register, which is subject to judicial review, 8 U.S.C. § 1189(a)(2)(A)(ii), (c)(1).  The statute provides that "[a]ny designation under this subsection shall cease to have effect upon an Act of Congress disapproving such designation."  8 U.S.C. § 1189 (2)(B)(ii).  There is no reason that Congress cannot use its national security authority to bar the provision of support to organizations that threaten national security, and leave to the Secretary the initial identification of organizations that threaten national security.  Nor does the prohibition on defendants challenging FTO status undermine Congress's authority to promulgate the statute under its national security powers.  As explained below, the fact that the organization is a designated FTO is an element of the offense, regardless of whether the organization is properly designated.

[7] *See, e.g.*, Tokyo Convention on Offenses and Certain Other Acts Committed on Board Aircraft, Sept. 14, 1963, [1969], 20 U.S.T. 2941, T.I.A.S. No. 6768, 1969 WL 97848; Hague Convention for the Unlawful Seizure of Aircraft, Dec. 16, 1970, [1971], 22 U.S.T. 1641, T.I.A.S. No. 7192, 1971 WL 122032; Montreal Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation, Sept. 23, 1971, [1973], 24 U.S.T. 565, T.I.A.S. No. 7570, 1973 WL 151803; Convention on the Prevention and Punishment of Crimes Against Internationally Protected Persons, Including Diplomatic Agents, Dec. 14, 1973, [1977], 28 U.S.T. 1975, T.I.A.S. No. 8532, 1973 WL 151803; International Convention Against the Taking of Hostages, Dec. 17, 1979, [1985], T.I.A.S. No. 11,081, 1983 WL 144724; Convention on the Physical Protection of Nuclear Material, Oct. 26, 1979, [1982], 18 I.L.M. 1419, 1456 U.N.T.S. 1987 (No. 24631), available at https://treaties.un.org/doc/db/Terrorism/Conv6-english.pdf; Protocol for the Suppression of Unlawful Acts of Violence at Airports Serving International Civil Aviation, (supplementing the 1971 Montreal Convention), Feb. 24, 1988, [1988], 27 I.L.M. 627, 27 I.L.M. 627 (1988), 1988 WL 482066; Rome Convention for the Suppression of Unlawful Acts Against the Safety of Maritime Navigation, March 10, 1988, 1678 U.N.T.S. 221 (No. 29004), available at https://treaties.un.org/doc/db/Terrorism/Conv8-english.pdf; Protocol for the Suppression of Unlawful Acts against the Safety of Fixed Platforms Located on the Continental Shelf (supplementing the Rome Convention), Mar. 10, 1988, 1678 U.N.T.S. 304, 27 I.L.M. 685, available at  https://treaties.un.org/doc/db/Terrorism/Conv9-english.pdf; 1991 Convention on the Marking of Plastic Explosives for the Purpose of Detection, March 1, 1991, 30 I.L.M. 721, 30 I.L.M. 721, 1991 WL 626582; Convention for the Suppression of Terrorist Bombings, Dec. 15, 1997, 116 Stat. 721, 2149 U.N.T.S. 284, available at https://treaties.un.org/doc/db/Terrorism/english-18-9.pdf; and Convention for the Suppression of the Financing of Terrorism, G.A. Res. 109, U.N. GAOR, 54th Sess., Supp. No. 49, at 408, U.N. Doc. A/54/49 (Vol. I) (1999), *entered into force* April 10, 2002, available at http://www.un.org/law/cod/finterr.htm.

under the Necessary and Proper Clause extends beyond those powers specifically enumerated in Article I, section 8," thus "Congress may enact laws necessary to effectuate the treaty power, enumerated in Article II of the Constitution.").

Additionally, where an offense involves violations of customary international law, Congress may draw on its authority to "punish [offenses] … against the law of nations." Const. art. I § 8, cl. 10.[8] Thus, Congress may criminalize providing material assistance to designated FTOs without drawing on its commerce or territorial authority because there are several other sources of authority pursuant to which Congress may regulate conduct that threatens US interests, violates treaties, and is against the law of nations.[9]

Defendants next argue that § 2339B is unconstitutional because it does not include, as an element of an offense, a "jurisdictional element" *expressly* tethering each prosecution under the

---

[8] Defendants argue that, generally, "terrorism" does not violate the laws of nations, and thus, Congress cannot rely on the "law of nations" clause to criminalize terrorism. Although there is no universal norm against "terrorism—unlike piracy, war crimes, and crimes against humanity," *Ramzi Yousef*, 327 F.3d at 106–08, Congress may nevertheless reach certain terrorist conduct under the "law of nations" clause, when the terrorist conduct *also* violates the law of nations. *See Almog v. Arab Bank, PLC*, 471 F. Supp. 2d 257, 275-76 (E.D.N.Y. 2007) (finding specific terrorist conduct of "widespread" and "systematic" "planning and commission of suicide bombings and other murderous attacks using explosives, incendiary weapons, and lethal devices in public places, which has resulted in the systematic and continuous killing and injury of thousands of unarmed innocent civilians…" violates the law of nations as a "crime[] against humanity" under Article 7 of the Rome Statute of the International Criminal Court) (claims subsequently dismissed on other grounds, *see* Dkt. 04-cv-2799 (NG) (VVP), ECF Entry dated 8/23/2013, under the Supreme Court's decision *Kiobel*, 133 S. Ct. at 1663, holding, in part, that the "the law of nations does not recognize corporate liability"); *Cf In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 792 F. Supp. 2d 1301, 1322 (S.D. Fla. 2011) ("[A] claim for terrorism *in general*, or material support thereof, is not based on a sufficiently accepted, established, or defined norm of customary international law to constitute a violation of the law of nations") (emphasis added).

[9] This is not to say that Congress cannot draw on its Commerce Clause authority. Congress may regulate terrorist conduct affecting interstate and foreign commerce under its power to "regulate commerce with foreign nations," U.S. Const. art. I, § 8, cl. 3. Thus, conduct prosecuted under 18 U.S.C. § 2339B(d)(1)(E), which permits application of the statute if "the offense occurs in or affects interstate or foreign commerce" is tethered to the Commerce Clause.

statute to one of Congress's enumerated powers.  In support of this proposition, they cite to a portion of the Supreme Court's decision in *United States v. Lopez*, in which the Court explained that the criminal statute at issue, the Gun-Free School Zones Act of 1990, was unconstitutional because, *inter alia*, it "contain[ed] no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce." 514 U.S. 549, 561-62 (1995).  Defendants are mistaken for several reasons.  *Lopez* merely holds that where a statute is promulgated *solely* pursuant to Congress's Commerce Clause authority *and* the statute does not target "some sort of economic endeavor," the presence of a "jurisdictional element may establish that the enactment is[, nevertheless,] in pursuance of Congress' regulation of interstate commerce."  *Morrison*, 529 U.S. at 612.

There is no reason to believe that this language has any application to a statute *not* promulgated under Congress's Commerce Clause authority.  In *Lopez*, Congress's *only* constitutional hook for passing the Gun-Free School Zone Act was the Commerce Clause, and thus, because the statute did not regulate economic activity, without a requirement that the firearm affected interstate commerce, the statute criminalized behavior beyond the purview of Congress.  514 U.S. at 567-68 (holding that a statute which criminalized possession of a firearm within 1,000 feet of a school was unconstitutional because "there is no requirement that his possession of the firearm have any concrete tie to interstate commerce").  Defendants wrongly assert that Congress only has the power to criminalize the material support of terrorism if Congress invokes the Commerce Clause.  However, as explained above, Congress's authority to enact § 2339B is not solely dependent on the Commerce Clause.

Moreover, the "jurisdictional element" discussion in *Lopez* did not impose an additional requirement on lawmakers that each statute include an express jurisdictional element.  The

Supreme Court merely explained that Congress could reach conduct not traditionally thought of

as affecting national commerce if, as an element of the offense, the Government proved that a

defendant's specific acts affected interstate commerce.  *United States v. Wilson*, 73 F.3d 675,

685 (7th Cir. 1995) ("In discussing the lack of a jurisdictional element in *Lopez*, the [Supreme]

Court simply did not state or imply that all criminal statutes must have such an element, or that

all statutes with such an element would be constitutional, or that any statute without such an

element is per se unconstitutional," but rather, "[r]ead in context, the Court simply stated that the

Gun-Free School Zones Act … lacks a jurisdictional element to 'ensure' constitutionality, not to

fulfill a prerequisite of constitutionality."); *Rancho Viejo, LLC v. Norton*, 323 F.3d 1062, 1068

(D.C. Cir. 2003) ("[A]ll of the circuits that have addressed the question since *Lopez* (as well as

those that have considered the matter since *Morrison*) have concluded that the absence of an

express jurisdictional element is not fatal to a statute's constitutionality under the Commerce

Clause.  Rather, … '[t]he absence of such a jurisdictional element simply means that courts must

determine independently whether the statute … substantially affect[s] interstate commerce.'")

(quoting *United States v. Moghadam*, 175 F.3d 1269, 1276 (11th Cir. 1999) (collecting cases));

*United States v. Morales-de Jesus*, 372 F.3d 6, 14 (1st Cir. 2004) ("[E]ven a complete absence of

a jurisdictional element in the text of a statute is not fatal to a statute challenged on Commerce

Clause grounds.").  Thus, there is simply no reason to require that the Government identify, as an

element in the indictment, precisely which of Congress's enumerated powers supports any

particular prosecution under the statute, let alone require that all prosecutions be supported by

the same enumerated power.  *State of Nev. v. Skinner*, 884 F.2d 445, 449 n.8 (9th Cir. 1989)

("Congress is not required to identify the precise source of its authority when it enacts

legislation. It is the duty of Congress to promulgate legislation, and it is the function of the courts to determine whether Congress has acted within the bounds of federal power.").

### 6.   *Is the Material Support Statute Void for Vagueness?*

Defendants argue that the material support statute is void for vagueness because it includes an overly broad definition of terrorist activity and imprecisely incorporates definitions from the Immigration and Nationality Act.  These arguments are meritless.

