SA/SDD/RMT/AMS
F.#2012R01574

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    12 CR 661 (S-2) (SLT)

     - against -

ALI YASIN AHMED,
MADHI HASHI and
MOHAMED YUSUF,

            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT'S MEMORANDUM OF LAW IN SUPPORT OF
MOTIONS IN LIMINE TO ADMIT CERTAIN EVIDENCE AGAINST
DEFENDANTS AND PRECLUDE CERTAIN DEFENSE LINES OF CROSS-
EXAMINATION AND ARGUMENTS DURING TRIAL

                             LORETTA E. LYNCH
                             United States Attorney
                             Eastern District of New York

Shreve Ariail
Seth D. DuCharme
Richard M. Tucker
Assistant U.S. Attorneys

Annamartine Salick
Trial Attorney, Department of Justice
     (Of Counsel)

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................1

STATEMENT OF FACTS ....................................................................................3

I.  Al-Shabaab ........................................................................................4

II.  Al-Shabaab's Recruitment and Use of Foreign Fighters ............................9

III. The Defendants' Conduct Prior to Traveling to Somalia to Join Al-Shabaab..................13

    A.  Ahmed and Yusuf....................................................................13

    B.  Hashi....................................................................................15

IV. The Defendants' Membership and Material Support of Al-Shabaab in Somalia..............17

    A.  Ahmed and Yusuf Attend Al-Shabaab Training Camps................17

    B.  Ahmed and Yusuf Join the Foreign Fighters in Mogadishu .........18

    C.  The Karan District Battles........................................................20

    D.  Ahmed and Yusuf Continue To Fight on Behalf of Al-Shabaab ................21

    E.  Hashi's Arrival in Somalia and Association with Al-Shabaab Foreign Fighters ........25

V.  The Defendants' Arrests in Djibouti and Transfer to the United States...........................27

IV. The Defendants' Inculpatory Statements While in BOP Custody...................................28

ARGUMENT ...................................................................................30

I.  Co-conspirator Statements Regarding Topics that Were Important to the
   Operation of the Charged Criminal Conspiracy Are Admissible at Trial ........................31

    A.  Legal Framework ....................................................................33

    B.  Discussion ..............................................................................35

        1.  Al-Shabaab's Radical Islamist Ideology and Primary Enemies............................35

        2.  Statements Regarding Al-Shabaab's Relationship with Al-Qaeda ........................37

        3.  Statements About Al-Shabaab's Leadership ........................................................39

i

4.  Statements Regarding Al-Shabaab's Training Programs and Camps ...................39

5.  Al-Shabaab's Operations, Use of Terrorist Tactics, and Reasons For Employing Such Terrorist Tactics........................................................................40

6.  Statements Regarding Al-Shabaab's Sources of Revenue ...................................42

II. Al-Shabaab Propaganda and Recruiting Videos.................................................................43

III. Evidence Regarding Imran Hersi and Bille Ilyas Mohamed ............................................46

IV. The Government Moves to Preclude Certain Inappropriate Defense Arguments.............47

A.  References to Government Conduct ...........................................................................47

1.  Government Charging Decisions and Investigative Actions .................................47

2.  Allegations of "Outrageous Government Conduct"...............................................48

3.  Commentary Regarding Discovery ........................................................................49

B.  Commentary Regarding the Lawfulness of the Defendants' Arrests by Djiboutian officials or the Defendants' Subsequent Transfers to U.S. Custody..........49

C.  Commentary or Evidence Regarding Conditions of Confinement in Djibouti...........50

D.  Duress or Combatant Immunity .................................................................................51

1.  Defendants Must Make a Prima Facie Showing of the Ability to Present a "Combatant Immunity" Defense Before Submitting Evidence of Such a Defense to the Jury ............................................................................................53

2.  The Defendants Are Not Entitled to Argue or Present Evidence of a Lawful Combatant Defense ................................................................................................53

3.  The Defendants Should Not Be Permitted to Raise These Arguments As a Vehicle for Advocating for Jury Nullification ...............................................59

CONCLUSION..............................................................................................................................61

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its motions <u>in limine</u> in advance of trial in this matter, which is scheduled to commence on May 26, 2015.  Specifically, and as set forth in greater detail below, the government seeks to admit all relevant evidence pertaining to the charged conspiracy to provide material support to the terrorist organization al-Shabaab, of which the defendants Ali Yasin Ahmed, Madhi Hashi and Mohammed Yusuf were members.  The Court should admit this evidence because it is direct proof of the charged offenses, and, in the alternative, because it is admissible pursuant to Rule 404(b) of the Federal Rules of Evidence.

In addition, the government moves <u>in limine</u> to introduce into evidence:

- co-conspirator statements on certain topics central to the operation of the charged criminal conspiracy, such as al-Shabaab's driving radical Islamist ideology and relationship to other terrorist organizations, combat tactics and strategies, methods for fund-raising, and leadership structure;

- certain al-Shabaab propaganda and recruiting videos, including a video in which defendant Mohamed Yusuf appears; and

- certain jihadist materials seized by authorities in the United Kingdom and Sweden from the residences of co-conspirators Imran Hersi and Bille Ilyas Mohamed, respectively.

The government further moves <u>in limine</u> to preclude the following defense arguments in the presence of the jury:

- any defense argument criticizing government charging decisions and investigative actions, or otherwise alleging "outrageous government conduct";

- any defense argument regarding the lawfulness of the defendants' arrests by Djiboutian officials or the defendants' subsequent transfers to U.S. custody;

- any commentary or evidence regarding the conditions of the defendants' confinement while in Djiboutian custody; and

- any argument that the defendants' participation in the conflict in Somalia was lawful as a product of duress or necessity, or under a theory of combatant immunity.

    Finally, the government demands notice from the defense of any intention to

advance an alibi defense.  <u>See</u> Fed. R. Crim. P. 12.1(a)(2).

## STATEMENT OF FACTS

The defendants Ali Yasin Ahmed, Madhi Hashi and Mohamed Yusuf have been charged with crimes relating to their support for and membership in a foreign terrorist organization.  More specifically, in the second superseding indictment, returned by the grand jury on December 1, 2014, the defendants are charged with conspiring to provide material support to al-Shabaab, a designated Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B, providing material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B, and attempting to provide material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B.  Ahmed and Yusuf are further charged with receiving military-type training from al-Shabaab, in violation of Title 18, United States Code, Section 2339D(a), and all three defendants are charged with using machineguns in furtherance of a crime of violence, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).

At trial, the government intends to introduce evidence and testimony regarding the following facts (among others), which establish the existence of the charged conspiracy, the defendants' criminal conduct as knowing members of that conspiracy, and the use of firearms, all of which were committed in furtherance of the charged conspiracy to provide material support to al-Shabaab.  This evidence further establishes that the defendants' criminal conduct occurred within the extraterritorial jurisdiction of the United States, as defined in Title 18, United States Code, Section 2339B.

I.     Al-Shabaab

At trial, the government anticipates introducing testimony from fact and expert witnesses regarding recent historical events in Somalia that led to the formation of al-Shabaab and its employment of terrorist tactics both within Somalia and as part of operations outside that country.

The circumstances that resulted in the emergence of al-Shabaab as a terrorist force in Somalia were initially set into motion by the collapse of Mohamed Siad Barre's military dictatorship in 1991 following a series of local rebellions across Somalia.  Barre's ouster was ultimately completed by the forces of a Somali militia known as the United Somali Congress, under the leadership of Mohamed Farah Aidad.  In the months and years that followed, Somalia devolved into civil war, with no functioning government.  Following failed efforts by the United Nations and United States to restore order, other African governments eventually assisted in the formation of the Somali Transitional Federal Government ("TFG") in 2004.  Although initially created as a government in exile, in 2005 the TFG returned to Somalia, aided by military support from the African Union Mission in Somalia ("AMISOM"), Uganda and Ethiopia.

During the period of instability following the collapse of Barre's regime, certain groups – including al-Shabaab – began to form with the express objective of establishing an Islamic state in Somalia where they would impose strict *sharia* law.  After Ethiopian and other foreign troops deployed to Somalia to support the TFG, al-Shabaab and certain of these other groups launched an armed insurgency aimed at toppling the TFG and driving AMISOM from Somalia's borders so that an Islamic caliphate could be created there.

Significantly, however, al-Shabaab employed certain brutal tactics not used by other groups resisting the TFG.  For example, al-Shabaab members regularly attempted to assassinate TFG officials, including the prime minister, the president, the deputy mayor of Mogadishu, and other national and local leaders.  Al-Shabaab also targeted journalists and foreign aid workers.  Al-Shabaab fighters frequently beheaded TFG and AMISOM fighters on the battlefield, to instill fear in their adversaries.  In addition, al-Shabaab distinguished itself by using suicide bombing attacks aimed at government leaders and institutions.  For example, al-Shabaab members launched a suicide bombing attack against the TFG president.  Although that attack failed to kill the president – the president's brother was killed instead – al-Shabaab subsequently used video footage of the bomber in its propaganda videos.  Al-Shabaab members also launched suicide bombing attacks against the Ambassador Hotel in Mogadishu, which was frequented by TFG officials, as well as several government and military institutions.

Al-Shabaab's use of such terrorist tactics led the United States to designate al-Shabaab as a foreign terrorist organization in February 2008.  In response, al-Shabaab spokesman Mukhtar Robow stated, in sum and substance, that al-Shabaab welcomed the designation as a "badge of honor."  Al-Shabaab also issued the following statement on April 5, 2008, directly threatening the United States and U.S. interests:

> To the other mujahideen included in the American terrorist
> list: O Mujahideen brothers! . . .  May you be successful in
> your jihad and may you frustrate the enemies.  May Allah help
> you . . . .  Please know, our beloved ones, that we are going
> through a crucial stage, in which the oppressors have crossed
> the line.  That is why we call upon you to round up and join
> forces under one leadership and a uniform flag in order to
> frustrate the enemies of Allah and execute his command . . . .

5

As a result, our jihad will be stronger and more harmful to our enemies.

In conclusion, we say to the patron and protector of the cross, America: the wager that you made on the Ethiopians, Ugandans, and Burundians in Somalia was a failure, and history has proven it. Allah willing, we will attack them, roam [through their ranks], cut off every path they will take, chase away those who follow them, and fight them as insects and wolves. [We] will give them a taste of the heat of flame, and throw them into hell.

Following its designation as a foreign terrorist organization, al-Shabaab maintained an aggressive operational tempo.  For example, in April 2008 an al-Shabaab member detonated a vehicle-borne improvised explosive device near a base for Burundian soldiers at Jaalle Siyaad Academy, killing one soldier and injuring numerous civilians. Similarly, on February 22, 2009, an al-Shabaab militant wearing an explosive belt targeted another African Union military base in Somalia manned by Burundian soldiers.  Al-Shabaab also claimed responsibility for a second suicide bombing attack on the same day at a Christian church filled with approximately 200 worshippers.  In addition, on December 3, 2009, al-Shabaab carried out the bombing of the Hotel Shamo in Mogadishu that killed 25 and wounded at least 60 others.  Casualties from that attack included three top Somali government ministers.

In addition to targeting TFG officials and AMISOM, African Union and Ethiopian soldiers in Somalia, al-Shabaab also has targeted U.S. and Western interests both inside and outside of the country.  For example:

- on October 29, 2008, a U.S. citizen named Shirwa Ahmed and other al-Shabaab operatives carried out five coordinated suicide bombing attacks in Hargeisa and Bosaso on various buildings, including several buildings operated by the United Nations;

6

- on September 17, 2009, al-Shabaab operatives executed twin suicide car bombing attacks at the Mogadishu airport, targeting what al-Shabaab spokesmen subsequently described as a U.S./NATO base, along with an AMISOM base; and

- on July 11, 2010, suicide bombers attacked crowded venues in Kampala, Uganda showing the televised 2010 FIFA World Cup soccer final, killing 74 people (including one U.S. citizen) and wounding at least 70 others. Two weeks later, al-Shabaab issued an official communiqué claiming responsibility for the Kampala bombings.

