367

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - X

UNITED STATES OF AMERICA,        : 12-CR-661(SLT)
                                 :
                                 :
                                 :
        -against-                : United States Courthouse
                                 : Brooklyn, New York
                                 :
                                 :
                                 : Tuesday, April 28, 2015
AHMED, et al.,                   :
                                 :
            Defendant.           :
                                 :

- - - - - - - - - - - - - X

        TRANSCRIPT OF CRIMINAL CAUSE FOR DAUBERT HEARING
          BEFORE THE HONORABLE SANDRA L. TOWNES
        UNITED STATES SENIOR DISTRICT COURT JUDGE

              A P P E A R A N C E S:

For the Government: LORETTA E. LYNCH, ESQ.
                    United States Attorney
                    Eastern District of New York
                      271 Cadman Plaza East
                      Brooklyn, New York 11201
                    BY:  SHREVE ARIAIL, ESQ.
                         SETH D. DuCHARME, ESQ.
                         RICHARD M. TUCKER, ESQ.
                         Assistant United States Attorney

                    DEPARTMENT OF JUSTICE
                    COUNTERTERRORISM SECTION
                      950 Pennsylvania Avenue, NW
                      Washington, DC  20530
                    BY:  ANNAMARTINE SALICK, ESQ.

For the Defendant    SUSAN GAIL KELLMAN, ESQ.
Ali Ahmed:             25 Eighth Avenue
                       Brooklyn, New York 11217
                     BY: SUSAN GAIL KELLMAN, ESQ., ESQ.

368

A P P E A R A N C E S:  (Continued)


For the Defendant        LAW OFFICE OF MARK S. DeMARCO
Madhi Hashi:                2027 Williamsbridge Road  2nd Fl
                           Bronx, New York  10461
                         BY:MARK S. DE MARCO, ESQ.




For the Defendant        ROTHMAN, SCHNEIDER, SOLOWAY & STERN, P.C.
Mohamed Yusuf:             100 Lafayette Street
                           Suite 501
                           New York, New York 10013
                         BY:DAVID STERN, ESQ.




INTERPRETERS:        Gunilla Medina & Anders Almgren



Court Reporter:  Richard W. Barry, RPR
                 Official Court Reporter
                 E-mail: rwbarrycourtreporter@gmail.com

         Proceedings recorded by computerized stenography.
         Transcript produced by Computer-aided Transcription.

- Proceedings -                                    369

1          COURTROOM DEPUTY:  Criminal cause for Daubert

2    hearing, docket 12-CR-661, United States of Americas versus

3    Ahmed, Hashi and Yusuf.

4          MR. ARIAIL:  Good afternoon, Shreve Ariail and

5    Annamartine Salick for the United States.

6          MR. STERN:  David Stern for Mr. Yusuf.

7          MS. KELLMAN:  Good afternoon, Your Honor, Susan

8    Kellman for Ali Ahmed.

9          MR. DE MARCO:  Mark DeMarco for Mr. Hashi.

10         COURTROOM DEPUTY:  We have two interpreters.

11         Please raise your right-hand.

12         (Courtroom Deputy swore Interpreter Gunilla Medina &

13   Anders Almgren.)

14         THE COURT:  Ready to proceed?

15         MR. ARIAIL:  We are, Your Honor, I think unless

16   defense counsel has something.

17         MR. STERN:  We are ready.  I will jut ask for a few

18   minutes after Doctor Nakasone's testimony.  I received a

19   number of pages of notes he took this morning that I have not

20   read yet.  It will not take me that long to read them, I will

21   need a little time.

22         THE COURT:  Yes.

23         MR. ARIAIL:  May I proceed, Your Honor?

24         THE COURT:  Please.

25         MR. ARIAIL:  The government calls Doctor Nakasone.

1    DR. HIROTAKA NAKASONE, having been first duly sworn, took the

2    stand and testified as follows:

3              THE COURT:  Thank you.

4    DIRECT EXAMINATION BY MR. ARIAIL:

5    Q    Afternoon, Doctor Nakasone.  If I can just ask you when

6    you testify, you should testify slowly.  I know there are some

7    complex things we are going to talk about.  Take your time so

8    that the Court Reporter can get everything down.

9    A    Yes, thank you very much.

10              Good morning.

11   Q    Good morning.

12   A    Good afternoon.

13   Q    Afternoon, you are right.

14              MR. ARIAIL:  Your Honor, may I approach with two

15   documents 3500-HN-8 and HN-26.  One is the resume for Doctor

16   Nakasone and the other is notes related to his testimony.

17              THE COURT:  You may.

18   Q    Doctor Nakasone, where do you work?

19   A    I work for the Federal Bureau of Investigation,

20   Operational Technology Division which is located in Quantico,

21   Virginia.

22   Q    What do you do for the F.B.I. at the Operational

23   Technology Division?

24   A    Currently I'm serving as a senior audio advisor for the

25   Operational Technology Division.  And I also, I oversee

1    research projects in speaker recognition development and when

2    they say, issues involving any kind of human language

3    technology, including speaker recognition, I will advise,

4    accordingly, my supervisors and my senior executives.

5             And also, I function as a liaison point with other

6    agencies, federal and local in terms of the-- any kind of

7    audio technology.

8             As a collateral duty, I also oversee the training of

9    the audio examiners within the forensic audio, video and image

10   analysis unit within the F.B.I. Operational Technology

11   Division in Quantico, Virginia.

12   Q    Just to back up a bit, you said Operational Technology

13   Division.  What is the Operational Technology Division of the

14   F.B.I.?

15   A    The division is charged with a lot of, in operational

16   technology components used in the investigative, you know,

17   aspect of the F.B.I.

18            It is-- the OTD, we call it OTD, is the main arm of

19   the technology development site.  They are concerned about the

20   telecommunications, lots of other technical domain of, you

21   know, collecting criminal informations through body recording

22   or telecommunications entity.  I cannot really go in detail.

23            They also have a cryptography, you know, technology

24   within it and it also houses the Bureau's, you know, digital

25   evidence laboratory which is, you know, accredited in a

1  laboratory by American Society of Crime Lab Directors

2  Accreditation Board.  In conjunction with the International

3  Standard Organizations under 17,025.

4  Q    Doctor Nakasone, when you say, operational aspects or

5  operational, what do you mean by "operational"?

6  A    Actual, you know, the operation-- needed by the F.B.I. to

7  perform investigations.

8  Q    Now, let's back up a little bit and talk about how you

9  got to where you are.  Where did you go to college?

10 A    My first college was in Japan, and I went to University

11 of Ryukyus.

12 Q    What 3500 number is marked on your CV?

13        THE COURT:  3500-HN-8.

14 Q    Where did you go to college?

15 A    First one was in Japan, Okinawa, Japan, University of

16 Ryukyus, which is one of the Japan's you know, national

17 universities.

18        Then I went to University of South Carolina, back in

19 1974, and I finished my second bachelor degree in psychology,

20 then moved on to Master degree from Michigan State University,

21 East Lansing.  I majored in speech sciences and obtained my

22 first, you know, Master degree back in 1979.

23        And then went on to PhD, and I finished my PhD in

24 speech science in 1984.  And I wrote my thesis for my, you

25 know PhD program, known as a computer voice identification

1   method by using deviation spectra and fundamental frequency

2   contour.

3   Q    And, let's talk about your career a little bit.  Can you

4   tell us a bit about some of the jobs that you have had over

5   the course of your career?

6   A    My first job was right after, my first degree.  I don't

7   know if it relates to what I do today.  But I worked as a

8   Court Appointed Interpreter, Japanese and English for

9   two years.  And then I moved on to, you know, U.S., to pursue

10  advanced degree.

11        My first appointment was assistant professor at the

12  Michigan State University.  But I stayed in that position,

13  very briefly, eighteen months or so.

14        And then I moved on to Los Angeles County Sheriff

15  Department to implement federal research grant in there.  I

16  received no grant -- I shouldn't say "I", my colleague and I

17  under Los Angeles County Sheriff Department received funding

18  from National Institute of Justice to conduct, you know,

19  development of speaker recognition, you know, technology by

20  using computer.

21        And that was done between 1985 through 1989.  I

22  think for the first two years or so, we received a funding in

23  the amount of $250,000.  After two years, it was extended

24  another two years.

25        In 1989, when the project was completed.  I was

1    hired by LA County Sheriff Department.  In 1989, as a voice

2    specialist.  I stayed there while conducting, the audio

3    related examinations, while continuing the further refinement

4    of the computer assisted, you know, voice identification

5    system.

6            I left LA County Sheriff Department in 1992 to join

7    the Bureau, and between 1992 through 1996, I was hired as an

8    outside consultant, but I stationed within the OTD, through

9    four years or so, and that was consequently followed by full

10   time employment.

11           In 1996, and since then, I have been working for the

12   Bureau for almost 19 years now.

13   Q    And, if you could, tell us a little bit about some of the

14   professional societies that you are affiliated with that

15   relate to your work at the F.B.I..

16   A    I am a member of the organization of scientific area

17   committees, which is the first, overarching organizations to

18   you know, oversee the entire forensic science, you know

19   disciplines, existing in the United States of America.  This

20   organization normally, usually called by its acronym, OSAC.

21           OSAC is established by National Institute of

22   Standards and Technology which is part of the -- U.S.

23   Department, and it is working in conjunction with the National

24   Commission of Forensic Sciences, established by U.S.

25   Department of Justice, back in 2014.  That is the, you know,

1   most recent, you know activity.  I get heavily involved.

2          I am a member of the American -- AAFS, American

3   Academy of Forensic Science.  I am a member of the Institute

4   of Electrical, Electronics Engineering.  I am a member of that

5   and I am also, you know, a member of the International

6   Association For Identification.

7          I am a member of the RDC, Speaker Recognition, the

8   Odyssey Speaker and Language Recognition.

9          And also the other-- a lot of, you know, the working

10  groups that I get involved.  I function as a U.S. government,

11  you know, review board member for the-- you know, research

12  programs within the IARPA, stands for Intelligence Advanced

13  Research Program Activities.

14  Q    And then, the group you just talked about there, OSAC, is

15  that the same group that Doctor James Wayman is a member of or

16  involved in?

17  A    It is.

18  Q    And, is there a particular subcommittee that you sit on

19  or deal with?

20  A    I am chairing the subcommittee for speaker recognition

21  within OSAC.

22  Q    And, what-- what is Doctor Wayman's title with respect to

23  that committee?

24  A    Doctor Wayman is also OSAC member as a vice chair of the

25  subcommittee for speaker recognition.

1   Q    Now, Doctor Nakasone, have you published papers over the

2   course of your career?

3   A    Yes, I have.

4   Q    Can you just give us a sample of some of the papers you

5   published over the course of your career as they relate to the

6   subject matter.

7   A    In earlier day, I publish a lot of, you know, research

8   projects, say like measuring the pause rate of an individual.

9   How pause and also, the voicing characteristics of individuals

10  who do not have larynx, called esophageal speech.

11          These were earlier days of my research topic and I

12  also did very serious, you know, experiment and studies on the

13  gunshot analysis in an effort to determine whether or not we

14  can determine the type of the weapons used by analyzing

15  acoustic signature in the recorded information.  I had two

16  publications on that.

17          And then I published the results of my, you know,

18  research activities in L.A. County Sheriff Department, known

19  as CAVIS, computer assistant voice identification system.  And

20  that was published in the CAVIS International Conference on

21  acoustics, speech processing.  That is part of the IEEE group.

22          After joining the F.B.I., my publications were

23  pretty much, you know, concentrated on either developing

24  speaker recognition systems, or supporting, funding other

25  organizations, research organizations who will do R&D effort

1    for the F.B.I..

2         I founded many organizations in my capacity as an

3    audio engineer for the F.B.I., and then speech.

4    Q    In addition to your scientific background, do you also

5    have forensic background in doing speech comparison?

6    A    Yes, sir.  In 1994, right after I joined the Bureau, they

7    trained me for almost two years or so.  I was qualified to do

8    audio enhancement and signal analysis and soon afterward, I

9    was qualified at the F.B.I. to conduct voice comparisons by

10   using spectrographic methodology.

11        And, probably since 1994 through 2009, I-- just ball

12   park figures, maybe about 30 to 40 cases, a year.  In each

13   case, pretty much, you know contains about four comparisons.

14        So, you can-- well, about 120 comparisons-- actual

15   voice comparisons a year over twenty years.  It is quite a

16   bit.  Maybe two thousand, make comparisons.

17   Q    Talking about automatic voice comparisons.

18   A    Well, that will pretty much it was done by spectra

19   comparisons because the long practiced spectrograph comparison

20   technology, continued until 2012, May of 2012.  Just about

21   three years ago, this unit that I was in, pretty much led by

22   me, forensic audio, video and image analysis unit, decided to,

23   you know, take a one step forward, to modernize speaker

24   recognition, you know, technology.

25        We abandoned the spectrograph comparisons and

1   implemented automated speaker recognition, sometimes people

2   use it interchangeably.  I try to be consistent.  Automated

3   speaker recognition technology.

4           And, to implement that, we did lots of-- prior to

5   the implementation of course, there was a decade of, you know,

6   research activities and evaluation of the activities in

7   selection of the appropriate, you know, software tools.

8           We operate the automatic speaker recognition, you

9   know, according to the standard operating procedures, that is,

10  you know, unique to the F.B.I..

11  Q    And, over the course of your career, have you received

12  awards for your work in this field?

13  A    Yes, I have.  Most recent one is award given to me by the

14  Office of Director of National Intelligence, Science

15  Technology Division.  That award was accompanied by cash of

16  $200,000, it is a grant, but not to my personal account.

17          It is a grant money to conduct basic research to

18  promote implementation of, you know, under pining, scientific

19  under pining of speaker recognition.

20          And, prior to that, I was awarded F.B.I. Director's

21  Science Award in 2007.  That was also accompanied by cash

22  award of three thousand.  That went to my bank account.

23  Q    Are there any other awards that are of significance that

24  we should know about Doctor Nakasone?

25  A    I have a few awards provided by U.S. Attorney's office in

1    Houston for the work that I provided, assistance that I

2    provided during a Frye hearing.

3              I also received, you know, award from my Alma Mater,

4    Michigan State University in 2005 for the accomplishment of

5    publications, I guess.

6              And that-- that award was simply honorary award.  I

7    was requested to stand and shake hands of the graduates during

8    commencement.

9    Q    I think we will move on.

10   A    Yes, there are more.

11   Q    We will be here for awhile.

12   A    Yes.

13   Q    At some point Doctor Nakasone, did you become involved in

14   this case and how did you first become involved.

15   A    I think it was sometime in January this year, the

16   divisions, you know, assistant general counsel, Greg Walsh

17   contacted me by E-mail, saying that I need to pay attention to

18   this, because I think, you know, F.B.I. hired, you know expert

19   witness from Sweden.

20             And I didn't know anything about that situation.  So

21   I asked him, who is he.  And Mr. Walsh told me that his name

22   is not Greg Lindh and still, I didn't know who he was.

23             Then, I think, you know, Mr. Walsh set up a

24   teleconference amongst ourselves and also between I think the

25   office of AUSA in Brooklyn.  And at that time, I think I spoke

Case 1:12-cr-00661-JG-LB   Document 302   Filed 05/01/15   Page 14 of 128 PageID #: 1869

1    with you know, Mr. Shreve Ariail and there was also a-- I

2    don't know who else was there, maybe Mr. Charmaine.

3    Q    Mr. DuCharme?

4    A    Right.

5    Q    And just to be clear, you said earlier, I think you said

6    Greg, you mean Jonas Lindh?

7    A    Yes.  Originally he misspelled his name so I could not

8    find him anywhere.  I was looking for Linda.  The "H" was not

9    there.

10   Q    And so at some point you had a conversation with

11   Assistant United States Attorneys and the F.B.I. agents

12   involved in the case?

13   A    Yes.  And during that time, I do remember requesting you

14   know, report so I can review it.  And I think that

15   conversation took place toward the end of January.

16   Q    And, during-- after you were contacted by the U.S.

17   Attorneys' office and the F.B.I., it was the agents in New

18   York City?

19   A    Yes.

20   Q    Were you asked to take a look at Mr. Lindh's report?

21   A    Yes, I was.

22   Q    And, if you recall, you know what exactly were you asked

23   to do?

24   A    Just assess the content of the report and how I think

25   about, you know, technical, you know, content of the report.

1  Q    And at some point, were you also contacted by the defense

2  attorneys in this case?

3  A    Yes, yes, sir.

4  Q    Tell us about that.

5  A    I received a phone call, I mean it was in my voice mail.

6  Actually, I do not know exactly how it went.  Either I

7  returned a phone call or I was called.  Maybe I-- either way,

8  the telephone conversation took place between me, myself, and

9  I think it was Mr. Dave Stern and Jane, Ms. Jane.  I think you

10 were in on the phone.

11        We talked about it and at that time, I felt that I

12 was obligated to speak to them because, you know, on my part,

13 I misunderstood, you know what Mr. Greg Walsh was telling me.

14 I thought he was telling me that the Court, the Court has

15 already authorized the defense to subpoena me.  So I willingly

16 and with free will, without worrying about too much, I

17 contacted and spoke.

18        But during that time, I mentioned to Mr. Smith and

19 Mr. Stern, that I had been already contacted by the

20 government.  And in fact, I told them that I was expecting to

21 receive package from AUSA following day through the Federal

22 Express.

23        So, not knowing exactly-- not having had a chance to

24 review the report, I was also complying-- you know, I was

25 going to talk to them because Mr. Stern requested me.  If we

1    could have a teleconference again, you know, March 2nd.

2    Because prior to March 2nd, you would be out of country.

3            So, I said, yes.  So March 2nd, I'm open.  But

4    following day, I received the package and that package

5    contained four items, including a letter.  I think it was a

6    motion from the defense side and that indicated that the

7    defense was going to request my testimony and also from Doctor

8    Wayman and Doctor Morrison.  Pretty much based upon the-- my

9    testimony, used during, you know, Zimmerman case in Florida.

10           And then on the other, you know, that I forgot what

11   it was, but two other in the package was the original report

12   written in, you know, unknown language to me.  Presumably, it

13   is not Swedish, but I could not tell what it was.

14           That content, you know, a few pages of the

15   translation.  Then I realized that there was a full English

16   version of the report was also attached.

17           So, original report, English version and two

18   documents that was produced by defense counsels.

19           After reviewing Mr. Lindh's report, I immediately--

20   I felt that report was comprehensive and thorough and

21   completely different from the-- any kind of product produced

22   by the prosecutions, you know, witness, Mr. Tom Owen, during

23   Frye test.

24           So, I sort of, you know, discussed with my general

25   counsel and said, this is going to be a little different.

1  This is going to be very tough for me to challenge this new

2  report.

3  Q    Just to back up Doctor Nakasone, you're talking about the

4  Zimmerman trial and Tom Owen.  Who is Tom Owen?

5  A    He was one of the two experts hired, used during

6  Zimmerman case.  And, I have known-- I had known Tom Owens

7  many many years.  And I really didn't think he had, you know,

8  appropriate background to do-- you know, speaker recognition.

9          And then I got involved in the Zimmerman case

10  because I analyzed audio tape right after the incidents.  The

11  case was sent from F.B.I. field office in Tampa and that case

12  came in as a hate crime.

13          And, incoming letter indicated to the examiner that

14  they need to know whether or not there is any usable speech

15  samples in the recording.

16          And then second question was, if we could detect in

17  the audio recording of this, you know, 911 containing the

18  commotions going on outside, including screaming and yelling.

19  I was asked to analyze, if there are any languages, word or

20  phrases, that may indicate, you know hate crime.

21          We did a very thorough analysis and I was the

22  primary examiner.  I issued two, you know, conclusions.  The

23  voice content in the recording is not suitable for doing any

24  kind of comparison at all, and we could not find any

25  derogatory languages in the recording of 911 call made by the

1   defendant Zimmerman to the 911 stations.

2           So, that was the extent of the work I personally

3   provided and that report that I issued to the Tampa field

4   office of the F.B.I..  So it became a -- I mean it was-- came

5   to the defense group.  That is why, I was called to testify.

6   Q    Doctor Nakasone, let's talk about your testimony at the

7   Zimmerman trial.  You ended up testifying for the defense in

8   that case, right?

9   A    Yes, sir.

10  Q    And, could you tell the Court generally what your

11  testimony was in that case.

12  A    Because the requesting defense was not, you know,

13  federal-- federally involved, my, you know legal counsel

14  issued a Touhy memo.  I testified under the constraint

15  limitations imposed by that Touhy memo.

16          And I simply testified to my qualifications, to the

17  fact that I analyzed the tape, and I provided, you know, those

18  conclusions.  And I was prohibited from preparing for rebuttal

19  against the government, you know defendants.

20  Q    Just generally Doctor Nakasone, what was your testimony

21  in the case?

22  A    It was that this screaming voice, which lasted in that

23  designated area for a couple of seconds or so, should not be

24  used for the purpose of the voice comparison against.

25  Q    Why not?

Case 1:12-cr-00661-JG-LB   Document 302   Filed 05/01/15   Page 19 of 128 PageID #: 1874

1  A    Because it doesn't have enough information.  Not only

2  that, when someone screams faced with the eminent death or you

3  know, injury to the-- physical injury, screaming starts using

4  different parts of the muscle structure around the neck in the

5  vocal tract and once that happens, they produce a scream

6  voice.  I don't think it is going to have typical, you know,

7  speaking characteristics.  Therefore, I even-- I guess I was

8  requested by Police Department, what kind of an approach I

9  should recommend them to enact screaming.  I recommended them

10  not to enact, because it is unlikely anybody can produce

11  identical screaming voices.

12  Q    Did you have any other issues with the testimony of Tom

13  Owen?

14  A    My concern-- my trouble-- my concern and trouble was the

15  fact that he tried to compare that screaming voice, such short

16  one against normal speech sample, Mr. Zimmerman.  And that

17  is-- that is common sense, anybody should know, that is not

18  doable.

19         And then, another concern that I had is, his

20  unethical conduct.  He imported that shortened screaming into

21  software he was using.  It is called, you know Easy Voice, by

22  Matrix.

23         That is Russian software and I don't have any qualm

24  with that Russian software, but that Russian software spits

25  out, spitted out, that audio back.  Saying that it is not

1  usable because it was short.

2        But Tom Owen went along, hey, I have a problem, my

3  sample is too short.  He talked to salesperson and then

4  salesperson said, well, you can make a loop.  And make a

5  longer screaming sound and that is a no no.

6        So, it is pretty much, he-- pretty much indicate

7  that his behavior is unethical and indicates that he really

8  does not have good understanding what it takes to analyze

9  human speech for the purposes of speaker recognition.

10 Q    So, Doctor Nakasone, just to be clear, the samples in the

11 Zimmerman case were inappropriate in your opinion for

12 analysis?

13 A    Yes.

14 Q    The expert witness in your opinion was unqualified to do

15 the analysis?

16 A    Yes, precisely.

17 Q    The methodology that the expert used was unethical?

18 A    Yes.  If you talking methodology in terms of the

19 procedure, not as technique.  In terms of procedure that was

20 not appropriate.

21 Q    And, are you familiar generally with the other witnesses

22 that testified for the defense in that case?

23 A    I was familiar with Doctor James Wayman.  I was familiar

24 with Doctor Peter French.  I was familiar-- I am familiar with

25 Doctor George Turlington.

1   Q    And, Doctor Wayman, obviously we know who Doctor James

2   Wayman is.  Who is George Turlington?

3   A    George Turlington is in the community, we call him father

4   of speaker recognition.  I think he was only one I could quote

5   back in 1982 or '83, when I was writing thesis.  He was, you

6   know-- he has a Phd from the University of Wisconsin, went to

7   Texas Instruments and eventually he went to Department of

8   Defense.  Then he went to, where else did he go?  He also

9   worked for National Institute of Standards and Technology.  He

10  has prolific publication in the area of speaker recognition.

11  I think even currently he serves as advisor for the National

12  Institute of Standards and Technology.

13  Q    And, who is Peter French?

14  A    Doctor French is-- I came to know him in person in 2004,

15  when we were having seminars in-- for the government.  We

16  invited him as a lecturer.  He is-- he is-- he uses, phonetic

17  knowledge to do forensic speaker recognition for the

18  government of the United Kingdom.

19  Q    To your knowledge in the Zimmerman case, did any of the

20  experts who testified criticize the use of the technique of

21  automated voice comparison as a scientific matter?

22  A    I don't think so.  The focus was how Tom Owen did his

23  analysis.

24  Q    So the concern was about the testifying witness in his

25  misapplication of the technique?

1   A    That is correct.

2   Q    Now, I want to go back to your conversations with the

3   U.S. Attorneys' office and the F.B.I..  Did you conduct an

4   initial assessment of the report that Mr. Lindh prepared in

5   this case?

6   A    I reviewed it and I think I provided my assessment of the

7   content of the report to you or your office over telephone.

8   Q    And just generally if you can tell the Court, what was

9   your initial assessment when you reviewed Mr. Lindh's report?

10  A    Initial assessment was, okay, this report is thorough.  I

11  started reading it and realized that he was carefully

12  evaluating, the quality of the input.  And also, he was shying

13  away from analyzing language unknown to him.  By reading

14  report, I could tell the language spoken in the evidence in

15  the audio included Somali language and then Swedish language.

16  Now and then inserted by other languages, like Arabic

17  language.

18       And, I noted that he didn't want to analyze for the

19  comparison purpose the language he was not familiar with.

20  Somali for his perception of phonetic analysis.  He

21  concentrated on, you know, Swedish language.  That was kind of

22  reasonable practice.  We do that as well.

23       And, another thing is that he was doing a very

24  careful analysis including acoustic measurements of speech

25  samples.  He was measuring articulation rate and measurement

1   of fundamental frequency, fundamental frequency.  And he was

2   also measuring format.

3            This are, well studied, you know, speech features

4   for research purposes, phonetic study.  And I don't know to

5   what extent it will be, you know, useful in discriminating,

6   individual speakers.  But it is useful.  How much?  I think it

7   depends on the preparation, I guess.

8            He has done that and that was good one.  And he

9   also, you know, applied automatic speaker recognition

10  software.  It is commercial software and remaining of my

11  testimony, I will be careful not to give any impression to the

12  Court or to the public that the F.B.I. is endorsing any

13  particular, you know, commercial software.

14           But I will be talking in terms, general trend of the

15  automated speaker recognition technology available.

16  Q    Just on that point, Doctor Nakasone, I don't want you

17  to -- put you in any position to be awkward for you generally,

18  what can you say about the software that Mr. Lindh used based

19  on your knowledge of the missed evaluations from 2012, the

20  SRE.

21  A    I didn't participate in SRE for several years, and also

22  judging from our own internal evaluations and everything else.

23           Okay.

24  Q    Doctor Nakasone, if I can-- may I withdraw the question

25  and repeat it.

1           THE COURT:  Yes.

2    Q    I just want Doctor Nakasone, I-- to the extent that you

3    can cavet your assessment based on your understanding of the

4    NIST evaluation, it would be helpful.  Because I don't want

5    you to talk about things that are not available for folks here

6    in the courtroom.

7           So, based on your understanding of the results of

8    the NIST, the NIST 2012 SRE results, can you tell the Court

9    your assessment of the software that Mr. Lindh used.

10   A    Before-- I need to do some clarification.  NIST has never

11   evaluated software itself used by Mr. Lindh.

12          But what they evaluated is many others and there was

13   a team called ABC.  And ABC, you know combination of three

14   research teams.  "A" stands for Agnitio; "B" stands for Bruno

15   University, in Czech Republic; and "C" stands for -- I cannot

16   spell out.  It is French university in Montreal. I'm sorry, I

17   can't give you a spelling.

18          So, therefore, the company who sells, you know,

19   Batvox, which Mr. Lindh used, participated in this evaluation

20   as one of the key members.  So I cannot really interpolate

21   performance of the ABC, with Mr. Lindh's software.

22          But, in general, it seems to be always somewhere in

23   the front pack.  Meaning that sometimes pretty good, sometime

24   in the middle of the pack, sometime maybe back of the pack.

25   But in my mind, it was kind of technology that I need to

1    track.

2    Q    When you say, it is a kind of technology you needed to

3    track, why did you need to track it?

4    A    Watching.

5    Q    Why did you need to track it?

6    A    Why it is a commercial software and sooner or later if it

7    is really good enough, probably it will be beneficial for an

8    agency to purchase it and use it.  Rather than pouring, multi

9    million dollars trying to establish our own government

10   proprietary software which tend to be very expensive.

11            So tracking, once a tracking is completed.  I guess,

12   probably we may want to, you know, more thoroughly evaluate

13   its functions in-house and that will require, you know, buying

14   it.

15            So, we bought Batvox in 2013, and it still going on,

16   evaluations, by designated individuals.  Not by me.  But

17   somebody else.

18            (Transcript continues on next page.)

19

20

21

22

23

24

25

Nakasone - direct - Ariail                392

1   BY MR. ARIAIL:   (Continuing)

2   Q    Dr. Nakasone, just to clarify, when you talked about ABC

3   and Agnitio's involvement in the, in the NIST evaluations, are

4   you able to say generally whether the technology that's in

5   Batvox, or, sorry, that was tested is the core technology of

6   Batvox?

7   A    That's what I assume.  The core technology --

8               MR. STERN:  Objection as to what he assumes, Your

9   Honor.

10  A    Okay.  The core technology was tested but once it becomes

11  commercial products, there will be a lot of interfaces and

12  there will be a lot of additional procedures implemented to

13  make it, you know, reference-worthy.  So I think, in general,

14  you know, it will be reasonable to assume that, you know, good

15  core technology may produce, you know, good, you know,

16  application software, but there's really no guarantee that

17  would be the case.

18  Q    And, in part, based on the ABC results in the NIST

19  evaluations, the FBI decided to buy Batvox?

20  A    Yes.

21  Q    So, Dr. Nakasone, after you provided the FBI and U.S.

22  Attorney's Office your initial assessment of Mr. Lindh's

23  report, did you do anything else in connection with the case?

24  A    Yes.  By request made by your office, Mr. Ariail's

25  office, I evaluated quality over entire audio recordings.

CMH      OCR      RMR      CRR      FCRR

1    Quality assessment is your first step.  Usually test is done

2    to assess and determine whether each audio file is good enough

3    to be compared against each other and I did, yes, I complete

4    that assessment and I think I conveyed the results of my

5    assessment over the phone.

6    Q    And, generally, if you could explain to the Court the

7    results of your assessment?

8    A    Okay.  There were -- okay.  We are talking about KS-1,

9    KS-2, UK-1, UKS-1, UKS-2 and UKS-3.  I found a few of those

10   audio files did not meet my criteria to do analysis.  I

11   indicated that in my notes.  And, further, I also did an

12   assessment whether or not there was any, you know, misbehavior

13   in terms of channel mismatch conditions.  To do, for me to

14   assess integrity of the channel effects, I have to run some,

15   you know, quick, you know, scoring and that scoring was

16   performed to check the integrity of the data, whether or not

17   cell phone channel --

18            MR. STERN:  Your Honor, I'm objecting to all of this

19   testimony.  This is not rebuttal.  It's expert testimony about

20   which we were not given notice.

21            MR. ARIAIL:  I apologize, Your Honor.  I actually

22   didn't mean for Dr. Nakasone to do a full analysis in front of

23   the Court, but there was notice of the report that he --

24            MR. STERN:  There was not expert notice.  He was

25   required to give a summary of his opinions and the bases for

1    those opinions.  So there was not expert notice.

2          MR. ARIAIL:  I apologize.  I'm going to withdraw,

3    Your Honor.  I'm just trying to get a general assessment from

4    Dr. Nakasone of his review of the report.

5          THE COURT:  All right.

6    Q    Dr. Nakasone, let's stay away from the details too much

7    here if we could and just kind of keep it focused on

8    generalities.  Let's talk about the materials in this case.

9          In your opinion, were the materials that Mr. Lindh

10   reviewed, were they sufficient for purposes of doing the

11   analysis?

12   A    I would say something like 60 to 70 percent was

13   sufficient audio recordings.

14   Q    And for what purpose?

15   A    For the speech recognition by machine, by computer.  And

16   some of them were insufficient by us, but I did not preclude

17   that an audio can be analyzed by somebody who knows language

18   well and also somebody who's got, you know, forensic knowledge

19   because forensic knowledge, if provided by well trained, you

20   know, phoneticians would provide, you know, some advantage

21   over regular, you know, speaker recognition experts who really

22   do not have no training in phonetic assessment.

23   Q    And can you explain that to the Court a little bit?  Why

24   would they, a phonetician have an advantage over someone who's

25   just doing automated voice comparison?

Nakasone - direct - Ariail                    395

1   A     The ultimate speaker recognition, Your Honor, is,

2   extracts speech features that would be correlates of the

3   biological anatomical makeup of individuals.

4              MR. STERN:  Judge, I'm sorry to interrupt.  May I

5   have a minute to speak to my co-counsel before this answer is

6   done?  I want to try and resolve something.