"A criminal statute must clearly define the conduct it proscribes."  *Skilling v. United States*, 561 U.S. 358, 415 (2010) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). Vague statutes violate due process because they (1) fail "to provide a person of ordinary intelligence fair notice of what is prohibited," or (2) are "so standardless that [they] authoriz[e] or encourag[e] seriously discriminatory enforcement."  *United States v. Williams*, 553 U.S. 285, 304 (2008); *see also United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013) ("The [void for vagueness] doctrine 'addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions.'") (quoting *Skilling*, 561 U.S. at 416).  "The 'touchstone' of the notice prong 'is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal.'" *Mannix v. Phillips*, 619 F.3d 187, 197 (2d Cir. 2010) (quoting *United States v. Lanier*, 520 U.S. 259, 267 (1997)).  "The arbitrary enforcement prong requires that a statute give 'minimal guidelines' to law enforcement authorities, so as not to 'permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Mannix*, 619 F.3d at 197 (quoting *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (internal quotation marks and brackets omitted in *Mannix*)).  However, while "a law must provide 'explicit standards,' it 'need not achieve meticulous specificity, which would come at the cost of flexibility and reasonable breadth.'"  *Mannix*, 619 F.3d at 197 (quoting *Dickerson*

*v. Napolitano*, 604 F.3d 732, 747 (2d Cir. 2010) (internal quotation marks omitted in *Mannix*)).

"A statute that is unconstitutionally vague cannot be saved by a more precise indictment, nor by

judicial construction that writes in specific criteria that its text does not contain."  *Skilling*, 561

U.S. at 415-16 (internal citations omitted).

"Vagueness challenges to statutes not threatening First Amendment interests are

examined in light of the facts of the case at hand; the statute is judged on an as-applied basis."

*Maynard v. Cartwright*, 486 U.S. 356, 361 (1988); *see also Mannix*, 619 F.3d at 197; *Farhane*,

634 F.3d at 138 (in vagueness challenge to §2339B, explaining that "[i]n the absence of First

Amendment concerns, courts generally view vagueness challenges to a statute as applied to the

defendant's case.") (citing, *inter alia*, *Chapman v. United States*, 500 U.S. 453, 467 (1991)

("First Amendment freedoms are not infringed by [the statute at issue], so the vagueness claim

must be evaluated as the statute is applied.")); *United States v. Rybicki*, 354 F.3d 124, 129-30 (2d

Cir. 2003) (collecting cases)).  This is because "[a] plaintiff who engages in some conduct that is

clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of

others."  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982).

In *Farhane*, the Second Circuit explained that:

> To the extent the Supreme Court has suggested that a facial challenge may be
> maintained against a statute that does not reach conduct protected by the First
> Amendment, the identified test is, in fact, only a variation on as-applied analysis,
> requiring the defendant to show "that the law is impermissibly vague in all of its
> applications." [quoting *Hoffman Estates*, 455 U.S. at 497 and citing] *United States
> v. Salerno*, 481 U.S. 739, 745 (1987) (observing that defendant mounting facial
> challenge bears heavy burden because he "must establish that no set of
> circumstances exists under which the Act would be valid").[10]

---

[10] A possible exception permitting facial vagueness challenges has been recognized
where a "law is 'permeated' with vagueness, … infringes on a constitutional right and has no
*mens rea* requirement." *Dickerson*, 604 F.3d at 744 (quoting *Rybicki*, 354 F.3d at 131).  That
exception is inapplicable here, as the material support and receipt of military-type training
statutes have *mens rea* requirements.

*Farhane*, 634 F.3d at 138-39; *Rybicki*, 354 F.3d at 150 (Raggi, J., concurring) ("Where, as in this case, defendants have already been prosecuted for specific conduct under the challenged law … [the court] should 'examine the complainant's conduct before analyzing other hypothetical applications.'") (quoting *Hoffman Estates*, 455 U.S. at 497).  Thus, when considering a void-for-vagueness challenge to a penal statute outside of the First Amendment context, courts will uphold the statute if "the particular enforcement at issue [is] consistent with the core concerns underlying the [statute]."  *Dickerson*, 604 F.3d at 748 (alterations in original) (quoting *Farrell v. Burke*, 449 F.3d 470, 493 (2d Cir. 2006)).  Put another way, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974); *Thibodeau v. Portuondo*, 486 F.3d 61, 69 (2d Cir. 2007) ("Even assuming, *arguendo*, that the statute did not provide sufficient objective, explicit criteria to prevent arbitrary enforcement, the statute as applied to [defendant] would not be unconstitutionally vague because the condut to which the statute was applied falls within the 'core meaning' of the statute.").

First, Defendants argue that the definition of "terrorist activity" in § 1182(a)(3)(B)(iii) renders § 2339B unconstitutional because § 1182(a)(3)(B)(iii)(V)(b) includes, in its definition of "terrorist activity," "the use of any … explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain) with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property."  Defendants contend that incorporating such a broad definition of terrorist activity renders the statute unconstitutional because it "encompasses traditionally local activities – just as an example, gang violence in Amsterdam."  (ECF No. 129-1, Yusuf Br. at 36.)  However, Defendants are not accused of engaging in purely local activities.  Knowingly participating in a *jihadi* training

program for the benefit al-Shabaab, planning and carrying out attacks on behalf of al-Shabaab, and featuring in online videos to recruit Westerners to join al-Shabaab all implicate the "core concerns" of the statute – international terrorism. *Dickerson*, 604 F.3d at 748; *see also United States v. Kassir*, No. 04 CR. 356 (JFK), 2009 WL 2913651, at *9 (S.D.N.Y. Sept. 11, 2009), *aff'd sub. nom*, *United States v. Mustafa*, 406 F. App'x 526, 530 (2d Cir. 2011) (summary order) (rejecting vagueness challenge to 18 U.S.C § 2339B, finding that "training young men and disseminating training manuals online for the benefit of al-Qaeda implicates the 'core meaning'" of the statute); *United States v. Warsame*, 537 F. Supp. 2d 1005, 1018 (D. Minn. 2008) (rejecting vagueness challenge to 18 U.S.C. § 2339B, finding that "the alleged participation in an Al Qaeda training camp is unambiguously encompassed within the plain meaning" of the statute).  Given that Defendants do not contend that the statute is impermissibly vague "in all applications," nor could they, as the statute is not impermissibly vague as applied to them, their non-First Amendment facial challenge to the statute fails because only as-applied void-for-vagueness challenges are cognizable.  *Farhane*, 634 F.3d at 138-39.  Therefore, this Court "address[es] Defendants' vagueness challenge on an as applied basis."  *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993).

Second, Defendants argue that § 2339B is void for vagueness because the statute purports to incorporate a definition set forth in the Immigration and Nationality Act, and the Immigration and Nationality Act contains two possible definitions which may be incorporated "[d]epending on where one puts the quotes."  (ECF No. 129-1, Yusuf Br. at 34.)  Section 2339B provides, in relevant part, that:

To violate this paragraph, a person must have knowledge that:

(1) the organization is a designated terrorist organization (as defined in subsection (g)(6)),

(2) that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or

(3) that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C. § 2339B(a)(1) (numbering added). Defendants take issue with the second of the three alternative knowledge requirements, which provides that "the organization has engaged or engages in terrorist activity," because the statute attempts to incorporate a definition from the Immigration and Nationality Act. Section 212(a)(3)(B) of the Immigration and Nationality Act has definitions for both the term "Terrorist Activity" and the term "Engages in Terrorist Activity." 8 U.S.C. § 1182(a)(3)(B)(iii) and (iv). Thus, Defendants argue that the statute is unconstitutionally vague, in that it fails to fairly apprise defendants of what conduct is prohibited. However, there is no ambiguity because the definition of "engage in terrorist activity" merely incorporates the definition of "terrorist activity." Section 212(a)(3)(B)(iv) of the Immigration and Nationality Act, which defines "engage in terrorist activity" provides:

(iv) "Engage in terrorist activity" defined

As used in this chapter, the term "engage in terrorist activity" means, in an individual capacity or as a member of an organization--

(I) to commit or to incite to commit, under circumstances indicating an intention to cause death or serious bodily injury, a terrorist activity;

(II) to prepare or plan a terrorist activity;

(III) to gather information on potential targets for terrorist activity;

(IV) to solicit funds or other things of value for--

      (aa) a terrorist activity;
      (bb) a terrorist organization described in clause (vi)(I) or (vi)(II); or
      (cc) a terrorist organization described in clause (vi)(III), unless the solicitor can demonstrate by clear and convincing evidence that he did not

know, and should not reasonably have known, that the organization was a terrorist organization;

(V) to solicit any individual—

        (aa) to engage in conduct otherwise described in this subsection;
        (bb) for membership in a terrorist organization described in clause (vi)(I) or (vi)(II); or
        (cc) for membership in a terrorist organization described in clause (vi)(III) unless the solicitor can demonstrate by clear and convincing evidence that he did not know, and should not reasonably have known, that the organization was a terrorist organization; or

(VI) to commit an act that the actor knows, or reasonably should know, affords material support, including a safe house, transportation, communications, funds, transfer of funds or other material financial benefit, false documentation or identification, weapons (including chemical, biological, or radiological weapons), explosives, or training—

        (aa) for the commission of a terrorist activity;
        (bb) to any individual who the actor knows, or reasonably should know, has committed or plans to commit a terrorist activity;
        (cc) to a terrorist organization described in subclause (I) or (II) of clause (vi) or to any member of such an organization; or
        (dd) to a terrorist organization described in clause (vi)(III), or to any member of such an organization, unless the actor can demonstrate by clear and convincing evidence that the actor did not know, and should not reasonably have known, that the organization was a terrorist organization.

8 U.S.C. § 1182(a)(3)(B)(iv).  Meanwhile, Section 212(a)(3)(B)(iii) of the Immigration and

Nationality Act, which defines "terrorist activity," provides:

(iii) "Terrorist activity" defined

As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:

(I) The highjacking or sabotage of any conveyance (including an aircraft, vessel, or vehicle).

(II) The seizing or detaining, and threatening to kill, injure, or continue to detain, another individual in order to compel a third person (including a governmental

organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained.

(III) A violent attack upon an internationally protected person (as defined in section 1116(b)(4) of Title 18) or upon the liberty of such a person.

(IV) An assassination.

(V) The use of any—

> (a) biological agent, chemical agent, or nuclear weapon or device, or

> (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),

> with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property.

(VI) A threat, attempt, or conspiracy to do any of the foregoing.