Al-Shabaab also has maintained strong links to other terrorist organizations – most significantly, al-Qaeda (sometimes also called "core al-Qaeda" or "al-Qaeda in Afghanistan") and al-Qaeda in the Arabian Peninsula ("AQAP"). For example, on July 1, 2006, now-deceased al-Qaeda leader Usama Bin Laden made a rare appearance in a new audiotape dealing with the subjects of Iraq and Somalia. The recording was distributed to television news agencies and by al-Qaeda's As-Sahab Media Foundation over the Internet. In his audio message, Bin Laden accused Western nations of interfering in Somalia as part of their new "crusade":

> . . . They are preparing to send military forces to Somalia at the suggestion of America, claiming it is to help and extended their security. And they lie and say that Somalia has suffered from tribal fighting since the defeat of America there ten years earlier. Is it intelligent to believe that they just discovered the tragedy today? Or is the real reason because the Shariah Courts have seized the capital and extended their influence over the most important regions, and is seeking to establish an Islamic state . . . . We promise almighty Allah that we will fight [crusader] soldiers on the land of Somalia with His Help and Power. We also reserve the right to punish them on their own land and in any available place at any time or in any way which is convenient for us. I also urge the Muslim youths and their merchants to sacrifice everything valuable and to provide for all the needs of the mujahideen through trusted people, especially in Palestine, Iraq, Somalia, Afghanistan and Sudan.

7

Later, in March 2007, the As-Sahab Media Foundation released a video featuring the

following statement from now-deceased al-Qaeda leader Abu Yahya al-Libi that is

sometimes referred to as the "Lions of Somalia" speech:

> Crying and sobbing has no place in a battle in which the infidels
> have combined all their powers, recruited all their troops, and
> called out to each other . . . . So, O' lions of Somalia and
> champions of the deserts and jungles . . . this is merely a distress
> which will vanish and a darkness which will pass, to be
> followed by nothing less than certain victory, pure consolidation
> and good outcomes. . . . The Abyssinian rabble didn't enter your
> land and occupy your country through conferences,
> negotiations, accords or talks.  No, they declared a blatant war
> against you, for which they readied armies and came together to
> wage it and sought help in it from partners. . . . So make it blood
> for blood, and destruction for destruction . . . . Fight a guerrilla
> war, for it is the most durable of battles and the least in losses,
> most crushing, and most appropriate for the weak and few.
> Carry out against them raid after raid, lay ambushes for them,
> shake the earth beneath them with bombs and mines, destroy
> their bases and fortresses with martyrdom operations and car
> bombs, cut their supply routes, frighten with them those behind
> them, disturb their security, and make their life miserable, for
> the blood of one of them is the blood of a dog.  Light a fire and
> make a volcano erupt under the feet of the invading occupiers
> regardless of their creed and their cover, and whether they
> invaded your country on the back of tanks and with the power of
> iron and fire, as Nazarene Ethiopia did, or came to you under
> the cloak of international legitimacy, Security Council
> resolutions, peacekeeping forces, or the African Union.

Months later, now-deceased al-Shabaab emir Ahmed Abdi Godane, also known as "Mukhtar

Abu Zubair," released an audio recording specifically thanking Abu Yahya al-Liby for

helping to "mobilize the Army of Despair – your words have had a more powerful impact

than a thousand courageous mujahideen in the battle of your brothers against the global

crusade."

To further strengthen al-Shabaab's relationship with al-Qaeda and AQAP, in early 2010, al-Shabaab leaders dispatched emissaries to Yemen to meet with AQAP's leadership; to obtain training in explosives and combat tactics; to develop new means of secure communications among al-Shabaab, al-Qaeda and AQAP; and to arrange a transfer of heavy weapons from AQAP to al-Shabaab.  Later, in February 2012, al-Shabaab and al-Qaeda formally merged when Godane pledged allegiance to al-Qaeda emir Ayman al-Zawayhiri.

II.     Al-Shabaab's Recruitment and Use of Foreign Fighters

During the time of the charged conspiracy (and thereafter), al-Shabaab aggressively and successfully recruited non-Somali citizens to come to Somalia and join the organization, attracting both ethnic Somalis living outside of Somalia and non-Somali foreigners, including U.S. citizens.  These individuals, known within al-Shabaab as "foreign fighters" and *muhajireen*, lived, trained and, for the most part, fought separately from, but in coordination with, other al-Shabaab fighters.  They had distinct leadership structures and were often given different combat assignments.  They were also especially valuable to al-Shabaab for several reasons.  For example, al-Shabaab frequently made Western foreign fighters the face of its fund-raising efforts as part of a broader strategy of emphasizing that the conflict in Somalia was part of a global jihad aimed at creating an Islamic caliphate, rather than merely a regional civil war.  Indeed, al-Shabaab historically has relied heavily on funds sent from ethnic Somalis living in the United States and Europe.  In addition, foreign fighters, with their foreign passports, could be given combat training in Somalia and then

sent elsewhere in support of external terrorist plots against Western countries and their allies in the region.

Because of the importance of foreign fighters to al-Shabaab's operations, al-Shabaab committed significant resources toward effectively recruiting them.  Al-Shabaab's recruitment efforts relied heavily on the use of the Internet – namely, jihadist discussion forums and web-distributed recruiting videos – to motivate foreign fighters to come to Somalia.  Such videos typically depicted al-Shabaab fighters marching, training and fighting, as well as al-Shabaab leaders giving religious lectures.

For example, "Ambush at Bardale" is a 30-minute video released by al-Shabaab in approximately March 2009 that features lengthy interviews and statements from now-deceased U.S. citizen and former al-Shabaab leader Omar Hammami, also known as "Abu Mansur al-Amriki."  In that video, Hammami speaks, sings and raps about how he felt joining the "jihad" in Somalia and encourages others to do the same.  Hammami explains:

> The only reason we are staying here, away from our families, away from the cities, away from candy bars [and] ice, all these other things, is because we are waiting to meet with the enemy. . . . If you can encourage more of your children, and more of your neighbors, and anyone around you to send people . . . to this jihad, it would be a great asset for us.

The video also includes footage from an al-Shabaab ambush of Ethiopian and Somali forces near Bardale, narrated by Hammami.  "We're waiting for the enemy to come," Hammai says.  "We're going to kill all of them."  Notably, one of the al-Shabaab fighters featured in the video is U.S. citizen Shirwa Ahmed, who participated in the October 29, 2008 suicide bombing attacks in Hargeisa and Bosaso.  Also featured in that video is Ahmed Ali Omar, also known as "Mustafa," another U.S. citizen who served as a leader of the foreign fighters.

In or about July 2010, al-Shabaab released a 21-minute video titled "Mogadishu: The Crusader's Graveyard."  The video is narrated in English and formatted like a Western news program, complete with sophisticated graphics, an on-screen logo for al-Kataib (al-Shabaab's media arm), excerpts from speeches by Godane, and an interview with a jihadist fighter in front of a destroyed tank.  Face covered, the jihadi signs off "Al Kataib News Channel, live from the frontlines of Mogadishu."  At one point during the video, the narrator says, "Just like Americans and Ethiopians, whose bodies have been dragged in the streets of Mogadishu, the charred bodies of your soldiers have now received the well-deserved treatment."

Another al-Shabaab propaganda video, titled "Message to the Ummah and Inspire the Believers," was produced by al-Kataib and released in November 2010.  This 30-minute video features footage of physical training, shooting drills, urban tactics, heavy weapons training and operational footage.  Foreign fighters in Somalia from Great Britain, Ethiopia, Kenya, Pakistan, Sudan, Sweden and Tanzania are shown.  The video also features excerpts from speeches by now-deceased al-Shabaab foreign fighter leader Saleh Nabhan, as well as Usama Bin Laden.

Significantly, approximately 25 minutes into the video, the defendant Yusuf appears and states the following in Swedish:

> To all my brothers and sisters in Sweden and other places, I greet you with as-salamu alaykum.  We are now here in Mogadishu, the capital of Somalia, and we are standing right now in one of the oldest arena of Mogadishu.  Dear brothers and sisters.  I wish to send you my warm greetings and also encourage you to make hijra[1] to this country.  That is to make

---

[1] To "make hijra" refers to travel or migrate to the land of Islam.

11

> hijra from the land of the infidels to the lands of Islam – which
> is an obligation upon you so that you may take part in this
> blessed jihad which is between good and evil, between light and
> darkness, and between truth and falsehood.  Dear brothers and
> sisters.  I encourage you to come here to Somalia to take part in
> jihad in Somalia.  And I want to send this warning to Lars Vilks
> who was behind the caricatures defaming our prophet.  And I
> say to Lars Vilks that wherever you are, if not today or
> tomorrow, know that we haven't forgotten about you.  We will
> get a hold of you and with Allah's permission, we will catch you
> wherever you are and in whatever hole you are hiding Inshallah,
> know what waits you, as it will be nothing but this: slaughter!
> For that is what you deserve.  And to my brothers and sisters, I
> call you to make Hijra and if you can kill this dog Lars Vilks,
> then you will receive a great award from Allah.

In addition, al-Shabaab has exploited for propaganda purposes the May 22,

2013 murder of a British Army soldier by two men near the Royal Artillery Barracks in the

Woolwich area of Southeast London.  The two men ran the soldier down with their car and

then used knives and a meat cleaver to stab and hack him to death.  Thereafter, in

approximately October 2013, al-Kataib released an hour-long video titled "Woolwich: It's

An Eye for an Eye."  That video incorporates video images from the attacks, as well as

footage of al-Shabaab fighters training and discharging weapons.  Notably, the video also

includes images of Bilal Berjawi and Mohamed Sakr, two British citizens whom the narrator

calls "Abu Hafza, a native of Lebanon, and Abu Uhud, who were both from London," and

who the narrator reports were "killed in U.S. strikes last year."  During that segment of the

video, Berjawi and Sakr are shown using heavy weapons, including mortars and rocket

launchers.  In addition, Sakr makes the following statement on camera:

> We will fight against the Americans by the permission of Allah,
> the one and only.  We will wage war against them and slaughter
> them by the will of Allah.

12

Notably, immediately after the portion of the video featuring Berjawi and Sakr, a masked

narrator states the following while images of knives, guns and explosives are shown under

the heading "Use Whatever You Can Get Your Hands On":

> Jihad is an obligation upon every Muslim living in the West
> today.  But quite understandably, it may not always be easy for
> every single Muslim in the West to make this momentous
> journey to the training camps of jihad.  So if it's impossible for
> you to make it safely to any of the lands of jihad, then follow the
> examples of your brothers in Woolwich, Toulouse, Texas and
> Boston.

III.    The Defendants' Conduct Prior to Traveling to Somalia to Join Al-Shabaab

A.    Ahmed and Yusuf

Defendants Ali Yasin Ahmed and Mohamed Yusuf were born in Somalia in

1985 and 1983, respectively, and subsequently moved to Sweden.

By late 2008, Ahmed and Yusuf were actively planning to travel together to

Somalia to join al-Shabaab.  At that time, Swedish authorities had grown concerned about al-

Shabaab's recruitment of number of young Muslim men in Sweden.  As a result, they opened

an investigation into Ahmed and Yusuf's conduct and received judicial authorization to

intercept telephones registered to Ahmed (in his name and Swedish national identity

number).  During the period between October 2, 2008 and December 2, 2008, Ahmed was in

regular contact with Yusuf, who was also communicating using a telephone registered to him

(in his name and Swedish national identity number).  Ahmed and Yusuf shared more than

700 telephone calls and text communications (an average of more than ten phone calls, text

messages or attempted calls per day) – far more than Ahmed had with anyone else.  In

connection with the investigation, they were surveilled by Swedish authorities meeting with

each other.  The communications also established that they were in contact with co-conspirator and fellow Swedish extremist, Bille Ilyas Mohamed and Ahmed's brother, Osman Yassin Ahmed, also known "Atosh," who was already an al-Shabaab foreign fighter and, along with Yassin Yare, also known as "Sheikh Yahye," served as an important liaison for Yusuf and Ahmed in their travel to Somalia to join al-Shabaab.