7              THE COURT:  With your co-counsel?

8              MR. STERN:  All of my co-counsel, I mean.

9              THE COURT:  Yes.

10             MR. STERN:  Thank you.

11             (Pause.)

12             MR. STERN:  Judge, I believe this is also expert

13  testimony which we did not receive notice and I believe it

14  does not rebut anything that we did, that this is just a way

15  of doing a second examination.  If they wanted to, they could

16  have done it in the first place.

17             I don't intend to stand up unless you tell me I have

18  to every single time this kind of testimony occurs.  I'd like

19  to have a standing objection to it.

20             THE COURT:  How am I supposed to know what your

21  standing objection is objecting to?  I mean --

22             MR. STERN:  Judge, I'm glad to stand up then.

23             I'm objecting.  I think this is expert testimony

24  which we did not get notice and I do not think it's rebuttal.

25  I object on both those grounds.

CMH       OCR       RMR       CRR       FCRR

1          MR. ARIAIL:  And, Your Honor, I'll just make a

2    record here obviously.  We obviously provided notice with

3    respect to Mr. Lindh's testimony, ample notice as the Court

4    has indicated.  Then we were advised by defense counsel that

5    they intended to call Drs. Morrison, Wayman and Nakasone to

6    rebut the government's proffered testimony.

7          After we learned about that information, the

8    government advised defense counsel and the Court that we

9    intended to call Dr. Nakasone as a rebuttal witness to address

10   the criticisms that were set forth in the document, many of

11   the documents the defendants filed in this case which

12   criticized the methodology, the science, the application,

13   qualifications of Mr. Lindh across the board including very

14   particular aspects of his report and I think this is fair

15   rebuttal.

16         I also think that the government has provided well

17   more than sufficient disclosure for Dr. Nakasone.  Excuse me.

18   We provided 3500 material and Giglio Yo material regarding

19   Dr. Nakasone, the bulk of it last Friday, two Fridays ago to

20   the defendants, and subsequently provided additional

21   disclosures as they became apparent to the government.  Those

22   included very specific notes that Dr. Nakasone took during his

23   review of Mr. Lindh's analysis.  They also included e-mail

24   conversations between the government and Dr. Nakasone.  They

25   included notes and reports related to conversations the

1    government had regarding Dr. Nakasone's assessment of

2    Mr. Lindh's analysis.  So, I think we've complied with our

3    obligations and this is an appropriate witness for us to call.

4              MR. STERN:  I think the government is surprisingly

5    confusing 3500 obligations with notice obligations.  They were

6    anxious for notice from us under the statute.  You directed us

7    to provide it and we did.

8              THE COURT:  Well, you keep saying you did.  I have

9    not ruled that you did, but go on with regard to Dr. Nakasone.

10             MR. STERN:  That notice and anything written before

11   this hearing is not part of this hearing.  Rebuttal --

12             THE COURT:  I'm going to, because it is, with regard

13   to criticism of Mr. Lindh's testimony so I am going to allow

14   it.

15             MR. STERN:  We never had our expert say one word

16   about the quality of the recordings, yet we're being given a

17   dissertation on the quality of the recordings.  That doesn't

18   rebut anything we did so I object to that testimony.

19             THE COURT:  All right.  Thank you.

20             MR. ARIAIL:  And just on that point, Your Honor,

21   defense specifically challenged that aspect of Mr. Lindh's

22   analysis in all of its filings and the obvious conclusion by

23   the testimony of Dr. Wayman yesterday is that Mr. Lindh did

24   not do an appropriate analysis of the materials which

25   necessarily includes some kind of objection to the materials

1  underlying the analysis that he did.  So I think it's

2  appropriate.

3           MR. STERN:  Not the quality of the materials.

4           THE COURT:  All right.  Overruled.

5  Q    So, Dr. Nakasone, just as a general matter, can you talk

6  about, and I just want to -- I'm not sure where we left off.

7  Can you talk about your opinion -- well, first off, let's just

8  talk about your assessment of Mr. Lindh as an expert in the

9  fields of phonetics, acoustics and automatic voice comparison.

10 A    It's kind of really ideal combination of the skill sets,

11 technology and knowledge and he's using the fused decisions by

12 mathematical computations by computer and he's applying his

13 own phonetic knowledge which is obtained through his academic,

14 you know, academic course and he is also using this risk

15 analysis.  And of course, you know, a fusion of those three

16 cannot really be done mathematically but probably he uses, you

17 know, the protocol made available by his organizations in

18 Sweden which I don't know.  I cannot talk about it because I

19 don't know.  But the, there is a trend in the scientific

20 community in the speaker recognition that probably it would be

21 best if the automated speaker recognition is augmented by high

22 level of information.

23           High level information means that something beyond

24 the anatomical qualities uncovered from the signal but

25 something which happens in the behavior part of those speech

1   production, say, like a computer doesn't know whether this

2   person is, has no pitch information, the computer wouldn't

3   know the nuance of the speech and right now, computer wouldn't

4   know what would be the marker kind of information by the

5   individuals.

6           For example, from my experience, there were, you

7   know, cases going on, kind of threatening case.  This

8   individual made many telephone calls from different parts of

9   the United States of America, but all the time this individual

10  used, you know, a particular phrase in a particular

11  intonation.  Like, he used to ask, Are you listening to me?

12  Are you listening to me?  He does that all the time.  Sometime

13  that kind of information become a cue, and imagine when

14  phoneticians can pick up something more subtle information,

15  not from, you know, sentence level but from, you know, smaller

16  units of sound.  They're trained to do so but, you know, I am

17  not trained in that.  It requires, you know extended training.

18  Q    And when you say it requires extended training, you're

19  talking about phonetics now, right?

20  A    That is correct.

21  Q    And do you -- is it your opinion that Mr. Lindh's

22  expertise in phonetics assisted in the evaluation that he did?

23  A    I believe so.

24  Q    And you talked, I think, briefly about acoustic analysis.

25  What's acoustic analysis again?

1  A    Usually it means measurement of speaking pitch.  That's

2  what we say, but in, you know, in the science community, we

3  call it fundamental frequency and that tells something about

4  the speaker.  And also acoustic, you know, measurements would

5  be to, you know, measure the speech of individuals, how many

6  syllables the person, you know, produces per, you know, minute

7  or per second.

8          Then, and then another column of measurement is

9  called formant measurements.  Formants are something created

10 by resonance happening in individual's, you know, vocal tract

11 and the nasal tract.  And these measurements are usually

12 called acoustic measurements and measurements are, you know,

13 objective and when we repeat the same measurements, we can

14 expect to get the same results.

15 Q    And I want to just ask you this question.  Not particular

16 to this case but, in general, does, is conducting acoustic

17 analysis, does that assist in voice identification analysis?

18 A    Not always.  Not always because those measurements tend

19 to be kind of, you know, general characteristics.

20         So, like, the pitch information, usually the male

21 grownup, when you ask, you know, has pitch around 120 hertz.

22 Female has double of that, 240 hertz.  And then it varies, you

23 know, say one standard deviation of 20 hertz or so.  But

24 probably the statistics of this pitch information would be

25 just like information provided by human height.  It's vary

1  across the human height.  We can tell from very tall man from

2  a shorter man, but if everybody's kind of on the average,

3  everybody's like a 5-10, 5-11, 5-8, you don't use that height

4  information to distinguish individuals because height may

5  change depending on what clothes they are wearing, what shoes

6  they are wearing, what kind of weight somebody might have.

7          Also, the pitch information is useful only as long

8  as the pitch measured from two individuals are extreme,

9  extremely different, but if they converge through the median

10  range or average range, it become useless.  So, it's a just

11  good means.  It would be a useful tool, but not all the time.

12  Q    So when you're doing speaker comparisons, is it a good

13  idea to do an acoustic analysis?

14  A    Yes.

15  Q    And is it also, to the extent that you're capable of

16  doing it, is it a good idea to phonetic analysis?

17              MR. STERN:  Objection.  This is not rebuttal.

18              THE COURT:  Objection overruled.

19  Q    And to the extent that you're capable of doing it, is it

20  a good idea to do phonetic analysis?

21  A    Yes.

22  Q    And does acoustic analysis and phonetic analysis give you

23  more comfort and competence in your automatic voice comparison

24  analysis?

25  A    Yes.  We quoted, you know, independent orthogonal

1  analysis.  If they give the same information as, you know, the

2  features captured by the computer, it's going to be useless,

3  but if they are independent, that's good.  And then that's why

4  it becomes critical for the, you know, analyst to be trained

5  thoroughly.  He will decide under what condition those

6  acoustic information would be useful or just doesn't do

7  anything.

8  Q    I want to turn to -- there was a lot of testimony.  You

9  were in the courtroom over the last few days.  There was a lot

10 of testimony about Mr. Lindh's conclusions and the way that he

11 expressed his conclusions.  Do you remember that testimony?

12 A    Yes, I do.

13 Q    Okay.  Could you generally just tell the Court your

14 opinion on the way that Mr. Lindh expressed his conclusions

15 and what you think about that?

16 A    First thing that come to my mind is by using this

17 hypothesis approach, as long as you use the one hypothesis,

18 he's indicating that results of the conclusion or his

19 conclusion must be taken as a supporting hypothesis, meaning

20 it's his best estimate or his likelihood, not precise nor

21 certainty.

22 Q    What's significant about that?

23 A    He's saying that, you know, there's a high likelihood

24 that the voice samples was produced this person or that

25 person, but he's not declaring that this voice was produced by

1    this individual.  That's the, I guess the nature of the, you

2    know, the word hypothesis.  It's not theory but hypothesis.

3    Q    Would it concern you if someone were to testify

4    conclusively about the identity of the speaker?

5    A    Yes.  If he was more forthcoming and offering, what do

6    you call it, conclusive results, I would have been concerned

7    because the consensus among the, you know, community is

8    speaker recognition technology has inherent errors because

9    it's, the features are not really measured physically.  Nobody

10   is going to look at the inside of mouth.  Rather, it's

11   inferring by analyzing the audio information.  It's indirect

12   assessment of vocal structure.  Because of that, they say

13   always inherent uncertainty.  If somebody offers, you know,

14   conclusively and positively, then not only myself but the

15   community would know this person really doesn't know what he's

16   doing.

17   Q    You talked about phonetics just a little while ago and I

18   want to go back to that for a second.

19         In order to phonetically analyze audio in a case,

20   what do you need to, what do you need?

21   A    I think usually -- okay.  I'm not phonetician.  I can't

22   speak for them.  It's outside scope of my expertise, but

23   usually --

24         MR. STERN:  Objection, Judge.

25   A    -- they assess --

Nakasone - direct - Ariail                404

1              THE COURT:  I'm sorry?

2              MR. STERN:  Objection to his answer.  He's not an

3    expert.  It's outside his expertise.

4              THE COURT:  Well, I'm going to allow him to finish

5    that.  I don't think he's testifying about it.  He's saying

6    that he can't.

7              MR. STERN:  Okay.  Let's see if that's what he's

8    testifying to, Your Honor.

9    Q    What do you need, Dr. Nakasone?

10   A    My response would be limited to my background but I have

11   taken a few courses in phonetics during my graduate program.

12   But, anyway, Mr. Ariail, can you please repeat the question

13   again?

14   Q    In order to do a phonetic assessment, what do you need?

15   A    Good hearing, good trained hearing, and that must be

16   augmented by device or machine that shows the graphic, you

17   know, rendition of a spoken message in three dimensional way.

18   I think that would help phoneticians to confirm what he hear

19   is actually there by looking at the graphics.

20   Q    I think my question is a little simpler.  Do you need to

21   speak the language?

22   A    Thank you very much.  Yes, you need to know, the analyst

23   need to know the language.  And --

24   Q    And what -- sorry.  Continue.

25   A    So, for example -- I cannot speak for Mr. Lindh.  For

1    example, if we receive a case containing, you know, language

2    unknown to us, we have to request linguistical assistant from

3    FBI language services sections.  Without them, we cannot go

4    anywhere.  And that was the case, truly the case with, when we

5    was still using the spectrographical comparisons, but there's

6    a little bit difference once we started using, you know,

7    automatic speaker recognition systems because nowadays, the

8    automatic speaker recognition available can handle comparing,

9    you know, two different languages.

10          My mother tongue is Japanese.  You take, you know,

11   my voice samples when I'm speaking in English, keep it to

12   yourself and then a week later, I'm going to speak in Japanese

13   and you take that one and compare to my previous version and

14   machine can reasonably recognize it's me.  Those are two

15   samples produced by me.  It's called cross-language speaker

16   recognition.  Now, there are error rates associated with it

17   but still it's doable.

18          So, but for the phonetician, for them to do

19   thorough, you know, analysis, definitely they can do only

20   language they are familiar with and most likely native, at the

21   native level.

22   Q    And does the FBI have on staff any Swedish phoneticians?

23   A    Unfortunately no.

24   Q    When you say unfortunately no, what do you mean by that?

25   A    In the past, we tried to, you know, hire phoneticians to

1  the laboratory.

2  Q    And as a result of reading Mr. Lindh's report, what are

3  your thoughts on hiring phoneticians from the FBI?

4  A    Okay.  I have to reflect what I was thinking.  If this

5  case came to me or to my unit, can I talk about that

6  hypothetical?

7  Q    Go right ahead, Mr. Lindh -- I'm sorry, Mr. Nakasone.

8  A    Finding out the condition of Somali, and if I knew there

9  was, you know, a Mr. Lindh somewhere in -- I didn't know

10  Mr. Lindh at the time, but if I knew hypothetically, I would

11  have, you know, recommended New York, US office or FBI office,

12  that, you know, please hire somebody from Sweden because this

13  person is well trained and speak the language and this

14  practice has been done pretty, you know, constantly.  When we

15  had, you know, Spanish language, of course, you know, I was

16  requested if there's anybody in the world who speaks Spanish

17  native, as a native tongue, and I can do, you know, careful, I

18  mean, ultimate analysis.  There was one person in Madrid I

19  knew so I recommended him to assist in the New York field

20  office.  That happens.

21        So, although -- I may be a little going ahead, I'm

22  sorry.  Although we don't really testify to the results within

23  us we did in the courtroom, but it is, I mean, it's okay for

24  us to recommend somebody else and I used to recommend my, you

25  know, mentor who is not with us, he's not under the FBI policy

1    not to testify.  He can testify freely.

2           So, you know, in other words, I don't speak, you

3    know, Somali nor Swedish and nobody else in the staff can do

4    that, so if this came, this came to us assisting our

5    assistance and we cannot do it, I -- it had been great

6    resolution I could provide by recommending somebody who

7    speaks, you know, and then also qualified examiners who speaks

8    the language and are qualified examiners.

9    Q    I want to talk about something you just brought up there.

10   Is there an FBI corporate level policy prohibiting the

11   testimony in court of examiners as to conclusions related to

12   automatic voice comparison?

13   A    I'm going to be careful in answering this question.  We

14   do have policy but that -- I think the word "policy" is

15   defined loosely.  We have a practice or protocol we practice

16   for a few decades.  To do the voice comparison only as an

17   investigative guidance to the contributor, not to testify in

18   the court, but the fact is that in a policy -- it's not really

19   incorporate in the policy.  It's not written by FBI attorneys

20   or gone through attorneys', you know, approval process.  It's

21   not corporate policy.  And the federal judge can subpoena any

22   voice comparison examiners and we don't have any reason to go

23   against, you know, federal subpoena.

24   Q    And let's just talk about that.  You're talking about

25   your protocol or practice with respect to testifying in court.

1   Why is it or what are the reasons why the FBI doesn't testify

2   about conclusions regarding automatic speaker recognition in

3   court?

4   A     Primary reason is the -- okay.  There are some

5   uncertainties about error rates coming up and there are some

6   uncertainties how machine is going to perform, but if you are

7   talking about the historical protocol, there was a limitation

8   in the technology so that we can produce, you know, conclusive

9   opinions.  Conclusive opinions means very small error rates

10  and because of that lack of, you know, error rates and also

11  because lack of the support by the, you know, scientific

12  community, we had that, you know, practice or protocol.

13         Now, in times of the -- because we kept in our

14  protocol even when we shifted from antiquated technology to

15  modernize, you know, ultimate speaker recognition about three

16  years ago, we kept that in the protocol because basically we

17  need to do a little more research to, you know, formalize the

18  standards and guidelines not just in the FBI.  I don't think

19  FBI will be ready to start testifying by themselves.  I think

20  they would like to see if it would be, you know, it will reach

21  a consensus in the community say we are ready to go.  And I

22  think that could be the one reason we have this, you know,

23  subcommittee within OSAC for speaker recognition.

24         Well, personally, it still may be, especially after

25  I joined the Bureau, I have testified numerous times against

1   the spectrograph, you know, voice comparison examiners and

2   often time I realized that these people should have, you know,

3   a sharp tool which they do not know how to use it.  In other

4   words, FBI did not really want to go out and begin to testify

5   by using this technology for several reasons.  That could be

6   one.  We don't want to be the one who opens up, you know, the

7   floodgates.

8   Q    So, Dr. Nakasone, is it fair to say that FBI is

9   conservative in its approach to forensic science?

10  A    Yes, especially for, you know, speaker recognition

11  domain, we remain very conservative.

12  Q    And is one of the reasons the FBI is very conservative

13  about its approach to automatic speaker recognition is because

14  of the history of charlatans testifying in court about voice

15  identification analysis without proper qualifications?

16              MS. KELLMAN:  Objection to the leading.

17              THE COURT:  Overruled.

18  A    That could be some concern.  That could be one of the

19  concerns.

20  Q    And is it fair to say that one of the main concerns the

21  FBI has about testifying to the results about ASR or automatic

22  voice comparison is that untrained examiners would

23  inappropriately seek to exploit the technology based on the

24  FBI's stamp of approval?

25              MR. STERN:  Objection.  Leading.

1            THE COURT:  Overruled.

2    A    I've got to be really careful answering this question.

3    The -- so far, really, there hasn't been any instance as far

4    as I know that automatic speaker recognition technology was

5    successfully introduced in the courtroom.  Nowadays, it is

6    very easy for many, you know, practitioners to buy cheaper

7    software now and we want to make sure that before we testify,

8    there would be, you know, globalized standards so that not

9    only us, but other people also can testify, and we have a

10   definition of the level of the training and we have a

11   guideline so that not just everybody else can do it.  Until

12   then, probably I think it would be FBI's position to maintain

13   this stance to keep it conservative.

14   Q    And that's what you were talking about a minute ago when

15   you were talking about a consensus?

16   A    Right.

17   Q    Okay.  And just to be clear, the consensus you're talking

18   about is a consensus on methodology?

19   A    Consensus on methodology and procedures including, you

20   know, how we are going to render our final opinions.  And

21   those, you know, standards, guidelines in the consensus to be

22   produced by this OSAC subcommittee for speaker recognition.

23   Q    The testimony that Mr. Lindh gave, you observed that,

24   right?

25   A    Yes, sir.

Nakasone - direct - Ariail                411

1   Q    And what are your thoughts in terms of Mr. Lindh's

2   testimony as it relates to automatic voice comparison?

3            MS. KELLMAN:  Objection to his thoughts.

4            THE COURT:  Yes.

5            MR. ARIAIL:  I'll be a little more specific.

6   Q    In this case, as applied by Mr. Lindh, what is your, what

7   is your opinion of the testimony that he offered?

8            MR. STERN:  Objection.

9            THE COURT:  Overruled.  I will hear it.

10  A    Opinion of his, about his testimony or his report?

11  Q    His testimony and the report.

12  A    His, you know, testimony was consistent.  I think that he

13  was sticking to his, you know, principle about the, you know,

14  the, I mean, you know, the hypothetical nature of his, you

15  know, conclusions.  And also he was consistent in his

16  testimony and I was impressed by the fact that, you know, he

17  really never offered that, his conclusion was conclusive.

18           MR. STERN:  Objection.

19           THE COURT:  Overruled.

20  A    And in terms of his reports as far as I reviewed a few

21  weeks ago, report is written far more comprehensively than we

22  practice and it was not thorough and probably his report is a

23  combination of our, you know, short report plus every notes we

24  have taken, but usually report is written so that, you know,

25  contributor can understand what's being reported and it's not

CMH      OCR      RMR      CRR      FCRR

1    written so that anybody else can completely repeat what he has

2    done.  It's written for the people who can -- especially for

3    Mr. Lindh's report.  I think he wrote a lot more than what,

4    you know, contributing agency needs.  It was written as if it

5    was in the paper but not quite a paper.

6              THE COURT:  When you say more comprehensive than our

7    reports, "our" is?

8              THE WITNESS:  I was talking about FBI's report.

9    A    And usually report is written in such a way that the

10   message about the methodology, why he was doing it, where he

11   got the evidence and how he did the analysis and what was the

12   result of analysis and what happened to, you know, the

13   evidence he received, and usually doesn't go into, you know,

14   references or bibliographies utilized for writing the report.

15             So, it was a little, a little, you know, more

16   information than I expect from a normal report of the results

17   of the, you know, speaker comparisons.  So it was hard for me

18   to, you know, to discard because of the quality of the report.

19   Q    And are you concerned in any way with Mr. Lindh's

20   conclusions, his methodologies or his expertise?

21   A    Just one.  Overall, I -- you know, I mean, the report

22   format is totally different from ours, however, everybody

23   reports in different ways.

24             He's using this scale from a minus 4 all the way to

25   zero and it keeps going up to a plus 4.  He's got, you know,

1    nine scales.  On the other hand, some only have seven and we

2    have five scales.  We just go by, you know, probable match,

3    match inconclusive, probable no match and a no match.  It's

4    just our decision is dictated only by five potential, you

5    know, categories.

6          There's some differences but because of that

7    difference, I'm not saying what he's doing is right, I mean,

8    wrong or right.  It's -- I think he's doing according to the

9    environment of his, you know, forensic laboratory.  So I don't

10   have an issue with that, but the only one issue I had was I

11   didn't know what he really means by small chance.

12         For example, in his conclusion of the hypothesis

13   one, he said that there's, the results of analysis supports

14   hypothesis one.  And then a chance of, you know, the

15   hypothesis correct is very small and what does he mean by very

16   small?  But, okay, it's okay, you know, because he's following

17   his own, you know, contribution or protocol, but I think I

18   want to know probably what he means by very small.  And he's

19   not qualifying it and probably we don't know how to qualify it

20   yet right now.  That's only my concern that I have.

21         (Continued on next page.)

22

23

24

25

Case 1:12-cr-00661-JG-LB  Document 302  Filed 05/01/15  Page 48 of 128 PageID #: 1903

1    BY MR. ARIAIL:

2    Q    Do you have any concerns as to whether or not about--

3    excuse me, do you have any concerns about having Mr. Lindh's

4    testimony be admitted in Court.

5              MR. STERN:  Objection.

6              MS. KELLMAN:  Objection.

7              THE COURT:  I'm going to allow you to answer that.

8    A    Okay.  I gotta formulate my thoughts carefully.

9              Okay.  What I'm going to offer, that is not really

10   represent the position of the organization of the scientific

11   area committees, it is just my thoughts.

12             MS. KELLMAN:  Objection, Your Honor.  He speaks for

13   a committee.

14             THE COURT:  Sustained.

15   Q    He can --

16             THE COURT:  No.

17             MR. ARIAIL:  I will rephrase Your Honor.

18   Q    Doctor Nakasone, can you offer your opinion as to-- let

19   me ask you this, in this case, as applied by Mr. Lindh, is it

20   your opinion that Mr. Lindh's testimony would assist the Court

21   and the trier of fact, in determining that the unknown voice

22   samples were likely or not likely to have been produced by the

23   defendants?

24             MR. STERN:  Objection.

25             MS. KELLMAN:  Objection.

1          THE COURT:  Can you answer that question?

2    A    Okay.

3          MS. KELLMAN:  That was a "yes" or "no" question.

4          MR. STERN:  Objection.

5    A    In the lack of-- I cannot.

6          THE COURT:  The objection is overruled.

7    A    In a lot of this, you know standards and guidelines it

8    takes a couple of years or so.  But in my opinion, in the

9    process or in the mean time, if good, you know, analysts and

10   good reporting, you know, practice comes along, I think we

11   should-- I mean I think it would be, you know, useful for the

12   Court.  You know, also fact finders, to accept that, you know

13   evidence provided by Mr. Lindh with the following conditions,

14   that his report should be corroborated with other evidence

15   available.

16          And so also, taken, in evidence, by Mr. Lindh, would

17   be taken under abundant cautions for the limited accuracy.

18   Q    And, talking about guidelines for a second and consensus

19   on guidelines.  You testified earlier that there is not a

20   consensus on guidelines on the offering of conclusions related

21   to voice identification.  Do you remember that?

22   A    Yes, I do.

23   Q    And, are you aware of global guidelines for other

24   forensic sciences?

25   A    No.

Nakasone - Direct - Ariail                416

1   Q    So there is no global forensic standard for the admission

2   of D.N.A. evidence that you are aware of?

3            MS. KELLMAN:  Objection, he said he is not aware.

4            THE WITNESS:  I can't speak.

5            THE COURT:  Yes, sustained.

6   Q    Are you familiar Doctor Nakasone with an article

7   entitled, Forensic Speaker Recognition, A Need For Caution?

8   A    Yes, I am.

9   Q    Can you just tell the Court a little bit about what that

10  article is about.

11  A    There are two which--

12           MS. KELLMAN:  Your Honor, can we get the offer.

13           MR. ARIAIL:  3500-VIM-6, written by Joseph.

14  Campbell, Wade Shen, Reva Schwartz, Jean Francois Bonastre.  I

15  can't pronounce the last name, Driss Matrouf.

16           MS. KELLMAN:  And the 3500.

17           MR. ARIAIL:  VIM-6.

18  Q    Are you familiar with the report?

19  A    Yes, I am.

20  Q    Generally, what is the thesis or the nature of that

21  report?

22  A    Okay.  This article was written in 1999, as a sequel or

23  update on the initial caution paper written in 2003.  I was

24  involved providing that information during 2003.  But, the

25  message of this caution paper in 2009 is that the speaker

1  recognition technology has attained, you know, certain

2  maturities, but is still there is some things that we need to

3  research.  And this is the conclusion by the-- you know, the

4  author, authors, I should say, that if it must be used, users

5  must be used in this kind of, you know, technology, with the--

6  you know, caution.

7          And the paper points out the-- all those factors

8  involved, say like room conditions, the psychological

9  condition of the speakers, and devices used for the submission

10 of the speech samples.  There are so many, you know, factors

11 that will effect the performance of the speaker recognition no

12 matter what you use, whether by using, I think there are

13 three, four kinds.  They talked about spectrograph, phonetic,

14 and then acoustic method.  Last one is the automatic speaker

15 recognition method.

16         Whichever being utilized, the results of the

17 analysis should be carefully, you know, considered with

18 caution.

19         And then the-- although I am fully aware of all of

20 those authors.  That is in my opinion, that is a good summary

21 of the, you know, scientific community for the speaker

22 recognition.

23 Q    The caution that you are talking about, that is caution

24 in making conclusory assessments of a speaker comparison?

25         MR. STERN:  Objection, leading.

Nakasone - Direct - Ariail                    418

1              THE COURT:  Overruled.

2    A    In my assessment, it simply means the technology is

3    useful tool to determine the, you know, the individual's

4    identity.  But because of the, you know, certain amount of

5    unknown error rates, the users, when this case-- I don't think

6    the author is not talking about the Court but in general

7    users, should proceed with caution.

8    Q    In terms of the technology that article was written in

9    2009, right?

10   A    Yes.

11   Q    And how has automated voice comparison technology

12   improved since 2009?

13   A    Maybe right after then, article came about, there was one

14   incremental improvement in the performance, mainly due to the

15   new, article known as a vector and I-vector, new algorithms,

16   were utilized by many, you know participants.

17              And, many systems who participated in NIST speaker

18   recognition evaluation workshop ever since 2010, utilized,

19   I-vector algorithms.

20              And as I said before, the speaker recognition has

21   been evolving rapidly.  But this breakthrough doesn't happen

22   overnight.  The improvement has been incremental.

23              Last incremental-- last incremental improvement took

24   place in 2010 and it still advancing right now.

25   Q    And the technology you talked about I-vector, is that the

1   technology utilized in Batvox?

2   A    I believe so.

3            MS. KELLMAN:  Objection.  Move to strike.  He

4   doesn't know.

5            THE COURT:  Do you know?

6            THE WITNESS:  Yes, I do have that, you know software

7   and in fact, I know it uses I-vector.

8   Q    And in terms of error rates, are you familiar with error

9   rates for Agnitio software?  In addition to the NIST error

10  rates that we talked about before?

11  A    I could talk about several error rates but I don't think

12  I am at liberty about the error rates --

13  Q    Understood.

14  A    -- in the in-house experiments.

15  Q    Did you take a look at a report that the government

16  provided you, called Comparative biometric testing, round 7

17  public report?

18  A    Yes.

19  Q    Did that report contain error rates for Batvox or Agnitio

20  software?

21  A    Agnitio software, yes.

22  Q    And, the techniques that Mr. Lindh applied, the phonetic

23  analysis, would that improve the accuracy of Mr. Lindh's

24  conclusions if it were also was based on automatic voice

25  comparison?

1  A    I believe it would.

2  Q    And, the acoustic analysis as a general matter would that

3  improve the conclusions related to automated voice comparison?

4  A    Usually it depends upon the data itself and the

5  individual speakers.  Sometimes it would, sometime it doesn't

6  and I do recall Mr. Lindh testifying it was-- it was not

7  improving it.

8           And, I think it-- my interpretation at that time was

9  probably those acoustic measurements were all in the average

10  range.

11  Q    And was Mr. Lindh cautious in stating his conclusions

12  regarding his analysis?

13           MR. STERN:  Objection.

14           THE COURT:  Overruled.

15  A    I think his conclusion is carefully phrased and as long

16  as he gives the, you know, the degree of, you know, his

17  certainty, I think he is exercising caution, enough caution.

18           And, in fact, the usage of the hypothesis itself,

19  indicates it is very cautious.

20           MR. ARIAIL:  Nothing further, Your Honor.

21           THE COURT:  All right.  We will take 15 minutes.

22           (Recess taken.)

23           THE COURT:  All right.  The defendants are present,

24  along with all counsel.

25           The doctor is on the stand and is still under oath.

- Proceedings -                    421

1  Mr. Stern.

2         MR. STERN:  Judge, having talked to my co-counsel, I

3  don't think we can meaningfully do this examination without

4  talking to our expert.  There has been a lot of expert

5  testimony adduced here.  I'm not equipped myself to understand

6  and question.   I need to talk to an expert before I can

7  meaningfully cross examine.

8         THE COURT:  How long do you need?

9         MR. STERN:  He is in Denver.

10         THE COURT:  How long do you need?

11         MR. STERN:  I think we can do it on Monday.

12         MR. ARIAIL:  I have to talk to Doctor Nakasone.

13         THE COURT:  All right.

14         MR. ARIAIL:  What does your schedule look like?

15         THE WITNESS:  When?

16         MR. STERN:  I don't-- you can do this at the side.

17         THE WITNESS:  I have duties, Monday.

18         (Off record conversation.)

19         MR. STERN:  What date is good for Doctor Nakasone, I

20  don't want to inconvenience him.

21         THE WITNESS:  I think the best day would be today.

22         MR. ARIAIL:  I think he is fairly --

23         THE COURT:  How about the second best day.

24         MR. STERN:  A day next week.

25         THE WITNESS:  Next week except Monday.

- Proceedings -                                422

1          MR. STERN:  Whatever day is good for Your Honor or

2    the government, I will make myself available.

3          MR. ARIAIL:  I might suggest, Your Honor, that we

4    start the cross examination today, and to the extent that

5    defense counsel has additional information they want.

6          THE COURT:  We can do that.

7          MR. STERN:  The reason that is not--

8          THE COURT:  Well, you can start today about what you

9    are knowledgeable about, then you have time.  I have given the

10   government a lot of leeway and I understand that.  But, it is

11   for my purposes to.

12         MR. STERN:  It is not the way cross examination

13   works.  That is an integrated examination.

14         THE COURT:  You may begin today and then talk to

15   your expert.

16         MR. STERN:  I am asking you not to make me.  I don't

17   think it will be an effective cross examination.

18         THE COURT:  We have him here and then you have an

19   opportunity to come back.

20         MR. STERN:  So I take it you are directing me to do

21   it.

22         THE COURT:  Yes.

23         MR. ARIAIL:  Your Honor, just in terms of the

24   record, obviously the discovery that we turned over, we turned

25   it over two weeks ago, Your Honor.  They have had these

Nakasone - Cross - Stern                          423

1    materials and the expert has reviewed them in the mean

2    while --

3              MR. STERN:  I'm not complaining about the discovery

4    if that is an issue.

5              THE COURT:  All right.  Please get started.

6    CROSS EXAMINATION BY MR. STERN:

7    Q    Doctor Nakasone, were you ever supportive of

8    spectrography?