8 U.S.C. § 1182(a)(3)(B)(iii).  As the Second Circuit has held, § 2339B incorporates the definition of "engages in terrorist activity" which is set forth in § 1182(a)(3)(B)(iv), which, in turn, repeatedly uses the term "terrorist activity" and incorporates the definition of that term from § 1182(a)(3)(B)(iii).  *See Weiss v. Nat'l Westminster Bank PLC*, 768 F.3d 202, 208 (2d Cir. 2014) ("Section 2339B(a)(1) explicitly incorporates the meaning of 'engage[ ] in terrorist activity' from § 212(a)(3)([B]) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(3)([B])(iv)(IV).").  Because the use of the phrase "engages in terrorist activity" is not vague, it defines the offense with sufficient clarity to allow ordinary people to understand what conduct is prohibited and is sufficiently definite that it does not permit arbitrary or discriminatory enforcement.  *See Skilling*, 561 U.S. at 402-03.

### 7.  Is Defendants' Inability To Challenge The FTO Designation Unconstitutional?

Defendants assert, in a footnote without adequate explanation, that their inability to challenge al-Shabaab's designation as an FTO under 8 U.S.C. § 1189 is unconstitutional

because, as an element of the offense, "the organization's threat to the security of the United

States … should be subject to proof beyond a reasonable doubt" and Defendants "have the due

process right to be heard on this issue."  While Defendants are correct that they are not permitted

to challenge whether al-Shabaab was properly designated as an FTO, 8 U.S.C. § 1189(a)(8),[11]

they are mistaken that *proper* designation is an element of the offense.  Whether designation is

proper or not "ha[s] no effect on the defendants," because the relevant element that must be

proven beyond a reasonable doubt is that defendants provided material support to al-Shabaab,

which "was, in fact, designated as an FTO."  *United States v. Sattar*, 272 F. Supp. 2d 348, 364-

65 (S.D.N.Y. 2003) (it is not an element of the offense "whether the Secretary of State correctly

designated [the organization] as an FTO"); *United States v. Taleb-Jedi*, 566 F. Supp. 2d 157, 166

(E.D.N.Y. 2008) (rejecting First, Fifth and Sixth Amendment and nondelegation challenges to

8 U.S.C. § 1189(a)(8), and collecting cases rejecting "[e]ach of these constitutional challenges …

in various appellate and district courts.").[12]  The Government must merely prove, beyond a

---

[11]  Under § 1189, the Secretary may designate an organization an FTO after finding: (1) that the organization is a foreign organization; (2) that the organization engages in terrorist activity; and (3) that the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States.  8 U.S.C. § 1189(a)(1)(A)-(C).  The Secretary independently compiles an "administrative record" and makes "findings" based on this record and additional "classified information" which is unavailable for review by public disclosure.  8 U.S.C. § 1189(a)(3)(A)-(B). The Secretary then submits a "classified communication" to members of Congress and committee members and publishes the designation in the Federal Register, 8 U.S.C. § 1189(a)(2)(A)(i)-(ii).  An organization designated as an FTO that wishes to challenge its designation can seek judicial review of the designation in the D.C. Circuit and must do so no later than 30 days after the Secretary publishes the designation in the Federal Register.  8 U.S.C. § 1189(c)(1).  Once a designation becomes effective, "a defendant in a criminal action … shall not be permitted to raise any question concerning the validity of the issuance of such designation as a defense or an objection at any trial or hearing."  8 U.S.C. § 1189(a)(8).

[12]  As a separate *mens rea* element, the Government must also prove that, at the time of the offense, the defendant knew either that "(1) the organization is a designated [FTO]," "(2) that the organization has engaged or engages in terrorist activity," or "(3) that the organization has engaged or engages in terrorism."  18 U.S.C. §§ 2339B(a)(1), 2339D(a) (numbering added).  If

reasonable doubt that, as of February 26, 2008, al-Shabaab was designated as "foreign terrorist

organization," pursuant to Section 219 of the Immigration and Nationality Act, 8 U.S.C.

§ 1189(a)(1), meaning that former-Secretary of State Condoleezza Rice (in consultation with the

Secretary of Treasury and the Attorney General, after review by members of Congress), found

that al-Shabaab "engages in terrorist activity" which "threatens the security of United States

nationals or the national security of the United States."  8 U.S.C. § 1189(a)(1), (d)(4);

Department of State Designation of al-Shabaab as a Foreign Terrorist Organization, 73 Fed. Reg.

14550-02 (March 18, 2008).  Defendants are free to argue that al-Shabaab was *not*, in fact, a

designated FTO.  That they are barred from arguing that al-Shabaab's designation was improper

is of no event, because proper designation is not an element of the offense.

### B.  *Defendants' Challenges to the Indictment*

Defendants assert that, for various reasons, the operative superseding indictment is

deficient.  The Sixth Amendment guarantees a defendant's right "to be informed of the nature

and cause of the accusation" against him. U.S. Const., amend. VI.  This guarantee is given effect,

in part, by Rule 7 of the Federal Rules of Criminal Procedure, which requires that an indictment

need only consist of "a plain, concise, and definite written statement of the essential facts

constituting the offense charged."  Fed. R. Crim. P. 7(c)(1); *United States v. Pirro*, 212 F.3d 86,

98 (2d Cir. 2000) ("The Sixth Amendment's notice protection is implemented by the requirement

of Rule 7(c)(1).").  In general, "[a]n indictment returned by a legally constituted and unbiased

grand jury, … if valid on its face, is enough to call for trial of the charge on the merits." *Costello*

---

the Government proceeds on the theory that the defendant knew of the designation, the defendant
may challenge that he knew that the organization was so designated.  *Moreno-Godoy v. United
States*, No. 07 CR 354, 2014 WL 1088300, at *16 (S.D.N.Y. Mar. 20, 2014) (defendants who
stipulated in prosecution under § 2339B that FARC was designated could still challenge, "at trial
his knowledge of FARC's terrorist designation.).  Again, proper designation is not an element of
the offense.

*v. United States*, 350 U.S. 359, 363 (1956).  An indictment is facially valid if it, first, "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend" and, second, "enables [a defendant] to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  Thus, "an indictment need only allege that a defendant committed a federal criminal offense at a stated time and place in terms plainly tracking the language of the relevant statute."  *United States v. Rubin*, 743 F.3d 31, 38 (2d Cir. 2014).

The material support statute provides that:

> **(1) Unlawful conduct.**--Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.   To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (g)(6)), that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C. § 2339B(a)(1).  Thus, the elements of the crimes of providing material support, or attempting or conspiring to do so, are:

> First, that the defendant "provide[d] material support or resources to a foreign terrorist organization … or attempt[ed] or conspire[d] to do so";

> Second, that the foreign terrorist organization was a designated FTO;

> Third, that the defendant acted "knowingly," that is (1) the defendant acted "knowingly and intentionally" and (2) the defendant had "knowledge that the organization is a designated terrorist organization …, that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)"; and

31

<u>Fourth</u>, the offense occurred in the extraterritorial jurisdiction of the United States.

*See Farhane*, 634 F.3d at 138 (finding that 2239B "does not prohibit simple membership in a terrorist organization. Rather, the statute prohibits the knowing provision of material support to a known terrorist organization. Proof of such provision (whether actual, attempted, or conspiratorial) together with the dual knowledge elements of the statute is sufficient to satisfy the personal guilt requirement of due process.").

The receipt of military-type training statute provides that:

**(a) Offense.** - Whoever knowingly receives military-type training from or on behalf of any organization designated at the time of the training by the Secretary of State under section 219(a)(1) of the Immigration and Nationality Act as a foreign terrorist organization shall be fined under this title or imprisoned for ten years, or both. To violate this subsection, a person must have knowledge that the organization is a designated terrorist organization (as defined in subsection (c)(4)), that the organization has engaged or engages in terrorist activity (as defined in section 212 of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989).

18 U.S.C. § 2339D(a).  Thus, the elements of the crime of receiving military type training are:

<u>First</u>, that the defendant "receive[d] military-type training from or on behalf of an[] organization";

<u>Second</u>, that the organization was a designated FTO "at the time of the training";

<u>Third</u>, that the defendant acted "knowingly," that is (1) the defendant acted "knowingly and intentionally" and (2) the defendant had "knowledge that the organization is a designated terrorist organization …, that the organization has engaged or engages in terrorist activity (as defined in section 212(a)(3)(B) of the Immigration and Nationality Act), or that the organization has engaged or engages in terrorism (as defined in section 140(d) (2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989)"; and

<u>Fourth</u>, the offense occurred in the extraterritorial jurisdiction of the United States.

The substantially identical extraterritoriality subsections of these statutes, which set out under what circumstances the statutes have extraterritorial reach, provide that "[t]here is extraterritorial Federal jurisdiction over an offense under this section," 18 U.S.C. § 2339B(d)(2); 18 U.S.C. § 2339D(b), and:

**(d) Extraterritorial jurisdiction**.--

**(1) In general**.--There is jurisdiction over an offense under subsection (a) if--

(A) an offender is a national of the United States … or an alien lawfully admitted for permanent residence in the United States …;

(B) an offender is a stateless person whose habitual residence is in the United States;

(C) after the conduct required for the offense occurs an offender is brought into or found in the United States, even if the conduct required for the offense occurs outside the United States;

(D) the offense occurs in whole or in part within the United States;

(E) the offense occurs in or affects interstate or foreign commerce; ***or***

(F) an offender aids or abets any person over whom jurisdiction exists under this paragraph in committing an offense under subsection (a) or conspires with any person over whom jurisdiction exists under this paragraph to commit an offense under subsection (a).

18 U.S.C. § 2339B(d)(1) (emphasis added); 18 U.S.C. § 2339D(b).

Here, the operative indictment charges, in Counts One through Three that the Defendants "'ALI YASIN AHMED, also known as 'Ismail,' MADHI HASHI, also known as 'Talha,' and MOHAMED YUSUF, also known as 'Abu Zaid,' 'Hudeyfa' and 'Mohammed Abdulkadir,' together with others" "within the extraterritorial jurisdiction of the United States," (1) "did knowingly and intentionally conspire to provide," (2) "did knowingly and intentionally provide," and (3) "did knowingly and intentionally attempt to provide" "material support and resources, as defined in 18 U.S.C. [§] 2339A(b), including currency and personnel, including themselves, to a

33

foreign terrorist organization, to wit: al-Shabaab."  Count One charges that Defendants acted "[i]n or about and between April 2008 and August 2012, both dates being approximate and inclusive."  Counts Two and Three allege that Defendants acted "[i]n or about and between December 2008 and August 2012."  Count Four charges that "[i]n or about and between January 2009 and December 2009, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendants [Ahmed and Yusuf,] together with others, did knowingly and intentionally receive military-type training from and on behalf of … al-Shabaab." Finally, Count Five charges that "[i]n or about and between December 2008 and August 2012, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendants [Ahmed, Hashi, and Yusuf,] together with others, did knowingly and intentionally use and carry one or more firearms during and in relation to one or more crimes of violence, to wit: the crimes charged in Counts One through Four, and did knowingly and intentionally possess such firearms in furtherance of said crimes of violence, one or more of which firearms was brandished and discharged, and one or more of which firearms was a machinegun."