In communications and text messages that were monitored by Swedish authorities,[2] Ahmed and Yusuf discussed the following topics, in sum and substance:

- On or about October 4, 2008, Ahmed and Yusuf spoke about finding a "job," and, based on the context of the discussion, that "job" apparently related to Somalia. Ahmed advised Yusuf that finding that "job" would not be a problem because they now had the "telephone number of the top bosses" in al-Shabaab.

- On or about October 30, 2008, Yusuf told Ahmed that he had made a decision, and that he had become surer and surer of that decision the more he prayed.  When Ahmed asked what the decision was, Yusuf said that "life on earth is short but life in paradise is eternal," and that was the reason for his decision.  Ahmed told Yusuf that Yusuf would not regret his decision as long as he did everything according to Islam. Yusuf also told Ahmed that he wanted to visit Mecca before November, or otherwise it would be too late.

- On or about November 4, 2008, Yusuf said he wanted Ahmed to call "Ilyas," presumably referring to co-conspirator Bille Ilyas Mohamed.  Ahmed responded that he had already contacted Ilyas, and Ilyas had not heard anything.

- On or about November 5, 2008, Yusuf and Ahmed discussed how inspired and excited they were about photographs of al-Shabaab's implementation of aspects of *sharia* law (flogging) in Somalia.

_____

[2] As the defense has been previously advised, Swedish authorities did not retain the recordings of these intercepted 2008 communications, pursuant to Swedish law.  However, certain of these recordings were preserved by one of the government's experts who was initially retained by Swedish law enforcement officials.  The government anticipates introducing certain of those recordings into evidence, as well as testimony from a Swedish law enforcement official regarding the substance of certain of the unpreserved communications based on the official's notes and recollections regarding those communications from his having personally monitored and listened to those communications.

- On or about November 7, 2008, Yusuf and Ahmed discussed a speech by an al-Shabaab leader who stated that all Muslims had a duty to fight jihad in Somalia.

- On or about November 13, 2008, Yusuf told Ahmed that he was starting to have his doubts about al-Shabaab and wanted to talk to a sheikh about those doubts, which arose in connection with his understanding that al-Shabaab had carried out suicide bombing attacks in Hargeisa and Bosaso on civilians, discussed above.  Ahmed responded that these casualties must have been a mistake, noting that everyone makes mistakes, even "our leaders."

Disregarding any concerns about al-Shabaab's willingness to carry out suicide bombing attacks on civilians, in December 2008, Ahmed and Yusuf traveled together from Sweden to Somalia by way of Kenya.  Both were observed together on December 2, 2008, by Swedish authorities as they boarded an Ethiopian Airlines flight to Nairobi, Kenya via Addis Ababa, Ethiopia.  Prior to his departure, on November 27, 2008, Ahmed withdrew the equivalent of approximately $3,000 from his bank account.

After their departure, family members of Ahmed and Yusuf filed missing persons reports with Swedish authorities related to their disappearance.  On September 27, 2012, Yusuf's mother filed a report indicating that her son had been missing since December 2, 2008, when she had last seen him at the Jakobsberg train station in Sweden.  And, on the same day, Ahmed's sister reported that Ahmed had been missing since December 2008 and that she and her siblings had not wanted to report his disappearance because they suspected he had traveled to Somalia to fight.

B.    Hashi

The defendant Madhi Hashi was born in Somalia in 1989.  In 1995, he traveled to Great Britain with his mother and two of his siblings, where they were reunited with

15

Hashi's father and others of his siblings, who had arrived in Great Britain from Somalia sometime earlier.  In 2004, Hashi received his British citizenship.

In 2005, Hashi traveled to Egypt with his mother and several of his siblings. After approximately two months, the rest of Hashi's family returned to Great Britain, but Hashi remained in Cairo, where he enrolled in a school that specialized in teaching Arabic and Islam.  Egyptian police later arrested and briefly imprisoned Hashi, and Hashi was subsequently deported back Great Britain in August 2006, where he was interviewed by British authorities upon his return.

In May 2007, Hashi and his father traveled to Damascus, Syria for what was supposed to be a two-week vacation.  However, Hashi once again decided to remain behind after his father returned to Great Britain, and Hashi stayed in Syria for approximately one year, during which time he enrolled in the Abu Nur school to study Arabic and Koranic subjects.  Hashi returned to Great Britain in May 2008, where he was again interviewed by British authorities.  During that interview, Hashi advised that he lived in Damascus with two other Somali males named "Ismail" and "Yusef," and spent most of his time there watching television.  Hashi did not volunteer additional detail about his activities in Syria during that one-year period.

Approximately one month later, in June 2008, British authorities following Bilal Berjawi in Kings Cross, London, in connection with an ongoing terrorism investigation, surveilled Hashi meeting with Berjawi, Mohamed Sakr and others for an extended period on that date.  Hashi, Berjawi and Sakr were subsequently observed entering a residential building in that area, where they remained for more than an hour, before they all left.

16

On April 1, 2009, Hashi attempted to fly from London Gatwick Airport to Somalia by way of Djibouti. During an interview with British authorities prior to his scheduled flight, Hashi advised that he was planning to travel to Bosaso. Hashi said he had intended to travel with his mother, but she had broken her arm and could not go. Hashi further advised that he intended to return to Great Britain in approximately five weeks.

As a result of the interview, Hashi missed his flight, although British authorities assisted him in booking another flight on April 8, 2009. Hashi flew to Djibouti on that date, but then returned to Great Britain on April 10, 2009. Hashi again left Great Britain in December 2009, where he traveled to Somalia by way of the United Arab Emirates.

IV.   The Defendants' Membership and Material Support of Al-Shabaab in Somalia

Upon their respective arrivals in Somalia, the defendants joined with other *muhajireen*, with whom they fought and worked on behalf of al-Shabaab.

A.   Ahmed and Yusuf Attend Al-Shabaab Training Camps

After their arrival in Somalia in late 2008, Ahmed and Yusuf attended basic combat training at the Buled Gadud training camp, one of several camps created by al-Shabaab foreign fighter leader Saleh Nabhan. Ahmed and Yusuf later received advanced "commando" training at another camp outside of Kismayo. This training involved, inter alia, advanced conditioning, weapons and combat tactics training, including the use of AK-47 machineguns. During this time at the training camp outside of Kismayo, Ahmed and Yusuf also participated in religious instruction, including lessons taught by fellow Swedish national Yassin Yare, also known as "Sheikh Yahya." Indeed, Yusuf assisted Yare by serving as

Yare's translator when Yare was providing religious training to other foreign fighters.  Yare, whom Ahmed and Yusuf knew from Sweden, also was in telephonic contact with fellow Swedish co-conspirator Bille Ilyas Mohamed and seeking to recruit him to join Ahmed and Yusuf in Somalia in the al-Shabaab training camp.  During a recorded conversation on February 2, 2009, Yare and Mohamed discussed the fact that Yusuf has already arrived in Somalia and, about halfway through their conversation, Yusuf joined the call and requested Mohamed to bring him a Swedish Koran, among other items, when he traveled to Somalia. It was also during this time that Ahmed and Yusuf met and first interacted with government witness ███████████████.

B.      Ahmed and Yusuf Join the Foreign Fighters in Mogadishu

In mid-2009, after completing this training, Ahmed and Yusuf, along with a number of other Americans and other foreign fighters, were transferred to fight with other *muhajireen* operating around Mogadishu.  Those foreign fighters included a large group of individuals who had recently traveled to Somalia from Minnesota, including:

- Mohamed Abdullahi Hassan, also known as "Ubyeda";

- Troy Matthew Kastigar, also known as "Mohamed";

- Mohamed Ali Hassan, also known as "Saifullah";

- Salam Hussein Ali, also known as "Uhud" or "Uhudin";

- Abdikadir Ali Abdi;

- Zakaria Sharif Maruf, also known as "Khalil";

- Abdirashid Ali Omar;

- Jamal Sheikh Bana, also known as "Ashraf"; and

18

- Burhan Ibrahim Hassan, also known as "Harun."

By this point, Yusuf – who had demonstrated leadership skills while in training that had drawn the attention of his al-Shabaab instructors – had been elevated to the position of a unit commander among the foreign fighters.  Ahmed, Yusuf and others from their training group were then placed under the command of government witness ████ ████████████, who at the time was serving as a commander of foreign fighters near Mogadishu.  During this period, Ahmed and Yusuf regularly associated with the foreign fighters from Minnesota with whom they had previously trained.  They also worked closely with Ahmed Ali Omar, also known as "Mustafa," who was a more senior ranking foreign fighter from Minnesota and who was ████████'s deputy commander.  In addition, Ahmed and Yusuf regularly associated with other foreign fighters from Sweden, including Ahmed's older brother, Osman Yassin Ahmed, as well as Shuaib Ali Sheik Mohammed, also known as "Yusuf Dhere," and "Mohamed Sweden," and Bille Ilyas Mohamed.

Notably, at this time, al-Shabaab's foreign fighters, or *muhajireen*, were a distinct fighting unit from the indigenous Somali members – sometimes called *ansari*, or "supporters."  The *muhajireen* had a separate chain of command, separate training facilities, separate sources of supply, and even distinct uniforms.  Further, al-Shabaab's military leadership tended to use to *muhajireen* for different types of missions than the *ansari*, given that the foreign fighters' training left them better suited for certain types of urban combat and other special operations.  By mid-2009, with the influx of approximately 20 new foreign fighters from Minnesota, there were approximately 60-to-70 al-Shabaab foreign fighters, including Ahmed and Yusuf, operating in and around Mogadishu.

C.    <u>The Karan District Battles</u>

During the summer of 2009, al-Shabaab forces began a lengthy battle for control of the strategically important Karan District of Mogadishu.  Ahmed and Yusuf actively participated in this battle, which went on for several months.  During the battle, both Ahmed and Yusuf regularly discharged AK-47 machineguns.  Around this time, Yusuf was promoted again to platoon leader, and assumed command of approximately 30 *muhajireen*. In his capacity as a commander, Yusuf worked closely with ███████ and ███████'s American deputy, Ahmed Ali Omar, also known as "Mustafa."  Yusuf relayed instructions from al-Shabaab's leadership to the men under his command and provided feedback to his own commanders regarding tactics and strategy during the battle.  During this battle at the Karan District, Yusuf distinguished himself as a capable and effective leader.  Ahmed was similarly known as a dedicated fighter, and on at least one occasion refused to go rest with other men in his unit during the ongoing battle, instead insisting on continuing to fight.  After several weeks of fighting, Yusuf was injured by a mortar round when he was resting behind the front lines.  He was subsequently transported to an al-Shabaab safehouse so that he could recover from his injuries.

Notably, the fighting during the Karan District battles was often extremely brutal, and al-Shabaab regularly employed the terrorist tactics that distinguished it from other groups operating in Somalia during those battles.  Al-Shabaab fighters sometimes decapitated TFG soldiers, leaving the soldiers' bodies on the battlefields with their severed heads resting on their chests.  For example, Salam Hussein Ali, also known as "Uhud" or "Uhudin," a foreign fighter from Minnesota with whom Ahmed and Yusuf trained and

20

fought, was involved in such an attack in Karan in 2009 in which he and a group of other foreign fighters gruesomely decapitated a captured TFG soldier.

In the fall of 2009, ███████ was relieved of command over the foreign fighters and eventually directed to travel to Yemen for the purpose of meeting with leaders from AQAP so that he could obtain additional training and arrange a weapons transaction between AQAP and al-Shabaab.  Following ███████'s reassignment, U.S. citizen Ahmed Ali Omar was named interim commander of the foreign fighters operating around Mogadishu.  Around this same time, Saleh Nabhan was killed, and the al-Shabaab leadership selected U.S. citizen Jehad Mostafa, also known as "Ahmed Gure," to take over responsibility for foreign fighter training.

D.   Ahmed and Yusuf Continue To Fight on Behalf of Al-Shabaab

Even after Yusuf's injury, Yusuf and Ahmed both continued to fight alongside other of al-Shabaab's foreign fighters.  For example, in August or September 2010, Ahmed requested and obtained a rocket-propelled grenade launcher from government witness ███████ while the two were fighting in the Shangani District outside of Mogadishu.