9    A    Yes, I was.

10   Q    When was that?

11   A    Starting from 1977 all the way up to 1994, maybe.

12   Q    During that period of time, did you ever testify in

13   support of spectrography as a mechanism for gathering evidence

14   presenting it in court?

15   A    Yes, I have.

16   Q    When you were doing that, you weren't a charlatan, were

17   you?

18   A    No.

19   Q    You weren't doing something dishonest?

20   A    No.

21   Q    You were doing what you thought was scientifically

22   appropriate at that time?

23   A    That's correct.

24   Q    And then later you came to the conclusion that you were

25   wrong?

Nakasone - Cross - Stern                    424

1    A    I don't know why you asking me that question.

2    Q    Well, did you ever testify in court, that spectrography

3    was not a way of conclusively distinguishing one person from

4    another?

5    A    Okay.  Let me answer the question in you know-- what

6    happened in reality when I testified in 1986 so --

7    Q    I'm not being rude, I'm listening, I left something on my

8    table.  Go ahead.

9    A    Okay.  I had a pretty good knowledge about the

10   interpretive in respect to spectrograms because of my training

11   in phonetics and Physics and Mathematics.

12            So I knew what I was doing and I testified in the

13   7th Circuit in Chicago for the, you know, the United States

14   Attorney, Assistant United States Attorney.

15            And, I testified for the results of analysis and

16   originally I was requested to testify to the reliability of

17   the technology, but primarily examiner who was supposed to

18   testify in that case, could not make it because of, you know,

19   medical reasons.  And I was requested to evaluate and then do

20   a comparison, actually.

21            I testified, and my testimony was, admitted during

22   Frye test.

23   Q    During -- what was that word?

24   A    During Frye test.

25   Q    A Frye?

Nakasone - Cross - Stern                    425

1  A    My testimony was admitted in 1986.  And a couple of years

2  later, it was upheld in the appellate court.

3         Now, that was my testimony.  However though, the

4  technology must be practiced by many other colleagues of mine,

5  I guess.

6         And over time, I testified several times to lay the

7  foundation for other spectrographic individuals, I mean

8  analysts.  But, after finding out so many inconsistencies in

9  their analyses, my, you know, confidence in this technology is

10  ubiquitous to, I started to have some sort of disappointment

11  because-- my confidence in this technology eroded it.

12  Q    Eroded?

13  A    Erode it.

14         So, that was the, you know, my experience about

15  spectrograms.

16  Q    It didn't turn out to be as good as you thought it was.

17  A    That's correct.

18  Q    Now, you have heard of a phenomena called, cognitive

19  bias, haven't you?

20  A    Yes.

21  Q    And, in the F.B.I., when you do voice identification

22  work, you do things to try to avoid the problem of cognitive

23  bias, don't you?

24  A    We do best we can.

25  Q    And what is the best you can, what is it that you do?

1  A    Okay.  First of all, when we do, you know analysis, it is

2  a built in practice that no single examiner's conclusion would

3  go out, unless it is confirmed by second qualified examiner.

4  Q    Why is that?

5  A    Well, this will-- this is implemented as a safeguard

6  against, you know, potential error that, you know, primary

7  examiner would make whether or not it is his competence or

8  some sort of--

9  Q    I'm sorry, the last word?

10  A    Incompetence.

11  Q    Incompetence.  Yes?

12  A    Whether or not it was caused by incompetence or caused by

13  uncontrollable bias.  But they develop the safeguard we apply.

14         And, now days, we also, you know implement, you know

15  secondary-- I mean, you know, the secondary examiner has to be

16  kept away from the primary examiner until the primary-- the

17  examiner finishes his or her exam.

18         And results would be hidden and only, you know,

19  relevant materials would be passed on to, you know, secondary

20  examiner and do examine and issue his or her conclusions

21  completely separate from the primary.  Separate from the

22  primary examiners.

23         So, we are fully aware of the existence of cognitive

24  bias but we never know how successful we are.

25  Q    You have, don't you in the F.B.I. standard operating

1  procedures.  Not the F.B.I., I'm sorry, your organization,

2  standard operating procedures for how things should be done.

3  A    Well, every exam we do, not only for speaker recognition,

4  you know examinations, is-- we have standard operating

5  procedures written.  So, speaker recognition examination also

6  has, you know, SOP.

7  Q    Your standard operating procedures, you have a specific

8  section, 6.12, that controls the use of this second opinion;

9  is that right?

10  A    Can I look at-- I don't remember exact section numbers.

11  Q    3500-HN-1.

12  A    Okay.

13          MR. ARIAIL:  He doesn't have a copy.

14          MR. STERN:  I will get a copy from one of my

15  colleagues and give it to you.

16          MR. ARIAIL:  I think it is 3500-HN-3.

17          MR. STERN:  Is this it?

18          MR. ARIAIL:  Yes.

19          MR. STERN:  Mine is HN-1.

20          For some reason we have different numbers for them.

21  The HN-1 that I have, HN-3 that the government has, are the

22  same document.  I'm not sure how that happened.  Anyway that

23  is the fact of it.

24  Q    Doctor Nakasone, I will show you this document, you tell

25  me if you recognize what-- may I approach, Judge?

1           THE COURT:  Yes, you may.

2   Q    You tell me if you recognize what it is.

3   A    Yes, I recognize it.  It is table of decision.

4   Q    What is the part below it, 6.12?

5   A    6.12.  Second opinion.

6   Q    Why don't you read that-- what are those, are those the

7   standard operating procedures that --

8   A    It is part of it.  Yes.

9   Q    Portion of it?

10  A    Yes.

11  Q    Read section 1.-- 6.12 and 6.121.

12  A    Second opinion, a second opinion by another qualified

13  voice comparison examiner must be obtained for all decisions

14  in the table of fused decision, including inconclusive

15  results.

16  Q    What is the table of fused decisions?

17  A    This table indicates rules of fusion of machine based

18  results and human based results.

19          And it encompasses from match, no match,

20  inconclusive, probable match, probable no match.

21  Q    So that chart would be used if two examiners came up with

22  different results?

23  A    No.  This table is meant to fuse, the final examiner's

24  perceptual results with the results coming from the computer.

25          (Transcript continues on next page.)

Nakasone - cross - Stern                               429

BY MR. STERN:  (Continuing)

Q    I see.  Okay.  Now if you would, read 6.121.

     First tell me what it's about and then read it if
you would.

A    6.121.  The second opinion process must be completely
independent of first examiner's decision and the first
examiner should not provide any oral or written information
about his or her final decisions.  However, the first examiner
must provide their case notes to include a list of recognition
algorithms, control groups, control speaker models, UBMs, and
result in scores for the second examiner to review.

Q    Now, that is a mechanism for trying at least to avoid
cognitive bias, right?

A    That is correct.

Q    And the rules that you have in your standard operating
procedures are important to the efficient functioning, the
accurate functioning of the work you do, isn't it?

A    That's correct.

Q    Okay.  Now, you talked about Dr. Lindh's report at some
length here, haven't you?

A    Today, yes.

Q    Yes, today.  And you said, I think, that you don't speak
Swedish.  Is that correct?

A    That's correct.

Q    And that while you know some phonetics, you're not an

1    expert in phonetics?

2    A    That's correct.

3    Q    And I think you also said that the FBI didn't have on

4    staff at least a person who speaks Swedish and knows

5    phonetics, is that right?

6    A    That's correct.

7    Q    So do you know whether or not Dr. Lindh's phonetic

8    analysis is accurate?

9    A    I simply know that if he's, you know, a phonetician, it

10   would add value to the final conclusions, but assessing his

11   competency of his phonetic knowledge really does not belong to

12   me.  I don't know.

13   Q    It doesn't belong to you because you can't do it, right?

14   A    Yes, because I don't speak his language and I have never

15   worked with him.  Only thing that I can assess his competency

16   is by reading his approach and a thorough documentation what

17   he does, but I do not know.

18         So, since I do not know his, you know, characters or

19   his reputations, I contacted three individuals who are in the

20   same field.  The first one was Dr. Jos, J-O-S, Bouten who is

21   the scientist at the Netherland Forensic Institute.  In

22   person, I asked him if he was aware of a Mr. Lindh and he said

23   yes.  And I said, I asked is he good or bad.  And his answer

24   was he is highly reputable.

25         MS. KELLMAN:  Objection to some other scientist.

Nakasone - cross - Stern                    431

1              THE COURT:  Overruled.  I mean, it's a question

2     asked by defense counsel.

3              MR. STERN:  Well, it's not really the question asked

4     by defense counsel.  My question was whether or not he

5     himself --

6              MR. ARIAIL:  Your Honor, he should be allowed to

7     finish his testimony.

8              THE COURT:  No.  Wait.

9              MR. STERN:  I think that --

10             THE COURT:  Wait a minute.  Two people cannot talk

11    at one time.  I mean she can't do it.

12             I'll allow you to answer.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  Yes.

15    A    Well, I did that because realistically speaking, I can't

16    judge other, you know, phoneticians', you know, integrity and

17    competencies unless I talk to somebody I trust.  So, Dr. Jos

18    Bouten of Netherland Forensic Institute mentioned to me they

19    know each other well and that he's highly reputable forensic,

20    you know, phoneticians.

21             Okay.  So, I contacted second person who was

22    Dr. Michael Jessen of the German forensic laboratory BKA.  He

23    also mentioned to me that he knows Mr. Lindh well and he's a

24    good, you know, phonetician.  All right.  These European

25    opinion.

1        So, I contacted the leading phonetic, you know,

2   speaker recognition in the United States of America.  Her name

3   is Ms. Eva Shwartz, E-V-A, S-H-W-A-R-T-Z.  And she also echoed

4   a similar response about Mr. Lindh.

5        I think this is, you know, it may be hearsay, but

6   usually when a scientist want to know other scientist

7   reputations, that's the only way we can assess.

8   Q    Well, did you talk to anyone who checked his work on this

9   case?

10  A    That -- I thought that's why I was reading his report.

11  Q    Well, you don't speak Swedish.

12  A    Oh.

13  Q    And you don't do phonetics.  Fair to say?

14  A    Right.

15  Q    So you didn't check his work on whether or not the

16  Swedish phonetics he applied in this case was accurate or

17  inaccurate, did you?

18  A    No, I did not, and that was not the, you know, I was

19  request to do.

20  Q    So did you talk to anyone who checked those things in

21  this case?

22  A    No, I did not.

23  Q    Did he have a second person like you have in your shop,

24  your organization, do it independently from him so you could

25  see if the results came out the same?

Nakasone - cross - Stern                      433

1  A     I was here during his, you know, examination, I mean,

2  testimony yesterday.  I do recall he mentioned that there are

3  two persons in Sweden who does speaker recognition and he's

4  the only one who was certified by NFC.  I think that's how it

5  was spelled, NFC.  National Forensic Center in Sweden.  So

6  this means that probably he cannot afford to have a second

7  examiner except he has, he also testified that he had Carly

8  working in his laboratory.

9  Q     Well, that wasn't independent, was it?  That was someone

10 working with him?

11 A     Okay.  If he was, the second person is equally qualified

12 as he is regardless of where he works, I think this person can

13 be qualified as a second examiner according to our, you know,

14 protocol, our regulations or our rules, I should say, but if

15 he was not qualified, no matter where he is, he can't function

16 as a second examiner.  So I don't know.

17 Q     Well, your rules say that one shouldn't know anything

18 about what the other is doing, don't they?

19 A     Except, you know, processing, but, yes, this decision

20 shouldn't be known to the other.

21 Q     So two people working together are not the same as that,

22 are they?

23 A     If there's a rule.  I mean, you know, even, you know, in

24 our environment, most examiners, you know, sometimes work in

25 the same environment but they can hide their conclusions in a

Nakasone - cross - Stern                434

1   computer.

2   Q    Did you hear any testimony that these two were hiding

3   their conclusions from one another?

4   A    During his testimony?

5   Q    Yes.

6   A    I think I missed it.

7   Q    Yes, I think I did too.

8        Did you hear them say we were keeping secret from

9   each other what our conclusions were, what our thoughts were,

10  what we were doing?

11  A    If he said it, I didn't hear it.  I don't know.

12  Q    So the answer is no, you did not hear that?

13  A    I don't remember.  Maybe not.

14  Q    As a matter of fact, what you heard is that they've

15  worked together, that one of the people was not a forensic

16  voice examination person, he was just a phoneticist, and that

17  they discussed what they were doing as they worked on it,

18  isn't that what you heard?

19  A    That may not be qualified as a second examiner.

20  Q    If that's what happened --

21  A    That may be team members.

22  Q    Team members, right.  Not a second examiner?

23  A    No.

24  Q    Okay.  Now, you have some knowledge about mismatched

25  speaking styles, right?

Nakasone - cross - Stern                    435

1   A    I think I spoke about it elsewhere, yes.

2   Q    And it's difficult to compare mismatched speaking styles,

3   isn't it?

4   A    Yes.  It also depends upon degree of a mismatch.  We know

5   that, we can't really compare red speech sample well

6   against --

7   Q    I'm sorry.  What is the word?

8   A    Red speech.

9   Q    Red, R-E-D?

10  A    Red speech against the element of speech or rapidly going

11  conversational speech.

12  Q    Yes, as a matter of fact, you believe, don't you, that in

13  regard to speaker style, rapid speech, mismatched speaking

14  styles are insufficient for use in analysis, that's what you

15  believe, isn't it?

16  A    It depends upon who, which voice you are comparing

17  against, yes.  If both are rapidly speaking, then that's okay,

18  but one is very monotonous in a slow rate for unknown reasons

19  and the other one is rapid talker and it could be, sometime it

20  could be due to the, you know, speaking characteristics of the

21  individuals but ideally, you know, both speech samples from

22  unknown and known should be spoken reasonably in a similar

23  conditions and speaking style.

24  Q    So both are red.  That would be okay, right?

25  A    Yes.

Nakasone - cross - Stern                              436

1    Q     If both are normal conversation, that would be all right?

2    A     That would be okay.

3    Q     But would pose difficulties if one were red and one were

4    normal conversation?

5    A     We do observe some degree of degradation in the results

6    of the comparisons if one voice is, you know, red and the

7    other is rapid exchange in the conversation.  Usually we

8    prefer to compare conversation against conversation.

9    Q     It would fairly state your opinion to say in those

10   mismatched styles, they are insufficient for use and analysis;

11   would that fairly state your opinion?

12   A     This is kind of, you know, a caution area for the

13   examiners, if the, you know, conversational speech is provided

14   to represent, you know, unknown voice or incriminating voice,

15   we have to compare against, say, interviewing the voice or red

16   speech.

17          We have to assess by using our experience whether or

18   not we should go ahead and compare or we may note the

19   difference is too drastic and then we may say, okay, it's not

20   doable.  It's a judgment call sometime because not everybody

21   reads things completely different way from normal

22   conversation.  That's kind -- that's got to be decided by

23   human forensic examiner.

24   Q     Dr. Nakasone, on April 17, 2015, you spoke with an agent,

25   didn't you, named Stefanie Roddy?

1    A    Yes.  I think there were many, I mean, a few individuals.

2    Q    Do you know who they were?

3    A    I think they were in New York.

4    Q    No, not where they were, who they were?

5    A    I -- okay.  Ms. Salick was there and Mister, you know,

6    Ariail was there and I couldn't tell whether it was, you know,

7    Agent Mary was there or Stefanie Roddy.  We never met before.

8    Wait a minute.  Did we meet?  Was it after we met?  I'm sorry.

9    Okay.  September?  Okay.  March 13th, we had a face-to-face

10   meeting.

11   Q    You know what?  I'm sorry.  I gave you the wrong date.

12   A    Yes.  I can't recall everything.

13   Q    Dr. Nakasone, I gave you the wrong date.  It's April 10th

14   of 2015.  I said the 17th but I was wrong.

15   A    Okay.  Thank you.

16   Q    So on the 10th, did you meet with this group of people

17   you're talking about?

18   A    I never met, but we had teleconference, I think,

19   telephone conference.

20   Q    A teleconference?

21   A    Teleconference.

22   Q    And in that teleconference, you were preparing to come

23   and work on this case, weren't you?

24   A    I was talking with them about the results of my quality

25   evaluation of the evidentiary audio files.

Nakasone - cross - Stern                    438

1    Q    Well, you talked about more than that, didn't you?

2    A    If you can remind me what I talked about, maybe I can

3    confirm what I've remember.

4    Q    I can fairly assume, can't I, that everything you told

5    them was the truth?

6    A    Of course.

7    Q    And didn't you tell them that in regard to speaker style,

8    for example, rapid speech, mismatched speaking styles are

9    insufficient for use in analysis?  Did you tell them that or

10   not?

11   A    I mentioned not in exactly the same way but let me just

12   try to remember, you know, in what context I spoke about it.

13   There was, at one particular -- there was three particular

14   recordings and that individual was speaking, it was known

15   voice samples was speaking as if he were just, he just woke up

16   or lying on his back for a long time.

17   Q    I'm not asking you about the specific situation.  I'm

18   asking you did you make that statement in regard to speaker

19   style, for example, rapid speech, mismatched speaking styles

20   are insufficient for use in analysis.  Did you make that

21   statement?

22        MR. ARIAIL:  Objection, Your Honor.  He was

23   answering the question.

24   A    Not exactly the same way because if one was -- if one is,

25   you know, using a different speaking style against the voice

CMH       OCR       RMR       CRR       FCRR

Nakasone - cross - Stern                    439

1   which supposed to be compare and then this kind of comparison

2   will not produce a meaningful result, but if both of them, the

3   question voice and known, both are rapidly, you know, engaged

4   in the speaking mode, the comparison would be okay.

5   Q    I'm going to read this to you again.  I'm going to focus

6   on the word "mismatched" which is what you're talking about,

7   okay?

8   A    Okay.

9   Q    Is this your statement?  In regard to speaker style, for

10  example rapid speech, mismatched speaking styles are

11  insufficient for use in analysis.  Is that your statement?

12        MR. ARIAIL:  Objection, Your Honor.  I think this is

13  a report he's referring to.  Dr. Nakasone had never seen this

14  report.  I think it would be appropriate to refresh his

15  recollection with a report given that he stated that he

16  doesn't remember exactly what he said, but --

17        MR. STERN:  I'm asking --

18        THE COURT:  Wait a minute.

19        Can you answer that question, is that your

20  statement?  Can you answer?

21  A    Okay.  I do recall that I -- well, it's kind of, you

22  know, my belief too.  Speaking style mismatch would cause

23  higher error rates.

24  Q    Higher error rates?

25  A    I didn't say -- I don't remember calling it insufficient,

Nakasone - cross - Stern                          440

1    but it tends to produce higher error rates.

2    Q    Let me show you this document then and see if that

3    refreshes your recollection.

4              MR. STERN:  May I approach, Judge?

5              THE COURT:  Yes.

6    Q    Starting here to here.

7              THE COURT:  What is this?  Is this his report?

8              MR. ARIAIL:  Your Honor --

9              MR. STERN:  It's a 302 that I take it an agent wrote

10   reporting what he said to them.

11             MR. ARIAIL:  It might be helpful to note for the

12   record what the 3500 number is.

13             MR. STERN:  That's not the front page.  I'll tell

14   you in one second.

15             It's 3500HN-19.

16             THE COURT:  HN-19?

17             MR. STERN:  Yes.

18             THE COURT:  Okay.

19   A    Okay.  This is notes taken by maybe special agent or

20   somebody on the other side and it is, you know, reasonable

21   representation of my belief.

22   Q    Okay.

23   A    Would that suffice?

24   Q    That will suffice.

25   A    It's a reasonable representation of my belief.

Nakasone - cross - Stern                441

1   Q     Okay.  Thank you.

2           MR. STERN:  Judge, can I have one moment, please?

3           THE COURT:  Yes.

4           (Pause.)

5           MR. STERN:  Thank you.

6   Q     Now, you've talked about OSAC.

7           I'm sorry.  Are you ready?

8   A     Yes, Mr. Stern.  I'm ready.

9   Q     You've talked about OSAC, right?

10  A     Yes.

11  Q     And tell me again what the committee you're on, if that's

12  the right word for it, is doing?

13  A      I'm on committee for, I mean, subcommittee of the speaker

14  recognition.  And the OSAC, you know, structurally, has maybe

15  approximately 24 individual subcommittees and speaker

16  recognition subcommittee is pledged under digital multimedia

17  scientific working, you know, committee and then four of those

18  subcommittees.

19          Speaker recognition is one of them, facial

20  recognition is another and image analysis is another and then

21  we have a digital evidence section as well.  Other sections

22  will contain DNA, fingerprints, block analysis, chemistry

23  analysis, and speaker recognition is just, you know, a brand

24  knew discipline within this, you know, large organization of

25  the forensic science disciplines in the United States.

Nakasone - cross - Stern                    442

1  Q     But what's the goal of the committee you're on in OSAC?

2  What are you trying to accomplish?

3  A     Our main goal is to, you know, strengthen the forensic

4  scientists in the United States of America and then the

5  individualized, you know, goals and objectives depends on each

6  subcommittee because each subcommittee has a different

7  experience and level of, you know, level of the strength of

8  the, you know, value of that, you know, subcommittees.

9          So, if I concentrate on speaker recognition

10  subcommittee, our goal is to establish the consensus-based

11  standards guidelines, the specifications for the collection of

12  the audio or samples in the transmissions over telephone and

13  also establishing, you know, standardized guidelines, what's

14  best practice to conduct speaker recognition by using

15  automatic speaker recognition algorithms as well as by

16  utilizing phonetics approach.

17  Q     So that's -- I'm sorry.

18  A     And of course, you know, subcommittee has, you know,

19  other functions.  We recently, the committee -- I mean, the

20  community recently established the first national standards

21  for voice transmissions and that standards is called the type

22  11 which is part of the larger, you know, standards currently

23  available in the United States of America and that is known

24  as, okay, ANSI NIST, American National Standards

25  Institute/National Institute of Standards and Technology.

Nakasone - cross - Stern                    443

1        They have this, you know, huge responsibility to

2   establish transaction standards for all biometrics including

3   from fingerprints, DNA, eyelids, face, and just recently the

4   community established first national standards to transact

5   audio informations and within this OSAC subcommittee for

6   speaker recognition, we have a task group to, you know,

7   produce best practice, you know, how to implement that into

8   each local state and local agencies so that, you know,

9   transaction will be standardized across communities.

10        (Continued on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nakasone - Cross - Stern                    444

1   CROSS EXAMINATION BY MR. STERN:

2   Q    Talking specifically about voice identification.

3   A    Yes.

4   Q    Why is it useful or important to do that, have the

5   standardized widely accepted guidelines?

6   A    So that there would be a uniform way of analyzing and

7   transmitting, exchanging data between multiple agencies.

8   Q    And is it also to be sure that testing is done in a way

9   that it can be checked, that is, people are qualified, that is

10  given certifications of some kind, their labs have the

11  appropriate equipment?  You talked about for example, bad

12  testing or something.  I don't remember the exact word that

13  you used?

14  A    Yeah, that would be -- come later.  But this voice

15  transaction standards was not meant for research purpose.  It

16  is operational.

17          This-- that transaction is written for actual

18  exchange of the voice data between organizations.

19  Q    By that you mean how people give one piece, if I use the

20  word "evidence", to another person or organization?

21  A    That's correct.

22  Q    But are the guidelines yet done for how testing should be

23  carried out?

24  A    Yeah, guidelines has been established.  It has been

25  published December of 2013.  And then this task group within

1  the OSAC, you know, subcommittee for speaker recognition now,

2  testing it and then they are going to establish now,

3  guidelines.  And I think they are charged to finish that up,

4  sometime in January of 2016.

5  Q    But it is not done quite yet?

6  A    Not yet.

7  Q    Okay.

8          Now, are you familiar with the process called

9  accreditation?

10  A    Yes, I am to certain extent.

11  Q    What is accreditation?

12  A    Accreditation is, you know, organizational line of

13  process and there is an -- F.B.I. is under accreditation

14  program under the ASCLB, American Society of Crime Lab

15  Directors.  Also it has component in it, known as lab or

16  laboratory accreditation board, in conjunction with the ISO

17  17,025, and the voice or speaker recognition program resides

18  within forensic audio, video and imaging analysis and then

19  within this evidence section.

20          Now, as a group, operational technology established

21  this evidence section and the entire digital evidence

22  laboratory of the ODT was going through accreditation process

23  and generally 2007, well, we were accredited by ASCLB.

24          Then I'm not sure if that is available in Europe or

25  elsewhere.  But accreditation, that is not really certified

1   individual examiners in any disciplines.  It is simply

2   accredits laboratory procedures and logistics and also quality

3   controls.  It does not accredit individual examiners.

4   Q     By quality controls, what do you mean?

5   A     Quality control means, there are lots of protocols.  We

6   have to be, you know, careful about, say like how we should

7   maintain chain of custody of the evidence.

8             And how we are going to write reports and what we

9   need to do with the evidence once examination is done.  What,

10  you know, evidence can be kept indefinitely and what evidence

11  must be returned to the contributor and what evidence must be

12  purged immediately.

13  Q     So when a laboratory is accredited, you have some kind

14  of, I don't know about assurances, but at least hope that they

15  follow all those kinds of rules you were just discussing?

16  A     That's correct.

17            And also, thanks-- I mean due to this, you know

18  accreditation process, we have, you know, standard operating

19  group procedures, to write standard operating procedures so

20  that there will be uniformity within the same laboratory.

21  Q     Do you allow each laboratory to write their own

22  protocols?

23  A     They have to write their own standard operating

24  procedures.  But, that, you know, format, must be in

25  compliance with the, you know, regulations established by this

1   manuals.

2   Q    Is that the same as a template for how a report should be

3   prepared, are those two things the same?

4   A    You are referring to standard operating procedures?

5   Q    Ah-hum.

6   A    No.  Standard operating procedures is not really step by

7   step, you know.  Dictated type of statement.  It is general,

8   it is a flow of the examinations.

9   Q    The flow?

10  A    Yeah.

11       What flow of the examinations.  Say like what tool

12  is approved by the F.B.I. and what examiner has to do first.

13  Followed by what and how, you know, assessment will be done

14  and what kind of, you know, safety guard must be implemented.

15  An examiner is expected to follow that, standard operating

16  procedure as much as they can.

17  Q    Okay.

18       Now, you talked at some length about Mr. Lindh's

19  report, do you recall that I assume?

20  A    Yes, I do.

21  Q    And, you talked about a number of things he did.  I want

22  to try to find out from you, whether or not you think those

23  things played a role in his decision making.  Okay.

24       So first of all, he did phonemic and morphemic

25  lexical analysis.  That did play a role in his decision

1   making, right?

2   A    I hope so.

3   Q    And then you talked about intonation and speech rhythm,

4   do you recall that, don't you?

5   A    Yes.

6   Q    And, there were no distinct rhythm features discovered,

7   right?

8   A    I don't recall, I'm sorry.

9        You mean in his report?

10  Q    His report, yes, that is what I mean.

11       Well, do you remember this report at all, or do you

12  have to have it in front of you to talk about it?

13  A    I rather want to have it in front of me, sir.

14       MR. STERN:  I'm sorry, my report is marked up.  If

15  you can ignore my marks on it.

16       MS. KELLMAN:  Maybe the government has a copy.

17       MR. ARIAIL:  I'm looking.  We have given many of

18  ours away.

19       (Pause.)

20       MS. KELLMAN:  If the government is out of copies,

21  Judge, perhaps we can take a 10-minute break and get a clean

22  copy.  I didn't know--

23       THE COURT:  Will we need a 10-minute break?

24       MR. ARIAIL:  Your Honor, I think if you give me a

25  second, we can get a copy.

1          THE COURT:  All right.

2          (Pause.)

3          MR. ARIAIL:  I will hand the witness 3500-JL-56,

4    Your Honor.

5          THE WITNESS:  Thank you.

6    Q    So if you will go to page ten, please.

7    A    Okay.  I'm here.

8    Q    You see a section 3.2.3, that's entitled intonation and

9    speech rhythm?

10   A    Okay.

11   Q    It says, no distinct rhythmic features were discovered,

12   right?

13   A    Yes.  I see that.

14   Q    And it says, the obvious similarities still give some

15   support of the hypothesis compared to the alternative

16   hypothesis, do you see that?

17   A    Yes.

18   Q    Now, can you tell me, how if there are no distinctive

19   rhythmic features, they can support either hypothesis?

20   A    I think what he means, and my understanding is that no

21   support means, he really cannot, you know, get any

22   deterministic information to tell the source of-- the source

23   of the message.  He is not supporting all hypothesis, nor

24   alternate hypothesis.

25   Q    So when he says, it still gives some support for the

1  hypothesis compared to the alternate hypothesis, you think he

2  doesn't really mean that?

3  A    He-- okay what he meant is that--

4         MS. KELLMAN:  Objection to what somebody meant, Your

5  Honor.

6         THE COURT:  Overruled.

7  A    He reached inconclusive results.  But it does-- it has

8  really nothing to do with the usefulness of the analysis.  He

9  simply indicated he did, but it was kind of a ball park, fell

10 in the average zone.  So he can't really use it.

11 Q    So it really had no meaning, that particular analysis of

12 intonation and speech rhythm?

13 A    Right.

14 Q    And then, there was voice quality, which you talked about

15 some, right?

16 A    Yes, I did.

17 Q    And there were no dissimilarities supporting any

18 alternative hypotheses, right?

19 A    I see it, yes.

20 Q    But it also didn't support the hypothesis?

21 A    That's correct.

22 Q    That is, it could have been the 5'10" person you talked

23 about or the, I think you said 1200 hertz, I might have the

24 number wrong, but the average voice?

25 A    Yes, 120 hertz.  Yes, very much average.

1   Q    So someone with the-- the fact somebody has an average

2   voice can neither support the alternative hypothesis or the

3   hypothesis, right?

4   A    That is correct.  And that happens when we listen to

5   individuals behind doors.  We cannot see them.  But somehow

6   these two individuals have same vocal quality.  Okay.  The

7   voice quality means what quality.  Like, you know, I have my

8   own tones and you know anybody can kind of tell my name.  And

9   you have your own.

10            So this is the-- vocal cord is something we listen

11  to, and assess his overall, you know, voice quality.  It is

12  not-- it is kind of unique characteristics of his voice.  He

13  simply saying he cannot tell whether they are the same voice

14  or they are different voices.  So, no.

15  Q    No help to him in reaching his ultimate conclusion?

16  A    Correct.

17  Q    Then let's go to 3.3.1 articulation rate.

18  A    Yes.

19  Q    And, that too, if you go to page 11, gave him no support

20  for any hypothesis?

21  A    Yes.  I see that.

22  Q    So that also was no help to him in reaching any

23  conclusion in this case?

24  A    Yes, that's correct.

25  Q    And, next he has the fundamental frequency rate, do you

1   see that, 3.3.2?

2   A    Yes.

3   Q    And, that also has no support for any hypothesis, right?

4   A    Yes, that's correct.

5   Q    So that was no help to him in reaching his ultimate

6   conclusion?

7   A    Yes.

8        May I inject something?  Or no.

9   Q    No.

10  A    Okay.

11  Q    Then there is 3.3.3 entitled format frequency analysis,

12  right?

13  A    Yes.

14  Q    And, as hypothesis one, he says, though it has the

15  highest range of support for hypothesis one, the range of

16  scores gives no distinct support, right?

17  A    Correct.

18  Q    And for hypothesis two, he says, there is no support for

19  any hypothesis because of, I-- due to audio quality.  I assume

20  that means poor audio quality; is that right?

21  A    Okay.

22  Q    And, number three, no support for any hypothesis, also,

23  right?

24  A    Okay.

25  Q    And so format frequency also was no real use to him in

Nakasone - Cross - Stern                    453

1  reaching his conclusion, is that fair to say?

2  A    Yes, that's-- his decisions by using those.

3  Q    So, really, the entire decision he made in this case, was

4  based on the myometric statistical comparison of voices and on

5  his lexical analysis of the morphemic and I will say it wrong,

6  so I will read it, phonetic and linguistic analysis.  He calls

7  it phonetic and linguistic analysis.  That and the biometric

8  analysis are the only two things he relied on in reaching his

9  conclusion, is that also fair to say?

10  A    In the end.  But in the process, he used three of those.

11  And one of them turns out to be very small weight given.  But

12  I do not discard the fact that he was using all of those.

13  Q    When you say, he was using all of those.

14  A    Acoustic, phonetic and automatic.

15  Q    For each of those, he says, no support, doesn't he?

16  A    Yes, no support means he reached nothing conclusive.  But

17  the fact he did, tells that he is using-- he is exhausting

18  every means available to him.

19          And, I think it is a good practice, and by looking

20  at the-- his fundamental frequency chart, and by looking at

21  that, the fundamental frequency chart, provides the

22  appearances that two people involved in this, by looking at

23  fundamental frequency.

24  Q    There are two?

25  A    Two.

1          But the fact that he concluded, inconclusive,

2   indicates he knows what he is doing.  Meaning that this kind

3   of small variation shouldn't be regarded as a, you know,

4   distinctive two voices.

5          So, this is sort of, you know, another way of

6   assessing how careful he is.  That's all.