This language is sufficient in that it tracks the language of the relevant statutes, identifies the terrorist organization in question (al-Shabaab), and states, in approximate terms, the time in which the offenses charged are alleged to have occurred, and the place (within the extraterritorial jurisdiction of the United States) of the alleged crimes.  (ECF No. 138); *see United States v. Naseer*, No. 10 CR 19 S-4 (RJD), 2014 WL 3871350, at *3 (E.D.N.Y. Aug. 6, 2014) (finding sufficient an indictment which "tracks the statutory language, identifies the terrorist organization in question (al-Qaeda) and other members of the conspiracy, and explains that the proscribed

conduct occurred between September 2008 and January 2010 in this District and elsewhere, 'including the extraterritorial jurisdiction of the United States.'").[13]

### 1.  Is the Indictment Deficient For its Silence as to a U.S. Nexus?

Defendants assert that the indictment is deficient because it is "silent as to a U.S. nexus." However, the Government is not required to set out the nature of the nexus to the United States in the indictment itself.  *See Jamal Yousef*, 750 F.3d at 260 (finding that territorial nexus is not an element of an offense under the material support statute and need not be alleged in the indictment); *United States v. Mostafa*, 965 F. Supp. 2d 451, 459 (S.D.N.Y. 2013) (finding nexus with United States sufficiently alleged in an indictment that charged defendant with providing material support to al Qaeda because "clear statements by al Qaeda to harm the United States made it foreseeable that defendant anticipated that his actions in supporting that organization could harm U.S. persons and interests").

### 2.  Is the Indictment Deficient For Failing to Charge All of the Elements of the Material Support Statute – Namely the Extraterritoriality Elements?

Defendants argue that the indictment is legally insufficient, in that it fails to state all of the essential elements – namely the extraterritoriality elements – of the crimes charged in Counts 1-3, *i.e.*, the alleged provision, conspiracy to provide, and attempted provision of material

---

[13] Defendants assert, in the heading of an argument but not in the body of their brief, that the time span alleged in the indictment is insufficiently specific to fairly inform the Defendants of the charges against them.  The indictment alleges that "between April 2008 and August 2012, both dates being approximate and inclusive," defendants conspired to provide material support; "between December 2008 and August 2012, both dates being approximate and inclusive," defendants provided and attempted to provide material support; and "between January 2009 and December 2009, both dates being approximate and inclusive," Defendants Ahmed and Yusuf received military-type training.  The argument, without citation or further exposition, is deemed abandoned.  In any event, the time span is sufficiently narrow that, when considered along with the allegations charged in the indictment, the indictment "provide[s] ample notice as to what acts are at issue."  *United States v. Hashmi*, No. 06 CRIM. 442 (LAP), 2009 WL 4042841, at *4 (S.D.N.Y. Nov. 18, 2009) (finding indictment sufficiently specific where it charged specific conduct and proved "a fairly narrow date range of approximately two and a half years in which Hashmi's conduct allegedly occurred").

assistance to al-Shabaab in violation of 18 U.S.C. § 2339B.  Defendants assert that, for a host of

reasons, 18 U.S.C. § 2339B "must be construed to require as essential elements … that 'the

offense occurs in whole or in part within the United States' and 'the offense occurs in or affects

interstate or foreign commerce'" – language Defendants take from subsections (D) and (E) of 18

U.S.C. § 2339B(d)(1), which, as explained above, sets out under which circumstances the

material assistance statute has extraterritorial application.

 Defendants acknowledge that 18 U.S.C. § 2339B(d)(1) states that "there is jurisdiction

over an offense … if" one of six scenarios is met, and sets out these six scenarios in the

disjunctive.  Despite Congress's use of the disjunctive 'or' in the statute, Defendants assert,

without citation,  that subsections (D) and (E) – requiring the offense occur in the United States

and affect interstate or foreign commerce – must both be read as essential elements of any

offense under 18 U.S.C. § 2339B because these subsections are inherently different from the rest

of the list.  Defendants assert that subsections (D) and (E) are different because they "fall within

the prescriptive jurisdictional arena," while the remaining subsections of 18 U.S.C. §

2339B(d)(1) fall within the Court's "adjudicative" jurisdiction.[14]  Defendants' argument finds no

support in the law.  Even assuming that subsections (D) and (E) are somehow different than the

---

[14] Prescriptive jurisdiction is the power, usually exercised by the legislature, "to make its law applicable to the activities, relations, or status of persons, or the interests of persons in things," while adjudicative jurisdiction is the power, usually exercised by courts, "to subject persons or things to the process of its courts or administrative tribunals, whether in civil or in criminal proceedings, whether or not the state is a party to the proceedings."  Restatement (Third) of Foreign Relations Law § 401 (1987); *see also Adventure Commc'ns, Inc. v. Kentucky Registry of Election Fin.*, 191 F.3d 429, 435 (4th Cir. 1999) (explaining that adjudicative jurisdiction "concerns the power of a state to resolve a particular dispute through its court system, while [prescriptive jurisdiction] involves the authority of a state to make its law applicable to persons or activities.") (citation and internal quotation marks omitted).  "To put it succinctly: [Prescriptive jurisdiction, otherwise known as l]egislative jurisdiction refers to both the lawmaking power of a state and the power of a state to *apply* its laws to any given set of facts, whereas adjudicative jurisdiction is the power of a state to *try* a particular action in its courts."  *Id.* (quotation marks and citations omitted, emphasis in original).

rest of the enumerated list,[15] there is no reason to construe these subsections as elements of the offense.

Defendants offer a host of confounding reasons purporting to explain why the express statutory language should be read to mean something other than what it plainly says. None has merit. The principles upon which Defendants rely – namely (1) the principle that a statute should be read to avoid rendering any portion of it superfluous, (2) the principle that a statute should be read to avoid placing its constitutionality in doubt, (3) the presumption against extraterritoriality, (4) the *Charming Betsy* doctrine, and (5) the rule of lenity – are inapplicable because this statute is not ambiguous. *United States v. Desposito*, 704 F.3d 221, 226 (2d Cir. 2013) ("In construing a statute, we begin with the plain language, giving all undefined terms their ordinary meaning. Absent an ambiguity, our analysis also ends with the statutory language. We must presume that the statute says what it means. We will resort to legislative history and other tools of statutory interpretation only if we conclude that the text is ambiguous.") (internal citations and quotation marks omitted). Because the statute is unambiguous, none of the principles or canons of construction cited by Defendants suffices to alter the plain meaning of the statute. *United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010) ("Absent ambiguity in the

---

[15] Defendants premise that subsections (D) and (E) "fall within the prescriptive jurisdictional arena," while the remaining subsections of 18 U.S.C. § 2339B(d)(1) fall within the Court's "adjudicative" jurisdiction is without support and incorrect. Contrary to Defendants' contentions, there is no reason to believe that any portion of 18 U.S.C. § 2339B(d)(1), which recites under what circumstances the statute has extraterritorial application, involves the judiciary's "adjudicative jurisdiction." The enumerated circumstances do not relate to the judiciary's personal or subject-matter jurisdiction. Indeed, as explained above, it is well-settled that "[t]he district courts of the United States shall have original jurisdiction … of all offenses against the laws of the United States." 18 U.S.C. § 3231. Rather, 18 U.S.C. § 2339B(d)(1) relates to Congress's prescriptive jurisdiction, in that by these provisions, Congress enumerated under which circumstances it has elected to make the statute applicable – *i.e.*, in cases involving, including by aiding and abetting: U.S. citizens, stateless U.S. residents, offenders located in the U.S., offenses occurring in the U.S., or offenses affecting U.S. or foreign commerce. 18 U.S.C. § 2339B(d)(1).

statutory text, '[o]nly the most extraordinary showing of contrary intentions in the legislative history will justify a departure from [the statutory] language.'") (quoting *United States v. Albertini*, 472 U.S. 675, 680 (1985)).

### A. Applicability of Canon of Construction that Ambiguous Statutes Should Be Read to Avoid Rendering Any Portion Superfluous

First, Defendants argue that subsections (D) and (E) must be read as elements of the offense because another reading would render the list superfluous because subdivisions (A), (B), (C), and (F) are "all encompassing."  Applying a canon of construction to disregard the plain and clear meaning of a statute is contrary to the rules of statutory interpretation.  *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) ("The preeminent canon of statutory interpretation requires [a court] to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there,' [thus, a court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous.") (citations omitted).  In any event, Defendants' reading of the statute is mistaken.  As the Government aptly notes, the indictment of defendants, such as the ones in this case, who are not U.S. citizens or residents, and *at the time of the indictment,* were located abroad, would not fall within the "offender categories" set out in subsections A-C.  (ECF No. 153, Gov't Br. at 35 n.29.)  Thus, subsections (D) and (E) provide additional and distinct circumstances under which foreign defendants who are indicted while they are abroad can be brought within the folds of the statute's reach.

### B. Applicability of Canon of Construction that Ambiguous Statutes Should Be Read to Avoid Placing Constitutionality in Doubt

Second, Defendants argue that the principle that a statute should be read to avoid placing its constitutionality in doubt requires this Court to import subsections (D) and (E) as essential elements.  Defendants overstate the canon of construction they seek to invoke.  "Statutes should be interpreted to avoid *serious* constitutional doubts, not to eliminate all possible contentions that

38

the statute *might* be unconstitutional." *Reno v. Flores*, 507 U.S. 292, 314 n.9 (1992) (internal

citation omitted, emphasis in original).  Moreover, "the proper interpretation of a statute should

[not] be dismissed for a more dubious one just because the proper interpretation potentially raises

constitutional questions." *United States v. Pettus*, 303 F.3d 480, 486 (2d Cir. 2002) (citing

*Harris v. United States*, 536 U.S. 545 (2002) (overruled on other grounds by *Alleyne v. United

States*, 133 S. Ct. 2151, 2163 (2013)).  In any event, as discussed above, *supra* I.A.5 (pp. 17-22),

there is no merit to Defendants' assertion that without subdivisions (D) and (E) as elements, the

material support statute is unconstitutional.