Also in 2010, Ahmed and Yusuf communicated regularly via telephone with co-conspirator Bille Ilyas Mohamed, who, after traveling to Somalia to fight on behalf of al-Shabaab, had returned to Sweden.  Swedish authorities had opened an investigation into Mohamed and received judicial authorization to intercept his telephone communications, many of which related to Mohamed's involvement in al-Shabaab, including his training as a foreign fighter in Somalia.

21

During those conversations with Yusuf and Ahmed and other al-Shabaab members, Mohamed frequently inquired about events in Somalia and expressed a desire to return and rejoin the al-Shabaab foreign fighters there.  For example, on or about February 26, 2010, Mohamed and Yusuf discussed a dream that Yusuf had recently had about Mohamed, and then Mohamed asked Yusuf, "So what are the men now?  Are they commandos?" presumably referring to the special al-Shabaab commando training program that Yusuf and Ahmed has both completed.  Yusuf also advised Mohamed that the "*ansars* and lots of others have died" and that Yusuf was "going into the woods, brother, you know, God willing."  During that same conversation, Yusuf handed the phone to Ahmed, who told Mohamed, among other things, that he had not slept more than five hours in a single stretch for more than three months, presumably because he had been on the front lines of the ongoing battles near Mogadishu.

During a conversation between Mohamed and Ahmed on April 11, 2010, Mohamed inquired about the situation in Mogadishu and certain foreign fighters with whom he was apparently familiar:

> Mohamed: [OV] Tell me about Mustafa; is Mustafa – Mustafa well? Is he okay? I really miss that guy as well.
>
> Ahmed: [OV] Mustafa is well. We were together; we are running around [UI].
>
> Mohamed: Okay. So you are in Moga, right?
>
> Ahmed: Yes – yes – yes – yes [UI] [OV]
>
> Mohamed: [OV] You were tasked with everything, right?
>
> Ahmed: Yes, Mustafa was there. So we – we helped him, Zubeyr, Baraa, and I, you know.

Mohamed: Okay, God willing – God willing – God willing.

Ahmed: [OV] [UI] Sometimes we are running around looking for stuff.

Mohamed: Very much so, very much so, very much so, very much so. Otherwise, what else, what else, what else? How does it look – [OV]

Ahmed: In the name of God, what did you say?

Mohamed: – anyway, how do things look like in Mogadishu?

Ahmed: I swear to God, the situation is stable, I swear to God. It is stable, I swear to God, I swear, there is not much to tell. [OV]

Mohamed: Do they – do they have something going on, or what? Are these guys planning something?

Ahmed: I swear to God…[OV]

Mohamed: Or are they just bragging about everything? They are all about bragging [OV]

Ahmed: No, no, things are looking slow, you know. They had a dispute. He is doing it because their leader – he is responsible for – what do you say – for these – what do you say – they said – what do you say – he was arrested; that he sat in his cell and his – his friends – what do you say – who were there, they, you know, protested; they – they went back, you know [UI] [OV]. Be aware of this situation; that kind of situation.

During a conversation on May 2, 2010, Ahmed and Mohamed discussed a recent battle in which several al-Shabaab fighters had been martyred, which they each referred to as getting "married." Mohamed also referred to a conversation between himself and Yusuf (referring to Yusuf by his kunya "Hudeyfa") in which they had discussed their mutual desire to "marry," as well as Mohamed's hope that Yusuf would wait to "marry" until Mohamed returned to Somalia so that they could "marry" together. Given the context, and

23

given the fact that Mohamed was married and living with his wife in Sweden, Mohamed

appeared to have expressed his and Yusuf's mutual desire to die as martyrs in jihad:

> Ahmed: Brother, I swear, God almighty, there was a big party at that place – Dabka [phonetic spelling ("PH")], do you understand?
>
> Mohamed: Right, [OV], there was a party; the man married. God almighty – God almighty, may God allow us to follow his wedding.
>
> Ahmed: Do you know Ibrahim Sudani [PH]?  [OV] they kissed him. They kissed him on the head, brother, God almighty.
>
> Mohamed: God almighty – God almighty – God almighty.  But Ibrahim Sudani [PH] is still there, right?
>
> Ahmed: Yes, he is there – he is there. He only received a quick kiss.
>
> Mohamed: Yes – yes – yes – yes. Allah – praise the lord.
>
> Ahmed: [UI] I swear [UI].
>
> Mohamed: Man, I swear, I believe that I will not see a person I know when I come back, if God makes it easy for me.
>
> Ahmed: Say a prayer, I swear [UI].
>
> Mohamed: Hudeyfa told me to pray for him; he told me so, you know.
>
> Ahmed: Yes, yes.
>
> Mohamed: He told me to pray for him. I said the stuff – he said to pray for him that God allows him to marry. I told him may God allow you to marry but may God not allow you to marry now. I said may God allow us to marry at the same time when I come.
>
> Ahmed: [Laughing]
>
> Mohamed: He said that I was mean [laughing]

Ahmed: [Laughing] [OV]

Mohamed: I told him that I wanted to see him before he got married; and to wait so we can get married together. So stop the prayer for a little while.

In addition, during a conversation on May 18, 2010, Ahmed was intercepted in a communication with Bille Ilyas Mohamed in which Ahmed ascribed responsibility for the Hotel Shamo bombing to al-Shabaab when he identified another al-Shabaab foreign fighter, whom he referred to as "Abdurhman al Denmark," as having carried out the suicide attack there.

In March 2010, Swedish authorities executed searches in connection with their counterterrorism investigation into Mohamed's and other Swedes' involvement in terrorist activity. As a result of the search of Mohamed's house, Swedish authorities identified and recovered numerous video recordings associated with Mohamed's radical Islamist ideology. One of the Swedish officers who participated in the search will testify that she/he recovered a number of such materials in Mohamed's house, including audio recordings produced by now-deceased AQAP leader Anwar al-Aulaqi, and multiple videos that specifically referenced jihad.

E.      Hashi's Arrival in Somalia and Association with Al-Shabaab Foreign Fighters

Hashi arrived in Somalia in December 2009, as the Karan District battles were winding down. Nevertheless, like Ahmed and Yusuf, he regularly associated with other foreign fighters, including members of al-Shabaab's martyrdom operation group. Indeed, on one occasion in 2011, government witness ███████, a Kenyan-born foreign fighter, preacher and leader of al-Shabaab's "Troublemakers" combat unit, observed Hashi in the

25

presence of Abdul Salam, a foreign fighter who was also a member of the martyrdom

operations group.  On that occasion, Hashi, ███ and Abdul Salam discussed a dream that

Hashi had had that related to Salam having died as part of a suicide bombing attack.

Later, in 2011 and 2012, Hashi met government witness ████████

████, a U.S. citizen from Massachusetts who had traveled to Somalia to join al-Shabaab.

Although he rarely spoke with him, ████ regularly saw Hashi in the close company of U.S.

citizen Omar Hammami and other al-Shabaab foreign fighters in Somalia.  Because of his

close association with Hammami, as well as his relationship to British foreign fighters Sakr

and Berjawi, Hashi drew the attention of al-Shabaab leader Ahmed Abdi Godane and other

*ansari* al-Shabaab members who were wary of the foreign fighters and hostile to certain

elements within the foreign fighter group.  When Sakr and Berjawi were purportedly killed

in a U.S. airstrike, Godane sympathizers from the al-Shabaab intelligence service, the

*Amniyat*, seized Hashi and imprisoned him on the pretext that he was a spy.  During Hashi's

incarceration, certain foreign fighters with whom ████ associated began to become more

vocal in their criticism of the way Godane and the *Amniyat* treated Hammami and his

supporters, including Hashi.  ████ himself was targeted by the *Amniyat* for criticizing

Godane.  When Hashi was released from custody, he sought out ████ as a sympathetic ear

because of ████'s prominence in the foreign fighter community and his reputation as a

critic of Godane.  Hashi asked ████ for advice, given the hostility he was facing from

Godane's supporters.  ████ advised Hashi that, in his opinion, the situation in Somalia was

bleak, and encouraged him to look elsewhere for jihad.

26

V.       The Defendants' Arrests in Djibouti and Transfer to the United States

              In early August 2012, Ahmed, Hashi and Yusuf attempted to travel together

from Somalia to Yemen by way of Djibouti.  To avoid detection by authorities in Djibouti,

the defendants enlisted the assistance of an individual who was known to facilitate travel

through Djibouti to Yemen (the "facilitator").   Ahmed told the facilitator, in sum and

substance, that Ahmed, Hashi and Yusuf were leaving Somalia together to go to Yemen.  To

pay the facilitator's fees for all three defendants, Hashi arranged for a money transfer from

an individual in Somalia to the facilitator while the defendants waited in a safehouse in

Djibouti arranged by the facilitator.  Shortly after the facilitator had collected the proceeds of

that money transfer that Hashi arranged, the facilitator was arrested by Djiboutian authorities.

Later that same night, Ahmed, Hashi and Yusuf were arrested together in a house in Djibouti.

Djiboutian authorities executing the arrests also seized approximately $300 and a cellular

phone that had belonged to Hashi, and which Hashi had given to the facilitator.

              In November 2012, the defendants were transferred into the custody of the

Federal Bureau of Investigations and flown to the Eastern District of New York.  Subsequent

to their transfer to the custody of the U.S. Bureau of Prisons ("BOP"), each defendant (and

their defense attorney) signed an affidavit that was substantially identical, and read as

follows, in relevant part:

> I, [Ali Yasin Ahmed], declare under penalties of perjury,
> pursuant to Title 28, United States Code, Section 1746, that the
> following is true and correct:
>
> On August 5, 2012, I was arrested with [Madhi Hashi and
> Mohamed Yusuf] in a house while in transit through Djibouti.
> At the time of our arrests, Madhi Hashi, Mohamed Yusuf and I
> had in our collective possession $300 in United States currency

27

> (the "seized currency"). The seized currency was part of a sum
> of money that we previously had received through a Hawala
> transfer from Imran Hersi in the United Kingdom.

Notably, British authorities in July 2012 had executed a search warrant at the residence of

Imran Hersi in London.  British authorities seized, among other things, a Toshiba laptop

computer that contained the resumé of Imran Hersi, along with numerous recorded lectures

by now-deceased AQAP leader Anwar al-Aulaqi and instructions on how to build an

improvised explosive device.

VI.     The Defendants' Inculpatory Statements While in BOP Custody

Notably, Hashi has made numerous inculpatory statements in presence of BOP

officials while in custody.  For example, in approximately September 2013, a BOP official

overheard Hashi speaking with another inmate while in the Metropolitan Correction Center

recreation deck regarding the killing of U.S. citizen and former al-Shabaab leader Omar

Hammami, also known as "Abu Mansur al-Amriki."  During that overheard conversation, the

other inmate asked Hashi, "Was it your people that took care of that American guy?"  Hashi

responded, "Yes, my brothers got him."  Notably, it had been widely reported in the news

media prior to that date that al-Shabaab fighters had targeted Hammami after he spoke

critically of al-Shabaab's leadership.

Hashi has also made statements directly to BOP officials wherein he has

stated, in sum and substance, that he was a member of al-Shabaab, but did not understand

why he had been brought to the United States to stand trial.

In addition to Hashi's statements that were overheard by BOP officials, all

three defendants have made inculpatory statements during recorded jail calls.  For example:

- On July 23, 2013, Hashi and his father discussed al-Shabaab and Hashi inquired about various al-Shabaab members.

- On July 26, 2013, Ahmed and his brother discussed a member of Ras Kamboni[3] and the fact that Ahmed had recently been in Somalia.

- On August 29, 2013, Yusuf confided to his mother that the Swedish government had given the U.S. authorities the phone call recordings of discussions between him and Ahmed – apparently referring to the Swedish intercepted communications discussed above.

---

[3] The Ras Kamboni Brigade was an Islamic jihadist group active primarily in Somalia.  Members of the group joined other Islamic jihadist groups in Somalia, including al-Shabaab, after the Ras Kamboni brigade dissolved in approximately 2010.