7   Q    By all the things he did, that ended up not providing any

8   support?

9   A    That is correct too.

10          (Transcript continues on next page.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Nakasone - cross - Stern                    455

1   BY MR. STERN:  (Continued)

2   Q    Is it fair to say that in doing this, he appears to have

3   no doubt on Somali-speaking Swedish people at least as far as

4   articulation?

5   A    Yes.

6   Q    Okay.  Now, the FBI has an official position when it

7   comes to speaking in court, don't they, testifying in court?

8   A    Yes, they do.

9   Q    And when you testified in the <u>Zimmerman</u> case in 2013, has

10  the technology gotten so much better that you've changed your

11  opinion on whether or not people working for the FBI should

12  testify in court?

13  A    In 2013, no.  I think the one incremental, you know,

14  improvement took place in 2010 so in 2013, we were still

15  riding on the same trend.

16  Q    Your opinion was the same as it is today?

17  A    That's correct.

18  Q    An is it your opinion that even after doing biometric and

19  human analysis, that you're still a couple of years away and

20  that there's a long way to go before the system is ready to

21  render its opinions in the courtroom?

22        Is that your opinion as you sit here now?

23  A    That's my opinion with a caveat.  If I may speak about

24  the caveat.

25  Q    Well, for now, I'm just asking is that your opinion.

Nakasone - cross - Stern                    456

1   A    Largely, it states it's my opinions but there's a "but."

2   Q    I guess you're determined to tell me the "but" so you

3   might as well.

4   A    Yes.  The -- I think the community believes --

5   Q    I'm sorry.  I didn't understand the second word you said.

6   The community?

7   A    The community, the community composed of scientists,

8   engineers who formed this speaker recognition area believes

9   that, you know, technology has come a long way and we have, we

10  recognize that there has been, you know, notable, you know,

11  maturity in the technology, however, there are so, you know,

12  inconsistent practices among the scientists because we've been

13  sort of isolated, not because, you know, research activity was

14  kind of, you know, dormant or anemic, but it has been quite,

15  you know, hot.  However, we feel would need to establish

16  standards and guidelines and I believe at least it would take

17  a couple of years or so, at least a few years or so.

18          In my opinions, not representing my, you know,

19  subcommittee of in OSAC, in my opinion, if something good

20  comes along, I think it's reasonable to, you know, provide,

21  you know, that, you know, technology would provide support of

22  the, you know, the investigators and also in a court and then

23  the factfinders by introducing this in evidence and this, you

24  know, condition must be clarified, of course.  This testimony

25  of speaker recognition, if done appropriately, should be

Nakasone - cross - Stern                    457

1   utilized in corroboration with other evidence and should be

2   taken under, you know, very, abundant, you know, cautions

3   about your potential or limited error rates.

4   Q    Well, I'm going to read you something from your standard

5   operating procedures and you tell me if I'm reading it correctly.

6   Okay?

7   A    Sure.

8   Q    And those are dated September 15, 2014.  Right?

9            MR. ARIAIL:  Objection.

10           THE COURT:  Yes.

11           MR. ARIAIL:  I don't know if he has the standard

12   operating procedure in front of him.

13           MR. STERN:  He doesn't.  I'm going to read it and

14   ask him if it's true or not.

15           THE COURT:  Do you have it or do you need it?

16           THE WITNESS:  I don't know what he has.

17           THE COURT:  Standard operating procedures.

18           MR. STERN:  It's HN-1.  You know what I'll do?  If I

19   can read it and then hand it to him because I only have my copy.

20   Q    So I'll read it and then hand it to you.  Okay?

21           MR. ARIAIL:  I have a copy.

22   A    I don't know if you're talking -- September 15, 2014?

23           MR. ARIAIL:  I have a copy, Your Honor.  I'll

24   provide to the witness.

25           THE WITNESS:  Oh, that must be the same copy that

Nakasone - cross - Stern                458

1    FBI released.

2              MR. ARIAIL:  Yes, for purposes --

3              THE WITNESS:  And this is the date signed off by the

4    unit chief.

5              MR. ARIAIL: It's the copy that was released by the FBI.

6    Q    Okay.  I don't know of any of that, but this is your

7    standard operating procedures, right?

8    A    Yes.  You said operational technology divisions.  Yes, I

9    was involved in the development of this standard operating

10   procedure.  Yes, I know what you're talking about.

11   Q    Okay.  These are still the operating procedures you

12   operate under, is that right?

13   A    That is correct.

14   Q    All right.  And these are from, this particular copy,

15   anyway, is from September 15, 2014.

16   A    Yes.

17   Q    And there's a specific section entitled, Limitations.

18   It's section four.  Is that right?

19   A    That's correct.

20   Q    And I'm going to read it to you and you tell me if I read

21   it accurately or not.

22              Voice comparison examinations by the automatic

23   method -- which is like, what, Batvox?

24   A    No, sir.

25   Q    What is the automatic method?

Nakasone - cross - Stern                    459

1   A    We have our own and I am not limited --

2   Q    I meant by something like Batvox.  I didn't mean

3   specifically what you use.  I mean a mechanism like Batvox.

4   A    I'm using one of those cutting edge technologies.  I

5   cannot reveal the name.

6   Q    No, I'm not asking you to do that.  The perceptual method

7   which is what?

8   A    By listening by the trained examiners.

9   Q    Or by a combination of two methods is not considered a

10  positive means of identification and, therefore, the results

11  of these examinations are furnished for investigative guidance

12  only.

13           Is that your standard operating procedure?

14  A    That is correct.

15  Q    Now, you also, as we've talked about, gave testimony in

16  the Zimmerman case in which you talked about it and I want to

17  read you a quote beginning on page -- are there page numbers

18  in here?  This doesn't appear to have page numbers unless I

19  missed it.

20           MR. STERN:  There's no page numbers, Your Honor.  So

21  I can read the quote and then show it to him but I don't have

22  the page number.

23  Q    But is this a quote of your testimony not at the trial,

24  but at some other proceeding involving Mr. Zimmerman.

25           Question:  Once you've processed the speech with

1    computer software, what do you do in your analysis next?

2           Answer by you:  Next would be the fusion of the

3    scores coming from human examiners, what scores coming from

4    computer and I said like the auditor examiner, I mean, was

5    compression.  The examiner comes up with a --

6           It actually said "exam" but I think it's supposed to

7    say "examiner."

8           The exam the comes up with match where the computer

9    says inconclusive or if computer says match also, only at that

10   time, examiner is allowed to render a final conclusion of

11   match, but if the computer comes up with a negative, a match

12   or no match, the examiner is forced to say inconclusive with

13   there are a variety of new rules to dictate what no

14   conclusions can be, a, you know, issued by first examiner is

15   final conclusions.

16          Question:  You don't make any match based solely on

17   the computer software?

18          Answer:  That's correct.

19          Question:  It's always reviewed by a listener,

20   trained listener?

21          Answer:  Right.

22          Question:  And when you say matched, does that mean

23   the examiner, at least from the FBI's perspective, would be

24   able to testify in court?

25          Answer:  No, sir.  Right now are still under the

Nakasone - cross - Stern                    461

1    policy guidelines.  The -- we can issue the report only as a

2    investigative guidance.  We do not go to court and testify the

3    results of analysis we did.  We, we about a couple of years.

4    That is a possibility, but we have a long way to go before the

5    system is ready to be rendered its opinion in the courtroom.

6              Is that a statement made by you in the Zimmerman case?

7    A    It's coming from my YouTube or -- you know, it's

8    consistent with what I said.

9    Q    Well, let me show it to you.

10   A    Yes.

11   Q    Would it help if I show to you?

12   A    No, I was a little bit surprised I was talking about the

13   fusion matrix, but if I said it, maybe I did.

14   Q    Well, let me show it to you and you can read it and see

15   if it reminds you that it's something you said on June 6, 2013.

16   A    June.

17            (Pause.)

18   A    Yes, I'm familiar with this.

19   Q    I'm sorry.  Could you say that again?

20   A    I'm familiar with this.

21   Q    Okay.  Is that a statement you made on June 6th?

22   A    The trial was on June 6th, yes.  It must have been.

23   Q    Okay.  Now, I want to just ask you a few more questions

24   about how you determine whether or not an automatic system is

25   being used appropriately.  Okay?

Nakasone - cross - Stern                    462

1  A     Okay.

2  Q     You know what an imposter set is, right?

3  A     Yes.  Usually imposter set means, you know, individuals,

4  that none of them belongs to the questioned voice.

5  Q     And do you know what a reference set is?

6  A     Usually, the community -- well, according to Batvox, I

7  should say, reference set means a smaller set of the universe

8  of background model and it could be much larger but it's sort

9  of, you know, reference set in which each individuals are

10 deemed to be very similar to the known individuals.

11 Q     And would you need to see those sets to know if a system

12 was being used appropriately?

13 A     I think this question, my answer would be the outside

14 scope of my testimony because I didn't check that.

15 Q     No, I'm not asking if you did check it on this particular

16 case.  I'm asking generally.

17 A     Yes.  Different, you know, level use different approach.

18 For example, within the FBI, we use different terminology to

19 do different things.  Say, like we use the terminology control

20 data set.

21 Q     Well, let me ask you the question a different way.

22 A     Yes.

23 Q     If a reference set were used wrong, could that affect the

24 way the test was done?

25 A     It will.

1    Q    And if an imposter set was used wrong, could that affect

2    the way a test was done?

3    A    It will.

4    Q    And if you couldn't see those things, if you weren't

5    allowed to see those things, could you determine whether or

6    not an automated system was being used appropriately?

7    A    Probably it would be difficult to assess if I know.

8    Q    Okay.

9              MR. STERN:  Judge, if I can have one moment.

10             THE COURT:  Yes.

11             (Pause.)

12             MR. STERN:  Thank you.

13             MR. ARIAIL:  Just briefly, Your Honor.

14             THE COURT:  Yes.

15   REDIRECT EXAMINATION BY MR. ARIAIL:

16   Q    Dr. Nakasone, you were testifying a minute ago about the

17   FBI protocol.  Does the FBI protocol include phonetic analysis

18   in its approach?

19   A    No, it doesn't.  I'm sorry.  It does not.

20   Q    And I think earlier, you testified that the use of

21   phonetic analysis would tend to improve the accuracy of an

22   analysis done with automated voice comparison?

23   A    I believe so.  That's my belief.

24   Q    And a minute ago with Mr. Stern, you made a comment, you

25   said something about, I think it was in the connection with

Case 1:12-cr-00661-JG-LB  Document 302  Filed 05/01/15  Page 98 of 128 PageID #: 1953

1   either formant analysis or acoustical analysis, you may have

2   injected something to Mr. Stern.  Do you remember that question?

3   A    Yes.

4   Q    What is it that you were going to say?

5   A    I think I testified already to what I meant that I wanted

6   to inject.

7   Q    Okay.  I'm sorry.  What was it that you wanted to say?

8   A    The fact that, you know, Mr. Lindh performed, you know, a

9   pitch analysis and he produced, you know, a chart of the pitch

10  distribution and that pitch distribution seems to be, you

11  know, seems to show a groupings of those data into two, namely

12  KS-1 and KS-2, but I was kind of, you know, happy to see the,

13  his final conclusions because he concluded that there was no

14  distinction between the two because that's correct answer by

15  me because there are some distinctions always.

16          The pitch is never stable and depending upon the

17  situational conditions, people use different pitches.

18  Probably in the morning, my, you know, pitch would be only 100

19  hertz, but, you know, as I'm talking in this courtroom, my

20  pitch goes up to 120 and depending upon who I am talking to,

21  it change all the time.  So, therefore, slight change in the

22  pitch shouldn't be regarded as a, you know, a sign of, you

23  know, two distinctive individuals.

24          So, if he was -- if he, you know, reached the

25  conclusion that this difference in the pitch would indicate

1    that, you know, there are two individuals, he didn't say that.

2    Instead, he decided to be a conservative.  Okay, maybe I

3    shouldn't say anything about that, it's kind of inconclusive.

4    To me, that was the correct answer and I sort of was happy to

5    see that.

6    Q     Mr. Stern asked you some questions about automatic

7    speaker recognition technology and Batvox.  I'm going to

8    withdraw that.

9          You talked a little bit about process, on cross

10   about Mr. Lindh's process.  And can you tell the Court what

11   your opinion is of the process that Mr. Lindh undertook to do

12   this analysis in this case?

13   A     I can tell only what's written and also gathering from

14   what he had spoken, testified yesterday, and I do not know how

15   he interacts, but I could gather by reading his voice that he

16   was careful in the assessment of the data just by reading his

17   voice and also, you know, he sort of covered every, you know,

18   analysis tools available and he documented every steps he took

19   and the measurements he took.

20         He also hypothesize some formulation which also

21   seems to be dictated, you know, by standards.  He didn't form

22   the hypothesis by himself.  He sort of, you know,

23   hypothesis -- those hypothesis one, two and three were given

24   by the contributing, you know, organization or agency.  But

25   this employs, okay, also, you know, a forensic analysis.  He

Nakasone - redirect - Ariail                    466

1    sort of, you know, seems to be, you know, providing a

2    tremendous constants in his approach.  It's his native tongue

3    and he can capture a lot of nuances no other people can.  So

4    that's, that's good one.

5          You know, he was sort of, you know, fusing his

6    results, but not in a way we do.  He really doesn't have to

7    because he's only one person or, you know, his team members,

8    but within the FBI, we have multiple examiners that have

9    multiple source of accounting and that's, in a way, the good

10   and bad.  If you are only one man company, you don't have

11   really a fair, you know, second opinion, but I think that's

12   would be sort of left to the National Forensic Center in Sweden.

13         So, overall, he was going through very carefully,

14   but only one thing, you know.  I mean, you know, I couldn't

15   really go into, you know, careful, you know, assessment of his

16   analysis.  My task in this particular case per, you know,

17   request made by, you know, a Mr. Shreve Ariail was to assess

18   the quality of the audio he handled because that question

19   became crucial because, in the Zimmerman case, you know,

20   Mr. Tom Owen applied, did not input data for analysis.  That

21   was the one, one of the major reasons he and, you know,

22   Dr. Reich were not admitted under the hearing and I just

23   wanted to point out that was not the same situation as Lindh.

24         Okay.  Did I answer your question?

25   Q    I think you did.

Nakasone - Redirect - Ariail                    467

1   BY MR. ARIAIL:

2   Q    I think you did.

3        In your experience as an F.B.I. scientist, have you

4   ever seen a more thorough speaker comparison before, prepared?

5   A    Mr. Lindh's report was very thorough, one of the most

6   comprehensive reports I have ever seen.

7   Q    How many comparison reports have you looked at in your

8   career?

9   A    Maybe a few thousands.

10       MR. ARIAIL:  May I approach, Your Honor?

11       THE COURT:  Yes.

12  Q    In connection with your testimony, in preparation for

13  your testimony today, did you draft an E-mail to yourself?

14  A    Yes, I did.

15  Q    Is it marked 3500-HN-29?

16  A    Yes.

17  Q    Could you read that E-mail aloud to the Court.

18       MR. STERN:  Objection.

19       THE COURT:  Well, I don't know what the E-mail is.

20  I mean I don't know whether it is objectionable.

21  Q    What is contained in the E-mail, Doctor Nakasone,

22  generally?

23  A    It is about the-- my thought process and things that I

24  want to convey during my, you know, testimony.  And since I'm

25  dealing with very sensitive issues, I didn't want to, you

1    know, make inappropriate comments.

2              MR. STERN:  I object to it.

3              THE COURT:  All right.

4              THE WITNESS:  I wrote an E-mail to myself.

5              THE COURT:  All right.

6              Read it.

7    Q    Go ahead and read it Doctor Nakasone.

8    A    For your information.

9              I would like to offer the following thoughts to the

10   Court as a scientist who endeavored for about 30 years in

11   developing the speaker recognition technology, and as a

12   practitioner of the technology.  Further, I would like to

13   clarify that the following thoughts do not represent the

14   official position of the Organization of Scientific Area

15   Committees, (OSAC), where I served as chair of the

16   subcommittee for speaker recognition.

17             I anticipate there will be a couple of more years at

18   least before the community has consensus based standards or

19   guidelines that underpins for the practice of speaker

20   recognition technology used as evidence in courtroom.

21             However, this thought should not preclude supporting

22   of a reasonably reliable technology and methodologies when

23   come along so long as it is proven to be qualified, credible,

24   have relevant knowledge, possess sufficient practical

25   experience, and taken under abundant caution for the

- Proceedings -                    469

1   limitation of the technology.

2          I believe Mr. Lindh's analysis and reported

3   conclusions in this case can provide a meaningful assistance

4   to the Court, and fact finders, if the conclusions are used in

5   corroboration with other evidence available, and with caution

6   for limitations.

7          That is the end of my E-mail.

8          MR. STERN:  I move to strike that.

9          THE COURT:  No, he testified to all of those things.

10         MR. STERN:  So why is this admissible?

11         THE COURT:  You know what, this is a hearing.  I'm

12  not striking it.

13         All right.

14  Q    Is that your opinion, Doctor Nakasone?

15  A    Yes.

16         MR. ARIAIL:  Nothing further.

17         THE COURT:  All right.  We are going to stop.  I

18  have another case on at 3:30.

19         We are coming back when?

20         MR. STERN:  I think Tuesday.  If there is not a

21  reason, I will inform everyone before that.

22         MR. ARIAIL:  That is fine with the government, Your

23  Honor.  I just bring one issue to the Court's attention, just

24  because I think we got a lot of things on our agenda over the

25  next month.

- Proceedings -                    470

1      THE COURT:  Yes.

2      MR. ARIAIL:  But in connection with the Rule 15

3 depositions, Your Honor, we have exchanged or we have provided

4 along with attorney for Mr. Hashi, our objections and comments

5 on the Rule 15 deposition to defense counsel.

6      We have been advised by the defense that they had

7 expected to get comments back to us today, I think today.

8      MS. KELLMAN:  Yes.

9      MR. ARIAIL:  So we can get them to the Court and I

10 understand Your Honor would like presumably like combined

11 comments.  I just would like to make sure that that process

12 gets finalized very quickly because I'm worried it will take a

13 lot of time to go through those documents.  Depositions are

14 rather long.

15      Once the comments are edited.  We have to then take

16 the depositions and give them to our videographer to edit the

17 appropriate testimony for the Court.

18      So I just-- I would like to understand from the

19 defense, when we are going to get their comments.

20      MR. STERN:  I have been unexpectedly a little busy.

21 I will get to them as-- within the next couple of days.

22      MS. KELLMAN:  Can we set Friday?

23      THE COURT:  All right.

24      MR. ARIAIL:  That is fine with the government.

25      MR. STERN:  Judge, I have one other request, both of

- Proceedings -                                   471

1   you and the government and marshals, unless somebody objects.

2   Since we have all the defendants here, if it is possible we

3   would like to meet with them.  We all signed, I think we have

4   updated SAM, haven't we?

5            MR. ARIAIL:  Yes-- with respect to a joint defense

6   meeting.  I think the issue maybe with the marshals because

7   the modified SAM'S only provide for meeting at the Bureau of

8   Prisons.  That is our issue.

9            So I don't know that we can have a meeting-- I can

10  talk to defense counsel afterwards.

11           MS. KELLMAN:  Perhaps we can meet them in the back

12  for ten minutes.

13           THE COURT:  Talk and let me know.

14           MS. KELLMAN:  The marshal --

15           MR. STERN:  I don't know if we need your

16  involvement.

17           MS. KELLMAN:  The marshals are saying they can put

18  them in the back.

19           MARSHAL:  Till the SAM order is modified it has to

20  be separate.

21           MS. KELLMAN:  We can do it in the back here.

22           MARSHAL:  You are not altogether.

23           MS. KELLMAN:  We are altogether back there when we

24  come to court, all three of them are together.

25           MARSHAL:  How do you want to work this?

RB        OCR

- Proceedings -                    472

1          MR. STERN:  They have been there together.

2          MS. KELLMAN:  They are always in the back together.

3          MR. ARIAIL:  I have to defer to the marshals.  I

4    just have the information I was given earlier.

5          MS. KELLMAN:  I am saying back there, when they are

6    housed back there.

7          THE COURT:  What is your position?  Until the SAM

8    order is modified what?  I could not hear you.

9          MARSHAL:  We have to do something here.  It is

10   either, I can put them together or I can't put them together.

11         THE COURT:  You can't put them together until the

12   SAM order is modified.

13         So, we will have to.

14         MS. KELLMAN:  That is at the Bureau of Prisons.

15   That is my understanding.  They are together every single time

16   we are in the-- come into the courtroom.

17         THE COURT:  Get back and show it to me.

18         MS. KELLMAN:  I think Mr. Ariail can confirm that.

19   That is it is at the Bureau of Prisons.

20         MR. ARIAIL:  I can only advise as to what the SAM

21   provides.  It provides that the defendants are to be

22   transported separately and to be housed separately in the

23   facilities and they are not to communicate with each other.

24         Whether they are or have been times where the rules

25   have been slightly bent or something, when they got to the

- Proceedings -                                    473

1   Courthouse, I can't really speak to that.  I don't think it
2   would be appropriate for me to speak to that.  I have to defer
3   to the United States Marshal Service since it is their
4   facility.
5            THE COURT:  Yes, so this can't happen today, until
6   we have modified SAM order.
7            MR. STERN:  Okay.
8            MR. ARIAIL:  I apologize, Your Honor.
9            THE COURT:  All right. We didn't schedule a time,
10  Tuesday, May 5th.
11           Since Doctor Nakasone has to come back.
12           MR. ARIAIL:  I think Your Honor, defense counsel had
13  indicated they weren't sure about that, and it might make
14  sense to wait until they report back and see what they
15  actually need.
16           MR. STERN:  That's right.  We will tell you by
17  Friday, whether we think we need to see Doctor Nakasone again.
18  If we don't, we will tell you and the government we do.
19           THE COURT:  Okay.
20           MS. KELLMAN:  One further question with respect to
21  the government's most recent in limine motion, I checked the
22  docket, I didn't see any date by which --
23           THE COURT:  I actually have an order that will be on
24  the docket, the order reads as follows -- it will be on the
25  docket soon.

- Proceedings -                                474

1          By motion filed April 26th, 2015, the government

2    moves in limine to admit certain evidence against defendants

3    and precludes certain lines of questioning by the defense.

4    The defendants are directed to respond to the government's

5    motion on or before May 8th, any reply by the government shall

6    be filed on or before May 11th, 2015.

7               MS. KELLMAN:  Thank you, Judge.

8               THE COURT:  So this order will go on the docket

9    sheet.

10              You may step down.

11              THE WITNESS:  Thank you, Your Honor.

12              (Witness excused.)

13              MR. ARIAIL:  One last thing, I want to confirm at

14   trial, we will be able to keep materials in the side room here

15   if that is possible just because we will have a lot of

16   materials coming back and forth.  I wanted to make sure that

17   is okay.

18              THE COURT:  That is fine with me.  Ms. Frullo.

19              COURTROOM DEPUTY:  I will make arrangements.

20              THE COURT:  She will make arrangements.

21              MR. ARIAIL:  Thank you, Your Honor.

22              (Matter adjourned.)

23

24

25

475

1                              <u>I N D E X</u>

2

3   <u>WITNESS</u>                                          <u>PAGE</u>

4

5

6        DR. HIROTAKA NAKASONE

7            DIRECT EXAMINATION BY MR. ARIAIL          370

8            CROSS EXAMINATION BY MR. STERN            423

9            REDIRECT EXAMINATION BY MR. ARIAIL        463

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## $

**$200,000** [1] - 378:16
**$250,000** [1] - 373:23

## '

**'83** [1] - 387:5

## 1

**1** [1] - 428:11
**10-minute** [2] - 448:21, 448:23
**100** [2] - 368:7, 464:18
**10013** [1] - 368:8
**10461** [1] - 368:3
**10th** [2] - 437:13, 437:16
**11** [2] - 442:22, 451:19
**11201** [1] - 367:16
**11217** [1] - 367:23
**11th** [1] - 474:6
**12-CR-661** [1] - 369:2
**12-CR-661(SLT** [1] - 367:3
**120** [4] - 377:14, 400:21, 450:25, 464:20
**1200** [1] - 450:23
**13th** [1] - 437:9
**15** [6] - 420:21, 457:8, 457:22, 458:15, 470:2, 470:5
**17** [1] - 436:24
**17,025** [2] - 372:3, 445:17
**17th** [1] - 437:14
**19** [1] - 374:12
**1974** [1] - 372:19
**1977** [1] - 423:11
**1979** [1] - 372:22
**1982** [1] - 387:5
**1984** [1] - 372:24
**1985** [1] - 373:21
**1986** [2] - 424:6, 425:1
**1989** [3] - 373:21, 373:25, 374:1
**1992** [2] - 374:6, 374:7
**1994** [3] - 377:6, 377:11, 423:11
**1996** [2] - 374:7, 374:11
**1999** [1] - 416:22

## 2

**20** [1] - 400:23
**2003** [2] - 416:23, 416:24
**2004** [1] - 387:14
**2005** [1] - 379:4
**2007** [2] - 378:21, 445:23
**2009** [4] - 377:11, 416:25, 418:9, 418:12
**2010** [3] - 418:18, 418:24, 455:14
**2012** [4] - 377:20, 389:19, 390:8
**2013** [6] - 391:15, 444:25, 455:9, 455:13, 455:14, 461:15
**2014** [4] - 374:25, 457:8, 457:22, 458:15
**2015** [5] - 367:7, 436:24, 437:14, 474:1, 474:6
**2016** [1] - 445:4
**2027** [1] - 368:3

## 2

**20530** [1] - 367:21
**24** [1] - 441:15
**240** [1] - 400:22
**25** [1] - 367:23
**26th** [1] - 474:1
**271** [1] - 367:16
**28** [1] - 367:7
**2nd** [4] - 368:3, 382:1, 382:2, 382:3

## 3

**3.2.3** [1] - 449:8
**3.3.1** [1] - 451:17
**3.3.2** [1] - 452:1
**3.3.3** [1] - 452:11
**30** [2] - 377:12, 468:10
**302** [1] - 440:9
**3500** [5] - 372:12, 396:18, 397:5, 416:16, 440:12
**3500-HN-1** [1] - 427:11
**3500-HN-29** [1] - 467:15
**3500-HN-3** [1] - 427:16
**3500-HN-8** [2] - 370:15, 372:13
**3500-JL-56** [1] - 449:3
**3500-VIM-6** [1] - 416:13
**3500HN19** [1] - 440:15
**370** [1] - 475:7
**3:30** [1] - 469:18

## 4

**4** [2] - 412:24, 412:25
**40** [1] - 377:12
**423** [1] - 475:8
**463** [1] - 475:9

## 5

**5'10** [1] - 450:22
**5-10** [1] - 401:3
**5-11** [1] - 401:3
**5-8** [1] - 401:3
**501** [1] - 368:8
**5th** [1] - 473:10

## 6

**6** [1] - 461:15
**6.12** [4] - 427:8, 428:4, 428:5, 428:11
**6.121** [3] - 428:11, 429:2, 429:5
**60** [1] - 394:12
**6th** [2] - 461:21, 461:22

## 7

**7** [1] - 419:16
**70** [1] - 394:12
**7th** [1] - 424:13

## 8

**8th** [1] - 474:5

## 9

**911** [3] - 383:17, 383:25, 384:1
**950** [1] - 367:20

## A

**AAFS** [1] - 375:2
**abandoned** [1] - 377:25
**ABC** [5] - 390:13, 390:21, 392:2, 392:18
**able** [3] - 392:4, 460:24, 474:14
**abundant** [3] - 415:17, 457:2, 468:25
**academic** [2] - 398:13, 398:14
**Academy** [1] - 375:3
**accept** [1] - 415:12
**accepted** [1] - 444:5
**accompanied** [2] - 378:15, 378:21
**accomplish** [1] - 442:2
**accomplishment** [1] - 379:4
**according** [4] - 378:9, 413:8, 433:13, 462:6
**accordingly** [1] - 371:4
**account** [2] - 378:16, 378:22
**accounting** [1] - 466:9
**accredit** [1] - 446:3
**Accreditation** [1] - 372:2
**accreditation** [8] - 445:9, 445:11, 445:12, 445:13, 445:16, 445:22, 445:25, 446:18
**accredited** [3] - 371:25, 445:23, 446:13
**accredits** [1] - 446:2
**accuracy** [3] - 415:17, 419:23, 463:21
**accurate** [3] - 429:17, 430:8, 432:16
**accurately** [1] - 458:21
**acoustic** [14] - 376:15, 388:24, 399:24, 399:25, 400:4, 400:12, 400:16, 401:13, 401:22, 402:6, 417:14, 420:2, 420:9, 453:14
**acoustical** [1] - 464:1
**acoustics** [2] - 376:21, 398:9
**acronym** [1] - 374:20
**Activities** [1] - 375:13
**activities** [3] - 376:18, 378:6
**activity** [2] - 375:1, 456:13
**actual** [3] - 372:6, 377:14, 444:17
**add** [1] - 430:10
**addition** [2] - 377:4, 419:9
**additional** [3] - 392:12, 396:20, 422:5
**address** [1] - 396:9
**adduced** [1] - 421:5
**adjourned** [1] - 474:22
**admissible** [1] - 469:10
**admission** [1] - 416:1
**admit** [1] - 474:2
**admitted** [4] - 414:4, 424:21, 425:1, 466:22
**Advanced** [1] - 375:12
**advanced** [1] - 373:10
**advancing** [1] - 418:24
**advantage** [2] - 394:20, 394:24
**advise** [2] - 371:3, 472:20

**advised** [3] - 396:4, 396:8, 470:6
**advisor** [2] - 370:24, 387:11
**affect** [2] - 462:23, 463:1
**affiliated** [1] - 374:14
**afford** [1] - 433:6
**afternoon** [5] - 369:4, 369:7, 370:5, 370:12, 370:13
**afterwards** [1] - 471:10
**agencies** [3] - 371:6, 443:8, 444:7
**agency** [3] - 391:8, 412:4, 465:24
**agenda** [1] - 469:24
**agent** [3] - 436:24, 440:9, 440:19
**Agent** [1] - 437:7
**agents** [2] - 380:11, 380:17
**Agnitio** [4] - 390:14, 419:9, 419:19, 419:21
**Agnitio's** [1] - 392:3
**ago** [9] - 377:21, 396:19, 403:17, 408:16, 410:14, 411:21, 422:25, 463:16, 463:24
**ah-hum** [1] - 447:5
**ahead** [5] - 406:7, 406:21, 424:8, 436:18, 468:7
**Ahmed** [3] - 367:23, 369:3, 369:8
**AHMED** [1] - 367:8
**aided** [1] - 368:17
**al** [1] - 367:8
**algorithms** [4] - 418:15, 418:19, 429:10, 442:15
**ali** [1] - 367:23
**Ali** [1] - 369:8
**allow** [5] - 397:13, 404:4, 414:7, 431:12, 446:21
**allowed** [3] - 431:6, 460:10, 463:5
**Alma** [1] - 379:3
**Almgren** [2] - 368:12, 369:13
**almost** [2] - 374:12, 377:7
**aloud** [1] - 467:17
**alternate** [2] - 449:24, 450:1
**alternative** [3] - 449:15, 450:18, 451:2
**altogether** [1] - 471:22, 471:23
**AMERICA** [1] - 367:3
**America** [5] - 374:19, 399:9, 432:2, 442:4, 442:23
**American** [5] - 372:1, 375:2, 442:24, 445:14
**Americas** [1] - 369:2
**amount** [2] - 373:23, 418:4
**ample** [1] - 396:3
**analyses** [1] - 425:9
**analysis** [75] - 371:10, 376:13, 377:8, 377:22, 383:21, 386:12, 386:15, 387:23, 388:20, 388:24, 393:10, 393:22, 394:11, 396:23, 397:2, 397:22, 397:24, 398:1, 398:15, 399:24, 399:25, 400:17, 401:13, 401:16, 401:20, 401:22, 401:24, 402:1, 405:19, 406:18, 409:15, 412:11, 412:12, 413:13, 417:17, 419:23, 420:2, 420:12, 424:15, 426:1, 430:8, 435:14, 436:10, 438:9, 438:20,