### C.   *Applicability of the Presumption Against Extraterritoriality*

Next, Defendants argue that their reading is required by the presumption that United

States law governs only domestically.  *See Kiobel*, 133 S. Ct. at 1664.  The so-called

presumption against extraterritoriality is "a canon of construction, or a presumption about a

statute's meaning, rather than a limit upon Congress's power to legislate." *Morrison v. Nat'l

Australia Bank Ltd.*, 561 U.S. 247, 255 (2010).  To override the presumption, Congress must

"clearly express" its affirmative intent that a particular statute have extraterritorial effect.  *Id.*

(citation omitted).  "When Congress has manifested clear intent that a statute apply

extraterritorially, it will generally apply extraterritorially." *Weiss*, 768 F.3d at 211.

Here, as explained above, the statute expressly states "[t]here is extraterritorial Federal

jurisdiction over an offense under this section."  18 U.S.C. § 2339B(d)(2).  Thus, the

presumption against extraterritoriality has no application.  Every court to have tackled the

material assistance statute has found that it has broad extraterritorial reach.  *See*, *e.g.*, *United

States v. Ahmed*, No. 10 CR 131 PKC, 2011 WL 5041456, at *2 (S.D.N.Y. Oct. 21, 2011) ("For

both the material support and military-type training offenses, the extrajurisdictional grant is set

forth in the same statute that defines the elements of the offense.").  Defendants' preferred

reading – importing a requirement that the offense took place at least in part in the United States

– would eviscerate the Congress's clear intent to have extraterritorial application.[16]

### D.  Applicability of the Charming Betsy Canon

Defendants next argue that subsections (D) and (E) must be read as elements under the

*Charming Betsy* canon.  That canon provides that "an act of Congress ought never to be

construed to violate the law of nations if any other possible construction remains," *Murray v. The*

*Charming Betsy*, 6 U.S. (2 Cranch) 64, 118, 2 L.Ed. 208 (1804), because the statute would

otherwise have "boundless extraterritorial reach" in violation of customary international law.

In *Yousef*, the Second Circuit rejected the defendant's argument that his prosecution

conflicted with customary international law because "customary international law … cannot alter

or constrain the making of law by the political branches of the government as ordained by the

Constitution."  *Ramzi Yousef*, 327 F.3d at 92-93.  The Second Circuit explained that "[t]he

*Charming Betsy* canon comes into play only where Congress's intent is ambiguous."  *Id.*

("[W]here legislation is susceptible to multiple interpretations, the interpretation that does not

conflict with 'the law of nations' is preferred ... [however, i]f a statute makes plain Congress's

---

[16] There is no merit to Defendants' argument that despite the plain language of the statute, the presumption against extraterritoriality limits the extraterritorial reach of § 2339B. Defendants cite to *Loginovskaya v. Batratchenko* for the proposition that "when a statute provides for *some* extraterritorial application, the presumption against extraterritoriality operates to limit *that provision* to its terms."  764 F.3d 266, 271 (2d Cir. 2014) (emphasis in *Loginovskaya*) (quoting *Morrison*, 561 U.S. at 265).  In *Morrison*, the Supreme Court explained that where a single provision of a broad statute contains a clear statement of extraterritorial effect, that "explicit provision for a specific extraterritorial application would be quite superfluous if the rest of the [statute] already applied [extraterritorially]."  *Morrison*, 561 U.S. at 265.  Thus, the *Morrison* Court held that where a statute contains a single provision that expressly provides for extraterritorial application, the extraterritorial reach of that statute should be limited to the terms of that provision.  By contrast, § 2339B provides for broad extraterritorial application that is not limited to a single provision of the statute, and thus, there is no reason to limit the extraterritorial application of the statute on these grounds.

intent (instead of employing ambiguous or 'general' words), then Article III courts … must enforce the intent of Congress irrespective of whether the statute conforms to customary international law.").  Thus, Courts will enforce laws which conflict with customary international law, so long as they are unambiguous.  *Id.*  ("It … is established that Congress 'may legislate with respect to conduct outside the United States, in excess of the limits posed by international law.'") (quoting *United States v. Pinto–Mejia*, 720 F.2d 248, 259 (2d Cir. 1983)).  Even assuming that the material support statute reaches conduct outside of the United States in excess of limits posed by international law, given that Congress's intent to reach such conduct is unambiguously articulated in the material support statute, the *Charming Betsy* canon has no application in this case.

### E.  Applicability of the Rule of Lenity

Defendants finally argue that the Rule of Lenity requires this Court to construe subsections (D) and (E) as elements of a material support offense.  However, as with the other rules of statutory interpretation relied upon by Defendants, the rule of lenity has no application to an unambiguous statute.  *Chapman*, 500 U.S. at 463 ("The rule of lenity, however, is not applicable unless there is a grievous ambiguity or uncertainty in the language and structure of the Act, such that even after a court has seized every thing from which aid can be derived, it is still left with an ambiguous statute.") (internal citations and quotation marks omitted); *Salinas v. United States*, 522 U.S. 52, 66 (1997) ("The rule [of lenity] does not apply when a statute is unambiguous or when invoked to engraft an illogical requirement to its text.").  Accordingly, this Court declines to read additional elements into the material offense statute.

### 3. Is Mens Rea Sufficiently Charged in the Indictment so as to Fairly Inform the Defendants of the Charges Against Them?

Defendants assert that there is insufficient precision as to the *mens rea* element with respect to the material support charge in the indictment.  The indictment alleges that Defendants acted "knowingly and intentionally."  (ECF No. 138, Counts One-Five.)  Defendants assert that the indictment's repeated use of the phrase "knowingly and intentionally" is insufficient to put them on notice of the charges against them because in addition to criminalizing "knowingly" providing material support to an FTO, the statute also requires that "[t]o violate this paragraph, a person must have knowledge that," either: (1) "the organization is a designated [FTO]," (2) "the organization has engaged or engages in terrorist activity" as defined in 8 U.S.C. § 1182(a)(3)(B), or (3) "the organization has engaged or engages in terrorism" as defined in § 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989.  18 U.S.C. § 2339B(a)(1); *see also* 18 U.S.C. § 2339D(a).  Thus, Defendants assert that in addition to alleging that they acted "knowingly," the indictment must also charge which of the knowledge requirements the Government intends to prove.

Defendants misinterpret the statutory language.  The statute's "dual knowledge elements" prohibit "knowing provision of material support to a known terrorist organization."  *Farhane*, 634 F.3d at 138 (explaining that, together, this dual knowledge requirement satisfies "the personal guilt requirement of due process").  The three alternative definitions of knowledge in §§ 2339B(a)(1) and 2339D(a) are not separate elements that must be proven in addition to proving that the defendant acted "knowingly."  Rather, they are qualifiers that help to define and narrow the term "knowingly," which is used in the previous sentence.  Read otherwise, the statutes would lack "a *mens rea* requirement that attaches to enough elements of the crime that together would be sufficient to constitute an act in violation of the law" because they would

42

otherwise criminalize a broad range of apparently innocent conduct – *e.g.*, knowingly providing support to an organization, with no knowledge that the organization is in any manner associated with terrorism.  *See United States v. Figueroa*, 165 F.3d 111, 115-16 (2d Cir. 1998) (construing the term "knowing," explaining that "[i]n the criminal arena, there is … a very strong presumption that some mental state is required for culpability … which distinguishes those who perform acts knowingly, intentionally, or recklessly from those who perform them by accident or by mistake").

In other words, to prove that the Defendants acted "knowingly" – as charged in the indictment – the Government must prove *both* that Defendants did not provide material support by some accident or mistake, *and* that Defendants knew the organization was a terrorist organization.  The three knowledge requirements merely set out three alternative ways that the Government can prove that a defendant supported a *known* terrorist organization.  As the Supreme Court has explained:

> Section 2339B(a)(1) prohibits "knowingly" providing material support. It then specifically describes the type of knowledge that is required: "To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization ..., that the organization has engaged or engages in terrorist activity ..., or that the organization has engaged or engages in terrorism...." [] Congress plainly spoke to the necessary mental state for a violation of § 2339B, and it chose knowledge about the ***organization's connection to terrorism***, not specific intent to further the organization's terrorist activities.

*Holder v. Humanitarian Law Project*, 561 U.S. 1, 16-17 (2010) (internal citation omitted, emphasis added); *see also Al Kassar*, 660 F.3d at 129 (identifying "two express scienter requirements: that the aid be intentional and that the defendant know the organization he is aiding is a terrorist organization or engages in acts of terrorism").  Thus, all the Government must allege in the indictment is that the defendant acted "knowingly."  "To prove this, the government must prove beyond a reasonable doubt, first, that the defendant acted voluntarily and

intentionally and not because of mistake or accident.  Second, the government must prove that

the defendant knew that [the FTO] had been designated by the Secretary of State as a 'foreign

terrorist organization' or that he knew that it had conducted or engaged in 'terrorist activity'" or

terrorism.  *United States v. Paracha*, No. 03 CR. 1197 (SHS), 2006 WL 12768, at *30-31

(S.D.N.Y. Jan. 3, 2006).

### 4.  Is the § 2339B Conspiracy Charge Deficient Due to the Omission of an Overt Act or Failure to Name Co-Conspirators?