## ARGUMENT

The government seeks to admit all relevant evidence pertaining to the charged conspiracy among foreign fighters, or *muhajireen*, to provide material support to the terrorist organization al-Shabaab, of which the defendants Ali Yasin Ahmed, Madhi Hashi and Mohammed Yusuf were members.  The Court should admit the evidence set forth above because it is direct proof of the charged offenses, and, in the alternative, because it is admissible pursuant to Rule 404(b) of the Federal Rules of Evidence.

In addition, the government specifically moves in limine to introduce into evidence:

- co-conspirator statements on certain topics central to the operation of the charged criminal conspiracy, such as al-Shabaab's driving radical Islamist ideology and relationship to other terrorist organizations, combat tactics and strategies, methods for fund-raising, and leadership structure;

- certain al-Shabaab propaganda and recruiting videos, including a video in which defendant Mohamed Yusuf appears; and

- certain jihadist materials seized by authorities in the United Kingdom and Sweden from the residences of co-conspirator Imran Hersi and Bille Ilyas Mohamed, respectively.

This evidence constitutes direct proof of the charged offenses and is particularly probative on the element of knowledge, as it tends to establish that the defendants had knowledge that al-Shabaab is a designated terrorist organization, and that it engaged in "terrorist activity" and terrorism, as defined in the statute.  See 18 U.S.C. § 2339B(a)(1).

30

The government also moves in limine to preclude the following defense

arguments in the presence of the jury:

- any defense argument criticizing government charging decisions and investigative actions, or otherwise alleging "outrageous government conduct";

- any defense argument regarding the lawfulness of the defendants' arrests by Djiboutian officials or the defendants' subsequent transfers to U.S. custody;

- any commentary or evidence regarding the conditions of the defendants' confinement while in Djiboutian custody; and

- any argument that the defendants' participation in the conflict in Somalia was lawful as a product of duress or necessity, or under a theory of combatant immunity.

Finally, the government demands notice from the defense of any intention to

advance an alibi defense. See Fed. R. Crim. P. 12.1(a)(2).

I.    Co-conspirator Statements Regarding Topics that Were Important to the
      Operation of the Charged Criminal Conspiracy Are Admissible at Trial

As set forth above, the government will establish at trial that the defendants

were members of a conspiracy within al-Shabaab comprising members of al-Shabaab's

foreign fighter corps, known as the *muhajireen*.  During the charged time period, the

*muhajireen* operated separately and distinctly from al-Shabaab's other combat units that

mostly comprised indigenous Somalis – sometimes referred to as *ansari*.  The *muhajireen*

trained separately from the *ansari*, receiving a combination of both military and religious

training aimed to indoctrinate *muhajireen* with a strong belief in al-Shabaab's core missions

of creating an Islamic caliphate in Somalia and imposing *sharia* law there.  Relatedly, al-

Shabaab carefully scrutinized the motives behind foreign fighters' decisions to travel to

Somalia, in part to identify new potential leaders, but also to detect Western spies who might

be attempting to infiltrate the organization

31

Most *muhajireen* were drawn from Western nations, such as the United States, Great Britain and Sweden, but also included fighters from the Middle East and African countries other than Somalia.  They were specially targeted by al-Shaabab's leadership using sophisticated Internet-based recruiting, with al-Shabaab producing numerous propaganda videos and lectures prominently featuring other *muhajireen* encouraging prospective foreign fighters in the West to come to Somalia to receive military training and otherwise join the "jihad."  Al-Shabaab's leadership assessed that such recruiting efforts were warranted because the *muhajireen* provided al-Shabaab with significant advantages in operational planning – both in combatting the foreign-backed TFG and in external operations where freedom of cross-border travel was necessary.  Moreover, prominently featuring Westerners in al-Shabaab's recruiting videos gave the organization an international face, assisting both in fund-raising and further recruiting.

Because of the unique responsibilities and characteristics of al-Shabaab's foreign fighter corps, as well as its key role in advancing al-Shabaab's broader goals, it was often important for *muhajireen* to be kept well informed regarding certain topics.  Access to this information made it possible to further indoctrinate, motivate and retain *muhajireen* fighters, who were operating in an unfamiliar environment far from their friends and family back home.  Advising *muhajireen* regarding these topics also made it possible for al-Shabaab's leadership to identify future potential leaders, as well as those who did not fully embrace the organization's extremist ideologies.  These topics included:

- al-Shabaab's radical Islamist ideology and its primary enemies;

- al-Shabaab's close relationship with al-Qaeada;

- the structure of al-Shabaab's leadership;

- al-Shabaab's various training programs and camps;

- al-Shabaab's combat operations, the terrorist tactics commonly employed by al-Shabaab in those operations, and the reasons for employing such tactics; and

- the methods by which al-Shabaab earned revenue during the period of the charged conspiracy.

As the government will establish through foundational questions during trial (as it did already during the overseas depositions), information on these topics was often disseminated to foreign fighters because the information allowed them to more effectively operate in support of the organization. Relatedly, at times such information was provided to specific foreign fighters to facilitate missions of the organization, some of which required secrecy. Accordingly, because this information was shared among al-Shabaab *muhajireen*, at times broadly and sometimes in order to assist in carrying out a specific mission in furtherance of their criminal conspiracy to provide material support to al-Shabaab, it is admissible pursuant to Federal Rule of Evidence 801(d)(2)(E).

      A.    <u>Legal Framework</u>

      "Rule 801(d)(2)(E) provides that '[a] statement is not hearsay if [t]he statement is offered against a party and is . . . [made] by a co-conspirator of a party during the course and in furtherance of the conspiracy.'" <u>In re Terrorist Bombings of U.S. Embassies in East Africa</u>, 552 F.3d 93, 137 (2d Cir. 2008) (quoting Fed. R. Evid. 801(d)(2)(E)). The existence of a conspiracy and the declarant's participation in that conspiracy are "preliminary questions of fact" to be resolved by the district court by applying a preponderance of the evidence standard. <u>Id.</u> "[T]he conspiracy that serves as the vehicle

for introduction of the co-conspirator's statements need not be charged in the indictment . . .

." United States v. Abu-Jihaad, 531 F. Supp. 2d 289, 294 (D. Conn. 2008).

The Second Circuit has explained that for statements to be "in furtherance" of the conspiracy:

> the statements must in some way have been designed to promote
> or facilitate achievement of the goals of the ongoing conspiracy,
> as by, for example, providing reassurance to a co-conspirator,
> seeking to induce a co-conspirator's assistance, serving to foster
> trust and cohesiveness, or informing co-conspirators as to the
> progress or status of the conspiracy, or by prompting the listener
> – who need not be a co-conspirator – to respond in a way that
> promotes or facilitates the carrying out of a criminal activity.

United States v. Tracy, 12 F.3d 1186, 1196 (2d Cir. 1993) (internal citations omitted); see also In re Terrorist Bombings, 552 F.3d at 139; United States v. Beech–Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989) ("The principal question in the 'in furtherance' issue is whether the statement promoted, or was intended to promote, the goals of the conspiracy. 'Idle chatter' does not meet the test, nor does a 'merely narrative' description by one co-conspirator of the acts of another.  Co-conspirator statements may be found to be 'in furtherance' . . . if they 'prompt the listener to respond in a way that facilitates the carrying out of criminal activity.' " (citations omitted)); United States v. Rahme, 813 F.2d 31, 35 (2d Cir. 1987) ("Statements by a co-conspirator are in furtherance of the conspiracy . . . if they prompt the listener to respond in a way that facilitates the carrying out of criminal activity."). A statement is also made in furtherance of a conspiracy where the statement "giv[es] associated persons information about [the conspiracy's] membership," including its "leadership and structure."  United States v. Russo, 302 F.3d 37, 46 (2d Cir. 2002) (collecting cases).

34

B.      Discussion

Here, the government seeks to elicit from certain witnesses co-conspirator statements pertaining to topics that were highly relevant to the operation of the charged *muhajireen* conspiracy.  Certain of the declarants of these co-conspirator statements were members of the charged *muhajireen* conspiracy, while other declarants were members of a broader, uncharged conspiracy comprising all al-Shabaab members.  In both cases, however, the statements at issue were made in furtherance of the *muhajireen* conspiracy.

As the government will elicit at trial (and did elicit during the overseas depositions) through its foundational questions, the *muhajireen* – of whom the defendants were members – played a unique and important role in the broader al-Shabaab organization. To facilitate the operation of the *muhajireen*, it was crucial that the foreign fighters be educated and informed regarding certain topics pertaining to al-Shabaab.

1.      Al-Shabaab's Radical Islamist Ideology and Primary Enemies

It was important for members of the *muhajireen* to both understand and adopt the central tenets of al-Shabaab's radical Islamist ideology – namely, al-Shabaab's goals of creating an Islamic caliphate in Somalia and imposing strict *sharia* law.  It was also important for *muhajireen* to embrace the central jihadist ideology that by fighting against non-believers, including the Western-backed TFG soldiers and potentially martyring themselves in such battles, they were acting in furtherance of a broader radical Islamist agenda.  Knowing this information made *muhajireen* more effective and committed fighters and aided in weeding out potential infiltrators.  To this end, al-Shabaab's leadership regularly provided religious instruction emphasizing the organizaton's primary goals in Somalia and

the world more broadly, while also advising *muhajireen* members as to the identities of al-Shabaab's main enemies – including the United States.  The dissemination of such information promoted intra-conspiracy trust and promoted al-Shabaab's broader goals.

For example, during the deposition testimony of ███████████ stated that he understood from al-Shabaab members that the United States is al-Shabaab's "enemy number one." (Tr. 20).  ████ explained how Hammami, a prominent leader among the foreign fighters, addressed ████'s graduating class from Saleh Nabhan's foreign fighter training camp, and inspired the al-Shabaab graduates by instilling in them al-Shabaab values and sense of brotherhood on the battlefield:

> He told us, "You people are very anxious, the training must be tough, the training – you have a very difficult life, you hated one another.  You didn't like – complaining about so many things.  But in the frontline, it's not like that.  The atmosphere is too good, the brotherhood – the atmosphere of brotherhood is too good.  And you will meet with different people from different places. A good mix there. You will love it."  He said, "In fact, Mogadishu is paradise."

(Tr. 71).

Similarly, during the deposition testimony of ███████████, ██████████ explained how when he first met Hammami before traveling to the foreign fighter training camp where he met Yusuf and Ahmed, Hammami "convince[ed] us about Jihad and [explained] the reason why we were there."  (Tr. 39).  Hammami continued, advising that "we had to commit to shahada, which means dying in during the war, and that there was no loss about that and instead we're going to receive Jannah." (Tr. 79).

██████████ also discussed how Yassin Yare, also known as "Sheikh Yahye," a co-conspirator of the defendants from Sweden discussed above, "was in charge of preaching

religiously to the fighters within the camp and reminding them not to forget the reason why they were present" fighting for al-Shabaab.  (Tr. 39).

Because such discussions regarding al-Shabaab's enemies and extremist ideologies promoted "trust and cohesiveness" within the organization, they are admissible as co-conspirator statements.  See Tracy, 12 F.3d at 1196.

2.      Statements Regarding Al-Shabaab's Relationship with Al-Qaeda

It was also important for *muhajireen* members to understand al-Shabaab's close relationship with al-Qaeda, the fact that al-Qaeda's leadership openly supported al-Shabaab, and the fact that certain of al-Shabaab's leaders were members of al-Qaeda.  This information served to motivate individual *muhajireen*, particularly because al-Qaeda carried particular cachet for many foreign fighters.  Further, former membership in al-Qaeda lended added credibility to certain al-Shabaab leaders when interacting with and – more importantly – instructing *muhajireen*.  For example, ███████████████ testified in the overseas depositions as follows:

> Q. And what is the relationship between Al-Shabaab and Al Qaeda?
>
> A. The first thing I know is that among people that created, started the – started it and established it and who actually led it, were trained and came from Al Qaeda.  Another thing is that we received an audio from Usama Bin Laden in 2009 giving them speech on the encouragement to fight – not to stop fighting the Shari[ff] government and TFG.