439:11, 441:20, 441:22, 441:23, 445:18, 447:25, 450:8, 450:11, 452:11, 453:5, 453:6, 453:7, 453:8, 455:19, 460:1, 461:3, 463:17, 463:21, 463:22, 464:1, 464:9, 465:12, 465:18, 465:25, 466:16, 466:20, 469:2
**analyst** [2] - 402:4, 404:22
**analysts** [2] - 415:9, 425:8
**analyze** [4] - 383:19, 386:8, 388:18, 403:19
**analyzed** [3] - 383:10, 384:17, 394:17
**analyzing** [4] - 376:14, 388:13, 403:11, 444:6
**anatomical** [2] - 395:3, 398:24
**Anders** [2] - 368:12, 369:13
**anemic** [1] - 456:14
**Angeles** [2] - 373:14, 373:17
**Annamartine** [1] - 369:5
**ANNAMARTINE** [1] - 367:21
**ANSI** [1] - 372:25
**answer** [14] - 395:5, 404:2, 414:7, 415:1, 424:5, 430:23, 431:12, 434:12, 439:19, 439:20, 462:13, 464:14, 465:4, 466:24
**Answer** [4] - 460:2, 460:18, 460:21, 460:25
**answering** [3] - 407:13, 410:2, 438:23
**anticipate** [1] - 468:17
**antiquated** [1] - 408:14
**anxious** [1] - 397:6
**anyway** [3] - 404:12, 427:22, 458:15
**apologize** [3] - 392:1, 394:2, 473:8
**apparent** [1] - 396:21
**appear** [1] - 459:18
**appearances** [1] - 453:22
**appellate** [1] - 425:2
**application** [2] - 392:16, 396:12
**applied** [6] - 389:9, 411:6, 414:19, 419:22, 432:16, 466:20
**apply** [1] - 426:13
**applying** [1] - 398:12
**Appointed** [1] - 373:8
**appointment** [1] - 373:11
**approach** [13] - 370:14, 385:8, 402:17, 409:9, 409:13, 427:25, 430:16, 440:4, 442:16, 462:17, 463:18, 466:2, 467:10
**appropriate** [11] - 378:7, 383:8, 386:20, 397:3, 397:24, 398:2, 423:22, 439:14, 444:11, 470:17, 473:2
**appropriately** [4] - 456:25, 461:25, 462:12, 463:6
**approval** [2] - 407:20, 409:24
**approved** [1] - 447:12
**April** [4] - 367:7, 436:24, 437:13, 474:1
**Arabic** [1] - 388:10
**area** [6] - 374:16, 384:23, 387:10, 414:11, 436:12, 456:8
**Area** [1] - 468:14
**Ariail** [6] - 369:4, 380:1, 404:12, 437:6, 466:17, 472:18
**ARIAIL** [58] - 367:17, 369:4, 369:15,

369:23, 369:25, 370:4, 370:14, 392:1, 393:21, 394:2, 396:1, 397:20, 411:5, 414:1, 414:17, 416:13, 416:17, 420:20, 421:12, 421:14, 421:22, 422:3, 422:23, 427:13, 427:16, 427:18, 431:6, 438:22, 439:12, 440:8, 440:11, 448:17, 448:24, 449:3, 457:9, 457:11, 457:21, 457:23, 458:2, 458:5, 463:13, 463:15, 467:1, 467:10, 469:16, 469:22, 470:2, 470:9, 470:24, 471:5, 472:3, 472:20, 473:8, 473:12, 474:13, 474:21, 475:7, 475:9
**Ariail's** [1] - 392:24
**arm** [1] - 371:18
**arrangements** [2] - 474:19, 474:20
**article** [6] - 416:6, 416:10, 416:22, 418:8, 418:13, 418:15
**articulation** [3] - 388:25, 451:17, 455:4
**ASCLB** [2] - 445:14, 445:23
**aspect** [2] - 371:17, 397:21
**aspects** [2] - 372:4, 396:14
**ASR** [1] - 409:21
**assess** [10] - 380:24, 393:2, 393:14, 403:25, 430:15, 432:7, 436:17, 451:11, 463:7, 466:17
**assessing** [2] - 430:10, 454:6
**assessment** [22] - 388:4, 388:6, 388:9, 388:10, 390:3, 390:9, 392:22, 393:1, 393:4, 393:5, 393:7, 393:12, 394:3, 394:22, 397:1, 398:8, 403:12, 404:14, 418:2, 447:13, 465:16, 466:15
**assessments** [1] - 417:24
**assist** [3] - 400:17, 406:19, 414:20
**assistance** [2] - 379:1, 407:5, 469:3
**assistant** [4] - 373:11, 376:19, 379:16, 405:2
**Assistant** [3] - 367:18, 380:11, 424:14
**assisted** [2] - 374:4, 399:22
**assisting** [1] - 407:4
**associated** [1] - 405:16
**Association** [1] - 375:6
**assume** [5] - 392:7, 392:14, 438:4, 447:19, 452:19
**assumes** [1] - 392:8
**assurances** [1] - 446:14
**attached** [1] - 382:16
**attained** [1] - 417:1
**attention** [2] - 379:17, 469:23
**attorney** [1] - 470:4
**Attorney** [4] - 367:15, 367:18, 424:14
**Attorney's** [2] - 378:25, 392:22
**Attorneys** [1] - 380:11
**attorneys** [2] - 381:2, 407:19
**attorneys'** [1] - 407:20
**Attorneys'** [2] - 380:17, 388:3
**audio** [26] - 370:24, 371:7, 371:9, 374:2, 377:3, 377:8, 377:22, 383:10, 383:17, 385:25, 388:15, 392:25, 393:2, 393:10, 394:13, 394:17, 403:11, 403:19, 437:25, 442:12, 443:5, 445:18, 452:19, 452:20, 466:18

**auditor** [1] - 460:4
**augmented** [2] - 398:21, 404:16
**AUSA** [2] - 379:25, 381:21
**author** [2] - 417:4, 418:6
**authorized** [1] - 381:15
**authors** [2] - 417:4, 417:20
**automated** [10] - 378:1, 378:2, 387:21, 389:15, 394:25, 398:21, 418:11, 420:3, 463:6, 463:22
**automatic** [21] - 377:17, 378:8, 389:9, 398:9, 401:23, 405:7, 405:8, 407:12, 408:2, 409:13, 409:21, 410:4, 411:2, 417:14, 419:24, 442:15, 453:14, 458:22, 458:25, 461:24, 465:6
**available** [11] - 389:15, 390:5, 398:17, 405:8, 415:15, 422:2, 442:23, 445:24, 453:18, 465:18, 469:5
**Avenue** [2] - 367:20, 367:23
**average** [7] - 401:2, 401:10, 420:9, 450:10, 450:24, 450:25, 451:1
**avoid** [2] - 425:22, 429:12
**award** [6] - 378:13, 378:15, 378:22, 379:3, 379:6
**Award** [1] - 378:21
**awarded** [1] - 378:20
**awards** [3] - 378:12, 378:23, 378:25
**aware** [6] - 415:23, 416:2, 416:3, 417:19, 426:23, 430:22
**awhile** [1] - 379:11
**awkward** [1] - 389:17

**B**

**bachelor** [1] - 372:19
**background** [5] - 377:4, 377:5, 383:8, 404:10, 462:8
**bad** [3] - 430:23, 444:11, 466:10
**ball** [2] - 377:11, 450:9
**bank** [1] - 378:22
**Barry** [1] - 368:14
**based** [13] - 382:8, 389:18, 390:3, 390:7, 392:18, 409:23, 419:24, 428:17, 428:18, 442:10, 453:4, 460:16, 468:18
**bases** [1] - 393:25
**basic** [1] - 378:17
**Batvox** [12] - 390:19, 391:15, 392:5, 392:6, 392:19, 419:1, 419:19, 458:23, 459:2, 459:3, 462:6, 465:7
**became** [3] - 384:4, 396:21, 466:19
**become** [4] - 379:13, 379:14, 399:13, 401:10
**becomes** [2] - 392:10, 402:4
**BEFORE** [1] - 367:12
**begin** [2] - 409:4, 422:14
**beginning** [1] - 459:17
**behavior** [2] - 386:7, 398:25
**behind** [1] - 451:5
**belief** [4] - 439:22, 440:21, 440:25, 463:23
**believes** [2] - 456:4, 456:8

**belong** [2] - 430:11, 430:13
**belongs** [1] - 462:4
**below** [1] - 428:4
**beneficial** [1] - 391:7
**bent** [1] - 472:25
**best** [8] - 398:21, 402:20, 421:21, 421:23, 425:24, 425:25, 442:14, 443:7
**better** [1] - 455:10
**between** [8] - 373:21, 374:7, 379:24, 381:8, 396:24, 444:7, 444:18, 464:14
**beyond** [1] - 398:23
**bias** [5] - 425:19, 425:23, 426:13, 426:24, 429:13
**bibliographies** [1] - 412:14
**biological** [1] - 395:3
**biometric** [3] - 419:16, 453:7, 455:18
**biometrics** [1] - 443:2
**bit** [11] - 371:12, 372:8, 373:3, 373:4, 374:13, 377:16, 394:23, 405:6, 416:9, 461:12, 465:9
**BKA** [1] - 431:22
**block** [1] - 441:22
**board** [3] - 375:11, 396:13, 445:16
**Board** [1] - 372:2
**body** [1] - 371:21
**Bonastre** [1] - 416:14
**bought** [1] - 391:15
**Bouten** [2] - 430:20, 431:18
**brand** [1] - 441:23
**break** [2] - 448:21, 448:23
**breakthrough** [1] - 418:21
**briefly** [3] - 373:13, 399:24, 463:13
**bring** [1] - 469:23
**Bronx** [1] - 368:3
**Brooklyn** [4] - 367:6, 367:16, 367:23, 379:25
**brought** [1] - 407:9
**Bruno** [1] - 390:14
**built** [1] - 426:2
**bulk** [1] - 396:19
**Bureau** [8] - 370:19, 374:7, 374:12, 377:6, 408:25, 471:7, 472:14, 472:19
**Bureau's** [1] - 371:24
**busy** [1] - 470:20
**buy** [2] - 392:19, 410:6
**buying** [1] - 391:13
**BY** [15] - 367:17, 367:21, 367:24, 370:4, 392:1, 414:1, 423:6, 429:1, 444:1, 455:1, 463:15, 467:1, 475:7, 475:8, 475:9
**BY:DAVID** [1] - 368:9
**BY:MARK** [1] - 368:4

**C**

**Cadman** [1] - 367:16
**Campbell** [1] - 416:14
**cannot** [15] - 371:22, 390:15, 390:20, 398:16, 398:18, 404:25, 405:3, 407:5, 415:5, 431:10, 433:6, 449:21, 451:5, 451:13, 459:5

**capable** [2] - 401:15, 401:19
**capacity** [1] - 377:2
**capture** [1] - 466:3
**captured** [1] - 402:2
**career** [6] - 373:3, 373:5, 376:2, 376:5, 378:11, 467:8
**careful** [9] - 388:24, 389:11, 406:17, 407:13, 410:2, 446:6, 454:6, 465:16, 466:15
**carefully** [5] - 388:11, 414:8, 417:17, 420:15, 466:13
**Carly** [1] - 433:7
**Carolina** [1] - 372:18
**carried** [1] - 444:23
**case** [47] - 377:13, 379:14, 380:12, 381:2, 382:9, 383:6, 383:9, 383:11, 384:8, 384:11, 384:21, 386:11, 386:22, 387:19, 388:5, 392:17, 392:23, 394:8, 396:11, 399:7, 400:16, 403:19, 405:1, 405:4, 406:5, 411:6, 414:19, 418:5, 424:18, 429:9, 432:9, 432:16, 432:21, 437:23, 451:23, 453:3, 455:9, 459:16, 461:6, 462:16, 465:12, 466:16, 466:19, 469:3, 469:18
**cases** [2] - 377:12, 399:7
**cash** [2] - 378:15, 378:21
**categories** [1] - 413:5
**CAUSE** [1] - 367:11
**caused** [2] - 426:12
**Caution** [1] - 416:7
**caution** [12] - 416:23, 416:25, 417:6, 417:18, 417:23, 418:7, 420:17, 436:12, 468:25, 469:5
**cautions** [2] - 415:17, 457:2
**cautious** [2] - 420:11, 420:19
**caveat** [2] - 455:23, 455:24
**cavet** [1] - 390:3
**CAVIS** [2] - 376:19, 376:20
**cell** [1] - 393:17
**Center** [2] - 433:5, 466:12
**certain** [5] - 417:1, 418:4, 445:10, 474:2, 474:3
**certainty** [2] - 402:21, 420:17
**certifications** [1] - 444:10
**certified** [2] - 433:4, 445:25
**chain** [1] - 446:7
**chair** [2] - 375:24, 468:15
**chairing** [1] - 375:20
**challenge** [1] - 383:1
**challenged** [1] - 397:21
**chance** [3] - 381:23, 413:11, 413:14
**change** [3] - 401:5, 464:21
**changed** [1] - 455:10
**channel** [3] - 393:13, 393:14, 393:17
**characteristics** [5] - 376:9, 385:7, 400:19, 435:20, 451:12
**characters** [1] - 430:18
**charged** [2] - 371:15, 445:3
**charlatan** [1] - 423:16
**charlatans** [1] - 409:14
**Charmaine** [1] - 380:2

**chart** [4] - 428:21, 453:20, 453:21, 464:9
**cheaper** [1] - 410:6
**check** [4] - 393:16, 432:15, 462:14, 462:15
**checked** [4] - 432:8, 432:20, 444:9, 473:21
**chemistry** [1] - 441:22
**Chicago** [1] - 424:13
**chief** [1] - 458:4
**Circuit** [1] - 424:13
**City** [1] - 380:18
**clarification** [1] - 390:10
**clarified** [1] - 456:24
**clarify** [2] - 392:2, 468:13
**clean** [1] - 448:21
**clear** [3] - 380:5, 386:10, 410:17
**clothes** [1] - 401:5
**co** [4] - 395:5, 395:7, 395:8, 421:2
**co-counsel** [4] - 395:5, 395:7, 395:8, 421:2
**cognitive** [4] - 425:18, 425:22, 426:23, 429:13
**collateral** [1] - 371:8
**colleague** [1] - 373:16
**colleagues** [2] - 425:4, 427:15
**collecting** [1] - 371:21
**collection** [1] - 442:11
**college** [3] - 372:9, 372:10, 372:14
**column** [1] - 400:8
**combination** [4] - 390:13, 398:10, 411:23, 459:9
**combined** [1] - 470:10
**comfort** [1] - 401:23
**coming** [7] - 408:5, 428:24, 460:3, 461:7, 469:19, 474:16
**commencement** [1] - 379:8
**comment** [1] - 463:24
**comments** [6] - 468:1, 470:4, 470:7, 470:11, 470:15, 470:19
**commercial** [4] - 389:10, 389:13, 391:6, 392:11
**Commission** [1] - 374:24
**committee** [7] - 375:23, 414:13, 441:11, 441:13, 441:17, 442:1, 442:19
**committees** [2] - 374:17, 414:11
**Committees** [1] - 468:15
**common** [1] - 385:17
**commotions** [1] - 383:18
**communicate** [1] - 472:23
**communities** [1] - 443:9
**community** [16] - 387:3, 398:20, 400:2, 403:7, 403:15, 408:12, 408:21, 417:21, 442:20, 443:4, 456:4, 456:6, 456:7, 462:6, 468:18
**company** [2] - 390:18, 466:10
**Comparative** [1] - 419:16
**compare** [8] - 385:15, 405:13, 435:2, 435:5, 436:8, 436:15, 436:18, 439:1
**compared** [3] - 393:3, 449:15, 450:1
**comparing** [2] - 405:8, 435:16
**comparison** [28] - 377:5, 377:19,

383:24, 384:24, 387:21, 388:19, 394:25, 398:9, 401:23, 407:12, 407:16, 407:22, 409:1, 409:22, 411:2, 417:24, 418:11, 419:25, 420:3, 424:20, 428:13, 439:1, 439:4, 453:4, 458:22, 463:22, 467:4, 467:7
**comparisons** [12] - 377:9, 377:13, 377:14, 377:15, 377:16, 377:17, 377:19, 377:25, 401:12, 405:5, 412:17, 436:6
**competence** [2] - 401:23, 426:7
**competencies** [1] - 431:17
**competency** [2] - 430:11, 430:15
**complaining** [1] - 423:3
**complete** [1] - 393:3
**completed** [2] - 373:25, 391:11
**completely** [5] - 382:21, 412:1, 426:21, 429:5, 436:21
**complex** [1] - 370:7
**compliance** [1] - 446:25
**complied** [1] - 397:2
**complying** [1] - 381:24
**component** [1] - 445:15
**components** [1] - 371:16
**composed** [1] - 456:7
**comprehensive** [3] - 382:20, 412:6, 467:6
**comprehensively** [1] - 411:21
**compression** [1] - 460:5
**computations** [1] - 398:12
**computer** [18] - 372:25, 373:20, 374:4, 376:19, 394:15, 398:12, 399:1, 399:2, 399:3, 402:2, 428:24, 434:1, 460:1, 460:4, 460:8, 460:9, 460:11, 460:17
**Computer** [1] - 368:17
**Computer-aided** [1] - 368:17
**computerized** [1] - 368:16
**concentrate** [1] - 442:9
**concentrated** [2] - 376:23, 388:21
**concern** [7] - 385:14, 385:19, 387:24, 403:3, 409:18, 413:20
**concerned** [3] - 371:19, 403:6, 412:19
**concerns** [4] - 409:19, 409:20, 414:2, 414:3
**concluded** [2] - 454:1, 464:13
**conclusion** [16] - 397:22, 402:18, 402:19, 411:17, 413:12, 417:3, 420:15, 423:24, 426:2, 451:15, 451:23, 452:6, 453:1, 453:9, 460:10, 464:25
**conclusions** [23] - 383:22, 384:18, 402:10, 402:11, 402:14, 407:11, 408:2, 411:15, 412:20, 415:20, 419:24, 420:3, 420:11, 426:20, 430:10, 433:25, 434:3, 434:9, 460:14, 460:15, 464:13, 469:3, 469:4
**conclusive** [5] - 403:6, 408:8, 408:9, 411:17, 453:16
**conclusively** [3] - 403:4, 403:14, 424:3
**conclusory** [1] - 417:24
**condition** [4] - 402:5, 406:8, 417:9,

456:24
**conditions** [5] - 393:13, 415:13, 417:8, 435:23, 464:17
**conduct** [6] - 373:18, 377:9, 378:17, 385:20, 388:3, 442:14
**conducting** [2] - 374:2, 400:16
**conference** [1] - 437:19
**Conference** [1] - 376:20
**confidence** [2] - 425:9, 425:11
**confirm** [4] - 404:18, 438:3, 472:18, 474:13
**confirmed** [1] - 426:3
**confusing** [1] - 397:5
**conjunction** [3] - 372:2, 374:23, 445:16
**connection** [4] - 392:23, 463:25, 467:12, 470:2
**consensus** [11] - 403:7, 408:21, 410:15, 410:17, 410:18, 410:19, 410:21, 415:18, 415:20, 442:10, 468:18
**consensus-based** [1] - 442:10
**consequently** [1] - 374:9
**conservative** [5] - 409:9, 409:11, 409:12, 410:13, 465:2
**considered** [2] - 417:17, 459:9
**consistent** [4] - 378:2, 411:12, 411:15, 461:8
**constantly** [1] - 406:14
**constants** [1] - 466:2
**constraint** [1] - 384:14
**consultant** [1] - 374:8
**contacted** [8] - 379:17, 380:16, 381:1, 381:17, 381:19, 430:19, 431:21, 432:1
**contain** [2] - 419:19, 441:22
**contained** [2] - 382:5, 467:21
**containing** [2] - 383:17, 405:1
**contains** [1] - 377:13
**content** [5] - 380:24, 380:25, 382:14, 383:23, 388:7
**context** [1] - 438:12
**continue** [1] - 404:24
**Continued** [2] - 368:1, 455:1
**continued** [3] - 377:20, 413:21, 443:10
**continues** [3] - 391:18, 428:25, 454:10
**continuing** [1] - 374:3
**Continuing** [2] - 392:1, 429:1
**contour** [1] - 373:2
**contributing** [2] - 412:4, 465:24
**contribution** [1] - 413:17
**contributor** [3] - 407:17, 411:25, 446:11
**control** [4] - 429:10, 446:5, 462:19
**controls** [3] - 427:8, 446:3, 446:4
**converge** [1] - 401:9
**conversation** [10] - 380:10, 380:15, 381:8, 421:18, 436:1, 436:4, 436:7, 436:8, 436:22
**conversational** [2] - 435:11, 436:13
**conversations** [3] - 388:2, 396:24, 396:25
**convey** [1] - 467:24
**conveyed** [1] - 393:4
**copies** [1] - 448:20

**copy** [1] - 427:13, 427:14, 448:16, 448:22, 448:25, 457:19, 457:21, 457:23, 457:25, 458:5, 458:14
**cord** [1] - 451:10
**core** [4] - 392:5, 392:7, 392:10, 392:15
**corporate** [2] - 407:10, 407:21
**correct** [27] - 388:1, 399:20, 413:15, 423:23, 425:17, 429:14, 429:18, 429:23, 429:24, 430:2, 430:6, 444:21, 446:16, 450:21, 451:4, 451:16, 451:24, 452:4, 452:17, 454:9, 455:17, 458:13, 458:19, 459:14, 460:18, 464:14, 465:4
**correctly** [1] - 457:5
**correlates** [1] - 395:2
**corroborated** [1] - 415:14
**corroboration** [2] - 457:1, 469:5
**counsel** [17] - 369:16, 379:16, 382:25, 384:13, 395:5, 395:7, 395:8, 396:4, 396:8, 420:24, 421:2, 422:5, 431:2, 431:4, 470:5, 471:10, 473:12
**counsels** [1] - 382:18
**COUNTERTERRORISM** [1] - 367:20
**country** [1] - 382:2
**County** [5] - 373:14, 373:17, 374:1, 374:6, 376:18
**couple** [8] - 384:23, 415:8, 425:1, 455:19, 456:17, 461:3, 468:17, 470:21
**course** [11] - 373:5, 376:2, 376:5, 378:5, 378:11, 398:14, 398:15, 406:15, 438:6, 442:18, 456:24
**courses** [1] - 404:11
**court** [15] - 407:11, 407:18, 407:25, 408:3, 409:14, 423:14, 424:2, 425:2, 455:7, 455:12, 456:22, 460:24, 461:2, 471:24
**COURT** [86] - 367:1, 367:12, 369:14, 369:22, 369:24, 370:3, 370:17, 372:13, 390:1, 394:5, 395:7, 395:9, 395:20, 397:8, 397:12, 397:19, 398:4, 401:18, 404:1, 404:4, 409:17, 410:1, 411:4, 411:9, 411:19, 412:6, 414:7, 414:14, 414:16, 415:1, 415:6, 416:5, 418:1, 419:5, 420:14, 420:21, 420:23, 421:8, 421:10, 421:13, 421:23, 422:6, 422:8, 422:14, 422:18, 422:22, 423:5, 428:1, 431:1, 431:8, 431:10, 431:14, 439:18, 440:5, 440:7, 440:16, 440:18, 441:3, 448:23, 449:1, 450:6, 457:10, 457:15, 457:17, 463:10, 463:14, 467:11, 467:19, 468:3, 468:5, 469:9, 469:11, 469:17, 470:1, 470:23, 471:13, 472:7, 472:11, 472:17, 473:5, 473:9, 473:19, 473:23, 474:8, 474:18, 474:20
**Court** [27] - 368:14, 368:15, 370:8, 373:8, 381:14, 384:10, 388:8, 389:12, 390:8, 393:6, 393:23, 394:23, 396:3, 396:8, 402:13, 414:4, 414:20, 415:12, 416:9, 418:6, 465:10, 467:17, 468:10, 469:4, 470:9, 470:17

**Court's** [1] - 469:23
**Courthouse** [2] - 367:5, 473:1
**courtroom** [9] - 390:6, 402:9, 406:23, 410:5, 455:21, 461:5, 464:19, 468:20, 472:16
**COURTROOM** [3] - 369:1, 369:10, 474:19
**Courtroom** [1] - 369:12
**covered** [1] - 465:17
**created** [1] - 400:9
**credible** [1] - 468:23
**Crime** [2] - 372:1, 445:14
**crime** [2] - 383:12, 383:20
**criminal** [2] - 369:1, 371:21
**CRIMINAL** [1] - 367:11
**criteria** [1] - 393:10
**critical** [1] - 402:4
**criticism** [1] - 397:13
**criticisms** [1] - 396:10
**criticize** [1] - 387:20
**criticized** [1] - 396:12
**cross** [6] - 405:15, 421:7, 422:4, 422:12, 422:17, 465:9
**CROSS** [2] - 423:6, 441:1, 475:8
**cross-language** [1] - 405:15
**crucial** [1] - 466:19
**cryptography** [1] - 371:23
**cue** [1] - 399:13
**custody** [1] - 446:7
**cutting** [1] - 459:4
**CV** [1] - 372:12
**Czech** [1] - 390:15

# D

**D.N.A** [1] - 416:2
**data** [8] - 393:16, 420:4, 444:7, 444:18, 462:20, 464:11, 465:16, 466:20
**date** [5] - 421:19, 437:11, 437:13, 458:3, 473:22
**dated** [1] - 457:8
**DAUBERT** [1] - 367:11
**Daubert** [1] - 369:1
**Dave** [1] - 381:9
**David** [2] - 381:9, 381:13
**days** [4] - 376:11, 402:9, 426:14, 470:21
**DC** [1] - 367:21
**DE** [2] - 368:4, 369:9
**deal** [1] - 375:19
**dealing** [1] - 467:25
**death** [1] - 385:2
**decade** [1] - 378:5
**decades** [1] - 407:16
**December** [1] - 444:25
**decide** [1] - 402:5
**decided** [4] - 377:22, 392:19, 436:22, 465:2
**decision** [8] - 413:4, 428:3, 428:14, 429:6, 433:19, 447:23, 447:25, 453:3
**decisions** [5] - 398:11, 428:13, 428:16, 429:8, 453:2

**declaring** [1] - 402:25
**deemed** [1] - 462:10
**defendant** [2] - 367:9, 384:1
**Defendant** [3] - 367:22, 368:2, 368:7
**defendants** [3] - 384:19, 396:11, 396:20, 414:23, 420:23, 471:2, 472:21, 474:2, 474:4
**defense** [23] - 369:16, 381:1, 381:15, 382:6, 382:7, 382:18, 384:5, 384:7, 384:12, 386:22, 396:4, 396:8, 397:21, 422:5, 431:2, 431:4, 470:5, 470:6, 470:19, 471:5, 471:10, 473:12, 474:3
**Defense** [1] - 387:8
**defer** [2] - 472:3, 473:2
**defined** [1] - 407:15
**definitely** [1] - 405:19
**definition** [1] - 410:10
**degradation** [1] - 436:5
**degree** [8] - 372:19, 372:20, 372:22, 373:6, 373:10, 420:16, 435:4, 436:5
**DeMarco** [2] - 368:2, 369:9
**Denver** [1] - 421:9
**Department** [9] - 373:15, 373:17, 374:1, 374:6, 374:23, 374:25, 376:18, 385:8, 387:7
**DEPARTMENT** [1] - 367:19
**deposition** [1] - 470:5
**depositions** [3] - 470:3, 470:13, 470:16
**DEPUTY** [3] - 369:1, 369:10, 474:19
**Deputy** [1] - 369:12
**derogatory** [1] - 383:25
**designated** [2] - 384:23, 391:16
**detail** [1] - 371:22
**details** [1] - 394:6
**detect** [1] - 383:16
**determine** [6] - 376:13, 376:14, 393:2, 418:3, 461:24, 463:5
**determined** [1] - 456:2
**determining** [1] - 414:21
**deterministic** [1] - 449:22
**develop** [1] - 426:13
**developing** [2] - 376:23, 468:11
**development** [4] - 371:1, 371:19, 373:19, 458:9
**deviation** [2] - 373:1, 400:23
**device** [1] - 404:16
**devices** [1] - 417:9
**dictate** [1] - 460:13
**dictated** [3] - 413:4, 447:7, 465:21
**difference** [4] - 405:6, 413:7, 436:19, 464:25
**differences** [1] - 413:6
**different** [20] - 382:21, 382:25, 385:4, 399:8, 401:9, 405:9, 412:22, 412:23, 427:20, 428:22, 436:21, 438:25, 442:6, 451:14, 462:17, 462:18, 462:19, 462:21, 464:17
**difficult** [2] - 435:2, 463:7
**difficulties** [1] - 436:3
**digital** [4] - 371:24, 441:16, 441:21, 445:21

**dimensional** [1] - 404:17
**DIRECT** [2] - 370:4, 475:7
**directed** [2] - 397:6, 474:4
**directing** [1] - 422:20
**Director** [1] - 378:14
**Director's** [1] - 378:20
**Directors** [2] - 372:1, 445:15
**disappointment** [1] - 425:10
**discard** [2] - 412:18, 453:12
**discipline** [1] - 441:24
**disciplines** [3] - 374:19, 441:25, 446:1
**disclosure** [1] - 396:17
**disclosures** [1] - 396:21
**discovered** [2] - 448:6, 449:11
**discovery** [2] - 422:24, 423:3
**discriminating** [1] - 389:5
**discussed** [2] - 382:24, 434:17
**discussing** [1] - 446:15
**dishonest** [1] - 423:19
**dissertation** [1] - 397:17
**dissimilarities** [1] - 450:17
**distinct** [3] - 448:6, 449:11, 452:16
**distinction** [1] - 464:14
**distinctions** [1] - 464:15
**distinctive** [3] - 449:18, 454:4, 464:23
**distinguish** [1] - 401:4
**distinguishing** [1] - 424:3
**distribution** [2] - 464:10
**DISTRICT** [3] - 367:1, 367:1, 367:12
**District** [1] - 367:15
**division** [1] - 371:15
**Division** [7] - 370:20, 370:23, 370:25, 371:11, 371:13, 378:15
**divisions** [2] - 379:16, 458:8
**DNA** [2] - 441:22, 443:3
**doable** [3] - 385:18, 405:17, 436:20
**docket** [5] - 369:2, 473:22, 473:24, 473:25, 474:8
**doctor** [3] - 375:24, 387:14, 420:25
**Doctor** [36] - 369:18, 369:25, 370:5, 370:15, 370:18, 372:4, 375:15, 375:22, 376:1, 378:24, 379:13, 382:7, 382:8, 383:3, 384:6, 384:20, 386:10, 386:23, 386:24, 386:25, 387:1, 389:16, 389:24, 390:2, 414:18, 416:6, 421:12, 421:19, 423:7, 427:24, 467:21, 468:7, 469:14, 473:11, 473:17
**document** [4] - 396:10, 427:22, 427:24, 440:2
**documentation** [1] - 430:16
**documented** [1] - 465:18
**documents** [4] - 370:15, 382:18, 396:11, 470:13
**dollars** [1] - 391:9
**domain** [2] - 371:20, 409:11
**done** [19] - 373:21, 377:18, 389:8, 393:1, 395:6, 395:16, 398:16, 406:14, 412:2, 427:2, 444:8, 444:22, 445:5, 446:9, 447:13, 456:25, 462:24, 463:2, 463:22
**doors** [1] - 451:5

**dormant** [1] - 456:14
**double** [1] - 400:22
**doubt** [1] - 455:3
**down** [2] - 370:8, 474:10
**Dr** [26] - 392:2, 392:21, 393:22, 394:4, 394:6, 396:9, 396:17, 396:19, 396:22, 396:24, 397:1, 397:9, 397:23, 398:5, 404:9, 409:8, 429:19, 430:7, 430:20, 431:17, 431:22, 436:24, 437:13, 439:13, 463:16, 466:22
**DR** [2] - 370:1, 475:6
**draft** [1] - 467:13
**drastic** [1] - 436:19
**Driss** [1] - 416:15
**Drs** [1] - 396:5
**DuCHARME** [1] - 367:17
**duCharme** [1] - 380:3
**due** [4] - 418:14, 435:20, 446:17, 452:19
**duly** [1] - 370:1
**during** [18] - 379:2, 379:7, 380:13, 380:16, 381:18, 382:9, 382:22, 383:5, 396:22, 404:11, 416:24, 423:12, 424:21, 424:23, 424:24, 433:1, 434:4, 467:24
**duties** [1] - 421:17
**duty** [1] - 371:8

### E

**e-mail** [1] - 396:23
**E-mail** [8] - 368:15, 379:17, 467:13, 467:17, 467:19, 467:21, 468:4, 469:7
**East** [2] - 367:16, 372:21
**EASTERN** [1] - 367:1
**Eastern** [1] - 367:15
**Easy** [1] - 385:21
**easy** [1] - 410:6
**echoed** [1] - 432:3
**edge** [1] - 459:4
**edit** [1] - 470:16
**edited** [1] - 470:15
**effect** [1] - 417:11
**effective** [1] - 422:17
**effects** [1] - 393:14
**efficient** [1] - 429:16
**effort** [2] - 376:13, 376:25
**eighteen** [1] - 373:13
**Eighth** [1] - 367:23
**either** [6] - 376:23, 381:6, 381:7, 449:19, 464:1, 472:10
**Electrical** [1] - 375:4
**Electronics** [1] - 375:4
**element** [1] - 435:10
**elsewhere** [3] - 435:1, 445:25
**eminent** [1] - 385:2
**employment** [1] - 374:10
**employs** [1] - 465:25
**enact** [2] - 385:9, 385:10
**encompasses** [1] - 428:19
**end** [3] - 380:15, 453:10, 469:7
**endeavored** [1] - 468:10