Defendants assert that the indictment should be dismissed because it fails to allege that

any person committed an overt act in support of the charged conspiracy to provide material

support to al-Shabaab under § 2339B.  In *United States v. Abdi*, the District Court for the

Southern District of Ohio considered and rejected this exact argument.  498 F. Supp. 2d 1048,

1064 (S.D. Ohio 2007).  In a well-reasoned opinion, the court explained that "there are two types

of conspiracy statutes: those that are modeled after 18 U.S.C. § 371, which requires an overt act,

and those that are modeled after the common law of conspiracy, which does not require an overt

act."  *Id*. (citing *Whitfield v. United States*, 543 U.S. 209 (2005).  "Where … 'Congress ha[s]

omitted from the relevant provision any language expressly requiring an overt act, the Court

[will] not read such a requirement into the statute.'"  *Id*. (alterations in original) (quoting

*Whitfield*, 543 U.S. at 213).  The *Abdi* court explained that "[i]n drafting section § 2339B,

Congress omitted any language requiring an overt act."  *Id*.  Moreover, § 2339B is not modelled

on 18 U.S.C. § 371.  For these same reasons, this Court, like the *Abdi* court, "will not read an

overt act requirement into the statute."  *Id*.[17]

---

[17] It is of no event that the Government, in a case pending before the Southern District, included overt acts in an indictment charging a conspiracy under 18 U.S.C. § 2339B.  *See United States v. Mostafa*, No. 04 CR 356 (KBF), 2014 WL 1744717, at *4 (S.D.N.Y. Apr. 23, 2014) (noting that the indictment charging defendant with conspiring to provide support or resources to

Defendants also assert that the conspiracy count fails to fairly apprise them of the charges against them because it does not identify Defendants' alleged co-conspirators.   However, "there is 'no requirement that the Indictment name co-conspirators….'"   *United States v. Hashmi*, No. 06 CRIM. 442 (LAP), 2009 WL 4042841, at *4 (S.D.N.Y. Nov. 18, 2009) (quoting *United States v. Ghannam*, No. 04 Cr. 1177 (DAB), 2005 WL 743066, at *1-2 (S.D.N.Y. Mar. 29, 2005) (rejecting argument that indictment should be dismissed for failure to identify co-conspirators). Accordingly, the Court finds that the conspiracy charge is sufficient to apprise Defendants of the charges against them.

### 5.   *Is the Firearms Charge Duplicitous?*

An indictment is duplicitous (1) if it joins two or more distinct crimes in a single count, "in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be 'a separate count for each offense,'" and (2) it thereby prejudices the defendant.  *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001).  "The vice[s] of duplicity [are] that there is no way for a jury to convict on one offense and acquit on another offense contained in the same count [and that,] … because the jurors have two crimes to consider in a single count, they may convict without reaching a unanimous agreement on either."  1A Wright & Leipold, Fed. Prac. & Proc. Crim. § 142 (4th ed.).  Even if an indictment includes a duplicitous count, "[d]uplicity ... is only a pleading rule and would in no event be fatal to the count."  *United States v. Droms*, 566 F.2d 361, 363 n.1 (2d Cir. 1977).  "[P]rior to a defendant's conviction, … the government [can] elect to proceed based upon only one of the distinct crimes included within a duplicitous count, … or [the Court can give] a jury instruction that ensures that the jury is unanimous as to the conduct underlying the conviction."  *Sturdivant*, 244 F.3d at 79 (internal citations omitted).

---

a jihad training camp charged defendant with two overt acts).  There is no overt act requirement in § 2339B.

In deciding whether an indictment includes a duplicitous count, the criminal statute alleged to have been violated must be examined.  The court's determination turns on whether the statute creates several distinct offenses or merely describes different means by which a single crime may be committed.  If the statute at issue creates separate offenses, a count charging multiple offenses will be considered duplicitous.  However, the Second Circuit has held that where there are several ways to violate a criminal statute, a charge alleging two distinct ways to violate a statute, is not only permissible but required.  *United States v. Mejia*, 545 F.3d 179, 207 (2d Cir. 2008) ("Where there are several ways to violate a criminal statute ... federal pleading requires ... that an indictment charge [be] in the conjunctive to inform the accused fully of the charges.  A conviction under such an indictment will be sustained if the evidence indicates that the statute was violated in any of the ways charged.") (citation and internal quotation marks omitted; alterations in *Mejia*).

Defendants argue that Count Five, the § 924(c) firearms charge, is impermissibly duplicitous because the Government does not specify which of the Defendants possessed which firearm when and in furtherance of which of the four predicate crimes of violence.  Defendants' contentions are without merit because the Government intends to prove that Defendants participated in a single conspiracy to provide material support to al-Shabaab, and that the offenses charged in Counts Two through Four are part of the same course of conduct committed within the same time period.  It is well settled that use or possession of one or multiple firearms over the course of a conspiracy may constitute a single § 924(c) offense, where a defendant is accused of use or possession of firearms "in furtherance of co-terminous predicate offenses involving essentially the same conduct."  *United States v. Wallace*, 447 F.3d 184, 187-88 (2d Cir. 2006) (citations omitted); *see also United States v. Finley*, 245 F.3d 199, 208 (2d Cir. 2001)

(stating that Congress did not intend to impose multiple consecutive sentences for two criminal transactions that "are so inseparably intertwined"); *United States v. Lindsay*, 985 F.2d 666, 674 (2d Cir. 1993) ("Where the government links multiple firearms to a single crime, only one § 924(c)(1) violation occurs."); *United States v. Love*, No. 10-CR-6116L, 2012 WL 1684600, at *5 (W.D.N.Y. May 14, 2012) (collecting cases standing for the proposition that "[w]here … multiple predicate offenses arise from the same event or conduct undertaken simultaneously, multiple Section 924(c) counts may amount to multiplicitous charges.").

This is not to say that the Government could not have charged Defendants with multiple § 924(c) charges, if it undertook to prove that the acts charged in Counts One through Four were "distinct in time and conduct."  *United States v. Barnes*, 560 F. App'x 36, 43 (2d Cir. 2014) (summary order) (citing *United States v. Salameh*, 261 F.3d 271, 277-79 (2d Cir. 2001) (upholding consecutive sentences for § 924(c)(1) violations involving same bomb, where predicate offenses were not co-terminous and punished defendant separately for carriage and use); *Mejia*, 545 F.3d at 205-06 (holding that single conspiracy connecting multiple assaults does not preclude treating assaults as separate predicate offense, nor does fact that assaults are clustered in time and space merge them into one predicate crime)).  However, given that the Government has undertaken to prove one count of § 924(c) against each Defendant – *i.e.*, that each Defendant, as principal or aider and abettor, used or carried one or more firearms in relation to the charged conspiracy or possessed one or more firearms in furtherance of the conspiracy – the count is not duplicitous.  If it appears after evidence has been presented to the jury that an instruction on unanimity is necessary in relation to the § 924(c) count, the jury will be so instructed.

### 6.  *Are the Attempt and Substantive Material Support Charges Multiplicitous?*

Defendant Yusuf argues, in his supplemental motion to dismiss the indictment, that Count Three, the attempted provision of material support count, should be dismissed as multiplicitous because it is a lesser included offense of Count Two, the substantive provision of material support charge.  Alternatively, Yusuf argues that the Government should be required to elect between Count Three and Count Two prior to trial.

The Double Jeopardy Clause of the Fifth Amendment provides that no person "shall ... be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. "This constitutional command encompasses three distinct guarantees: (1) It protects against a second prosecution for the same offense after acquittal. (2) It protects against a second prosecution for the same offense after conviction. (3) And it protects against multiple punishments for the same offense." *United States v. Josephberg*, 459 F.3d 350, 354-55 (2d Cir. 2006) (per curiam) (alterations in *Josephberg*) (quoting *Illinois v. Vitale*, 447 U.S. 410, 415 (1980)).  However, "[w]here there has been no prior conviction or acquittal, the Double Jeopardy Clause does not protect against simultaneous prosecutions for the same offense, so long as no more than one punishment is eventually imposed." *Id.* at 355; *see also Rutledge v. United States*, 517 U.S. 292, 307 (1996) (holding that lesser included offense of conspiracy merges into continuing criminal enterprise for purposes of sentencing).  The appropriate remedy, where a defendant is prosecuted and convicted on multiplicitous counts, is to "vacate the conviction on all but one." *Josephberg*, 459 F.3d at 355.

Here, there is no need to engage in an inquiry into whether Counts Two and Three are multiplicitous, because it is well-settled that, generally, "[a]n attempt merges into the completed

crime." *United States v. Madonna*, 582 F.2d 704, 705 (2d Cir. 1978) (per curiam).[18]  The

Government does not dispute that, in the event of a conviction on both counts, the attempt charge

under 18 U.S.C. § 2339B merges into the substantive count.  Thus, if the Defendants are

convicted on both the attempt and substantive counts, these two convictions will merge for the

purposes of sentencing.  *See United States v. Burke*, No. 09-CR-0135 S-5 (SJ)(JO), 2011 WL

2609839, at *8 (E.D.N.Y. Feb. 26, 2011), *R&R adopted*, 2011 WL 2609837 (E.D.N.Y. July 1,

2011) (finding that "the overlap between … two counts is no bar to their simultaneous

prosecution, and that [a defendant is] entitled only to have the sentences on both counts merged

in the event he is found guilty of both."); *United States v. Rivera*, No. 09-CR-619 SJF, 2011 WL

1429125, at *4 (E.D.N.Y. Apr. 13, 2011) ("Since it is possible that the jury will convict

defendants on only one (1) of the respective counts that they allege are multiplicitous, and acquit

defendants on all of the counts with which they allege that count is multiplicitous, the issue of

whether the counts are multiplicitous in violation of the Double Jeopardy Clause is premature at

the pretrial stage.") (internal footnote omitted); *United States v. Mostafa*, 965 F. Supp. 2d 451,

464 (S.D.N.Y. 2013) ("[M]ultiplicity is properly addressed by the trial court at the sentencing

stage. At that time, the district court would be required to vacate one of the two convictions.").

Yusuf's motion to dismiss the attempt count as multiplicitous is denied because "[t]his Court will

not engage in a multiplicity inquiry at this time.  In accordance with Second Circuit precedent,

any such issues may be raised post-trial."  *Mostafa*, 965 F. Supp. 2d at 464.

---

[18] "An indictment is multiplicitous when it charges a single offense as an offense multiple
times, in separate counts, when, in law and fact, only one crime has been committed." *United
States v. Chacko*, 169 F.3d 140, 145 (2d Cir. 1999).  "[T]o determine whether there are two
offenses or only one," courts ask "whether each provision requires proof of a fact which the
other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932).  "If there is an element
in each offense that is not contained in the other, they are not the same offense for purposes of
double jeopardy, and they can both be prosecuted." *Chacko*, 169 F.3d at 146.