(Tr. 56).

Similarly, ████████ testified that Saleh Nabhan informed him about his role in the al-Qaeda-led attack on the United States Embassies in Nairobi, Kenya and Dar es

37

Salaam, Tanzania, to educate him about keeping tight operational security in connection with

al-Shabaab's (aborted) 2009 plan to attack the U.S. Embassy in Kampala, Uganda:

> Q:  How do you know that al-Qaeda claimed responsibility for
> the attacks on the U.S. Embassies in Dar es Salaam, Tanzania
> and Nairobi, Kenya?
>
> A: As far as I'm concerned, one of the people that led me and
> who  - to whom I was close, was known as Saleh Nabhan,
> playes a big role in it, who also was the leader of the group
> known as muhajareen in Somalia.
>
> Q: How do you know, though, that al-Qaeda claimed
> responsibility for those attacks?
>
> A: Nabhan himself, when he sent me to Uganda, he told me to
> be careful in order to avoid being like him, because he also
> messed up which resulted in him being wanted worldwide.  And
> he talked about what he messed up about in terms of a vehicle
> that was used in places such as the attack that happened to the
> U.S. Embassy in Nairobi."

(Tr. 58-59).[4] ███████ further explained that because of Nabhan's involvement in this

operation and his former membership in al-Qaeda, he had sought Nabhan's assistance in

learning how to avoid capture by authorities and transfer to Guantanamo. (Tr. 60-62).  Such

statements regarding the relationship between al-Shabaab and al-Qaeda, as well as other al-

Shabaab members' former membership in al-Qaeda, are admissible because they facilitated

the charged conspiracy.  See Tracy, 12 F.3d at 1196.

---

[4] After Nabhan died in 2009, the al-Shabaab leader known as Ikrima took over the
planning for the operation and modified Nabhan's plan to use suicide bombers to target
locations in Uganda that were easier to infiltrate than the U.S. Embassy.  Ultimately, this
resulted in the July 11, 2010 attacks in Kampala at the Kyadondo Rugby Club and at the
Ethiopian Village restaurant.

3.      Statements about Al-Shabaab's Leadership

*Muhajireen* frequently were advised by their superiors and discussed among themselves the structure of al-Shabaab's leadership.  This leadership structure was dynamic, in part because al-Shabaab members were sometimes killed or otherwise removed from power.  For example, the government expects ▓▓▓▓ to testify regarding the restructuring of al-Shabaab's foreign fighter leadership following the death of Saleh Nabhan in 2009 – a restructuring that ▓▓▓▓ learned about from other al-Shabaab members.  Similarly, the government expects that ▓▓▓ will testify about information he received from other foreign fighters regarding Omar Hammami's alienation from the other al-Shabaab leadership in 2013, culminating with Hammami's death in September 2013.  Such efforts to provide "associated persons [with] information about [the conspiracy's] membership," including its "leadership and structure" are admissible as co-conspirator statements.  See Russo, 302 F.3d at 46.

4.      Statements Regarding Al-Shabaab's Training Programs and Camps

A formative step for any new *muhajireen* following his arrival in Somalia was his receipt of military and religious training at one of al-Shabaab's various training camps.  Even after receiving that basic training, *muhajireen* frequently were invited to more advanced training on a range of topics, such as "commando" training covering advanced combat tactics, or explosives and Islamist ideology training for members of al-Shabaab's martyrdom units.  Members of al-Shabaab regularly discussed the various training programs that were available, in part to determine what additional training they themselves might seek to pursue.  In addition, for those in leadership positions within the *muhajireen*, it was

important to know what types of training particular fighters had received so that decisions could be made about what training they should receive in the future and how they would be most effectively used by the organization – <u>e.g.</u> in battlefield, assassination or martyrdom operations. Such information also informed members about the progress of the broader conspiracy, and – more importantly – facilitated the conspiracy's goals of making al-Shabaab a more effective fighting force. <u>See, e.g.</u>, <u>Tracy</u>, 12 F.3d at 1196. Accordingly, statements such as those to ██████ and ██████ from conspiracy members regarding certain training that al-Shabaab offered, and what specific training Ahmed and Yusuf received, are admissible as co-conspirator statements.

>           5.     Al-Shabaab's Operations, Use of Terrorist Tactics,
>                  <u>and Reasons For Employing Such Terrorist Tactics</u>

Members of the *muhajireen* and of al-Shabaab more generally regularly shared news regarding the organization's successful combat operations. The purposes of the dissemination of this information were straightforward: to keep organization members informed about al-Shabaab's progress in defeating the TFG and converting Somalia into an Islamic state, and to provide general reassurance to members that al-Shabaab was achieving successes on the battlefield. Relatedly, al-Shabaab members regularly discussed the specific means by which al-Shabaab was carrying out its operations – <u>e.g.</u> assassinations of Somali government leaders, suicide bombings and other martyrdom operations, and beheadings on the battlefield.

During the overseas depositions, ████ and ██████ both testified about having received news from other al-Shabaab members regarding successfully completed al-Shabaab operations, including suicide bombings. ██████ testified about information

provided to him by the al-Shabaab foreign fighter leader Ikrima, regarding an al-Shabaab external operation in Europe. ███████ testified that when he and other al-Shabaab foreign fighters learned of an attack that had been carried out in Europe on a Danish cartoonist who had reportedly mocked the prophet Mohamed, "Ikrima stood up and started saying 'Allahu Akbar, Allahu Akbar,' saying that – asking us if we knew who was going to carry out that attack. And that's what we asked him, [ ] we didn't understand what he was saying.  And he said to us, it was Abu Jabril who was our member but eventually returned there [to Europe], which was when he called him 'suja,'which means a hero who fears nothing, which was when the conversation started between us." (Tr. 219). ███████ further testified that it was important for al-Shabaab to disseminate information about al-Shabaab's involvement in external operations and to be recognized for its involvement in the attack: "[it] helps them with their propaganda, and it's an action that serves its campaign and show[s] that it's capable of reaching everywhere."  (Tr. 229).

███ also testified, for example, about the significance of learning from fellow al-Shabaab foreign fighters that Saleh Nabhan had been killed by U.S. forces – the foreign fighters quickly changed their tactics in an effort to avoid further major casualties:

> Q.  And when your trainer in the camp reported to you that Saleh Nabhan had been killed by American gun[ships], what, if anything, immediately happened in the camp?
>
> A.  He kept it hiding from us until the next morning.  But he put there, the shield cast there, anti-artillery on the edges of the camp.  For all us, we wondered what's happened.  We didn't know.  We are very – there are experts there, quickly put at the edges of the camp.  And then at the night, desperate and then we can walk out, around 17 hours walk away from the [camp].

(Tr. 118).

███████████ testified that he was told by other foreign fighters that Ahmed and Yusuf's training camp in Beled Gudud was consolidated with the al-Shabaab foreign fighter training camp outside of Kismayo because "allegedly there were airplances that would surround the skies and were in charge of spying on them, saying that no else would send them other than Americans because the Somalia government did not have capabilities of sending" them.  (Tr. 102) .  Likewise, in the training camps that ███████████ attended, the foreign fighter leadership advised the foreign fighters "to stand under the trees" to avoid being seen or attacked by "planes," which they were told were "sent by the U.S. government."  (Tr. 103).

Similarly, ███████ is expected to testify about receiving information from other al-Shabaab members about several suicide bombing attacks, including the suicide bombing attacks in Hargeisa and Bosaso in October 2008.  Given that such information was shared among *muhajireen* to keep one another apprised regarding the status and progress of the conspiracy, such statements are admissible.

6.      Statements Regarding Al-Shabaab's Sources of Revenue

The government expects that ████████ will testify that as a leader of the *muhajireen*, one of his responsibilities was to make certain his fighters were adequately supplied and regularly paid.  In furtherance of those responsibilities, ████████ regularly met with other al-Shabaab leaders to discuss the organization's finances.  In the course of those conversations, ████████ was given information about the various ways in which al-Shabaab obtained money, including by soliciting funding from the Somali diaspora in the United States and in Europe, through abductions and kidnappings for ransom of Westerners in

42

Somalia, and through extortion of international shipping out of port cities controlled by al-Shabaab.  Similarly, ▮▮▮▮▮▮▮ testified that he was aware, as a member of the *muhajireen,* that al-Shabaab obtained money, which he called "taxes," through its control of the port city of Kismayo.  (Tr. 83-85).  Because the dissemination of this information was necessary to promote other broader goals of the al-Shabaab conspiracy – namely, to assist in the efficient distribution of al-Shabaab funds and to educate members regarding the sources of those funds – such statements from co-conspirators regarding al-Shabaab streams of revenue are admissible.

•

In sum, the effective dissemination of information pertaining to certain topics such as al-Shabaab's driving radical Islamist ideology, combat tactics and strategies, methods for fund-raising, and leadership structure were essential to the operation of the charged criminal conspiracy.  Receipt of this information from other al-Shaabab members and from other *muhajireen* motivated the foreign fighters, including the defendants, and allowed them to work and fight more effectively on behalf of the conspiracy.  The examples of such admissible co-conspirator statements set forth above are not meant to be an exhaustive list, but rather are intended to serve as a framework to aid the Court in making admissibility determinations both in reviewing the deposition transcripts and during trial.

II.     Al-Shabaab Propaganda and Recruiting Videos

The government moves <u>in limine</u> for permission to introduce into evidence in their entirety and publish to the jury two 30-minute al-Shabaab propaganda videos titled "Ambush At Bardale" and "Message to the Ummah and Inspire the Believers."  The

government further moves to admit into evidence excerpts from "Mogadishu: The Crusader's Graveyard" and "Woolwich: It's An Eye for an Eye."  In addition to proving that Yusuf was a member of al-Shabaab and worked to recruit other Westerners to join al-Shabaab, these videos are highly probative regarding several extremely relevant topics, including:

- al-Shabaab's active recruitment of Westerners, including Americans, to join the *muhajireen* using Internet-distributed propaganda;

- the nature of combat training provided to foreign fighters, including tactics used in assassinations;

- details regarding religious training provided to foreign fighters;

- weapons used by foreign fighters, including machineguns, rocket-propelled grenades and explosives typically used in suicide bombing attacks;

- al-Shabaab's close affiliation with al-Qaeda, illustrated by the incorporation of statements by al-Qaeda leaders such as Usama Bin Laden and Abu Yahya al-Libi to al-Shabaab-produced videos; and

- al-Shabaab's commitment to launching external operations against Western interests, including encouraging Westerners to launch attacks in their home countries.

Several of the government's witnesses will testify that viewing these videos motivated them to travel to Somalia and join al-Shabaab.  In addition, these videos prominently feature certain individuals who will be the subject of substantial testimony by other government witnesses, including Omar Hammami, also known as "Abu Mansur al-Amriki," Saleh Nabhan, Shirwa Ahmed and Ahmed Ali Omar, also known as "Mustafa."  They also show al-Shabaab members Bilal Berjawi and Mohamed Sakr, who the government will prove through surveillance by British authorities were close associates of Hashi.

In addition, these videos are important proof that al-Shabaab, and the defendants through their material support to al-Shabaab, intended to "cause harm inside the

44

United States or to U.S. citizens or interests" by both targeting U.S. interests for terrorist attacks, and by actively recruiting U.S. citizens to join al-Shabaab. See United States v. Al Kassar, 600 F.3d 108, 118 (2d Cir. 2011); see also March 24, 2015 Memorandum and Order (ECF #228) at 10-11. They further go to prove that the defendants were on notice that al-Shabaab was engaged in terrorist acts and that their conduct was "self-evidently criminal." Id. (citing Al Kassar, 600 F.3d at 118). Indeed, Yusuf appears in a recruiting video where terrorist tactics including assassination are featured, and Yusuf himself calls for Westerners to travel to Somalia "to take part in this blessed jihad." They are also highly corroborative of testimony from other government witnesses regarding how al-Shabaab operated and recruited its foreign fighter members. As such, there can be no question that the videos are relevant under Federal Rules of Evidence 401 and 402. Likewise, admission of such evidence does not run afoul of Rule 403 because the evidence's probative value is not "substantially outweighed" by any unfair prejudice, as the footage is not unduly graphic, nor is it more violent than the defendants' specifically charged conduct. See, e.g., United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996).[5] Finally, given the relatively short length of these videos, there is no danger that their introduction into evidence will unduly lengthen the trial or distract from other issues in dispute.