**ended** [2] - 384:7, 454:7
**endorsing** [1] - 389:12
**engaged** [1] - 439:3
**engineer** [1] - 377:3
**Engineering** [1] - 375:4
**engineers** [1] - 456:8
**English** [4] - 373:8, 382:15, 382:17, 405:11
**enhancement** [1] - 377:8
**entire** [4] - 374:18, 392:25, 445:21, 453:3
**entitled** [4] - 416:7, 449:8, 452:11, 458:17
**entity** [1] - 371:22
**environment** [3] - 413:9, 433:24, 433:25
**equally** [1] - 433:11
**equipment** [1] - 444:11
**equipped** [1] - 421:5
**erode** [1] - 425:13
**eroded** [2] - 425:11, 425:12
**error** [16] - 405:16, 408:5, 408:9, 408:10, 418:5, 419:8, 419:9, 419:11, 419:12, 419:19, 426:6, 439:23, 439:24, 440:1, 457:3
**errors** [1] - 403:8
**esophageal** [1] - 376:10
**especially** [3] - 408:24, 409:10, 412:2
**ESQ** [10] - 367:14, 367:17, 367:17, 367:18, 367:21, 367:22, 367:24, 368:4, 368:9
**establish** [5] - 391:9, 442:10, 443:2, 445:2, 456:15
**established** [7] - 374:21, 374:24, 442:20, 443:4, 444:24, 445:20, 446:25
**establishing** [1] - 442:13
**estimate** [1] - 402:20
**et** [1] - 367:8
**Europe** [1] - 445:24
**European** [1] - 431:24
**Eva** [1] - 432:3
**EVA** [1] - 432:3
**evaluate** [2] - 391:12, 424:19
**evaluated** [3] - 390:11, 390:12, 392:25
**evaluating** [1] - 388:12
**evaluation** [6] - 378:6, 390:4, 390:19, 399:22, 418:18, 437:25
**evaluations** [5] - 389:19, 389:22, 391:16, 392:3, 392:19
**eventually** [1] - 387:7
**evidence** [24] - 371:25, 388:14, 412:11, 412:13, 415:13, 415:14, 415:16, 416:2, 423:13, 441:21, 444:20, 445:19, 445:21, 446:7, 446:9, 446:10, 446:11, 456:23, 457:1, 468:20, 469:5, 474:2
**evidentiary** [1] - 437:25
**evolving** [1] - 418:21
**exact** [2] - 427:10, 444:12
**exactly** [6] - 380:22, 381:6, 381:23, 438:11, 438:24, 439:16
**exam** [4] - 426:17, 427:3, 460:6, 460:8

**EXAMINATION** [7] - 370:4, 423:6, 444:1, 463:15, 475:7, 475:8, 475:9

**examination** [10] - 395:15, 421:3, 422:4, 422:12, 422:13, 422:17, 427:5, 433:1, 434:16, 446:9

**examinations** [6] - 374:3, 427:4, 447:8, 447:11, 458:22, 459:11

**examine** [2] - 421:7, 426:20

**examiner** [28] - 383:13, 383:22, 424:17, 426:3, 426:7, 426:15, 426:16, 426:17, 426:20, 428:13, 429:7, 429:8, 429:11, 433:7, 433:13, 433:16, 434:19, 434:22, 436:23, 447:12, 447:15, 460:4, 460:5, 460:7, 460:10, 460:12, 460:14, 460:23

**examiner's** [2] - 426:2, 428:23, 429:6

**examiners** [16] - 371:9, 407:7, 407:8, 407:11, 407:22, 409:1, 409:22, 426:22, 428:21, 433:24, 436:13, 446:1, 446:3, 459:8, 460:3, 466:8

**example** [9] - 399:6, 404:25, 405:1, 413:12, 438:8, 438:19, 439:10, 444:11, 462:18

**except** [3] - 421:25, 433:7, 433:19

**exchange** [2] - 436:7, 444:18

**exchanged** [1] - 470:3

**exchanging** [1] - 444:7

**excuse** [2] - 396:17, 414:3

**excused** [1] - 474:12

**executives** [1] - 371:4

**exercising** [1] - 420:17

**exhausting** [1] - 453:17

**existence** [1] - 426:23

**existing** [1] - 374:19

**expect** [2] - 400:14, 412:16

**expected** [2] - 447:15, 470:7

**expecting** [1] - 381:20

**expensive** [1] - 391:10

**experience** [6] - 399:6, 425:14, 436:17, 442:7, 467:3, 468:25

**experiment** [1] - 376:12

**experiments** [1] - 419:14

**expert** [17] - 379:18, 386:14, 386:17, 393:19, 393:24, 394:1, 395:12, 395:23, 397:15, 398:8, 404:3, 421:4, 421:6, 422:15, 423:1, 430:1

**expertise** [4] - 399:22, 403:22, 404:3, 412:20

**experts** [3] - 383:5, 387:20, 394:21

**explain** [2] - 393:6, 394:23

**exploit** [1] - 409:23

**Express** [1] - 381:22

**expressed** [2] - 402:11, 402:14

**extended** [3] - 373:23, 399:17, 399:18

**extent** [7] - 384:2, 389:5, 390:2, 401:15, 401:19, 422:4, 445:10

**extracts** [1] - 395:2

**extreme** [1] - 401:8

**extremely** [1] - 401:9

**eyelids** [1] - 443:3

## F

**F.B.I** [20] - 370:22, 371:10, 371:14, 371:17, 372:6, 376:22, 377:3, 377:9, 378:20, 379:18, 380:11, 380:17, 383:11, 389:12, 425:21, 426:25, 427:1, 445:13, 447:12, 467:3

**F.B.I.** [5] - 374:15, 377:1, 378:10, 384:4, 388:3

**face** [3] - 437:9, 443:3

**face-to-face** [1] - 437:9

**faced** [1] - 385:2

**facial** [1] - 441:19

**facilities** [1] - 472:23

**facility** [1] - 473:4

**fact** [18] - 381:20, 384:17, 385:15, 407:18, 411:16, 414:21, 415:12, 419:7, 420:18, 427:23, 434:14, 435:12, 451:1, 453:12, 453:17, 454:1, 464:8, 469:4

**factfinders** [1] - 456:23

**factors** [2] - 417:7, 417:10

**fair** [8] - 396:14, 409:8, 409:20, 432:13, 453:1, 453:9, 455:2, 466:11

**fairly** [4] - 421:22, 436:9, 436:11, 438:4

**familiar** [13] - 386:21, 386:23, 386:24, 388:19, 405:20, 416:6, 416:18, 419:8, 445:8, 461:18, 461:20

**far** [5] - 410:3, 411:20, 411:21, 455:3

**father** [1] - 387:3

**FBI** [25] - 392:19, 392:21, 405:3, 405:22, 406:3, 406:11, 406:25, 407:10, 407:19, 408:1, 408:18, 408:19, 409:4, 409:8, 409:12, 409:21, 430:3, 455:6, 455:11, 458:1, 458:5, 462:18, 463:17, 466:8

**FBI's** [4] - 409:24, 410:12, 412:8, 460:23

**features** [7] - 389:3, 395:2, 402:2, 403:9, 448:6, 449:11, 449:19

**Federal** [2] - 370:19, 381:21

**federal** [5] - 371:6, 373:15, 384:13, 407:21, 407:23

**federally** [1] - 384:13

**fell** [1] - 450:9

**felt** [2] - 381:11, 382:20

**female** [1] - 400:22

**few** [12] - 369:17, 378:25, 382:14, 393:9, 402:9, 404:11, 407:16, 411:20, 437:1, 456:17, 461:23, 467:9

**field** [5] - 378:12, 383:11, 384:3, 406:19, 430:20

**fields** [1] - 398:9

**figures** [1] - 377:12

**file** [1] - 393:2

**filed** [3] - 396:11, 474:1, 474:6

**files** [2] - 393:10, 437:25

**filings** [1] - 397:22

**final** [7] - 410:20, 428:23, 429:8, 430:10, 460:10, 460:15, 464:13

**finalized** [1] - 470:12

**finders** [2] - 415:12, 469:4

**fine** [3] - 469:22, 470:24, 474:18

**fingerprints** [2] - 441:22, 443:3

**finish** [2] - 404:4, 431:7, 445:3

**finished** [2] - 372:19, 372:23

**finishes** [1] - 426:17

**first** [25] - 370:1, 372:10, 372:15, 372:22, 373:6, 373:11, 373:22, 374:17, 379:14, 393:1, 395:16, 398:7, 402:16, 426:1, 429:3, 429:6, 429:8, 430:20, 442:20, 443:4, 447:12, 447:24, 460:14

**five** [2] - 413:2, 413:4

**FI** [1] - 368:3

**floodgates** [1] - 409:7

**Florida** [1] - 382:9

**flow** [3] - 447:8, 447:9, 447:11

**focus** [2] - 387:22, 439:5

**focused** [1] - 394:7

**folks** [1] - 390:5

**follow** [2] - 446:15, 447:15

**followed** [1] - 374:9, 447:13

**following** [6] - 381:21, 382:4, 413:16, 415:13, 468:9, 468:13

**follows** [2] - 370:2, 473:24

**FOR** [1] - 367:11

**forced** [1] - 460:12

**Forensic** [7] - 374:24, 375:3, 416:7, 430:21, 431:18, 433:5, 466:12

**forensic** [19] - 371:9, 374:18, 377:5, 377:22, 387:17, 394:18, 394:19, 409:9, 413:9, 415:24, 416:1, 431:19, 431:22, 434:15, 436:23, 441:25, 442:3, 445:18, 465:25

**forgot** [1] - 382:10

**form** [1] - 465:21

**formalize** [1] - 408:17

**formant** [2] - 400:9, 464:1

**formants** [1] - 400:9

**format** [5] - 389:2, 412:22, 446:24, 452:11, 452:25

**formed** [1] - 456:8

**formulate** [1] - 414:8

**formulation** [1] - 465:20

**forth** [2] - 396:10, 474:16

**forthcoming** [1] - 403:5

**forward** [1] - 377:23

**foundation** [1] - 425:7

**founded** [1] - 377:2

**four** [6] - 374:9, 377:13, 382:5, 417:13, 441:17, 458:18

**Francois** [1] - 416:14

**free** [1] - 381:16

**freely** [1] - 407:1

**French** [4] - 386:24, 387:13, 387:14, 390:16

**frequency** [10] - 373:1, 389:1, 400:3, 451:25, 452:11, 452:25, 453:20, 453:21, 453:23

**Friday** [3] - 396:19, 470:22, 473:17

**Fridays** [1] - 396:19

**front** [6] - 390:23, 393:22, 440:13,

448:12, 448:13, 457:12
**Frullo** [1] - 474:18
**Frye** [5] - 379:2, 382:23, 424:22, 424:24, 424:25
**full** [3] - 374:9, 382:15, 393:22
**fully** [2] - 417:19, 426:23
**function** [3] - 371:5, 375:10, 433:15
**functioning** [2] - 429:16, 429:17
**functions** [2] - 391:13, 442:19
**fundamental** [8] - 373:1, 389:1, 400:3, 451:25, 453:20, 453:21, 453:23
**funding** [3] - 373:17, 373:22, 376:24
**furnished** [1] - 459:11
**fuse** [1] - 428:23
**fused** [3] - 398:11, 428:14, 428:16
**fusing** [1] - 466:5
**fusion** [4] - 398:15, 428:17, 460:2, 461:13

## G

**GAIL** [2] - 367:22, 367:24
**gather** [1] - 465:15
**gathering** [2] - 423:13, 465:13
**general** [12] - 379:16, 382:24, 389:14, 390:22, 392:13, 394:3, 398:5, 400:16, 400:19, 418:6, 420:2, 447:7
**generalities** [1] - 394:8
**generally** [12] - 384:10, 384:20, 386:21, 388:8, 389:17, 392:4, 393:6, 402:13, 416:20, 445:23, 462:16, 467:22
**George** [2] - 386:25, 387:2
**george** [1] - 387:3
**German** [1] - 431:22
**Giglio** [1] - 396:18
**given** [10] - 378:13, 393:20, 397:16, 422:9, 439:15, 444:10, 448:17, 453:11, 465:23, 472:4
**glad** [1] - 395:22
**global** [2] - 415:23, 416:1
**globalized** [1] - 410:8
**goal** [3] - 442:1, 442:3, 442:10
**goals** [1] - 442:5
**gotta** [1] - 414:8
**government** [25] - 369:25, 375:10, 381:20, 384:19, 387:15, 387:18, 391:9, 396:8, 396:16, 396:21, 396:24, 397:1, 397:4, 419:15, 422:2, 422:10, 427:21, 448:16, 448:20, 469:22, 470:24, 471:1, 473:18, 474:1, 474:5
**Government** [1] - 367:14
**government's** [3] - 396:6, 473:21, 474:4
**graduate** [1] - 404:11
**graduates** [1] - 379:7
**grant** [4] - 373:15, 373:16, 378:16, 378:17
**graphic** [1] - 404:16
**graphics** [1] - 404:19
**great** [1] - 407:5
**Greg** [4] - 379:16, 379:22, 380:6, 381:13
**grounds** [1] - 395:25

**group** [9] - 375:14, 375:15, 376:21, 384:5, 437:16, 443:6, 444:25, 445:20, 446:19
**groupings** [1] - 464:11
**groups** [2] - 375:10, 429:10
**grownup** [1] - 400:21
**guarantee** [1] - 392:16
**guard** [1] - 447:14
**guess** [7] - 379:5, 385:7, 389:7, 391:11, 403:1, 425:5, 456:2
**guidance** [3] - 407:17, 459:11, 461:2
**guideline** [1] - 410:11
**guidelines** [12] - 408:18, 410:21, 415:7, 415:18, 415:19, 415:20, 415:23, 442:11, 442:13, 444:5, 444:22, 444:24, 445:3, 456:16, 461:1, 468:19
**Gunilla** [1] - 369:12
**gunilla** [1] - 368:12
**gunshot** [1] - 376:13

## H

**hand** [5] - 369:11, 413:1, 449:3, 457:19, 457:20
**handle** [1] - 405:8
**handled** [1] - 466:18
**hands** [1] - 379:7
**happy** [2] - 464:12, 465:4
**hard** [1] - 412:17
**Hashi** [4] - 368:3, 369:3, 369:9, 470:4
**hate** [2] - 383:12, 383:20
**hear** [7] - 404:18, 411:9, 434:2, 434:8, 434:11, 434:12, 472:8
**heard** [3] - 425:18, 434:14, 434:18
**hearing** [8] - 369:2, 379:2, 397:11, 404:15, 466:22, 469:11
**HEARING** [1] - 367:11
**hearsay** [1] - 432:5
**heavily** [1] - 375:1
**height** [4] - 400:25, 401:1, 401:3, 401:4
**help** [5] - 404:18, 451:15, 451:22, 452:5, 461:11
**helpful** [2] - 390:4, 440:11
**hertz** [6] - 400:21, 400:22, 400:23, 450:23, 450:25, 464:19
**hidden** [1] - 426:18
**hide** [1] - 433:25
**hiding** [1] - 434:2
**high** [3] - 398:21, 398:23, 402:23
**higher** [3] - 439:23, 439:24, 440:1
**highest** [1] - 452:15
**highly** [2] - 430:24, 431:19
**himself** [2] - 431:5, 465:22
**hire** [2] - 405:25, 406:12
**hired** [5] - 374:1, 374:7, 379:18, 383:5
**hiring** [1] - 406:3
**HIROTAKA** [2] - 370:1, 475:6
**historical** [1] - 408:7
**history** [1] - 409:14
**HN-1** [3] - 427:19, 427:21, 457:18
**HN-19** [1] - 440:16

**HN-26** [1] - 370:15
**HN-3** [1] - 427:21
**Honor** [39] - 369:7, 369:15, 369:23, 370:14, 392:9, 393:18, 393:21, 394:3, 395:1, 396:1, 397:20, 404:8, 414:12, 414:17, 416:12, 420:20, 422:1, 422:3, 422:23, 422:25, 431:6, 431:13, 438:22, 439:12, 440:8, 448:24, 449:4, 450:5, 457:23, 459:20, 463:13, 467:10, 469:23, 470:3, 470:10, 473:8, 473:12, 474:11, 474:21
**HONORABLE** [1] - 367:12
**honorary** [1] - 379:6
**hope** [2] - 446:14, 448:2
**hot** [1] - 456:15
**house** [2] - 391:13, 419:14
**housed** [2] - 472:6, 472:22
**houses** [1] - 371:24
**Houston** [1] - 379:1
**huge** [1] - 443:1
**hum** [1] - 447:5
**human** [11] - 371:2, 386:9, 400:25, 401:1, 428:18, 436:23, 455:19, 460:3
**hypotheses** [1] - 450:18
**hypothesis** [29] - 402:17, 402:19, 403:2, 413:12, 413:14, 413:15, 420:18, 449:15, 449:16, 449:19, 449:23, 449:24, 450:1, 450:20, 451:2, 451:3, 451:20, 452:3, 452:14, 452:15, 452:18, 452:19, 452:22, 465:22, 465:23
**hypothesize** [1] - 465:20
**hypothetical** [2] - 406:6, 411:14
**hypothetically** [1] - 406:10

## I

**I-vector** [4] - 418:15, 418:19, 418:25, 419:7
**IARPA** [1] - 375:12
**idea** [3] - 401:13, 401:16, 401:20
**ideal** [1] - 398:10
**ideally** [1] - 435:21
**identical** [1] - 385:11
**identification** [9] - 372:25, 374:4, 376:19, 400:17, 409:15, 415:21, 425:21, 444:2, 459:10
**Identification** [1] - 375:6
**identity** [2] - 403:4, 418:4
**IEEE** [1] - 376:21
**ignore** [1] - 448:15
**image** [3] - 371:9, 377:22, 441:20
**imagine** [1] - 399:13
**imaging** [1] - 445:18
**immediately** [2] - 382:19, 446:12
**implement** [4] - 373:15, 378:4, 426:14, 443:7
**implementation** [2] - 378:5, 378:18
**implemented** [4] - 378:1, 392:12, 426:5, 447:14
**important** [2] - 429:16, 444:4

**imported** [1] - 385:20
**imposed** [1] - 384:15
**imposter** [3] - 462:2, 462:3, 463:1
**impressed** [1] - 411:16
**impression** [1] - 389:11
**improve** [3] - 419:23, 420:3, 463:21
**improved** [1] - 418:12
**improvement** [4] - 418:14, 418:22, 418:23, 455:14
**improving** [1] - 420:7
**in-house** [2] - 391:13, 419:14
**inaccurate** [1] - 432:17
**inappropriate** [2] - 386:11, 468:1
**inappropriately** [1] - 409:23
**incidents** [1] - 383:10
**include** [2] - 429:9, 463:17
**included** [4] - 388:15, 396:22, 396:23, 396:25
**includes** [1] - 397:25
**including** [8] - 371:3, 382:5, 383:18, 388:24, 396:13, 410:19, 428:14, 443:2
**incoming** [1] - 383:13
**incompetence** [3] - 426:10, 426:11, 426:12
**inconclusive** [8] - 413:3, 428:14, 428:20, 450:7, 454:1, 460:9, 460:12, 465:3
**inconsistencies** [1] - 425:8
**inconsistent** [1] - 456:12
**inconvenience** [1] - 421:20
**incorporate** [1] - 407:19
**incremental** [5] - 418:14, 418:22, 418:23, 455:13
**incriminating** [1] - 436:14
**indefinitely** [1] - 446:10
**independent** [4] - 401:25, 402:3, 429:6, 433:9
**independently** [1] - 432:24
**indicate** [3] - 383:20, 386:6, 464:25
**indicated** [6] - 382:6, 383:13, 393:11, 396:4, 450:9, 473:13
**indicates** [4] - 386:7, 420:19, 428:17, 454:2
**indicating** [1] - 402:18
**indirect** [1] - 403:11
**individual** [10] - 376:8, 389:6, 399:8, 399:9, 403:1, 420:5, 438:14, 441:15, 446:1, 446:3
**individual's** [2] - 400:10, 418:3
**individualized** [1] - 442:5
**individuals** [18] - 376:9, 391:16, 395:3, 399:5, 400:5, 401:4, 401:8, 425:7, 430:19, 435:21, 437:1, 451:5, 451:6, 462:3, 462:9, 462:10, 464:23, 465:1
**inferring** [1] - 403:11
**inform** [1] - 469:21
**information** [24] - 376:15, 385:1, 396:7, 398:22, 398:23, 399:2, 399:4, 399:13, 399:14, 400:20, 400:24, 400:25, 401:4, 401:7, 402:1, 402:6, 403:11, 412:16, 416:24, 422:5, 429:7, 449:22,

468:8, 472:4
**informations** [2] - 371:21, 443:5
**inherent** [2] - 403:8, 403:13
**initial** [5] - 388:4, 388:9, 388:10, 392:22, 416:23
**inject** [2] - 452:8, 464:6
**injected** [1] - 464:2
**injury** [2] - 385:3
**input** [2] - 388:12, 466:20
**inserted** [1] - 388:16
**inside** [1] - 403:10
**instance** [1] - 410:3
**instead** [1] - 465:2
**Institute** [8] - 373:18, 374:21, 375:3, 387:9, 387:12, 430:21, 431:18, 442:25
**Institute/National** [1] - 442:25
**Instruments** [1] - 387:7
**insufficient** [7] - 394:16, 435:14, 436:10, 438:9, 438:20, 439:11, 439:25
**integrated** [1] - 422:13
**integrity** [3] - 393:14, 393:16, 431:16
**Intelligence** [2] - 375:12, 378:14
**intend** [1] - 395:17
**intended** [2] - 396:5, 396:9
**interacts** [1] - 465:15
**interchangeably** [1] - 378:2
**interfaces** [1] - 392:11
**internal** [1] - 389:22
**International** [3] - 372:2, 375:5, 376:20
**interpolate** [1] - 390:20
**interpretation** [1] - 420:8
**Interpreter** [2] - 369:12, 373:8
**INTERPRETERS** [1] - 368:12
**interpreters** [1] - 369:10
**interpretive** [1] - 424:10
**interrupt** [1] - 395:4
**interviewing** [1] - 436:15
**intonation** [4] - 399:11, 448:3, 449:8, 450:12
**introduced** [1] - 410:5
**introducing** [1] - 456:23
**Investigation** [1] - 370:19
**investigations** [1] - 372:7
**investigative** [4] - 371:16, 407:17, 459:11, 461:2
**investigators** [1] - 456:22
**invited** [1] - 387:16
**involved** [12] - 375:1, 375:10, 375:16, 379:13, 379:14, 380:12, 383:9, 384:13, 416:24, 417:8, 453:22, 458:9
**involvement** [2] - 392:3, 471:16
**involving** [2] - 371:2, 459:24
**ISO** [1] - 445:16
**isolated** [1] - 456:13
**issue** [8] - 413:10, 423:4, 426:20, 461:1, 469:23, 471:6, 471:8
**issued** [4] - 383:22, 384:3, 384:14, 460:14
**issues** [3] - 371:2, 385:12, 467:25
**items** [1] - 382:5
**itself** [3] - 390:11, 420:4, 420:18

**James** [3] - 375:15, 386:23, 387:1
**Jane** [2] - 381:9
**January** [3] - 379:15, 380:15, 445:4
**Japan** [3] - 372:10, 372:15
**Japan's** [1] - 372:16
**Japanese** [3] - 373:8, 405:10, 405:12
**Jean** [1] - 416:14
**Jessen** [1] - 431:22
**job** [1] - 373:6
**jobs** [1] - 373:4
**join** [1] - 374:6
**joined** [2] - 377:6, 408:25
**joining** [1] - 376:22
**joint** [1] - 471:5
**Jonas** [1] - 380:6
**Jos** [2] - 430:20, 431:17
**JOS** [1] - 430:20
**Joseph** [1] - 416:13
**JUDGE** [1] - 367:12
**judge** [8] - 395:4, 395:12, 395:22, 407:21, 421:2, 431:16, 463:9, 470:25
**Judge** [6] - 403:24, 427:25, 440:4, 441:2, 448:21, 474:7
**judging** [1] - 389:22
**judgment** [1] - 436:20
**June** [4] - 461:15, 461:16, 461:21, 461:22
**Justice** [2] - 373:18, 374:25
**JUSTICE** [1] - 367:19
**jut** [1] - 369:17

**keep** [5] - 394:7, 397:8, 405:11, 410:13, 474:14
**keeping** [1] - 434:8
**keeps** [1] - 412:25
**KELLMAN** [30] - 367:22, 367:24, 369:7, 409:16, 411:3, 414:6, 414:12, 414:25, 415:3, 416:3, 416:12, 416:16, 419:3, 430:25, 448:16, 448:20, 450:4, 470:8, 470:22, 471:11, 471:14, 471:17, 471:21, 471:23, 472:2, 472:5, 472:14, 472:18, 473:20, 474:7
**Kellman** [1] - 369:8
**kept** [4] - 408:13, 408:16, 426:16, 446:10
**key** [1] - 390:20
**kind** [33] - 371:2, 371:6, 382:21, 383:24, 385:8, 388:21, 390:25, 391:2, 394:7, 395:18, 397:25, 398:10, 399:4, 399:7, 399:13, 400:19, 401:2, 401:6, 417:5, 436:12, 436:22, 439:1, 439:21, 444:10, 446:13, 447:14, 450:9, 451:8, 451:12, 454:2, 456:14, 464:12, 465:3
**kinds** [2] - 417:13, 446:15
**Kingdom** [1] - 387:18
**knowing** [1] - 381:23
**knowledge** [11] - 387:17, 387:19, 389:19, 394:18, 394:19, 398:11,

398:13, 424:9, 430:11, 434:24, 468:24
**knowledgeable** [1] - 422:9
**known** [12] - 372:25, 376:18, 383:6, 418:15, 433:20, 435:22, 438:14, 439:3, 442:23, 445:15, 462:10
**knows** [4] - 394:17, 430:4, 431:23, 454:2
**KS-1** [2] - 393:8, 464:12
**KS-2** [2] - 393:9, 464:12

## L

**L.A** [1] - 376:18
**LA** [2] - 374:1, 374:6
**lab** [1] - 445:15
**Lab** [2] - 372:1, 445:14
**laboratory** [12] - 371:25, 372:1, 406:1, 413:9, 431:22, 433:8, 445:16, 445:22, 446:2, 446:13, 446:20, 446:21
**labs** [1] - 444:10
**lack** [3] - 408:10, 408:11, 415:5
**Lafayette** [1] - 368:7
**Language** [1] - 375:8
**language** [20] - 371:2, 382:12, 388:13, 388:14, 388:15, 388:17, 388:19, 388:21, 394:17, 404:21, 404:23, 405:1, 405:3, 405:15, 405:20, 406:13, 406:15, 407:8, 430:14
**languages** [4] - 383:19, 383:25, 388:16, 405:9
**Lansing** [1] - 372:21
**large** [1] - 441:24
**largely** [1] - 456:1
**larger** [2] - 442:22, 462:8
**larynx** [1] - 376:10
**last** [8] - 396:19, 402:9, 416:15, 417:14, 418:23, 426:9, 474:13
**lasted** [1] - 384:22
**LAW** [1] - 368:2
**lay** [1] - 425:6
**leading** [4] - 409:16, 409:25, 417:25, 432:1
**learned** [1] - 396:7
**least** [8] - 429:12, 430:4, 446:14, 455:3, 456:16, 456:17, 460:23, 468:18
**lecturer** [1] - 387:16
**led** [1] - 377:21
**leeway** [1] - 422:10
**left** [4] - 374:6, 398:6, 424:7, 466:12
**legal** [1] - 384:13
**length** [2] - 429:20, 447:18
**letter** [2] - 382:5, 383:13
**level** [9] - 398:22, 398:23, 399:15, 405:21, 407:10, 410:10, 442:7, 462:17
**lexical** [2] - 447:25, 453:5
**liaison** [1] - 371:5
**liberty** [1] - 419:12
**likelihood** [2] - 402:20, 402:23
**likely** [3] - 405:20, 414:22
**limine** [2] - 473:21, 474:2
**limitation** [2] - 408:7, 469:1

**Limitations** [1] - 458:17
**limitations** [2] - 384:15, 469:6
**limited** [4] - 404:10, 415:17, 457:3, 459:1
**Linda** [1] - 380:8
**Lindh** [30] - 379:22, 380:6, 388:4, 389:18, 390:9, 390:11, 390:19, 394:9, 396:13, 397:23, 398:8, 402:14, 404:25, 406:7, 406:9, 406:10, 410:23, 411:6, 414:19, 415:13, 415:16, 419:22, 420:6, 420:11, 430:22, 431:23, 432:4, 464:8, 465:11, 466:23
**Lindh's** [25] - 380:20, 382:19, 388:9, 390:21, 392:22, 396:3, 396:23, 397:2, 397:13, 397:21, 399:21, 402:10, 406:2, 411:1, 412:3, 412:19, 414:3, 414:20, 419:23, 429:19, 430:7, 447:18, 465:10, 467:5, 469:2
**line** [2] - 445:12
**lines** [1] - 474:3
**linguistic** [2] - 453:6, 453:7
**linguistical** [1] - 405:2
**list** [1] - 429:9
**listen** [2] - 451:4, 451:10
**listener** [2] - 460:19, 460:20
**listening** [4] - 399:11, 399:12, 424:7, 459:8
**local** [3] - 371:6, 443:8
**located** [1] - 370:20
**logistics** [1] - 446:2
**look** [5] - 380:20, 403:10, 419:15, 421:14, 427:10
**looked** [1] - 467:7
**looking** [6] - 380:8, 404:19, 448:17, 453:19, 453:20, 453:22
**loop** [1] - 386:4
**loosely** [1] - 407:15
**LORETTA** [1] - 367:14
**Los** [2] - 373:14, 373:17
**lying** [1] - 438:16
**LYNCH** [1] - 367:14

## M

**machine** [5] - 394:15, 404:16, 405:14, 408:6, 428:17
**Madhi** [1] - 400:20
**Madrid** [1] - 406:18
**mail** [10] - 368:15, 379:17, 381:5, 396:23, 467:13, 467:17, 467:19, 467:21, 468:4, 469:7
**main** [3] - 371:18, 409:20, 442:3
**maintain** [2] - 410:12, 446:7
**major** [1] - 466:21
**majored** [1] - 372:21
**makeup** [1] - 395:3
**male** [1] - 400:20
**man** [3] - 401:1, 401:2, 466:10
**manuals** [1] - 447:1
**March** [4] - 382:1, 382:2, 382:3, 437:9
**MARCO** [2] - 368:4, 369:9

**mark** [1] - 369:9
**MARK** [1] - 368:2
**marked** [3] - 372:12, 448:14, 467:15
**marker** [1] - 399:4
**marks** [1] - 448:15
**marshal** [2] - 471:14, 472:9
**MARSHAL** [3] - 471:19, 471:22, 471:25
**Marshal** [1] - 473:3
**marshals** [4] - 471:1, 471:6, 471:17, 472:3
**Mary** [1] - 437:7
**Master** [2] - 372:20, 372:22
**match** [14] - 413:2, 413:3, 428:19, 428:20, 460:8, 460:9, 460:11, 460:12, 460:16
**matched** [1] - 460:22
**Mater** [1] - 379:3
**material** [2] - 396:18
**materials** [9] - 394:8, 394:9, 397:24, 397:25, 398:3, 423:1, 426:19, 474:14, 474:16
**mathematical** [1] - 398:12
**mathematically** [1] - 398:16
**Mathematics** [1] - 424:11
**matrix** [1] - 461:13
**Matrix** [1] - 385:22
**Matrouf** [1] - 416:15
**matter** [9] - 376:6, 387:21, 398:5, 417:12, 420:2, 433:15, 434:11, 435:12, 474:22
**maturities** [1] - 417:2
**maturity** [1] - 456:11
**mean** [38] - 372:5, 380:6, 381:5, 384:4, 393:22, 395:8, 395:21, 405:24, 406:18, 406:23, 411:14, 412:21, 413:7, 413:15, 415:9, 415:11, 423:1, 425:7, 426:15, 431:1, 431:11, 433:1, 433:23, 437:1, 441:13, 442:19, 444:19, 446:4, 446:17, 448:9, 448:10, 450:2, 459:2, 459:3, 460:4, 460:22, 466:14, 467:20
**meaning** [4] - 390:23, 402:19, 450:11, 454:2
**meaningful** [2] - 439:2, 469:3
**meaningfully** [2] - 421:3, 421:7
**means** [18] - 398:23, 400:1, 401:11, 408:9, 413:11, 413:18, 418:2, 433:6, 446:5, 449:20, 449:21, 451:7, 452:20, 453:16, 453:18, 459:10, 462:3, 462:7
**meant** [6] - 428:23, 444:15, 450:3, 450:4, 459:2, 464:5
**measure** [1] - 400:5
**measured** [2] - 401:8, 403:9
**measurement** [3] - 388:25, 400:1, 400:8
**measurements** [10] - 388:24, 400:4, 400:9, 400:11, 400:12, 400:13, 400:18, 420:9, 465:19
**measuring** [3] - 376:8, 388:25, 389:2
**mechanism** [3] - 423:13, 429:12, 459:3
**median** [1] - 401:9
**medical** [1] - 424:19