To the extent that Yusuf seeks to compel the Government to elect between Counts Two and Three, his motion is denied. "Although district courts have the discretion to compel prosecutors to elect under which … multiplicitous counts they will seek to prosecute a defendant … *when inclusion of the multiplicitous counts will prejudice the defendant*, … that discretion must be balanced against the government's 'broad discretion to conduct criminal prosecutions, including its power to select the charges to be brought in a particular case.'" *Rivera*, 2011 WL 1429125, at *4 (internal citations omitted, emphasis added). The only prejudice alleged by Yusuf is that a jury may infer criminality from the fact that he is prosecuted in a five count, as opposed to a four count, indictment – an argument belied by the fact that the jury would regardless be instructed on attempt as lesser included offense, and more importantly, "any such prejudice can be simply cured by, *inter alia,* an appropriate instruction to the jury." *Id*. at *5.

### 7. *Was the Indictment Filed Within the Time Limitations Set Out in 18 U.S.C. § 3161(b)?*

The Speedy Trial Act provides, in relevant part, that an "indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). Defendants were arrested by Djiboutian officials for illegally entering Djibouti on or about August 12, 2012. They were not indicted by the United States until October 18, 2012 – more than 30 days after that arrest. Defendants argue that because they were not indicted within 30 days of arrest, the indictment must dismissed. However, Defendants are mistaken that the time period prescribed in 18 U.S.C. § 3161(b) runs from when a defendant is taken into custody, as opposed to when a defendant is taken into *United States* custody. *See United States v. Homaune*, 898 F. Supp. 2d 153, 166 (D.D.C. 2012) (holding that a defendant's arrest by Turkish and then German authorities did not start the speedy-trial clock because "only

an arrest by *U.S. federal* authorities triggers the Speedy Trial Act") (emphasis in original);

*United States v. Abu Ali*, 395 F. Supp. 2d 338, 384 (E.D. Va. 2005) (the Speedy Trial Act was

not triggered when defendant was arrested by Saudi Arabian officials, but rather, ran from the

date that the defendant was transferred into United States custody).  Moreover, as evident from

the plain language of the Speedy Trial Act, the 30 day time-period does not begin to run until a

defendant is arrested "in connection with [the commission of the] charges [in the indictment]," as

opposed to an arrest on unrelated charges.  18 U.S.C. § 3161(b).  Here, it is of no event that

Defendants were arrested at some point by Djiboutian officials for illegally entering Djibouti.

They were not taken into *United States* custody on the charges in the indictment until November

15, 2012 – after they were indicted.  Thus, 18 U.S.C. § 3161(b) presents no obstacle to this

prosecution.

## II.   *Motion for a Bill of Particulars*

Defendants move for a bill of particulars under Federal Rule of Criminal Procedure 7(f).

"A bill of particulars is required only where the charges of the indictment are so general that they

do not advise the defendant of the specific acts of which he is accused."  *United States v. Chen*,

378 F.3d 151, 163 (2d Cir. 2004) (citation and internal quotation marks omitted).  The purpose of

a bill or particulars is to enable the defendant "to prepare for trial, to prevent surprise, and to

interpose a plea of double jeopardy should he be prosecuted a second time for the same offense."

*United States v. Rigas*, 490 F.3d 208, 237 (2d Cir. 2007) (citation and internal quotation marks

omitted).  "[T]he proper inquiry is not whether the requested information would be helpful to the

defense (which it almost invariably would), but rather whether the information is *necessary* to

the defense."  *United States v. Kahale*, 789 F. Supp. 2d 359, 370-71 (E.D.N.Y. 2009).  Even

where an indictment is deficient, "a bill of particulars is not necessary where the government has

made sufficient disclosures concerning its evidence and witnesses by other means."  *Chen*, 378

F.3d at 163 (citation and internal quotation marks omitted); *see also United States v. Barnes*, 158 F.3d 662, 665-66 (2d Cir. 1997) (explaining that the district court has discretion to deny a motion for a bill of particulars where the defendant is apprised of the details of the charges against him in "some acceptable alternate form," such as discovery).

Here, the Government sufficiently apprised Defendants of the acts that they are accused of committing, and with whom, by providing Defendants with voluminous discovery, including the bulk of the Jencks Act, 18 U.S.C. § 3500, materials well in advance of trial, as well as providing detailed factual proffers in support of its motion for an anonymous jury and in opposition to the instant motion. Considered together, the Government's disclosures have more than adequately informed the Defendants of the evidence supporting the charges in the indictment. Accordingly, a bill of particulars providing additional evidentiary details is not required.

### III.   *Motion in Limine Regarding the Terms "Terrorist," "Terrorist Activity," or "Terrorism"*

Defendants move *in limine* to preclude "any Government witness … who testifies on the subject of the conduct of the defendant[s], al-Shabaab, or any other person or group, from using the terms 'terrorist,' 'terrorist activity (or activities),' or 'terrorism.'" Defendants assert that these words are prejudicial and inflammatory and amount to legal conclusions that must be left for the jury to determine. Defendants' request is unnecessary and impractical. The charged offenses require the Government to prove, *inter alia*, that the Defendants assisted a designated foreign *terrorist* organization. 18 U.S.C. §§ 2339B(a)(1), D(a). Moreover, the *mens rea* requirements of several counts will require the Government to prove that each defendant knew that either al-Shabaab: (1) "is a designated [foreign *terrorist* organization]," (2) "has engaged or engages in *terrorist* activity" as defined in 8 U.S.C. § 1182(a)(3)(B), or (3) "has engaged or

engages in *terrorism*" as defined in § 140(d)(2) of the Foreign Relations Authorization Act, Fiscal Years 1988 and 1989.  18 U.S.C. §§ 2339B(a)(1), D(a) (emphasis added).  To the extent that Defendants argue that the Government's expert witnesses should not be permitted to testify about the ultimate question of whether al-Shabaab engages in terrorist activity or terrorism, as defined in the statutes, they are certainly correct.  *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992) ("This circuit … requir[es the] exclusion of expert testimony that expresses a legal conclusion.").  However, Defendants provide no basis to excise these words from the case entirely.  Indeed, it is unclear how the Government could meet its burden of proving, for example, that al-Shabaab was a designated foreign terrorist organization, without using the word "terrorism."  To the extent these terms are defined by the relevant statutes, the Court will instruct the jury on these definitions and the jury will remain the ultimate fact-finder on whether the Government has proven its case.  However, there is no basis to preclude the Government from using words that are central to the case.

**IV.**   ***Motion to Strike Aliases From the Indictment***

Defendant Yusuf moves under Fed. R. Crim. P. 7(d) to strike certain aliases from the indictment.  For material to be struck, it must be "not relevant to the crime charged and [be] inflammatory and prejudicial."  *United States v. Scarpa*, 913 F.2d 993, 1013 (2d Cir. 1990) (citation and internal quotation marks omitted); *United States v. Miller*, 381 F.2d 529, 536 (2d Cir. 1967) (aliases are properly listed in an indictment where they are relevant to the case).  The Government submits that several Government witnesses will identify Yusuf and will testify that they only knew Yusuf by his aliases.  The Court is not equipped, at this juncture, to determine the relevance or potential prejudice of the aliases.  Thus, given that the jury will not receive the language of the indictment until it enters the deliberation phase, the Court reserves decision on this issue until after the Government has had an opportunity to demonstrate the relevance of the

aliases.  *United States v. Ahmed*, No. 10 CR 131 (PKC), 2011 WL 5041456, at *3 (S.D.N.Y. Oct.

21, 2011) ("This Court will follow the practice adopted by others of awaiting the government's

evidence before ruling on the motion [to strike surplusage].").

## V.     *Motions Concerning Confessions Made in Djiboutian Custody*

"In the criminal context, confessions or testimony procured by torture are excluded under

the Due Process Clause because such admissions would run contrary to 'fundamental principles

of liberty and justice which lie at the base of all our civil and political institutions.'"  *Mohammed*

*v. Obama*, 689 F. Supp. 2d 38, 61-62 (D.D.C. 2009) (quoting *Brown v. Mississippi*, 297 U.S.

278, 286 (1936)).  Defendants allege that they were tortured by Djiboutian authorities, and that

subsequently, while still in Djiboutian custody, they were interrogated by two teams of FBI

agents.  The first FBI team did not provide *Miranda* warnings as required by *Miranda v.*

*Arizona*, 384 U.S. 436, 469 (1966).  The Government has never sought to introduce these

statements.  Defendants subsequently made statements to the second team of FBI agents,

purportedly after receiving *Miranda* warnings.  The Government initially indicated it would seek

to admit these statements at trial.  Based on these facts, Defendants seek three forms of relief.

First, Defendants seek to suppress their statements, both for the purposes of the Government's

case in chief and for impeachment purposes.  (ECF Nos. 99, 100, 101.)  Second, Defendants

move for a *pre-trial* "taint hearing at which the government bears the burden of demonstrating

that none of the evidence it seeks to produce at trial is the product of either the illegal

interrogation or the illegal arrest."  (ECF Nos. 103, 123, 129-1, Yusuf Br. at 51.)  Finally,

Defendants move for "disclosure of the grand jury minutes pursuant to Fed. R. Crim. P.

6(3)(E)(ii) [*sic*]."  (ECF Nos. 123, 129-1, Yusuf Br. at 51.)

With regard to Defendants' suppression motions, the Government has indicated that it will not introduce any of the disputed statements for any purposes. Accordingly, Defendants' motions to suppress are denied as moot. *United States v. Burke*, No. 09 CR 135 (SJ), 2009 WL 4263635, at *4 (E.D.N.Y. Nov. 24, 2009) (motion to suppress denied as moot where Government indicates it will not introduce disputed statements at trial), *R&R adopted*, Dkt. 09-cr-135 (SJ) (JO), ECF No. 66.