---

[5] While the government respectfully submits that these al-Shabaab propaganda videos constitute direct proof of the charged crimes for the reasons set forth above and in the Court's March 24, 2015 Memorandum and Order, these videos are also admissible pursuant to Federal Rule of Evidence 404(b) because they are relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident. See, e.g., United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988). Such videos also establish the defendants' knowledge that al-Shabaab is a designated terrorist organization, or that al-Shabaab engaged in terrorist activities or terrorism. See 18 U.S.C. § 2339B(a)(1).

III.   Evidence Regarding Imran Hersi and Bille Ilyas Mohamed

As described above, the government will establish at trial that Imran Hersi and Bille Ilyas Mohamed were close co-conspirators of the defendants. Hersi sent money to the defendants to facilitate their transit from Somalia to Yemen, and Mohamed conspired to join al-Shabaab with Ahmed and Yusuf while the three were still in Sweden, fought alongside Ahmed and Yusuf in Somalia, and then remained in telephone contact with Ahmed and Yusuf while the defendants were in Somalia after Mohamed returned to Sweden.

For these reasons, the government moves in limine to introduce certain carefully tailored evidence regarding Hersi and Mohamed, because such evidence is highly probative of the defendants' guilt. First, with respect to Hersi, the government moves to admit testimony regarding the seizure of a Toshiba laptop from Hersi's residence in London, as well as subsequent forensic analysis of that laptop, which revealed that it contained certain jihadist media, including lectures by now-deceased AQAP leader Anwar al-Aulaqi. Notably, British authorities seized that laptop in July 2012, less than one month before the defendants were arrested in possession of money sent to them by Hersi to facilitate their transit through Djibouti. Introduction of this evidence will corroborate another witness who will testify that the defendants were traveling through Djibouti to Yemen, and it will support an inferential argument that the defendants were making that trip to join AQAP.

For similar reasons, the government moves to admit several intercepted phone calls between Mohamed and other co-conspirators, as well as limited testimony and photographs related to Swedish authorities' search of Mohamed's house and their discovery of jihadist media there.

IV.     The Government Moves to Preclude Certain Inappropriate Defense Arguments

Based on the defense motions to date, as well as certain topics of cross-examination pursued by defense counsel during the overseas depositions, the government believes that the defense may intend to advance certain inappropriate defenses at trial – either implicitly or explicitly – in an effort to invite jury nullification.  Any such efforts should be precluded.  See, e.g., United States v. Thomas, 116 F.3d 606, 614-16 (2d Cir. 1997) (stating that the Court of Appeals "categorically reject[s] the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent" and noting that "trial courts have the duty to forestall or prevent such conduct"); see also United States v. Malpeso, 115 F.3d 155, 162 (2d Cir. 1997) (excluding evidence and precluding argument on issues that had "little or no relevance" to the charged crimes and might encourage jury nullification).

A.     References to Government Conduct

The government moves in limine to preclude the defense from eliciting testimony or making arguments or objections before the jury regarding the following:

1.     Government Charging Decisions and Investigative Actions

Arguments and comments on the charging decisions of the government are irrelevant to whether the evidence is sufficient to convict the defendant.  See, e.g., United States v. Regan, 103 F.3d 1072, 1082 (2d Cir. 1997) (explaining that a selective prosecution claim is an issue for the court and not for the jury) (citing United States v. Armstrong, 517 U.S. 456, 463-64 (1996)); United States v. Demosthene, 334 F. Supp. 2d 378, 380 (S.D.N.Y. 2004) (refusing to allow defendant to discuss government's charging decisions or

47

investigative agent's state of mind during the investigation in presence of jury); see also

United States v. Castro, 411 Fed. Appx. 415, 420 (2d Cir. 2011) (affirming district court's

refusal to allow defense to admit evidence of state prosecution for same underlying facts as

federal case because the introduction of such evidence could invite jury nullification).

Accordingly, the government moves to preclude any arguments by defense counsel or

evidence regarding the propriety of the government's decision to charge the defendants in

this case.  Evidence bearing on the government's decision to prosecute is "extraneous and

collateral" and thus should be excluded from trial.  See, e.g., United States v. Johnson, 605

F.2d 1025, 1030 (7th Cir. 1979) (affirming the exclusion of evidence offered to show that the

"indictment was a political instrument").  It is settled law that inquiries regarding the

subjective intentions or motivations of a government agent are irrelevant to determining the

factual guilt or innocence of a defendant.  See, e.g., Demosthene, 334 F. Supp. 2d at 380 (a

defendant "may not argue before the jury issues relating to the overall propriety of the

Government's investigation in this case"); see also United States v. Goulding, 26 F.3d 656,

667 (7th Cir. 1994) (noting, even in the context of an entrapment defense, it was proper for

the trial court not to "allow the defense to mount an inquiry into the mental states of the

investigating officers since such an inquiry was irrelevant").

       2.      Allegations of "Outrageous Government Conduct"

      Outrageous governmental conduct is a question of law and is resolved by the

Court, not the jury.  See Regan, 103 F.3d at 1082 (citing United States v. Cuervelo, 949 F.2d

559, 567 (2d Cir. 1991)); see also United States v. Nguyen, 250 F.3d 643, 645-46 (8th Cir.

2001) (citing United States v. Russell, 411 U.S. 423, 431-32 (1973)).  Accordingly, the

48

government respectfully requests that the Court preclude any allegations of "outrageous government conduct" before the jury.

      3.    <u>Commentary Regarding Discovery</u>

      The government moves to preclude defense counsel from requesting discovery from witnesses or opposing counsel, moving the Court for such discovery, or otherwise commenting on discovery matters, in the presence of the jury.  Such requests from counsel in front of the jury are inappropriate and may create the impression that one side has suppressed information as a means of seeking an unfair advantage.  These requests, if appropriate, can easily be made to the Court or opposing counsel outside the presence of the jury with no prejudice resulting to either side.  Accordingly, requests for discovery or comments relating to discovery should be made outside the jury's presence.

      B.    Commentary Regarding the Lawfulness of the Defendants' Arrests by
            <u>Djiboutian officials or the Defendants' Subsequent Transfers to U.S. Custody</u>

      The government moves to preclude any commentary or argument before the jury regarding the lawfulness of the defendants' arrests by Djiboutian officials or the defendants' subsequent transfers to U.S. custody.  In their various motions, the defendants have already made motions pertaining to these topics, as they are fully entitled to do.  However, these arguments, which pertain to questions of law, are <u>not</u> appropriately made before the jury.

      The long-standing rule has been that even allegedly "forcible abduction" does not strip a court of jurisdiction over a defendant.  <u>See</u> <u>Ker v. Illinois</u>, 119 U.S. 436, 444 (1886) (fugitive convicted of larceny abducted in Peru by bounty hunter).  The Supreme Court reaffirmed this rule in <u>United States v. Alvarez-Machain</u>, 504 U.S. 655 (1992)

(Mexican doctor, indicted for torture-murder of DEA agent, kidnapped in Mexico and brought to United States for trial with U.S. government involvement).  See also Kasi v. Angelone, 300 F.3d 487, 493 (4th Cir. 2002) ("Under this Court's jurisprudence, it has long been held that a criminal defendant who has been abducted to the United States from a foreign nation with which the United States has an extradition treaty does not thereby acquire a defense to the jurisdiction of the courts within this country.").

Here, as the government has maintained throughout these proceedings, the defendants' arrests in Djibouti and transfers to the United States were lawful.  Even assuming arguendo that there was some legal defect in these arrests and transfers, these issues are not relevant to the jury's determination of whether the government has proved the elements of the charged offenses.  Accordingly, defense counsel should be precluded from raising these arguments before the jury.

C.    Commentary or Evidence Regarding Conditions of Confinement in Djibouti

Through affidavits submitted in support of their respective motions to suppress their statements to Federal Bureau of Investigation agents while in Djibouti, the defendants alleged that they had been abused by Djiboutian officials while in custody there.

The government hereby moves in limine to preclude the introduction of any evidence at trial regarding the conditions of the defendants' confinement in Djibouti, as well as any cross-examination or arguments relating to that subject.  Put simply, the circumstances of the defendants' Djiboutian confinement are entirely irrelevant because they have no bearing on the question of whether the defendants are guilty of the charged crimes. Rather, any effort by defense counsel to prove that the defendants suffered abusive treatment

50

while in Djiboutian custody would be nothing more than an effort to inflame the jury and engender sympathy, with the ultimate goal of tacitly (or explicitly) arguing for jury nullification.  See, e.g., Thomas, 116 F.3d at 614-16.  Accordingly, the defense should be precluded from introducing evidence or eliciting testimony on these subjects.

        D.       <u>Duress or Combatant Immunity</u>

        Federal criminal law recognizes certain legal defenses of justification such as duress and, in the case of a member of a State's military, combatant immunity.  These defenses are inapplicable in this case, and the defense has provided no notice that they intend to rely on any affirmative defense and has not made a <u>prima</u> <u>facie</u> showing that such a defense would apply in this case.  <u>See</u> <u>United States v. Gonzalez</u>, 407 F.3d 118, 122 (2d Cir. 2005) ("A defendant is entitled to an instruction on an affirmative defense only if the defense has 'a foundation in the evidence.'" (citing <u>United States v. Podlog</u>, 35 F.3d 699, 704 (2d Cir. 1994))).  Therefore, the Court should preclude the defendants from advancing these legally insufficient defenses at trial whether through argument or through presenting evidence.

        Three discrete elements must be met to establish coercion or duress.  These are: (1) a threat of force directed at the time of the defendant's conduct; (2) a threat sufficient to induce a well-founded fear of impending death or serious bodily injury; and (3) a lack of reasonable opportunity to escape harm other than by engaging in the illegal activity.  <u>See</u> <u>Gonzalez</u>, 407 F.3d at 122; <u>see also</u> <u>United States v. Stevens</u>, 985 F.2d 1175, 1181 (2d Cir. 1993).  A defendant must make some showing on each element, including the element that the defendant lacked a reasonable means to escape the threatening conduct "by seeking the

intervention of the appropriate authorities."  United States v. Bakhtiari, 913 F.2d 1053, 1058 (2d Cir. 1990) (internal quotation marks omitted); see also United States v. Bailey, 444 U.S. 394, 410 (1980) (holding that there is no duress when there exists "a reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm") (internal quotation marks omitted).

   Here, the defendants have not, and cannot, show that their actions were the product of apprehension of death or serious injury.  Further, the government will establish that the defendants knowingly, intentionally and voluntarily placed themselves into a situation where they would be called to fight and act in material support of al-Shabaab.  They should not be permitted to advance any defense of duress or necessity to the jury.

   Similarly, the defendants should not be permitted to argue that in fighting with al-Shabaab, they were merely participating in a Somali civil war.  Such an argument, which suggests a defense akin to that of "combatant immunity," cannot, in the context of these charges, provide a basis for his exculpation.  As explained below, that defense is available only to lawful military combatants, which does not include the defendants and their co-conspirators.  In any event, absent a proffer of evidence demonstrating entitlement to such a defense, the defense should be foreclosed from presenting evidence or argument in support thereof.  Such evidence would suggest an invalid defense, would confuse the jury, and could lead to jury nullification.