**Medina** [2] - 368:12, 369:12
**meet** [5] - 393:10, 437:8, 437:16, 471:3, 471:11
**meeting** [4] - 437:10, 471:6, 471:7, 471:9
**member** [9] - 374:16, 375:2, 375:3, 375:4, 375:5, 375:7, 375:11, 375:15, 375:24
**members** [4] - 390:20, 434:21, 434:22, 466:7
**memo** [1] - 384:14, 384:15
**mentioned** [5] - 381:18, 431:18, 431:23, 433:2, 438:11
**mentor** [1] - 406:25
**message** [4] - 404:17, 412:10, 416:25, 449:23
**met** [3] - 437:7, 437:8, 437:18
**method** [6] - 373:1, 417:14, 417:15, 458:23, 458:25, 459:6
**methodologies** [2] - 412:20, 468:22
**methodology** [7] - 377:10, 386:17, 386:18, 396:12, 410:18, 410:19, 412:10
**methods** [1] - 459:9
**Michael** [1] - 431:22
**Michigan** [3] - 372:20, 373:12, 379:4
**middle** [1] - 390:24
**might** [6] - 401:6, 422:3, 440:11, 450:23, 456:3, 473:13
**million** [1] - 391:9
**mind** [2] - 390:25, 402:16
**mine** [2] - 425:4, 427:19
**minus** [1] - 412:24
**minute** [8] - 395:5, 400:6, 410:14, 431:10, 437:8, 439:18, 463:16, 463:24
**minutes** [3] - 369:18, 420:21, 471:12
**misapplication** [1] - 387:25
**misbehavior** [1] - 393:12
**mismatch** [3] - 393:13, 435:4, 439:22
**mismatched** [8] - 434:24, 435:2, 435:13, 436:10, 438:8, 438:19, 439:6, 439:10
**missed** [3] - 389:19, 434:6, 459:19
**misspelled** [1] - 380:7
**Mister** [1] - 437:5
**misunderstood** [1] - 381:13
**mode** [1] - 439:4
**model** [1] - 462:8
**models** [1] - 429:10
**modernize** [2] - 377:23, 408:15
**modified** [5] - 471:7, 471:19, 472:8, 472:12, 473:6
**Mohamed** [1] - 368:7
**moment** [2] - 441:2, 463:9
**Monday** [3] - 421:11, 421:17, 421:25
**money** [1] - 378:17
**monotonous** [1] - 435:18
**month** [1] - 469:25
**months** [1] - 373:13
**Montreal** [1] - 390:16
**morning** [4] - 369:19, 370:10, 370:11,

464:18
**morphemic** [2] - 447:24, 453:5
**Morrison** [2] - 382:8, 396:5
**most** [6] - 375:1, 378:13, 405:20, 433:24, 467:5, 473:21
**mother** [1] - 405:10
**motion** [4] - 382:6, 473:21, 474:1, 474:5
**mouth** [1] - 403:10
**move** [3] - 379:9, 419:3, 469:8
**moved** [3] - 372:20, 373:9, 373:14
**moves** [1] - 474:2
**MR** [130] - 369:4, 369:6, 369:9, 369:15, 369:17, 369:23, 369:25, 370:4, 370:14, 392:1, 392:8, 393:18, 393:21, 393:24, 394:2, 395:4, 395:8, 395:10, 395:12, 395:22, 396:1, 397:4, 397:10, 397:15, 397:20, 398:3, 401:17, 403:24, 404:2, 404:7, 409:25, 411:5, 411:8, 411:18, 414:1, 414:5, 414:17, 414:24, 415:4, 416:13, 416:17, 417:25, 420:13, 420:20, 421:2, 421:9, 421:11, 421:12, 421:14, 421:16, 421:19, 421:22, 421:24, 422:1, 422:3, 422:7, 422:12, 422:16, 422:20, 422:23, 423:3, 423:6, 427:13, 427:14, 427:16, 427:17, 427:18, 427:19, 429:1, 431:3, 431:6, 431:9, 438:22, 439:12, 439:17, 440:4, 440:8, 440:9, 440:11, 440:13, 440:17, 441:2, 441:5, 444:1, 448:14, 448:17, 448:24, 449:3, 455:1, 457:9, 457:11, 457:13, 457:18, 457:21, 457:23, 458:2, 458:5, 459:20, 463:9, 463:12, 463:13, 463:15, 467:1, 467:10, 467:18, 468:2, 469:8, 469:10, 469:16, 469:20, 469:22, 470:2, 470:9, 470:20, 470:24, 470:25, 471:5, 471:15, 472:1, 472:3, 472:20, 473:7, 473:8, 473:12, 473:16, 474:13, 474:21, 475:7, 475:8, 475:9
**MS** [28] - 369:7, 409:16, 411:3, 414:6, 414:12, 414:25, 415:3, 416:3, 416:12, 416:16, 419:3, 430:25, 448:16, 448:20, 450:4, 470:8, 470:22, 471:11, 471:14, 471:17, 471:21, 471:23, 472:2, 472:5, 472:14, 472:18, 473:20, 474:7
**multi** [1] - 391:8
**multimedia** [1] - 441:16
**multiple** [2] - 444:7, 466:8, 466:9
**muscle** [1] - 385:4
**must** [15] - 402:19, 404:15, 417:4, 417:5, 425:4, 428:13, 429:5, 429:9, 446:11, 446:24, 447:14, 456:24, 457:25, 461:22
**myometric** [1] - 453:4

**N**

**Nakasone** [46] - 369:25, 370:5, 370:16, 370:18, 372:4, 376:1, 378:24, 379:13, 383:3, 384:6, 384:20, 386:10, 389:16, 389:24, 390:2, 392:2, 392:21, 393:22,

394:4, 394:6, 396:5, 396:9, 396:17, 396:19, 396:22, 396:24, 397:9, 398:5, 404:9, 406:7, 409:8, 414:18, 416:6, 421:12, 421:19, 423:7, 427:24, 436:24, 437:13, 439:13, 463:16, 467:21, 468:7, 469:14, 473:11, 473:17
**NAKASONE** [2] - 370:1, 475:6
**Nakasone's** [2] - 369:18, 397:1
**name** [6] - 379:21, 380:7, 416:15, 432:2, 451:8, 459:5
**named** [1] - 436:25
**namely** [1] - 464:11
**nasal** [1] - 400:11
**national** [3] - 372:16, 442:20, 443:4
**National** [9] - 373:18, 374:21, 374:23, 378:14, 387:9, 387:11, 433:5, 442:24, 466:12
**native** [5] - 405:20, 405:21, 406:17, 466:2
**nature** [3] - 403:1, 411:14, 416:20
**necessarily** [1] - 397:25
**neck** [1] - 385:4
**need** [27] - 369:21, 379:17, 383:14, 390:10, 390:25, 391:3, 391:5, 403:20, 404:9, 404:14, 404:20, 404:22, 404:23, 408:17, 417:2, 421:6, 421:8, 421:10, 446:9, 448:23, 456:15, 457:15, 462:11, 471:15, 473:15, 473:17
**Need** [1] - 416:7
**needed** [2] - 372:6, 391:2
**needs** [1] - 412:4
**negative** [1] - 460:11
**Netherland** [2] - 430:21, 431:18
**never** [9] - 390:10, 397:15, 411:17, 426:24, 430:14, 437:7, 437:18, 439:13, 464:16
**new** [4] - 383:1, 418:15, 460:13
**NEW** [1] - 367:1
**New** [9] - 367:6, 367:15, 367:16, 367:23, 368:3, 368:8, 380:17, 406:11, 406:19, 437:3
**next** [12] - 391:18, 413:21, 421:24, 421:25, 428:25, 443:10, 451:25, 454:10, 460:1, 460:2, 469:25, 470:21
**NFC** [2] - 433:4, 433:5
**nine** [1] - 413:1
**NIST** [9] - 390:4, 390:8, 390:10, 392:3, 392:18, 418:17, 419:9, 442:24
**nobody** [2] - 403:9, 407:3
**none** [1] - 462:4
**normal** [5] - 385:16, 412:16, 436:1, 436:4, 436:21
**normally** [1] - 374:20
**notable** [1] - 456:10
**note** [2] - 436:18, 440:11
**noted** [1] - 388:18
**notes** [8] - 369:19, 370:16, 393:11, 396:22, 396:25, 411:23, 429:9, 440:19
**nothing** [4] - 420:20, 450:8, 453:16, 469:16

**notice** [11] - 393:20, 393:23, 393:24, 394:1, 395:13, 395:24, 396:2, 396:3, 397:5, 397:6, 397:10
**nowadays** [2] - 405:7, 410:5
**nuance** [1] - 399:3
**nuances** [1] - 466:3
**number** [7] - 369:19, 372:12, 440:12, 447:21, 450:24, 452:22, 459:22
**numbers** [5] - 427:10, 427:20, 459:17, 459:18, 459:20
**numerous** [1] - 408:25
**NW** [1] - 367:20

## O

**oath** [1] - 420:25
**object** [3] - 395:25, 397:18, 468:2
**objecting** [3] - 393:18, 395:21, 395:23
**objection** [30] - 392:8, 395:19, 395:21, 397:25, 401:17, 401:18, 403:24, 404:2, 409:16, 409:25, 411:3, 411:8, 411:18, 414:5, 414:6, 414:12, 414:24, 414:25, 415:4, 415:6, 416:3, 417:25, 419:3, 420:13, 430:25, 438:22, 439:12, 450:4, 457:9, 467:18
**objectionable** [1] - 467:20
**objections** [1] - 470:4
**objective** [1] - 400:13
**objectives** [1] - 442:5
**objects** [1] - 471:1
**obligated** [1] - 381:12
**obligations** [3] - 397:3, 397:5
**observe** [1] - 436:5
**observed** [1] - 410:23
**obtained** [3] - 372:21, 398:13, 428:13
**obvious** [2] - 397:22, 449:14
**obviously** [4] - 387:1, 396:2, 422:24
**occurs** [1] - 395:18
**ODT** [1] - 445:22
**Odyssey** [1] - 375:8
**OF** [5] - 367:1, 367:3, 367:11, 367:19, 368:2
**offer** [4] - 414:9, 414:18, 416:12, 468:9
**offered** [2] - 411:7, 411:17
**offering** [2] - 403:5, 415:20
**offers** [1] - 403:13
**OFFICE** [1] - 368:2
**Office** [2] - 378:14, 392:22
**office** [12] - 378:25, 379:25, 380:17, 383:11, 384:4, 388:3, 388:7, 392:24, 392:25, 406:11, 406:20
**official** [2] - 455:6, 468:14
**Official** [1] - 368:15
**often** [1] - 409:2
**Okinawa** [1] - 372:15
**once** [7] - 385:5, 391:11, 392:10, 405:6, 446:9, 459:25, 470:15
**one** [65] - 370:15, 372:15, 372:16, 377:23, 378:13, 383:5, 385:16, 387:4, 389:8, 390:20, 397:15, 400:23, 402:17, 405:13, 406:18, 408:22,

409:6, 409:12, 409:18, 409:20, 412:21, 413:10, 413:13, 413:14, 417:14, 418:13, 424:3, 427:14, 430:20, 431:11, 433:4, 433:17, 434:3, 434:15, 435:18, 435:19, 436:3, 436:6, 438:13, 438:24, 440:14, 441:2, 441:19, 444:19, 452:14, 452:15, 453:11, 455:13, 459:4, 463:9, 465:23, 466:4, 466:7, 466:10, 466:14, 466:21, 467:5, 469:23, 470:25, 473:20, 474:13
**open** [1] - 382:3
**opens** [1] - 409:6
**operate** [2] - 378:8, 458:12
**operating** [20] - 378:9, 426:25, 427:2, 427:4, 427:7, 428:7, 429:15, 446:18, 446:19, 446:23, 447:4, 447:6, 447:15, 457:5, 457:12, 457:17, 458:7, 458:9, 458:11, 459:13
**operation** [1] - 372:6
**Operational** [6] - 370:20, 370:22, 370:25, 371:10, 371:12, 371:13
**operational** [7] - 371:15, 372:4, 372:5, 444:16, 445:20, 458:8
**opinion** [31] - 386:11, 386:14, 394:9, 398:7, 399:21, 402:14, 411:7, 411:10, 414:18, 414:20, 415:8, 417:20, 427:8, 428:5, 428:12, 429:5, 431:25, 436:9, 436:11, 455:11, 455:16, 455:18, 455:22, 455:23, 455:25, 456:19, 461:5, 465:11, 466:11, 469:14
**opinions** [8] - 393:25, 394:1, 408:9, 410:20, 455:21, 456:1, 456:18
**opportunity** [1] - 422:19
**oral** [1] - 429:7
**order** [9] - 403:19, 404:14, 471:19, 472:8, 472:12, 473:6, 473:23, 473:24, 474:8
**Organization** [1] - 468:14
**organization** [8] - 374:16, 374:20, 414:10, 427:1, 432:24, 441:24, 444:20, 465:24
**organizational** [1] - 445:12
**Organizations** [1] - 372:3
**organizations** [4] - 374:17, 376:25, 377:2, 398:17, 444:18
**original** [2] - 382:11, 382:17
**originally** [2] - 380:7, 424:16
**orthogonal** [1] - 401:25
**OSAC** [15] - 374:20, 374:21, 375:14, 375:21, 375:24, 408:23, 410:22, 441:6, 441:9, 441:14, 442:1, 443:5, 445:1, 456:19, 468:15
**OTD** [3] - 371:18, 374:8
**ourselves** [1] - 379:24
**outside** [5] - 374:8, 383:18, 403:22, 404:3, 462:13
**overall** [2] - 412:21, 451:11, 466:13
**overarching** [1] - 374:17
**overnight** [1] - 418:22
**overruled** [11] - 398:4, 401:18, 409:17, 410:1, 411:9, 411:19, 415:6, 418:1,

420:14, 431:1, 450:6
**oversee** [3] - 370:25, 371:8, 374:18
**Owen** [7] - 382:22, 383:4, 385:13, 386:2, 387:22, 466:20
**Owens** [1] - 383:6
**own** [9] - 389:22, 391:9, 398:13, 413:17, 446:21, 446:23, 451:8, 451:9, 459:1

## P

**P.C** [1] - 368:7
**pack** [3] - 390:23, 390:24
**package** [4] - 381:21, 382:4, 382:11
**PAGE** [1] - 475:3
**page** [13] - 391:18, 413:21, 428:25, 440:13, 443:10, 449:6, 451:19, 454:10, 459:17, 459:18, 459:20, 459:22
**pages** [2] - 369:19, 382:14
**paper** [5] - 412:5, 416:23, 416:25, 417:7
**papers** [2] - 376:1, 376:4
**park** [2] - 377:12, 450:9
**part** [9] - 374:22, 376:21, 381:12, 392:18, 397:11, 398:25, 428:4, 428:8, 442:22
**participants** [1] - 418:16
**participate** [1] - 389:21
**participated** [2] - 390:19, 418:17
**particular** [12] - 375:18, 389:13, 396:14, 399:10, 400:15, 438:13, 450:11, 458:14, 462:15, 466:16
**parts** [2] - 385:4, 399:8
**passed** [1] - 426:19
**past** [1] - 405:25
**Pause** [2] - 448:19, 449:2
**pause** [6] - 376:8, 376:9, 395:11, 441:4, 461:17, 463:11
**pay** [1] - 379:17
**Pennsylvania** [1] - 367:20
**people** [15] - 378:1, 409:2, 410:9, 412:2, 431:10, 433:21, 434:15, 437:16, 444:9, 444:19, 453:22, 455:3, 455:11, 464:17, 466:3
**per** [3] - 400:6, 400:7, 466:16
**percent** [1] - 394:12
**perception** [1] - 388:20
**perceptual** [2] - 428:24, 459:6
**perform** [2] - 372:7, 408:6
**performance** [3] - 390:21, 417:11, 418:14
**performed** [2] - 393:16, 464:8
**perhaps** [2] - 448:21, 471:11
**period** [1] - 423:12
**person** [19] - 387:14, 399:2, 400:6, 402:24, 402:25, 403:15, 406:13, 406:18, 424:3, 430:4, 430:22, 431:21, 432:23, 433:12, 434:16, 444:20, 450:22, 466:7
**personal** [1] - 378:16
**personally** [2] - 384:2, 408:24
**persons** [1] - 433:3

**perspective** [1] - 460:23
**Peter** [2] - 386:24, 387:13
**Phd** [4] - 372:23, 372:25, 387:6
**phenomena** [1] - 425:18
**phone** [5] - 381:5, 381:7, 381:10, 393:5, 393:17
**phonemic** [1] - 447:24
**phonetic** [19] - 387:16, 388:20, 389:4, 394:22, 398:13, 401:16, 401:20, 401:22, 404:14, 417:13, 419:22, 430:7, 430:11, 432:1, 453:6, 453:7, 453:14, 463:17, 463:21
**phonetically** [1] - 403:19
**phonetician** [5] - 394:24, 403:21, 405:18, 430:9, 431:24
**phoneticians** [7] - 394:20, 399:14, 404:18, 405:22, 405:25, 406:3, 431:20
**phoneticians'** [1] - 431:16
**phoneticist** [1] - 434:16
**phonetics** [12] - 398:9, 399:19, 399:22, 403:17, 404:11, 424:11, 429:25, 430:1, 430:5, 432:13, 432:16, 442:16
**phrase** [1] - 399:10
**phrased** [1] - 420:15
**phrases** [1] - 383:20
**physical** [1] - 385:3
**physically** [1] - 403:9
**Physics** [1] - 424:11
**pick** [1] - 399:14
**piece** [1] - 444:19
**pining** [2] - 378:18, 378:19
**pitch** [15] - 399:2, 400:1, 400:20, 400:21, 400:24, 401:7, 401:8, 464:9, 464:10, 464:16, 464:18, 464:20, 464:22, 464:25
**pitches** [1] - 464:17
**place** [5] - 380:15, 381:8, 395:16, 418:24, 455:14
**play** [1] - 447:25
**played** [1] - 447:23
**Plaza** [1] - 367:16
**pledged** [1] - 441:16
**plus** [2] - 411:23, 412:25
**point** [7] - 371:5, 379:13, 380:10, 381:1, 389:16, 397:20, 466:23
**points** [1] - 417:7
**Police** [1] - 385:8
**policy** [8] - 406:25, 407:10, 407:14, 407:18, 407:19, 407:21, 461:1
**poor** [1] - 452:20
**portion** [1] - 428:9
**pose** [1] - 436:3
**position** [7] - 373:12, 389:17, 410:12, 414:10, 455:6, 468:14, 472:7
**positive** [1] - 459:10
**positively** [1] - 403:14
**possess** [1] - 468:24
**possibility** [1] - 461:4
**possible** [2] - 471:2, 474:15
**potential** [3] - 413:4, 426:6, 457:3
**pouring** [1] - 391:8

**practical** [1] - 468:24
**practice** [13] - 388:22, 406:14, 407:15, 407:25, 408:12, 411:22, 415:10, 426:2, 442:14, 443:7, 453:19, 468:19
**practiced** [2] - 377:19, 425:4
**practices** [1] - 456:12
**practitioner** [1] - 468:12
**practitioners** [1] - 410:6
**precise** [1] - 402:20
**precisely** [1] - 386:16
**preclude** [2] - 394:16, 468:21
**precludes** [1] - 474:3
**prefer** [1] - 436:8
**preparation** [2] - 389:7, 467:12
**prepared** [2] - 388:4, 447:3, 467:4
**preparing** [2] - 384:18, 437:22
**present** [1] - 420:23
**presenting** [1] - 423:14
**presumably** [2] - 382:12, 470:10
**pretty** [10] - 376:23, 377:13, 377:18, 377:21, 382:8, 386:6, 390:23, 406:14, 424:9
**previous** [1] - 405:13
**primarily** [1] - 424:17
**primary** [7] - 383:22, 408:4, 426:6, 426:16, 426:21, 426:22
**principle** [1] - 411:13
**Prisons** [3] - 471:8, 472:14, 472:19
**probable** [4] - 413:2, 413:3, 428:20
**problem** [2] - 386:2, 425:22
**procedure** [6] - 386:19, 447:16, 457:12, 458:10, 459:13
**procedures** [19] - 378:9, 392:12, 410:19, 427:1, 427:2, 427:5, 427:7, 428:7, 429:16, 446:2, 446:19, 446:24, 447:4, 447:6, 457:5, 457:17, 458:7, 458:11
**proceed** [3] - 369:14, 369:23, 418:7
**proceeding** [1] - 459:24
**Proceedings** [1] - 368:16
**process** [13] - 407:20, 415:9, 429:5, 445:8, 445:13, 445:22, 446:18, 453:10, 465:9, 465:10, 465:11, 467:23, 470:11
**processed** [1] - 459:25
**processing** [2] - 376:21, 433:19
**produce** [7] - 385:5, 385:10, 392:15, 408:8, 439:2, 440:1, 443:7
**produced** [9] - 368:17, 382:18, 382:21, 402:24, 402:25, 405:15, 410:22, 414:22, 464:9
**produces** [1] - 400:6
**product** [1] - 382:21
**production** [1] - 399:1
**products** [1] - 392:11
**professional** [1] - 374:14
**professor** [1] - 373:11
**proffered** [1] - 396:6
**Program** [1] - 375:13
**program** [4] - 372:25, 404:11, 445:14, 445:17

**programs** [1] - 375:12
**prohibited** [1] - 384:18
**prohibiting** [1] - 407:10
**project** [1] - 373:25
**projects** [2] - 371:1, 376:8
**prolific** [1] - 387:10
**promote** [1] - 378:18
**pronounce** [1] - 416:15
**proper** [1] - 409:15
**proprietary** [1] - 391:10
**prosecutions** [1] - 382:22
**protocol** [11] - 398:17, 407:15, 407:25, 408:7, 408:12, 408:14, 408:16, 413:17, 433:14, 463:17
**protocols** [2] - 446:5, 446:22
**proven** [1] - 468:23
**provide** [10] - 394:20, 397:7, 407:6, 429:7, 429:9, 456:20, 456:21, 457:24, 469:3, 471:7
**provided** [17] - 375:25, 379:1, 379:2, 384:3, 384:17, 388:6, 392:21, 394:19, 396:2, 396:16, 396:18, 396:20, 400:25, 415:13, 419:16, 436:13, 470:3
**provides** [3] - 453:21, 472:21
**providing** [3] - 416:24, 454:7, 466:1
**psychological** [1] - 417:8
**psychology** [1] - 372:19
**public** [2] - 389:12, 419:17
**publication** [1] - 387:10
**publications** [5] - 376:16, 376:22, 379:5
**publish** [1] - 376:7
**published** [5] - 376:1, 376:5, 376:17, 376:20, 444:25
**purchase** [1] - 391:8
**purged** [1] - 446:12
**purpose** [4] - 384:24, 388:19, 394:14, 444:15
**purposes** [5] - 386:9, 389:4, 394:10, 422:11, 458:2
**pursue** [1] - 373:9
**put** [5] - 389:17, 471:17, 472:10, 472:11

**Q**

**qualifications** [3] - 384:16, 396:13, 409:15
**qualified** [12] - 377:7, 377:9, 407:7, 407:8, 426:3, 428:12, 433:11, 433:13, 433:15, 434:19, 444:9, 468:23
**qualify** [1] - 413:19
**qualifying** [1] - 413:19
**qualities** [1] - 398:24
**quality** [19] - 388:12, 392:25, 393:1, 397:16, 397:17, 398:3, 412:18, 437:24, 446:2, 446:4, 446:5, 450:14, 451:6, 451:7, 451:11, 452:19, 452:20, 466:18
**qualm** [1] - 385:23
**Quantico** [2] - 370:20, 371:11
**questioned** [1] - 462:4
**questioning** [1] - 474:3

**questions** [2] - 461:23, 465:6
**quick** [1] - 393:15
**quickly** [1] - 470:12
**quite** [4] - 377:15, 412:5, 445:5, 456:14
**quote** [4] - 387:4, 459:17, 459:21, 459:23
**quoted** [1] - 401:25

# R

**R&D** [1] - 376:25
**raise** [1] - 369:11
**range** [5] - 401:10, 420:10, 452:15
**rapid** [6] - 435:13, 435:19, 436:7, 438:8, 438:19, 439:10
**rapidly** [4] - 418:21, 435:10, 435:17, 439:3
**rate** [5] - 376:8, 388:25, 435:18, 451:17, 451:25
**rates** [15] - 405:16, 408:5, 408:9, 408:10, 418:5, 419:8, 419:9, 419:10, 419:11, 419:12, 419:19, 439:23, 439:24, 440:1, 457:3
**rather** [4] - 391:8, 403:10, 448:13, 470:14
**RDC** [1] - 375:7
**reach** [1] - 408:20
**reached** [3] - 450:7, 453:16, 464:24
**reaching** [5] - 451:15, 451:22, 452:5, 453:1, 453:8
**read** [20] - 369:20, 428:6, 428:11, 429:2, 429:3, 439:5, 453:6, 457:4, 457:13, 457:19, 457:20, 458:20, 459:17, 459:21, 461:14, 467:17, 468:6, 468:7
**reading** [8] - 388:11, 388:13, 406:2, 430:16, 432:10, 457:5, 465:15, 465:16
**reads** [2] - 436:21, 473:24
**ready** [8] - 369:14, 369:17, 408:19, 408:21, 441:7, 441:8, 455:20, 461:5
**real** [1] - 452:25
**realistically** [1] - 431:15
**reality** [1] - 424:6
**realized** [3] - 382:15, 388:11, 409:2
**really** [34] - 371:22, 383:7, 386:7, 390:20, 391:7, 392:16, 394:21, 398:10, 398:16, 403:9, 403:15, 406:22, 407:18, 409:4, 410:2, 410:3, 411:17, 413:11, 414:9, 430:11, 431:3, 435:5, 445:25, 447:6, 449:21, 450:2, 450:8, 450:10, 450:11, 453:3, 466:6, 466:11, 466:15, 473:1
**reason** [6] - 407:22, 408:4, 408:22, 422:7, 427:20, 469:21
**reasonable** [5] - 388:22, 392:14, 440:20, 440:25, 456:20
**reasonably** [3] - 405:14, 435:22, 468:22
**reasons** [6] - 408:1, 409:5, 409:12, 424:19, 435:18, 466:21
**rebut** [2] - 395:14, 396:6, 397:18
**rebuttal** [7] - 384:18, 393:19, 395:24, 396:9, 396:15, 397:11, 401:17
**receive** [3] - 381:21, 395:13, 405:1

**received** [9] - 369:18, 373:16, 373:17, 373:22, 378:11, 379:3, 381:5, 382:4, 412:13
**recent** [3] - 375:1, 378:13, 473:21
**recently** [3] - 442:19, 442:20, 443:3
**recess** [1] - 420:22
**recognition** [62] - 371:1, 371:3, 373:19, 375:20, 375:25, 376:24, 377:24, 378:1, 378:3, 378:8, 378:19, 383:8, 386:9, 387:4, 387:10, 387:17, 389:9, 389:15, 394:15, 394:21, 395:1, 398:20, 398:21, 403:8, 405:7, 405:8, 405:16, 408:2, 408:15, 408:23, 409:10, 409:13, 410:4, 410:22, 417:1, 417:11, 417:15, 417:22, 418:18, 418:20, 427:3, 427:5, 429:9, 432:2, 433:3, 441:14, 441:16, 441:19, 441:20, 441:23, 442:9, 442:14, 442:15, 443:6, 445:1, 445:17, 456:8, 456:25, 465:7, 468:11, 468:16, 468:20
**Recognition** [3] - 375:7, 375:8, 416:7
**recognize** [5] - 405:14, 427:25, 428:2, 428:3, 456:10
**recollection** [2] - 439:15, 440:3
**recommend** [3] - 385:9, 406:24
**recommended** [3] - 385:9, 406:11, 406:19
**recommending** [1] - 407:6
**record** [4] - 396:2, 421:18, 422:24, 440:12
**recorded** [2] - 368:16, 376:15
**recording** [5] - 371:21, 383:15, 383:17, 383:23, 383:25
**recordings** [5] - 392:25, 394:13, 397:16, 397:17, 438:14
**red** [8] - 435:5, 435:8, 435:9, 435:10, 435:24, 436:3, 436:6, 436:15
**RED** [1] - 435:9
**REDIRECT** [2] - 463:15, 475:9
**reference** [5] - 392:13, 462:5, 462:7, 462:9, 462:23
**reference-worthy** [1] - 392:13
**references** [1] - 412:14
**referring** [2] - 439:13, 447:4
**refinement** [1] - 374:3
**reflect** [1] - 406:4
**refresh** [1] - 439:14
**refreshes** [1] - 440:3
**regard** [6] - 397:9, 397:12, 435:13, 438:7, 438:18, 439:9
**regarded** [2] - 454:3, 464:22
**regarding** [4] - 396:18, 397:1, 408:2, 420:12
**regardless** [1] - 433:12
**regular** [1] - 394:21
**regulations** [2] - 433:14, 446:25
**Reich** [1] - 466:22
**relate** [2] - 374:15, 376:5
**related** [6] - 370:16, 374:3, 396:25, 407:11, 415:20, 420:3
**relates** [2] - 373:7, 411:2

**released** [2] - 458:1, 458:5
**relevant** [2] - 426:19, 468:24
**reliability** [1] - 424:16
**reliable** [1] - 468:22
**relied** [1] - 453:8
**remain** [1] - 409:11
**remaining** [1] - 389:10
**remember** [12] - 380:13, 402:11, 415:21, 427:10, 434:13, 438:3, 438:12, 439:16, 439:25, 444:12, 448:11, 464:2
**remind** [1] - 438:2
**reminds** [1] - 461:15
**render** [3] - 410:20, 455:21, 460:10
**rendered** [1] - 461:5
**rendition** [1] - 404:17
**repeat** [4] - 389:25, 400:13, 404:12, 412:1
**rephrase** [1] - 414:17
**reply** [1] - 474:5
**report** [56] - 380:14, 380:20, 380:24, 380:25, 381:24, 382:11, 382:16, 382:17, 382:19, 382:20, 383:2, 384:3, 388:4, 388:7, 388:9, 388:10, 388:14, 392:23, 393:23, 394:4, 396:14, 406:2, 411:10, 411:11, 411:21, 411:22, 411:23, 411:24, 412:3, 412:8, 412:9, 412:14, 412:16, 412:18, 412:21, 415:14, 416:18, 416:21, 419:15, 419:17, 419:19, 429:19, 432:10, 439:13, 439:14, 439:15, 440:7, 447:2, 447:19, 448:9, 448:10, 448:11, 448:14, 461:1, 467:5, 473:14
**reported** [2] - 411:25, 469:2
**Reporter** [3] - 368:14, 368:15, 370:8
**reporting** [2] - 415:10, 440:10
**reports** [7] - 396:25, 411:20, 412:7, 412:23, 446:8, 467:6, 467:7
**represent** [3] - 414:10, 436:14, 468:13
**representation** [2] - 440:21, 440:25
**representing** [1] - 456:18
**Republic** [1] - 390:15
**reputable** [2] - 430:24, 431:19
**reputations** [2] - 430:19, 432:7
**request** [6] - 382:7, 392:24, 405:2, 432:19, 466:17, 470:25
**requested** [5] - 379:7, 381:25, 385:8, 406:16, 424:16, 424:19
**requesting** [2] - 380:13, 384:12
**require** [1] - 391:13
**required** [1] - 393:25
**requires** [2] - 399:17, 399:18
**research** [15] - 371:1, 373:15, 375:11, 376:7, 376:11, 376:18, 376:25, 378:6, 378:17, 389:4, 390:14, 408:17, 417:3, 444:15, 456:13
**Research** [1] - 375:13
**resides** [1] - 445:17
**resolution** [1] - 407:6
**resolve** [1] - 395:6
**resonance** [1] - 400:10

**respect** [6] - 375:22, 396:3, 407:25, 424:10, 471:5, 473:20
**respond** [1] - 474:4
**response** [2] - 404:10, 432:4
**responsibility** [1] - 443:1
**result** [4] - 406:2, 412:12, 429:11, 439:2
**results** [29] - 376:17, 390:7, 390:8, 392:18, 393:4, 393:7, 400:14, 402:18, 403:6, 406:22, 409:21, 412:16, 413:13, 417:16, 424:15, 426:18, 428:15, 428:18, 428:22, 428:24, 432:25, 436:5, 437:24, 450:7, 459:10, 461:3, 466:6
**resume** [1] - 370:15
**returned** [2] - 381:7, 446:11
**Reva** [1] - 416:14
**reveal** [1] - 459:5
**review** [6] - 375:11, 380:14, 381:24, 394:4, 396:23, 429:11
**reviewed** [6] - 388:6, 388:9, 394:10, 411:20, 423:1, 460:19
**reviewing** [1] - 382:19
**rhythm** [4] - 448:3, 448:6, 449:9, 450:12
**rhythmic** [2] - 449:11, 449:19
**richard** [1] - 368:14
**RICHARD** [1] - 367:18
**riding** [1] - 455:15
**right-hand** [1] - 369:11
**risk** [1] - 398:14
**Road** [1] - 368:3
**Roddy** [2] - 436:25, 437:7
**role** [2] - 447:23, 447:25
**room** [2] - 417:8, 474:14
**ROTHMAN** [1] - 368:7
**round** [1] - 419:16
**RPR** [1] - 368:14
**rude** [1] - 424:7
**rule** [1] - 433:23
**Rule** [2] - 470:2, 470:5
**ruled** [1] - 397:9
**rules** [7] - 428:17, 429:15, 433:14, 433:17, 446:15, 460:13, 472:24
**run** [1] - 393:14
**Russian** [3] - 385:23, 385:24
**rwbarrycourtreporter@gmail.com** [1] - 368:15
**Ryukyus** [2] - 372:11, 372:16