With regard to Defendants' motion for a taint hearing, Defendants' request is not sufficiently particularized to trigger the need for such a hearing. Defendants are correct that, generally, "the fruit of the poisonous tree doctrine requires the exclusion of the fruits of illegally obtained evidence unless, ... 'granting establishment of the primary illegality, the evidence … has been come at ... instead by means sufficiently distinguishable to be purged of the primary taint.'" *United States v. Ghailani*, 743 F. Supp. 2d 242, 250 (S.D.N.Y. 2010) (quoting *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963) (internal citations and footnotes omitted)).[19] For example, in *Ghailani*, the District Court for the Southern District of New York conducted a taint hearing after the defendant alleged that, because his custodial statements, which were coerced by torture, led the Government to identify a witness, that witness "should be precluded from testifying at trial because that testimony would constitute 'fruit of the poisonous tree'—evidence derived from his illegally obtained statements." *Id*. at 249. However, in order to trigger the need for a *pre-trial* taint hearing, Defendants must do more than merely speculate that all of the

_____

[19] "The principles governing the treatment of fruits of the poisonous tree in the Fourth Amendment context apply to the extent that their logic is consistent also with the underlying concerns of the Fifth and Sixth Amendments." *Ghailani*, 743 F. Supp. at 252-53 (Although the Supreme Court has not had occasion to extend the "fruit of the poisonous tree doctrine" to coerced confessions, "[l]ower courts and commentators consistently have assumed that the poisonous fruit doctrine, with its qualifications, applies to coerced confessions and Sixth Amendment violations.").

Government's evidence *may* be tainted and demand that the Government prove the genealogy of each and every piece of evidence it intends to use against them.

Generally, where a defendant does not make a particularized motion to suppress on the grounds of taint, allegations of possible taint are best resolved post-trial. *See United States v. Ostrer*, 481 F. Supp. 407, 415 (S.D.N.Y. 1979) (deferring taint hearing until after trial where defendants could not specify which evidence they believed was tainted); *United States v. Birrell*, 269 F. Supp. 716, 727-29 (S.D.N.Y. 1967) (deferring taint hearing where defendant wanted the Government to prove that none of its evidence was tainted). By contrast, in all of the *pretrial* taint hearing cases identified by the Court, the defendant first identified specifically which evidence he or she believed was tainted. *See*, *e.g.*, *Ghailani*, 743 F. Supp. 2d at 247 (defendant sought to preclude the Government from calling a specific individual as a trial witness on the ground that the Government only identified that witness by using the defendant's coerced statements); *United States v. Valentine*, 591 F. Supp. 2d 238, 241 (E.D.N.Y. 2008) (defendant sought to suppress firearms and heroine recovered during a consent search of his apartment on the ground that the search was tainted by his unlawful arrest); *United States v. Vilar*, 530 F. Supp. 2d 616, 637-641 (S.D.N.Y. 2008) (denying unparticularized motion for a taint hearing and directing defendants to specifically review Government disclosures to determine whether any evidence raises issues of taint prior to renewing motion to suppress tainted evidence); *see also United States v. Kandik*, 633 F.2d 1334, 1335-36 (9th Cir. 1980) (explaining that "a defendant has the initial burden of establishing a factual nexus between the illegality and the challenged evidence," and affirming district court's refusal to conduct a taint hearing where defendant did not establish such a factual nexus although "the illegally seized evidence [wa]s known to all

parties, and any connection between it and the challenged testimony would be readily traceable.").

Here, despite having received copious amounts of discovery, including records of the contents of Defendants' statements and the bulk of the Jencks Act material, Defendants do not point to a single piece of evidence that they believe is impermissibly derived from coerced statements they made to Djiboutian officials or to FBI agents while in Djiboutian custody.[20]  In this context, based on the paucity of Defendants' submissions, it would defy logic to order a pre-trial hearing at which the Government must preview each and every piece of its evidence for the Defendants.  *See Nardone v. United States*, 308 U.S. 338, 342 (1939) ("[C]laims that taint attaches to any portion of the Government's case must satisfy the trial court with their solidity and not be merely a means of eliciting what is in the Government's possession before its submission to the jury.").[21]  If Defendants have any reasonable basis to believe that specific portions of the Government's evidence are the fruits of the poisonous tree, the Court will conduct a pre-trial taint hearing.  However, such a hearing will be scheduled only if Defendants submit a

---

[20] Defendants have not suggested that they do not have the information necessary to make a determination as to taint.  As the Second Circuit explained in *United States v. Huss*, "[t]o compel a party who objects to the use of evidence obtained as a result of unlawful wiretapping to go forward with a showing of taint, and then to withhold from him the means or tools to meet that burden[, *e.g.*, the records of the wiretap], is to create an absurdity in the law."  482 F.2d 38, 47 (2d Cir. 1973).

[21] *See also Ostrer*, 481 F. Supp. at 415 (where "the defendants have not pointed to specific evidence which is tainted, [but rather] they seek to hold the government to its proof at a pre-trial hearing that *all* of the evidence to be used has an independent legitimate source," permitting such a hearing "would likely result in a protracted evidentiary hearing much longer than the trial itself," "[i]t would be a waste of judicial time to require the government to make its showing now on evidence which may never be offered," and an "extensive pre-trial hearing … would give [the defendants] an unfair preview of the government's case which would otherwise not be allowed."); *see also Birrell*, 269 F. Supp. at 727-29 ("[A] pretrial hearing of the scope desired by defendant would unavoidably amount to a comprehensive and unrestricted preview of the Government's entire case.").

sufficiently particularized request.  At this juncture, Defendants' motion for a taint hearing is denied without prejudice.  *See Vilar*, 530 F. Supp. 2d at 642 ("[W]hile a pre- or post-trial evidentiary hearing may prove to be the appropriate vehicle for resolving claims of taint[,] … a hearing need not be convened upon Defendants' request, if at all.").

With regard to Defendants' motion for disclosure of the grand jury minutes, Rule 6(e)(3)(E)(ii) of the Federal Rules of Criminal Procedure provides that the court may authorize disclosure of grand-jury minutes "at the request of a defendant who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury."  Fed. R. Crim. P. 6(e)(3)(E)(ii).  "Grand jury proceedings carry a 'presumption of regularity,'" *United States v. Torres*, 901 F.2d 205, 232 (2d Cir. 1990) (citation omitted), and "[t]he burden is on the party seeking disclosure to show a *particularized* need that outweighs the need for secrecy," *In re Grand Jury Subpoena*, 103 F.3d 234, 239 (2d Cir. 1996) (emphasis added) (citation and quotation marks omitted).  For this reason, "review of grand jury minutes is rarely permitted without specific factual allegations of government misconduct."  *Torres*, 901 F.2d at 233.

Here, Defendants' motion for disclosure of the grand jury minutes was not particularized, but rather, generally speculated that evidence tainted by their coerced statements may have been submitted to the grand jury.  Even assuming this were true, after the Defendants' motion was filed with the Court, the grand jury returned a superseding indictment.  According to the Government, no evidence related or derived from Defendants' statements was presented to this grand jury.  As Defendants have not made a particularized request for disclosure of the grand jury minutes and in light of the Government's representation about the evidence before the grand jury which returned the operative indictment, Defendants' motion for disclosure of the grand jury minutes is denied.

**VI.**     ___*Motion for Rule 404(b) Notice*___

Defendants move, pursuant to Rule 404(b) of the Federal Rules of Evidence, for notice of every uncharged act that the Government intends to use at trial.  The purpose of the Rule 404(b) notice provision is "to reduce surprise and promote early resolution" of any challenge to admissibility of the proffered evidence.  Fed. R. Evid. 404(b) advisory committee note (1991). The Government must make its Rule 404(b) disclosures within a "reasonable" time, and preemptive requests for such disclosures are routinely denied as premature.  *United States v. Morante*, 947 F. Supp. 2d 309, 315 (E.D.N.Y. 2013) (denying Rule 404(b) motion as premature); *United States v. Barret*, 824 F. Supp. 2d 419, 458 (E.D.N.Y. 2011) (explaining that ten days to two weeks before trial is usually reasonable); *United States v. Bronson*, No. 05-CR-714 (NGG), 2007 WL 2455138, at *14 (E.D.N.Y. Aug. 23, 2007) (finding that two weeks before trial constitutes reasonable notice); *United States v. Torres*, No. 05-CR-838 (NGG), 2006 WL 1982750, at *6 (E.D.N.Y. July 13, 2006) (explaining that "[i]t has been the practice of courts in this circuit to deem notice afforded more than ten working days before trial as 'reasonable' within the meaning of Rule 404(b)" and denying motion as premature) (citation and internal quotation marks omitted); *United States v. Solnin*, No. 12-CR-040 (ADS), 2015 WL 332132, at *15 (E.D.N.Y. Jan. 23, 2015) (explaining that while notice is typically provided two to three weeks before trial, a longer period may be appropriate and ordering the Government to provide any Rule 404(b) notice within 45 days of trial).  Defendants' motion, made months in advance of trial, is denied as premature.  To the extent that Defendants wish to renew their motion, they may do so in accordance with applicable scheduling orders.[22]

---

[22]  To the extent that Defendants argue that this Court should preemptively exclude all evidence of "gruesome" and "grisly" conduct by al-Shabaab, on the grounds that it is more prejudicial than probative and not relevant to Defendants' conduct, the motion is premised on mere speculation about the Government's proof and inappropriate at this juncture.

**VII.** <u>**Motion in Limine to Preclude Testimony of the Government's Voice-Identification Expert**</u>

Defendant Yusuf moves to preclude the anticipated testimony of the Government's voice identification expert on the grounds that his testimony does not meet the threshold reliability requirements of Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993).  This Court has scheduled a *Daubert* hearing on this issue.  Decision on this portion of Yusuf's motion is reserved until after the hearing is concluded.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that:

Defendants' (1) motions to dismiss the indictment; (2) motion for a bill of particulars; (3) motion *in limine* to preclude the Government's witnesses from using the terms "terrorist," "terrorist activity," or "terrorism"; and (4) motion for immediate Rule 404(b) notice are **DENIED**. (ECF Nos. 129, 130, 131.)

Defendants' motions to suppress statements are **DENIED** as moot.  (ECF Nos. 99, 100, 101.)

Defendants' motion for a taint hearing and motion for discovery of grand jury minutes are **DENIED**.  (ECF Nos. 103, 123, 129.)

Defendant Yusuf's motion to dismiss Count Two as multiplicitous or compel the Government to elect between Counts Two and Three is **DENIED**.  (ECF No. 147.)

The Court **RESERVES DECISION** on Yusuf's motion to strike aliases from the indictment until after trial, (ECF No. 147) and on Yusuf's motion *in limine* to preclude voice identification expert testimony until after the *Daubert* hearing is concluded.  (ECF No. 133.)

**SO ORDERED**                     _____/s/_____

                                         SANDRA L. TOWNES
                                         United States District Judge

Dated: Brooklyn, New York
        March 24, 2015