1.      Defendants Must Make a <u>Prima Facie</u> Showing of the
        Ability to Present a "Combatant Immunity" Defense
        <u>Before Submitting Evidence of Such a Defense to the Jury</u>

At the threshold, before any defendant may present evidence to support any affirmative defense, the trial court has a duty to require him to make a <u>prima facie</u> showing that he can produce evidence on each element of the defense.[6]  <u>See, e.g.</u>, <u>United States v. Johnson</u>, 416 F.3d 464, 468 (6th Cir. 2005).  Thus, as the Supreme Court explained in <u>United States v. Bailey</u>, 444 U.S. 394, 416 (1980), "[i]f . . . an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, the trial court and jury need not be burdened with testimony supporting other elements of the defense."  <u>See, e.g.</u>, <u>United States v. Portillo-Vaga</u>, 478 F.3d 1194, 1198 (10th Cir. 2007) (same); <u>United States v. Tokash</u>, 282 F.3d 962, 967 (7th Cir. 2007) ("[W]here the evidence proffered in response to a [government] motion <u>in limine</u> is insufficient as a matter of law to support an affirmative defense a pretrial ruling precluding the presentment of the defense at trial is appropriate.").  In this case, the defendants cannot satisfy the threshold requirement of demonstrating, by a <u>prima facie</u> showing, an entitlement to present evidence in support of a lawful combatant defense.

2.      The Defendants Are Not Entitled to Argue or
        <u>Present Evidence of a Lawful Combatant Defense</u>

The affirmative defense of combatant immunity has its origin in the laws governing armed conflict and is comprised of international conventions and Treaty Law,

_____

[6] The government hereby moves for immediate notice from the defense if they intend to rely on an alibi defense or any other affirmative defense at trial.  <u>See</u> Fed. R. Crim. P. 12.1(a)(2).

such as the Hague[7] and Geneva Conventions,[8] and international custom, such as the

principles of military necessity and humanity.[9]  In 1949, with the formulation and acceptance

of the four Geneva Conventions,[10] armed conflict was bifurcated into international armed

conflicts and noninternational armed conflicts.

   International Armed Conflicts are defined in article 2 of the Geneva

Conventions (known as Common Article 2 because that article is common to all four

conventions) to include only conflicts between two nations.[11]  To these inter-state conflicts,

---

[7] Hague Regulations, annexed to the Convention Respecting the Laws and Customs of War on Land, Oct. 18, 1907, 36 Stat. 2277.

[8] Geneva Convention for the Amelioration of the Condition of the Wounded and Sick in Armed Forces in the Field Art. 12, Aug. 12, 1949, 75 U.N.T.S. 31; Geneva Convention for the Amelioration of the Condition of the Wounded, Sick and Shipwrecked Members of the Armed Forces at Sea Art. 3, Aug. 12, 1949, 75 U.N.T.S. 85; Geneva Convention Relative to the Treatment of Prisoners, Aug. 12, 1949, 75 U.N.T.S. 135; Geneva Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 75 U.N.T.S. 287.

[9] Digest of International Law: Volume 10, 300 (M. Whiteman, ed., Washington, D.C., U.S. Dep't of State, 1968).

[10] The United States signed the Geneva Conventions on August 12, 1949 and deposited its instrument of ratification on August 2, 1955 after the Senate gave its Advise and Consent. Somalia became a Party to the Conventions on July 12, 1962.

[11] Article 2 states:

   In addition to the provisions which shall be implemented in peacetime, the present Convention shall apply to all cases of declared war or of any other armed conflict which may arise between two or more of the High Contracting Parties, even if the state of war is not recognized by one of them.

   The Convention shall also apply to all cases of partial or total occupation of the territory of a High Contracting Party, even if the said occupation meets with no armed resistance.

the whole content of the Geneva Conventions and the other provisions of the Law of Armed

Conflict apply, including provisions that confer combatant immunity to those lawfully

participating in armed conflict.

    In contrast, Non-International Armed Conflicts are defined in Article 3 of all

four Conventions and encompass armed conflicts between a state and an insurgent group or

between two rebel groups that occur within a nation's borders.[12]

---

    Although one of the Powers in conflict may not be a party to the present Convention, the Powers who are parties thereto shall remain bound by it in their mutual relations. They shall furthermore be bound by the Convention in relation to the said Power, if the latter accepts and applies the provisions thereof.

(Emphasis added.) Because the Geneva Conventions have now been ratified or acceded to by every nation, the limiting term of "High Contracting Parties" no longer has meaning.

[12] Article 3 states:

    In the case of armed conflict not of an international character occurring in the territory of one of the High Contracting Parties, each Party to the conflict shall be bound to apply, as a minimum, the following provisions:

    (1) Persons taking no active part in the hostilities, including members of armed forces who have laid down their arms and those placed hors de combat by sickness, wounds, detention, or any other cause, shall in all circumstances be treated humanely, without any adverse distinction founded on race, colour, religion or faith, sex, birth or wealth, or any other similar criteria.

    To this end the following acts are and shall remain prohibited at any time and in any place whatsoever with respect to the above-mentioned persons:
    *(a)* violence to life and person, in particular murder of all kinds, mutilation, cruel treatment and torture;
    *(b)* taking of hostages;
    *(c)* outrages upon personal dignity, in particular, humiliating and degrading treatment;

55

The Supreme Court clarified the applicability of the Non-International Armed Conflict legal paradigm in <u>Hamdan v. Rumsfeld</u>, 584 U.S. 557, 630-32 (2006), where it held that Common Article 3 applied to all conflicts that were not international.  Therefore, according to U.S. and international law, there are two types of armed conflicts: International Armed Conflicts that occur between two nations and are governed by the full Law of Armed Conflict, and Non-International Armed Conflicts that cover all other armed conflicts and that are governed by the provisions of Common Article 3 and other customary rules.

The armed conflict in Somalia in which the defendants participated was not an International Armed Conflict because it was not a conflict between two nations.  Though the TFG sought and received assistance from other nations, including Ethiopia and the African Union, these forces were acting together with and at the behest of the legitimate Somali government to fight against insurgent groups.  As such, this is a traditional Non International Armed Conflict and is governed by the provisions of Common Article 3 and other customary laws of war which contain no provisions that confer combatant immunity to any of the participants in armed conflict, including government forces.  Common Article 3 prohibits certain acts by Parties to the armed conflict toward persons taking no active part in hostilities

---

*(d)* the passing of sentences and the carrying out of executions without previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples.

(2) The wounded and sick shall be collected and cared for.

The key provision is the first phrase which contrasts this article's applicability with that of Article 2.

and requires Parties to collect and care for the wounded and sick, but it does not provide
immunity for combat acts, including killing.

Thus, as a matter of law, the defendants are ineligible to assert claims of
combat immunity.  See United States v. Pineda, 04 CR 232 (TFH), 2006 WL 785287
(D.D.C. March 28, 2006) (holding that the defense of combatant immunity is unavailable to
an alleged member of "FARC" because the United States was not engaged in hostilities with
FARC while it was embroiled in a civil war with Colombia).

But even if the Court determines that the internecine conflict in Somalia was
an International Armed Conflict, and the whole content of the Geneva Conventions, and the
other provisions of the Law of Armed Conflict, apply – including provisions that could
confer combatant immunity – the defendants still would not be able to qualify for this
immunity.  The defendants must show that they fall into one of the categories of lawful
combatants set out in Article 4 to the Geneva Convention Relative to the Treatment of
Prisoners ("GPW").  As the defendants were not "[m]embers of the armed forces of a Party
to the conflict," they could qualify for eligibility as lawful combatants only if they can
demonstrate that they are members of a militia that (1) is commanded by a person
responsible for his subordinates; (2) which has a fixed, distinctive sign recognizable at a
distance; (3) carries its arms openly; and (4) conducts its operation in accordance with the
laws and customs of war.  GPW. Art. 4A.(2); see also Hague Convention Respecting the
Laws and Customs of War On Land, Oct. 18, 1907, 36 Stat. 2277, T.S. No. 539, Annex to
the Convention, Regulations Respecting the Laws and Customs of War On Land, (hereafter
"Hague Regulations") Art. 1; United States v. Lindh, 212 F. Supp. 2d 541, 557 n.35 (E.D.

57

Va. July 11, 2002) (noting that "the four criteria have long been understood under customary international law to be the defining characteristics of any armed force . . . Thus, all armed forces of militias, regular and irregular, must meet the four criteria if their members are to receive combatant immunity"); see also United States v. Yunis, 924 F.2d 1086, 1097-99 (D.C. Cir. 1991) (confining affirmative defense of "obedience to military orders" to members of legitimate military organization that fulfill the four component test).  The defendants have made, and could make, no such showing here.

            In conclusion, given that the intramural strife in Somalia is a Non International Armed Conflict, the Geneva Conventions extend no protections, save for those in Common Article 3, to persons participating in the conflict.  But, even if that were not the case, in order to assert the defense of combatant immunity, it would still be incumbent upon the defendants to present at least some evidence demonstrating satisfaction of each of the four elements described in Article 4 of the GPW.  Lindh, 212 F. Supp. 2d at 557-558 ("In the application of these criteria to the case at bar, it is Lindh who bears the burden of establishing the affirmative defense that he is entitled to lawful combatant immunity, i.e. that the Taliban satisfied the four criteria required for lawful combatant status outlined in [the Geneva Prisoner of War Convention].  On this point, he has not carried his burden . . . ."); United States v. Arnaout, 236 F. Supp. 2d 916, 917-18 (N.D. Ill. 2003) (citing Lindh with approval, and holding that defendant had failed to demonstrate that al-Qaeda and other terrorist organizations failed to meet the four criteria for lawful combatant status); see also Pineda, 2006 WL 785287, at *4.

3. The Defendants Should Not Be Permitted
to Raise These Arguments As a
Vehicle for Advocating for Jury Nullification

Because there is no factual basis for the legal defenses set forth above, the government respectfully requests that the Court preclude the defense from arguing, or otherwise presenting evidence or pursuing lines of inquiry, such as whether the defendants and their co-conspirators were entitled to travel to Somalia to violently oust the Ethiopian military from Somalia, whether other members of the Somali community encouraged them to travel to Somalia, and whether the Ethiopians were, in fact, committing atrocities.  Such inquiries could lead only to jury nullification.

The law is plain that it is improper for a defendant to suggest in any way that the jury should acquit even if it finds that the government has met its burden of proof.  See, e.g., Thomas, 116 F.3d at 614-16; United States v. Perez, 86 F.3d 735, 736 (7th Cir. 1996) ("An unreasonable jury verdict, although unreviewable if it is an acquittal, is lawless, and the defendant has no right to invite the jury to act lawlessly.  Jury nullification is a fact, because the government cannot appeal an acquittal; it is not a right, either of the jury or of the defendant.") (citing United States v. Kerley, 838 F.2d 932, 938 (7th Cir. 1988)).

Although the government is unable to anticipate each form of "jury nullification" argument or evidence that the defendants may seek to interject into this trial, the defendants should be precluded, at a minimum, from arguing that the defendants and their co-conspirators were permitted to kill the Ethiopians, African Union or TFG forces in self-defense, in defense of others, or were otherwise justified as lawful combatants in killing the Ethiopians because they were occupying parts of Somalia or threatening third parties.

Simply put, the actual conduct of the Ethiopian forces in Somalia is not a relevant issue at trial and whether the defendants and their co-conspirators felt justified in traveling to Somalia to take up arms against them is likewise irrelevant.  The jury will not be called upon to decide whether Ethiopian forces were benevolent or malevolent in order to decide whether the defendants were guilty of the charged crimes.  The only purpose of such evidence would be to improperly influence, mislead and confuse the jury into believing that the defendants' actions were somehow legally justified because the Ethiopians invaded Somalia or were otherwise engaged in improper behavior while in Somalia.  Not only does any evidence regarding an alleged Ethiopian invasion or alleged mistreatment of Somalis by Ethiopian forces not relate to any lawful defense, it also does not tend to prove or disprove any element of the charged offenses.

<u>CONCLUSION</u>

For the reasons set forth above, the Court should grant the government's

motions <u>in</u> <u>limine</u>.

Dated:  Brooklyn, New York
        April 26, 2015

                                        Respectfully submitted,

                                        LORETTA E. LYNCH,
                                        United States Attorney,
                                        Eastern District of New York


                            By:    ___/s/_____
                                        Shreve Ariail
                                        Seth D. DuCharme
                                        Richard M. Tucker
                                        Assistant U.S. Attorneys

                                        Annamartine Salick
                                        Trial Attorney, Department of Justice

61