**S**

**S-H-W-A-R-T-Z** [1] - 432:3
**safeguard** [2] - 426:5, 426:13
**safety** [1] - 447:14
**salesperson** [2] - 386:3, 386:4
**SALICK** [1] - 367:21
**Salick** [2] - 369:5, 437:5
**SAM** [6] - 471:4, 471:19, 472:7, 472:12, 472:20, 473:6
**SAM'S** [1] - 471:7
**sample** [4] - 376:4, 385:16, 386:3, 435:5
**samples** [11] - 383:15, 386:10, 388:25,

402:24, 405:11, 405:15, 414:22, 417:10, 435:21, 438:15, 442:12
**SANDRA** [1] - 367:12
**scale** [1] - 412:24
**scales** [2] - 413:1, 413:2
**schedule** [2] - 421:14, 473:9
**SCHNEIDER** [1] - 368:7
**Schwartz** [1] - 416:14
**science** [6] - 372:24, 374:18, 396:12, 400:2, 409:9, 441:25
**Science** [3] - 375:3, 378:14, 378:21
**sciences** [2] - 372:21, 415:24
**Sciences** [1] - 374:24
**Scientific** [1] - 468:14
**scientific** [9] - 374:16, 377:4, 378:18, 387:21, 398:19, 408:11, 414:10, 417:21, 441:17
**scientifically** [1] - 423:21
**scientist** [6] - 430:21, 430:25, 432:6, 467:3, 468:10
**scientists** [3] - 442:4, 456:7, 456:12
**scope** [2] - 403:22, 462:14
**scores** [4] - 429:11, 452:16, 460:3
**scoring** [2] - 393:15
**scream** [1] - 385:5
**screaming** [8] - 383:18, 384:22, 385:3, 385:9, 385:11, 385:15, 385:20, 386:5
**screams** [1] - 385:2
**second** [26] - 372:19, 383:16, 395:15, 400:7, 403:18, 415:18, 421:23, 426:3, 427:8, 428:5, 428:12, 429:5, 429:11, 431:21, 432:23, 433:6, 433:11, 433:13, 433:16, 434:19, 434:22, 440:14, 448:25, 456:5, 466:11
**secondary** [3] - 426:15, 426:19
**seconds** [1] - 384:23
**secret** [1] - 434:8
**SECTION** [1] - 367:20
**section** [9] - 427:8, 427:10, 428:11, 441:21, 445:19, 445:21, 449:8, 458:17, 458:18
**sections** [2] - 405:3, 441:21
**see** [21] - 404:7, 408:20, 429:2, 432:25, 440:2, 449:8, 449:13, 449:16, 450:19, 451:5, 451:21, 452:1, 461:14, 462:11, 463:4, 463:5, 464:12, 465:5, 473:14, 473:17, 473:22
**seek** [1] - 409:23
**selection** [1] - 378:7
**sells** [1] - 390:18
**seminars** [1] - 387:15
**senior** [2] - 370:24, 371:4
**SENIOR** [1] - 367:12
**sense** [2] - 385:17, 473:14
**sensitive** [1] - 467:25
**sent** [1] - 383:11
**sentence** [1] - 399:15
**separate** [3] - 426:21, 471:20
**separately** [2] - 472:22
**September** [4] - 437:9, 457:8, 457:22, 458:15

**sequel** [1] - 416:22
**serious** [1] - 376:12
**served** [1] - 468:15
**serves** [1] - 387:11
**Service** [1] - 473:3
**services** [1] - 405:3
**serving** [1] - 370:24
**set** [12] - 379:23, 396:10, 462:2, 462:3, 462:5, 462:7, 462:9, 462:20, 462:23, 463:1, 470:22
**SETH** [1] - 367:17
**sets** [2] - 398:10, 462:11
**seven** [1] - 413:1
**several** [4] - 389:21, 409:5, 419:11, 425:6
**shake** [1] - 379:7
**shall** [1] - 474:5
**sharp** [1] - 409:3
**sheet** [1] - 474:9
**Shen** [1] - 416:14
**Sheriff** [5] - 373:14, 373:17, 374:1, 374:6, 376:18
**shifted** [1] - 408:14
**shoes** [1] - 401:5
**shop** [1] - 432:23
**short** [4] - 385:15, 386:1, 386:3, 411:23
**shortened** [1] - 385:20
**shorter** [1] - 401:2
**show** [8] - 427:24, 440:2, 459:21, 461:9, 461:11, 461:14, 464:11, 472:17
**shows** [1] - 404:16
**SHREVE** [1] - 367:17
**Shreve** [3] - 369:4, 380:1, 466:17
**Shwartz** [1] - 432:3
**shying** [1] - 388:12
**side** [4] - 382:6, 421:16, 440:20, 474:14
**sign** [1] - 464:22
**signal** [2] - 377:8, 398:24
**signature** [1] - 376:15
**signed** [2] - 458:3, 471:3
**significance** [1] - 378:23
**significant** [1] - 402:22
**similar** [3] - 432:4, 435:22, 462:10
**similarities** [1] - 449:14
**simpler** [1] - 404:20
**simply** [7] - 379:6, 384:16, 418:2, 430:9, 446:1, 450:9, 451:13
**single** [3] - 395:18, 426:2, 472:15
**sit** [2] - 375:18, 455:22
**site** [1] - 371:19
**situation** [3] - 379:20, 438:17, 466:23
**situational** [1] - 464:17
**skill** [1] - 398:10
**slight** [1] - 464:21
**slightly** [1] - 472:25
**slow** [1] - 435:18
**slowly** [1] - 370:6
**small** [7] - 408:9, 413:11, 413:15, 413:16, 413:18, 453:11, 454:3
**smaller** [2] - 399:15, 462:7

**Smith** [1] - 381:18
**societies** [1] - 374:14
**Society** [2] - 372:1, 445:14
**software** [22] - 378:7, 385:21, 385:23, 385:24, 389:10, 389:13, 389:18, 390:9, 390:11, 390:21, 391:6, 391:10, 392:16, 410:7, 419:6, 419:9, 419:20, 419:21, 460:1, 460:17
**solely** [1] - 460:16
**SOLOWAY** [1] - 368:7
**Somali** [5] - 388:15, 388:20, 406:8, 407:3, 455:3
**Somali-speaking** [1] - 455:3
**someone** [5] - 385:2, 394:24, 403:3, 433:9, 451:1
**sometime** [8] - 379:15, 390:23, 390:24, 399:12, 420:5, 435:19, 436:20, 445:4
**sometimes** [4] - 378:1, 390:23, 420:5, 433:24
**somewhere** [2] - 390:22, 406:9
**soon** [2] - 377:8, 473:25
**sooner** [1] - 391:6
**SOP** [1] - 427:6
**sorry** [20] - 390:16, 392:5, 395:4, 404:1, 404:24, 406:7, 406:22, 426:9, 427:1, 435:7, 437:8, 437:11, 441:7, 442:17, 448:8, 448:14, 456:5, 461:19, 463:19, 464:7
**sort** [12] - 382:24, 425:10, 426:8, 454:5, 456:13, 462:8, 465:4, 465:17, 465:22, 466:1, 466:5, 466:12
**sound** [2] - 386:5, 399:16
**source** [3] - 449:22, 466:9
**South** [1] - 372:18
**Spanish** [2] - 406:15, 406:16
**Speaker** [3] - 375:7, 375:8, 416:7
**speaker** [70] - 371:1, 371:3, 373:19, 375:20, 375:25, 376:24, 377:23, 378:1, 378:3, 378:8, 378:19, 383:8, 386:9, 387:4, 387:10, 387:17, 389:9, 389:15, 394:21, 395:1, 398:20, 398:21, 400:4, 401:12, 403:4, 403:8, 405:7, 405:8, 405:15, 408:2, 408:15, 408:23, 409:10, 409:13, 410:4, 410:22, 412:17, 416:25, 417:11, 417:14, 417:21, 417:24, 418:17, 418:20, 427:3, 427:5, 429:10, 432:2, 433:3, 435:13, 438:7, 438:18, 439:9, 441:13, 441:15, 441:19, 441:23, 442:9, 442:14, 442:15, 443:6, 445:1, 445:17, 456:8, 456:25, 465:7, 467:4, 468:11, 468:16, 468:19
**speakers** [3] - 389:6, 417:9, 420:5
**speaking** [20] - 385:7, 400:1, 405:11, 431:15, 434:25, 435:2, 435:13, 435:17, 435:20, 435:23, 438:8, 438:14, 438:15, 438:19, 438:25, 439:4, 439:10, 439:22, 455:3, 455:7
**speaks** [5] - 406:16, 407:7, 414:12, 430:4
**special** [1] - 440:19

**specialist** [1] - 374:2
**specific** [5] - 396:22, 411:5, 427:7, 438:17, 458:17
**specifically** [3] - 397:21, 444:2, 459:3
**specifications** [1] - 442:11
**spectra** [2] - 373:1, 377:18
**spectrograms** [2] - 424:10, 425:15
**spectrograph** [4] - 377:19, 377:25, 409:1, 417:13
**spectrographic** [2] - 377:10, 425:7
**spectrographical** [1] - 405:5
**spectrography** [3] - 423:8, 423:13, 424:2
**speech** [33] - 372:21, 372:24, 376:10, 376:21, 377:3, 377:5, 383:14, 385:16, 386:9, 388:24, 389:3, 394:15, 395:2, 398:25, 399:3, 400:5, 417:10, 435:5, 435:8, 435:10, 435:11, 435:13, 435:21, 436:13, 436:16, 438:8, 438:19, 439:10, 448:3, 449:9, 450:12, 459:25
**spell** [1] - 390:16
**spelled** [1] - 433:5
**spelling** [1] - 390:17
**spits** [1] - 385:24
**spitted** [1] - 385:25
**spoken** [4] - 388:14, 404:17, 435:22, 465:14
**SRE** [3] - 389:20, 389:21, 390:8
**stable** [1] - 464:16
**staff** [3] - 405:22, 407:3, 430:4
**stamp** [1] - 409:24
**stance** [1] - 410:13
**stand** [5] - 370:2, 379:7, 395:17, 395:22, 420:25
**Standard** [1] - 372:3
**standard** [21] - 378:9, 400:23, 416:1, 426:25, 427:2, 427:4, 427:7, 428:7, 429:15, 446:18, 446:19, 446:23, 447:4, 447:6, 447:15, 457:4, 457:11, 457:17, 458:7, 458:9, 459:13
**standardized** [3] - 442:13, 443:9, 444:5
**Standards** [5] - 374:22, 387:9, 387:12, 442:24, 442:25
**standards** [14] - 408:18, 410:8, 410:21, 415:7, 442:11, 442:20, 442:21, 442:22, 443:2, 443:4, 444:15, 456:16, 465:21, 468:18
**standing** [2] - 395:19, 395:21
**stands** [4] - 375:12, 390:14, 390:15
**start** [3] - 408:19, 422:4, 422:8
**started** [4] - 388:11, 405:6, 423:5, 425:10
**starting** [2] - 423:11, 440:6
**starts** [1] - 385:3
**state** [3] - 436:9, 436:11, 443:8
**State** [3] - 372:20, 373:12, 379:4
**statement** [8] - 438:18, 438:21, 439:9, 439:11, 439:20, 447:7, 461:6, 461:21
**states** [1] - 456:1
**STATES** [3] - 367:1, 367:3, 367:12

**States** [15] - 367:5, 367:15, 367:18, 369:2, 369:5, 374:19, 380:11, 399:9, 424:13, 424:14, 432:2, 441:25, 442:4, 442:23, 473:3
**stating** [1] - 420:11
**stationed** [1] - 374:8
**stations** [1] - 384:1
**statistical** [1] - 453:4
**statistics** [1] - 400:24
**statute** [1] - 397:6
**stay** [1] - 394:6
**stayed** [2] - 373:12, 374:2
**Stefanie** [2] - 436:25, 437:7
**stenography** [1] - 368:16
**step** [5] - 377:23, 393:1, 447:6, 447:7, 474:10
**steps** [1] - 465:18
**Stern** [5] - 369:6, 381:9, 381:19, 381:25, 421:1
**STERN** [74] - 368:7, 368:9, 369:6, 369:17, 392:8, 393:18, 393:24, 395:4, 395:8, 395:10, 395:12, 395:22, 397:4, 397:10, 397:15, 398:3, 401:17, 403:24, 404:2, 404:7, 409:25, 411:8, 411:18, 414:5, 414:24, 415:4, 417:25, 420:13, 421:2, 421:9, 421:11, 421:16, 421:19, 421:24, 422:1, 422:7, 422:12, 422:16, 422:20, 423:3, 423:6, 427:14, 427:17, 427:19, 429:1, 431:3, 431:9, 439:17, 440:4, 440:9, 440:13, 440:17, 441:2, 441:5, 444:1, 448:14, 455:1, 457:13, 457:18, 459:20, 463:9, 463:12, 467:18, 468:2, 469:8, 469:10, 469:20, 470:20, 470:25, 471:15, 472:1, 473:7, 473:16, 475:8
**stern** [4] - 441:8, 463:24, 464:2, 465:6
**sticking** [1] - 411:13
**still** [14] - 379:22, 391:15, 405:5, 405:17, 408:24, 417:2, 418:24, 420:25, 449:14, 449:25, 455:14, 455:19, 458:11, 460:25
**stop** [1] - 469:17
**Street** [1] - 368:7
**strength** [1] - 442:7
**strengthen** [1] - 442:3
**strike** [2] - 419:3, 469:8
**striking** [1] - 469:12
**structurally** [1] - 441:14
**structure** [2] - 385:4, 403:12
**studied** [1] - 389:3
**studies** [1] - 376:12
**study** [1] - 389:4
**style** [7] - 435:13, 435:23, 438:7, 438:19, 438:25, 439:9, 439:22
**styles** [7] - 434:25, 435:2, 435:14, 436:10, 438:8, 438:19, 439:10
**subcommittee** [15] - 375:18, 375:20, 375:25, 408:23, 410:22, 441:13, 441:16, 442:6, 442:10, 442:18, 443:5, 445:1, 456:19, 468:16
**subcommittees** [3] - 441:15, 441:18,

442:8

**subject** [1] - 376:6
**submission** [1] - 417:9
**subpoena** [3] - 381:15, 407:21, 407:23
**subsequently** [1] - 396:20
**subtle** [1] - 399:14
**successful** [1] - 426:24
**successfully** [1] - 410:5
**suffice** [1] - 440:23, 440:24
**sufficient** [4] - 394:10, 394:13, 396:17, 468:24
**suggest** [1] - 422:3
**suitable** [1] - 383:23
**Suite** [1] - 368:8
**summary** [2] - 393:25, 417:20
**supervisors** [1] - 371:4
**support** [18] - 408:11, 423:13, 449:15, 449:19, 449:21, 449:25, 450:20, 451:2, 451:19, 452:3, 452:15, 452:16, 452:18, 452:22, 453:15, 453:16, 454:8, 456:21
**supporting** [5] - 376:24, 402:19, 449:23, 450:17, 468:21
**supportive** [1] - 423:7
**supports** [1] - 413:13
**supposed** [4] - 395:20, 424:17, 439:1, 460:6
**surprised** [1] - 461:12
**surprisingly** [1] - 397:4
**Susan** [1] - 369:7
**SUSAN** [2] - 367:22, 367:24
**sustained** [2] - 414:14, 416:5
**Sweden** [6] - 379:19, 398:18, 406:12, 433:3, 433:5, 466:12
**Swedish** [10] - 382:13, 388:15, 388:21, 405:22, 407:3, 429:23, 430:4, 432:11, 432:16, 455:3
**swore** [1] - 369:12
**sworn** [1] - 370:1
**syllables** [1] - 400:6
**system** [7] - 374:5, 376:19, 455:20, 461:5, 461:24, 462:11, 463:6
**systems** [3] - 376:24, 405:7, 418:17

---

**T**

**table** [6] - 424:8, 428:3, 428:14, 428:16, 428:17, 428:23
**talker** [1] - 435:19
**tall** [1] - 401:1
**Tampa** [2] - 383:11, 384:3
**tape** [2] - 383:10, 384:17
**task** [3] - 443:6, 444:25, 466:16
**team** [4] - 390:13, 434:21, 434:22, 466:7
**teams** [1] - 390:14
**technical** [2] - 371:20, 380:25
**technique** [3] - 386:19, 387:20, 387:25
**techniques** [1] - 419:22
**technologies** [1] - 459:4
**Technology** [11] - 370:20, 370:23, 370:25, 371:10, 371:12, 371:13,

374:22, 378:15, 387:9, 387:12, 442:25
**technology** [47] - 371:3, 371:7, 371:16, 371:19, 371:23, 373:19, 377:20, 377:24, 378:3, 389:15, 390:25, 391:2, 392:4, 392:5, 392:7, 392:10, 392:15, 398:11, 403:8, 408:8, 408:14, 409:5, 409:23, 410:4, 417:1, 417:5, 418:2, 418:8, 418:11, 418:25, 419:1, 424:17, 425:4, 425:9, 425:11, 445:20, 455:10, 456:9, 456:11, 456:21, 458:8, 465:7, 468:11, 468:12, 468:20, 468:22, 469:1
**telecommunications** [2] - 371:20, 371:22
**teleconference** [6] - 379:24, 382:1, 437:18, 437:20, 437:21, 437:22
**telephone** [5] - 381:8, 388:7, 399:8, 437:19, 442:12
**template** [1] - 447:2
**ten** [2] - 449:6, 471:12
**tend** [3] - 391:10, 400:18, 463:21
**tends** [1] - 440:1
**terminology** [2] - 462:18, 462:19
**terms** [10] - 371:6, 386:18, 386:19, 389:14, 393:13, 411:1, 411:20, 418:8, 419:8, 422:23
**test** [6] - 382:23, 393:1, 424:22, 424:24, 462:24, 463:2
**tested** [2] - 392:5, 392:10
**testified** [18] - 370:2, 384:14, 384:16, 386:22, 387:20, 408:25, 415:19, 424:6, 424:12, 424:15, 424:21, 425:6, 433:7, 455:9, 463:20, 464:5, 465:14, 469:9
**testify** [19] - 370:6, 384:5, 403:3, 406:22, 407:1, 407:17, 408:1, 409:4, 410:7, 410:9, 423:12, 424:2, 424:16, 424:18, 455:12, 460:24, 461:2
**testifying** [11] - 384:7, 387:24, 404:5, 404:8, 407:25, 408:19, 409:14, 409:21, 420:6, 455:7, 463:16
**testimony** [48] - 369:18, 370:16, 382:7, 382:9, 384:6, 384:11, 384:20, 385:12, 389:11, 393:19, 395:13, 395:18, 395:23, 396:3, 396:6, 397:13, 397:18, 397:23, 402:8, 402:10, 402:11, 407:11, 410:23, 411:2, 411:7, 411:10, 411:11, 411:12, 411:16, 414:4, 414:20, 421:5, 424:21, 425:1, 425:3, 431:7, 433:2, 434:2, 434:4, 456:24, 459:15, 459:23, 462:14, 467:12, 467:13, 467:24, 470:17
**testing** [5] - 419:16, 444:8, 444:12, 444:22, 445:2
**Texas** [1] - 387:7
**THE** [99] - 367:12, 369:14, 369:22, 369:24, 370:3, 370:17, 372:13, 390:1, 394:5, 395:7, 395:9, 395:20, 397:8, 397:12, 397:19, 398:4, 401:18, 404:1, 404:4, 409:17, 410:1, 411:4, 411:9, 411:19, 412:6, 412:8, 414:7, 414:14, 414:16, 415:1, 415:6, 416:4, 416:5,

418:1, 419:5, 419:6, 420:14, 420:21, 420:23, 421:8, 421:10, 421:13, 421:15, 421:17, 421:21, 421:23, 421:25, 422:6, 422:8, 422:14, 422:18, 422:22, 423:5, 428:1, 431:1, 431:8, 431:10, 431:13, 431:14, 439:18, 440:5, 440:7, 440:16, 440:18, 441:3, 448:23, 449:1, 449:5, 450:6, 457:10, 457:15, 457:16, 457:17, 457:25, 458:3, 463:10, 463:14, 467:11, 467:19, 468:3, 468:4, 468:5, 469:9, 469:11, 469:17, 470:1, 470:23, 471:13, 472:7, 472:11, 472:17, 473:5, 473:9, 473:19, 473:23, 474:8, 474:11, 474:18, 474:20
**themselves** [1] - 408:19
**theory** [1] - 403:2
**therefore** [4] - 385:7, 390:18, 459:10, 464:21
**thesis** [3] - 372:24, 387:5, 416:20
**they've** [1] - 434:14
**thinking** [1] - 406:4
**thorough** [8] - 382:20, 383:21, 388:10, 405:19, 411:22, 430:16, 467:4, 467:5
**thoroughly** [2] - 391:12, 402:5
**thoughts** [8] - 406:3, 411:1, 411:3, 414:8, 414:11, 434:9, 468:9, 468:13
**thousand** [2] - 377:16, 378:22
**thousands** [1] - 467:9
**threatening** [1] - 399:7
**three** [13] - 377:21, 378:22, 390:13, 398:15, 404:17, 408:15, 417:13, 430:19, 438:13, 452:22, 453:10, 465:23, 471:24
**title** [1] - 375:22
**today** [12] - 373:7, 421:21, 422:4, 422:8, 422:14, 429:21, 429:22, 455:16, 467:13, 470:7, 473:5
**together** [9] - 433:21, 434:15, 471:24, 472:1, 472:2, 472:10, 472:11, 472:15
**Tom** [8] - 382:22, 383:4, 383:6, 385:12, 386:2, 387:22, 466:20
**tones** [1] - 451:8
**tongue** [3] - 405:10, 406:17, 466:2
**took** [9] - 369:19, 370:1, 380:15, 381:8, 396:22, 418:23, 455:14, 465:18, 465:19
**tool** [4] - 401:11, 409:3, 418:3, 447:11
**tools** [2] - 378:7, 465:18
**topic** [1] - 376:11
**totally** [1] - 412:22
**tough** [1] - 383:1
**Touhy** [2] - 384:14, 384:15
**toward** [1] - 380:15
**TOWNES** [1] - 367:12
**track** [4] - 391:1, 391:3, 391:5
**tracking** [2] - 391:11
**tract** [3] - 385:5, 400:10, 400:11
**trained** [9] - 377:7, 394:19, 399:16, 399:17, 402:4, 404:15, 406:13, 459:8, 460:20

**training** [6] - 371:8, 394:22, 399:17, 399:18, 410:10, 424:10
**transact** [1] - 443:4
**transaction** [4] - 443:2, 443:9, 444:15, 444:17
**TRANSCRIPT** [1] - 367:11
**transcript** [2] - 391:18, 428:25
**Transcript** [2] - 368:17, 454:10
**Transcription** [1] - 368:17
**translation** [1] - 382:15
**transmissions** [2] - 442:12, 442:21
**transmitting** [1] - 444:7
**transported** [1] - 472:22
**tremendous** [1] - 466:2
**trend** [3] - 389:14, 398:19, 455:15
**trial** [5] - 383:4, 384:7, 459:23, 461:22, 474:14
**tried** [2] - 385:15, 405:25
**trier** [1] - 414:21
**trouble** [2] - 385:14
**true** [1] - 457:14
**truly** [1] - 405:4
**trust** [1] - 431:17
**truth** [1] - 438:5
**try** [5] - 378:2, 395:6, 425:22, 438:12, 447:22
**trying** [4] - 391:9, 394:3, 429:12, 442:2
**TUCKER** [1] - 367:18
**Tuesday** [3] - 367:7, 469:20, 473:10
**Turlington** [3] - 386:25, 387:2, 387:3
**turn** [2] - 402:8, 425:16
**turned** [2] - 422:24
**turns** [1] - 453:11
**twenty** [1] - 377:15
**two** [38] - 369:10, 370:14, 373:9, 373:22, 373:23, 373:24, 376:15, 377:7, 377:16, 382:11, 382:17, 383:5, 383:22, 396:19, 401:8, 405:9, 405:14, 416:11, 422:25, 428:21, 431:10, 433:3, 433:21, 434:2, 447:3, 451:6, 452:18, 453:8, 453:22, 453:24, 453:25, 454:4, 459:9, 464:11, 464:14, 464:23, 465:1, 465:23
**type** [3] - 376:14, 442:21, 447:7
**typical** [1] - 385:6

## U

**U.S** [8] - 373:9, 374:22, 374:24, 375:10, 378:25, 380:16, 388:3, 392:21
**ubiquitous** [1] - 425:10
**UBMs** [1] - 429:10
**UK-1** [1] - 393:9
**UKS-1** [1] - 393:9
**UKS-2** [1] - 393:9
**UKS-3** [1] - 393:9
**ultimate** [5] - 395:1, 406:18, 408:15, 451:15, 452:5
**uncertainties** [2] - 408:5, 408:6
**uncertainty** [1] - 403:13
**uncontrollable** [1] - 426:13

**uncovered** [1] - 398:24
**under** [18] - 372:3, 373:17, 378:18, 378:19, 384:14, 397:6, 402:5, 406:25, 415:17, 420:25, 441:16, 445:13, 445:14, 457:2, 458:12, 460:25, 466:22, 468:25
**underlying** [1] - 398:1
**underpins** [1] - 468:19
**understood** [1] - 419:13
**undertook** [1] - 465:11
**unethical** [3] - 385:20, 386:7, 386:17
**unexpectedly** [1] - 470:20
**unfortunately** [2] - 405:23, 405:24
**uniform** [1] - 444:6
**uniformity** [1] - 446:20
**unique** [2] - 378:10, 451:12
**unit** [5] - 371:10, 377:21, 377:22, 406:5, 458:4
**UNITED** [1] - 367:1, 367:3, 367:12
**United** [16] - 367:5, 367:15, 367:18, 369:2, 369:5, 374:19, 380:11, 387:18, 399:9, 424:13, 424:14, 432:2, 441:25, 442:4, 442:23, 473:3
**units** [1] - 399:16
**universe** [1] - 462:7
**universities** [1] - 372:17
**university** [1] - 390:16
**University** [8] - 372:10, 372:15, 372:18, 372:20, 373:12, 379:4, 387:6, 390:15
**unknown** [4] - 382:12, 388:13, 405:2, 414:21, 418:5, 435:18, 435:22, 436:14
**unless** [6] - 369:15, 395:17, 426:3, 431:17, 459:18, 471:11
**unlikely** [1] - 385:10
**unqualified** [1] - 386:14
**untrained** [1] - 409:22
**up** [22] - 371:12, 372:8, 379:23, 383:3, 384:7, 395:17, 395:22, 399:14, 407:9, 408:5, 409:6, 412:25, 423:11, 428:21, 438:15, 445:3, 448:14, 454:7, 460:5, 460:8, 460:11, 464:20
**update** [1] - 416:23
**updated** [1] - 471:4
**upheld** [1] - 425:2
**US** [1] - 406:11
**usable** [2] - 383:14, 386:1
**usage** [1] - 420:18
**useful** [8] - 389:5, 389:6, 401:7, 401:11, 402:6, 415:11, 418:3, 444:4
**usefulness** [1] - 450:8
**useless** [2] - 401:10, 402:2
**users** [3] - 417:4, 418:5, 418:7
**uses** [3] - 387:16, 398:16, 419:7
**utilized** [6] - 412:14, 417:16, 418:16, 418:18, 419:1, 457:1
**utilizing** [1] - 442:16

## V

**value** [2] - 430:10, 442:8
**variation** [1] - 454:3

**varies** [1] - 400:22
**variety** [1] - 460:13
**vary** [1] - 400:25
**vector** [5] - 418:15, 418:19, 418:25, 419:7
**version** [3] - 382:16, 382:17, 405:13
**versus** [1] - 369:2
**vice** [1] - 375:24
**video** [3] - 371:9, 377:22, 445:18
**videographer** [1] - 470:16
**VIM-6** [1] - 416:17
**Virginia** [2] - 370:21, 371:11
**vocal** [5] - 385:5, 400:10, 403:12, 451:6, 451:10
**Voice** [1] - 385:21
**voice** [61] - 372:25, 374:1, 374:4, 376:19, 377:9, 377:15, 377:17, 381:5, 383:23, 384:22, 384:24, 385:6, 385:15, 387:21, 394:25, 398:9, 400:17, 401:23, 402:24, 402:25, 405:11, 407:12, 407:16, 407:22, 409:1, 409:14, 409:22, 414:21, 415:21, 418:11, 419:24, 420:3, 425:21, 428:13, 434:16, 435:16, 436:6, 436:14, 436:15, 438:15, 438:25, 439:3, 442:21, 444:2, 444:14, 444:18, 445:17, 450:14, 450:24, 451:2, 451:7, 451:11, 451:12, 451:13, 458:22, 462:4, 463:22, 465:15, 465:17
**voices** [4] - 385:11, 451:14, 453:4, 454:4
**voicing** [1] - 376:9

## W

**Wade** [1] - 416:14
**wait** [5] - 431:8, 431:10, 437:8, 439:18, 473:14
**Walsh** [4] - 379:16, 379:21, 379:23, 381:13
**Washington** [1] - 367:21
**watching** [1] - 391:4
**Wayman** [8] - 375:15, 375:24, 382:8, 386:23, 387:1, 387:2, 396:5, 397:23
**Wayman's** [1] - 375:22
**ways** [1] - 412:23
**weapons** [1] - 376:14
**wearing** [2] - 401:5, 401:6
**week** [3] - 405:12, 421:24, 421:25
**weeks** [2] - 411:21, 422:25
**weight** [2] - 401:6, 453:11
**whichever** [1] - 417:16
**widely** [1] - 444:5
**Williamsbridge** [1] - 368:3
**willingly** [1] - 381:15
**Wisconsin** [1] - 387:6
**withdraw** [3] - 389:24, 394:2, 465:8
**WITNESS** [15] - 412:8, 416:4, 419:6, 421:15, 421:17, 421:21, 421:25, 431:13, 449:5, 457:16, 457:25, 458:3, 468:4, 474:11, 475:3

**witness** [9] - 379:19, 382:22, 386:14, 387:24, 396:9, 397:3, 449:3, 457:24, 474:12

**witnesses** [1] - 386:21

**woke** [1] - 438:15

**word** [12] - 383:19, 397:15, 403:2, 407:14, 424:23, 426:9, 435:7, 439:6, 441:12, 444:12, 444:20, 456:5

**words** [2] - 407:2, 409:4

**works** [2] - 422:13, 433:12

**workshop** [1] - 418:18

**world** [1] - 406:16

**worried** [1] - 470:12

**worrying** [1] - 381:16

**worthy** [1] - 392:13

**write** [4] - 446:8, 446:19, 446:21, 446:23

**writing** [2] - 387:5, 412:14

**written** [17] - 382:12, 397:10, 407:19, 411:21, 411:24, 412:1, 412:2, 412:4, 412:9, 416:13, 416:22, 416:23, 418:8, 427:5, 429:7, 444:17, 465:13

**wrote** [4] - 372:24, 412:3, 440:9, 468:4

## Y

**year** [3] - 377:12, 377:15, 379:15

**years** [20] - 373:9, 373:22, 373:23, 373:24, 374:9, 374:12, 377:7, 377:15, 377:21, 383:7, 389:21, 408:16, 415:8, 425:1, 455:19, 456:17, 461:3, 468:10, 468:17

**yelling** [1] - 383:18

**yesterday** [3] - 397:23, 433:2, 465:14

**Yo** [1] - 396:18

**YORK** [1] - 367:1

**York** [11] - 367:6, 367:15, 367:16, 367:23, 368:3, 368:8, 380:18, 406:11, 406:19, 437:3

**yourself** [2] - 405:12, 467:13

**YouTube** [1] - 461:7

**Yusuf** [3] - 368:7, 369:3, 369:6

## Z

**zero** [1] - 412:25

**Zimmerman** [14] - 382:9, 383:4, 383:6, 383:9, 384:1, 384:7, 385:16, 386:11, 387:19, 455:9, 459:16, 459:24, 461:6, 466:19

**zone** [1] - 450:10