

U.S. Department of Justice

*United States Attorney
Eastern District of New York*

SA/SDD/RMT/AMS  
F. #2012R01574

*271 Cadman Plaza East
Brooklyn, New York 11201*

September 22, 2015

By ECF

Honorable John Gleeson
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. Ahmed, et al. 12 CR 661 (S-2) (SLT)

Dear Judge Gleeson:

        The government respectfully submits this letter in response to the defendants' joint letter regarding the Special Administrative Measures ("SAMS") in place in the above-referenced case. (ECF #321). In their filing, the defendants essentially argue that the SAMs should be modified in various ways on the grounds that the defendants "pleas of guilty and acceptance of responsibility constituted a change of circumstances that warranted 'a re-evaluation of the calculus that resulted in the imposition of'" SAMS and "that easier access to our clients would help defense counsel prepare for sentencing." (Def. Letter Sept. 10, 2015 Letter at ¶ 3). The defendants request that the Court make the following modifications, to the SAMs, authorizing: (a) "[c]ontact visits between counsel and [the defendants];" (b) "[c]ontact visits between [the defendants] and extended family or friends who may possibly visit them;" (c) "housing [the defendants] on the same wing of the SHU and permitting some degree of contact between them and other inmates," (d) providing the defendants with "[a]ccess to the prison library so that they can access books that do not require weeks of waiting time," and (e) providing the defendants with "[t]he ability to request items from the commissary list available to the general population." (Id. at ¶ 4). The defendants appear also to request that the Court (f) modify any restrictions prohibiting the defendants from having "telephone calls with extended family." (Id. at ¶ 3). As set forth below, as an initial matter, these requests should be rejected on jurisdictional grounds because the defendants have failed to exhaust their administrative remedies. Furthermore, the defendants' claims are without merit because the SAMs comply with 28 C.F.R. § 501.3, and no constitutional claim has been articulated. To better understand why SAMs are in place in this case, which is at the heart of the matter, some discussion of the background of the offense conduct may be helpful, as set forth below.

I.      The Charged Offenses and the Defendants' Guilty Pleas

In the second superseding indictment, returned by the grand jury on December 1, 2014, the defendants were charged with conspiring to provide material support to al-Shabaab, a designated Foreign Terrorist Organization, in violation of Title 18, United States Code, Section 2339B, providing material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B, and attempting to provide material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B.  Ahmed and Yusuf were further charged with receiving military-type training from al-Shabaab, in violation of Title 18, United States Code, Section 2339D(a), and all three defendants are charged with using machineguns in furtherance of a crime of violence, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(ii), 924(c)(1)(A)(iii) and 924(c)(1)(B)(ii).  On May 12, 2015, the defendants each pleaded guilty to one count of conspiring to provide material support to al-Shabaab, in violation of Title 18, United States Code, Section 2339B.

II.     Background on Al-Shabaab

The circumstances that resulted in the emergence of al-Shabaab as a terrorist force in Somalia were initially set into motion by the collapse of Mohamed Siad Barre's military dictatorship in 1991 following a series of local rebellions across Somalia.  Following failed efforts by the United Nations and United States to restore order, other African governments eventually assisted in the formation of the Somali Transitional Federal Government ("TFG") in 2004.  Although initially created as a government in exile, in 2005 the TFG returned to Somalia, aided by military support from the African Union Mission in Somalia ("AMISOM"), Uganda and Ethiopia.  During the period of instability following the collapse of Barre's regime, certain groups – including al-Shabaab – began to form with the express objective of establishing an Islamic state in Somalia where they would impose strict *sharia* law.  Al-Shabaab employed brutal tactics not used by other groups resisting the TFG.  For example, al-Shabaab members regularly attempted to assassinate TFG officials, including the prime minister, the president, the deputy mayor of Mogadishu, and other national and local leaders.  Al-Shabaab's use of terrorist tactics led the United States to designate al-Shabaab as a foreign terrorist organization in February 2008.  In response, al-Shabaab spokesman Mukhtar Robow stated, in sum and substance, that al-Shabaab welcomed the designation as a "badge of honor."

Following its designation as a foreign terrorist organization, al-Shabaab maintained an aggressive operational tempo.  For example, in April 2008 an al-Shabaab member detonated a vehicle-borne improvised explosive device near a base for Burundian soldiers at Jaalle Siyaad Academy, killing one soldier and injuring numerous civilians.  Similarly, on February 22, 2009, an al-Shabaab militant wearing an explosive belt targeted another African Union military base in Somalia manned by Burundian soldiers.  Al-Shabaab also claimed responsibility for a second suicide bombing attack on the same day at a church filled with approximately 200 worshipers.  In addition, on December 3, 2009, al-Shabaab carried out the bombing of the Hotel Shamo in Mogadishu that killed 25 and wounded at least 60 others.  Casualties from that attack included three top Somali government ministers.  In addition to targeting TFG officials and AMISOM, African Union and Ethiopian soldiers in Somalia, al-Shabaab also has targeted U.S. and Western interests both inside and outside of the country.  Al-Shabaab also has maintained strong links to other terrorist organizations – most significantly, al-Qaeda (sometimes also called "core al-Qaeda" or "al-Qaeda in Afghanistan") and al-Qaeda in the Arabian Peninsula ("AQAP").

III. Al-Shabaab's Use of Foreign Fighters

During the time of the charged conspiracy (and thereafter), al-Shabaab aggressively and successfully recruited non-Somali citizens to come to Somalia and join the organization, attracting both ethnic Somalis living outside of Somalia and non-Somali foreigners, including U.S. citizens. These individuals, known within al-Shabaab as "foreign fighters" and *muhajireen*, lived, trained and, for the most part, fought separately from, but in coordination with, other al-Shabaab fighters. They had distinct leadership structures and were often given different combat assignments. They were also especially valuable to al-Shabaab for several reasons. For example, al-Shabaab frequently made Western foreign fighters the face of its fund-raising efforts as part of a broader strategy of emphasizing that the conflict in Somalia was part of a global jihad aimed at creating an Islamic caliphate, rather than merely a regional civil war. Indeed, al-Shabaab historically has relied heavily on funds sent from ethnic Somalis living in the United States and Europe. In addition, foreign fighters, with their foreign passports, could be given combat training in Somalia and then sent elsewhere in support of external terrorist plots against Western countries and their allies in the region. Al-Shabaab has exploited for propaganda purposes the May 22, 2013 murder of a British Army soldier by two men near the Royal Artillery Barracks in the Woolwich area of Southeast London. The two men ran the soldier down with their car and then used knives and a meat cleaver to stab and hack him to death.

IV. Summary of the Defendants' Offense Conduct

A. Ahmed and Yusuf

Defendants Ali Yasin Ahmed and Mohamed Yusuf were born in Somalia in 1985 and 1983, respectively, and subsequently moved to Sweden. By late 2008, Ahmed and Yusuf were actively planning to travel together to Somalia to join al-Shabaab. At that time, Swedish authorities had grown concerned about al-Shabaab's recruitment of a number of young Muslim men in Sweden. As a result, they opened an investigation into Ahmed and Yusuf's conduct and received judicial authorization to intercept telephones registered to Ahmed. During the period between October 2, 2008 and December 2, 2008, Ahmed was in regular contact with Yusuf, who was also communicating using a telephone registered to him. Ahmed and Yusuf shared more than 700 telephone calls and text communications (an average of more than ten phone calls, text messages or attempted calls per day). In connection with the investigation, they were surveilled by Swedish authorities meeting with each other.

In communications monitored by Swedish authorities, Ahmed and Yusuf discussed, in sum and substance, traveling to Somalia to join al-Shabaab. Disregarding concerns about al-Shabaab's willingness to carry out suicide bombing attacks on civilians, in December 2008, Ahmed and Yusuf traveled together from Sweden to Somalia by way of Kenya. After their arrival in Somalia, Ahmed and Yusuf attended basic combat training at the Buled Gadud training camp, one of several camps created by al-Shabaab foreign fighter leader Saleh Nabhan. Ahmed and Yusuf later received advanced "commando" training at another camp outside of Kismayo. This training involved, inter alia, advanced conditioning, weapons and combat tactics training, including the use of AK-47 machineguns. During this time at the training camp outside of Kismayo. In mid-2009, after completing this training, Ahmed and Yusuf, along with a number of other Americans and other foreign fighters, were transferred to fight with other *muhajireen* operating around Mogadishu. Yusuf was wounded during one of these battles. Even after Yusuf's injury, Yusuf and Ahmed both continued to fight alongside other of al-Shabaab's foreign fighters. They were apprehended in East Africa in August 2012 in a neighboring country.

3

B. <u>Hashi</u>

Madhi Hashi was born in Somalia in 1989. In 1995, he traveled to Great Britain with his mother and two of his siblings, where they were reunited with Hashi's father and others of his siblings, who had arrived in Great Britain from Somalia sometime earlier. In 2004, Hashi received his British citizenship. On April 1, 2009, Hashi attempted to fly from London Gatwick Airport to Somalia by way of Djibouti. During an interview with British authorities prior to his scheduled flight, Hashi advised that he was planning to travel to Bosaso. As a result of the interview, Hashi missed his flight, although British authorities assisted him in booking another flight on April 8, 2009. Hashi flew to Djibouti on that date, but then returned to Great Britain on April 10, 2009. Hashi again left Great Britain in December 2009, where he traveled to Somalia by way of the United Arab Emirates. Hashi arrived in Somalia, regularly associated with other foreign fighters, including members of al-Shabaab's martyrdom operation group. Hashi also associated with U.S. citizen Omar Hammami and other al-Shabaab foreign fighters in Somalia. In June 2012, the British Authorities gave notice to Madhi Hashi that the U.K. Security Service assess him to have been involved in Islamist extremism and that he presented a risk to the national security of the United Kingdom due to his extremist activities and advised him that the Home Secretary intended to remove Hashi's Citizenship, as a result, under Section 40(f) of the British Nationality Act of 1981. Hashi also ultimately was apprehended in August 2012 in East Africa.

V. <u>The Defendants' Transfer and Custody in the United States</u>

In November 2012, the defendants were transferred into the custody of the Federal Bureau of Investigations and flown to the Eastern District of New York. They have remained in BOP custody since that time. Initially, Ali Yassin Ahmed was lodged in the MDC while Yusuf and Hashi were lodged in the MCC. Later, at the request of defense counsel, Ahmed was transferred to MCC where he now resides.

VI. <u>The SAMs</u>

On April 19, 2013, the Attorney General, in the context of the above, approved the imposition of SAMs, pursuant to 28 C.F.R. § 501.3, based on the substantial risk that the defendants' communications or contacts with persons could result in death or serious bodily injury, or substantial damage to property that would entail the risk of death or serious bodily injury. (<u>See</u> Origination of Special Administration Measures Memoranda for Federal Bureau of Prisons Pretrial Inmate Ali Yasin Ahmed, Mohamed Yusuf, and Madhi Hashi, each dated April 19, 2013). This finding was based on information set forth in those prior memoranda related to the defendants involvement in terrorist activity, among other things, and they were renewed April 2014, and again in April 2015. (<u>See</u> <u>e.g</u>. Extension of Special Administrative Measures Memoranda for Federal Bureau of Prisons Pretrial Inmates Ali Yasin, Ahmed, Mohamed Yusuf, and Madhi Hashi, each dated April 16, 2015 (the "2015 SAMs Memoranda", attached hereto)).

In addition to the information set forth in the 2015 SAMs Memoranda related to Ahmed, Hashi and Yusuf's deep ties and relationship to the terrorist organization al-Shabaab, additional information was included about Hashi and Ahmed's prior attempts to circumvent the SAMs while in BOP custody. With respect to Hashi, the Attorney General also relied upon the fact that "during the current SAM authorization period, BOP employees reported finding a "drop note" left by Hashi in the recreation room at MCC New York . . . . [and] although the note was not addressed to any specific individual, it is believed that Hashi left the note with the hopes that one of his co-defendants would find it . . . .[as] the note appeared to contain a coded message for the reader to decipher, as well as the telephone numbers of Hashi's wife who reside in Somalia and his mother who resides in the United Kingdom." (Extension of Special Administrative Measures Memorandum for Federal Bureau of Prisons Pretrial Inmate Madhi Hashi, dated April 16, 2015).

4

Similarly, with respect to Ahmed, the Attorney General also relied upon the fact that "in February 2014, during a call with his mother, and despite being advised by BOP of the SAM rules pertaining to telephone calls, Ahmed's mother placed the call on speaker and allowed several unidentified family members to communicate with Ahmed in violation of the SAM. Ahmed failed to advise his mother not to place the call on speaker, but instead engaged in conversation with the unauthorized third parties. The following month, during a call with his brother, Ahmed provided the name and a Somali telephone number for Ahmed's wife and instructed his brother to make contact with her. Additionally, in April 2014, while conducting a routine search of Ahmed's cell, a BOP officer discovered a note that appeared to contain a written code hidden behind some books . . . [and] during a telephone call with family members in June 2014, Ahmed's brother connected him with an unknown third party via speakerphone, which is a violation of the SAM. As with the call with his mother, months before, Ahmed did not advise his brother not to place the call on speaker, but instead engaged in conversation with the third party." (Extension of Special Administrative Measures Memorandum for Federal Bureau of Prisons Pretrial Inmate Ali Yasin Ahmed, dated April 16, 2015).

The SAMs set forth a number of provisions designed to mitigate the risk posed by the defendants by restricting his access to the mail, the media, the telephone, and visitors. In general, the SAMs limit contacts and communications between the defendant and other persons based upon a determination that such communications or contacts could result in death or serious bodily injury to others. (See SAMs Memoranda, ¶ 1c). Notwithstanding the limits regarding third-party contacts, the SAM restrictions clearly permit counsel and precleared staff, who have signed affirmations, to communicate with the defendant in a variety of ways to prepare his defense. (See id. ,¶ 2c ("Attorney/Client Privileged Visits"); ¶ 2e ("Unaccompanied Attorney's Precleared Paralegal(s) May Meet With Client"); ¶ 2f ("Simultaneous Multiple Legal Visitors"); ¶ 2g ("Legally Privileged Telephone Calls"); ¶ 2h ("Documents Provided by Attorney to Inmate"); ¶ 2i ("Legal Mail")). By signing the affirmation, counsel and counsel's staff would agree not to forward third- party messages to or from the defendant. (See id. ¶ 2a). The SAM restrictions further provide, however, that counsel for the defendant "may disseminate the contents of the inmate's communication to third parties for the sole purpose of preparing the inmate's defense – and not for any other reason – on the understanding that any such dissemination shall be made solely by the inmate's attorney, and not by the attorney's staff." (See id. ¶ 2d).

VII. Defense Counsel's Prior SAMs Modification Requests

On a numerous occasions, the defendants have made requests of the government for assistance in seeking to adjust certain conditions at the MDC and the MCC and to otherwise modify the SAMS. The government has on each every occasion facilitated those requests, where permissible under the SAMS, and consistent with the BOP's restrictions, and otherwise interacted with the BOP, the Office of Enforcement Operations, and the Federal Bureau of Investigation, among others, to assist in the speedy resolution of such issues. For example, the government facilitated the transfer of defendant Ahmed to the MCC from the MDC, given Ahmed's attorney's repeated complaints about the conditions at that facility and her access to her client there. Additionally, with respect to Hashi, the government has received repeated requests for assistance – at times on an emergency basis - in accommodating Hashi in allowing access to his U.K. attorneys who are representing him in his unsuccessful litigation to regain his citizenship in the United Kingdom. (See e.g. Transcript dated January 16, 2013, Special Immigration Appeals Commission ("SIAC"), attached hereto, (noting the "helpful" "telephone call facilitated last night by the US prosecutor")).[1]

---

[1] Hashi was able to file a an affidavit before the SIAC, which was presiding over Hashi's claim that the U.K. government had failed to provide him with adequate required notice of his removal of

5

On June 9, 2015, the government received a letter request from the defendants, seeking to modify the SAMs and to adjust certain conditions at the MCC. Thereafter, the government forwarded the letter to the BOP and the other various agencies within the Department of Justice responsible for the administration of the SAMs and the other restrictions at the BOP. Thereafter, the government received a request from the defendants to modify the SAMs to permit further joint defense meetings among the defendants, which the government immediately facilitated. At no time during that process were the defendants' requests of June 9, 2015 raised with the government by counsel for the defendants. Thereafter, on September 10, 2015, the government received the defendants' request for modification referred to above that is the subject of this letter and has similarly engaged with the BOP and the Department to see which if any of the requests may be accommodated under the SAMS.

VIII.    Legal Authority for the SAMS and the Defendants' Administrative Remedies

As a general matter, the authority to impose SAMs stems from the Attorney General's authority over the federal penal system, which has been delegated to the Bureau of Prisons. See, e.g., 18 U.S.C. §§ 3621, 4401(b), 4042. The BOP establishes the conditions of confinement for all persons in its custody pursuant to BOP regulations and policies. The regulations govern inmate communications and contacts, among other conditions of confinement. The severity of the conditions of confinement depends upon where the prisoner is housed by the type of crime for which an individual is being incarcerated. The Bureau of Prisons may impose SAMs based on violence or terrorism-based concerns pursuant to 28 C.F.R. § 501.3. Notably too, while the Office was involved in the drafting and administration of the SAMs, the Office and the BOP are prohibited from modifying the SAMs, without approval from the Department.

Additionally, as the Court is aware, the Prison Litigation Reform Act ("PLRA") expressly states that, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that the exhaustion requirement of the PLRA is mandatory. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Booth v. Churner, 532 U.S. 731, 739 (2001). The exhaustion of remedies requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes. Porter, 534 U.S. at 532. The Supreme Court noted that Congress described the cases covered by the exhaustion requirement as "actions brought with respect to prison conditions." Id. at 525. The Court reasoned that Congress enacted the broad reaching exhaustion requirement "to reduce the quantity and improve the quality of prisoner suits," noting that this would give corrections officials "time and opportunity to address complaints internally before allowing the initiation of a federal case." Id.; accord United States v. Al-Marri, 239 F.Supp.2d 366, 367 (S.D.N.Y. 2002) ("[t]he Supreme Court's decision in Porter . . . makes clear that courts should not intervene in matters regarding prison conditions until corrections officials had had the time and opportunity to address such complaints internally.").

Here, it is our understanding that the defendants have not taken steps to exercise their rights under the Administrative Remedy Program.[2] The defendants' list of requests as to specific SAM or

citizenship under Section 40(2) of the British Nationality Act of 1981, due to the fact that "the [U.K.] Security Service assess[ed] that [Hashi was] involved in Islamist extremism and present[ed] a risk to the national security of the United Kingdom due to [his] extremist activities."( See Letter to Mr. Mahdi Mohammed Hashi, dated June 15, 2012, attached hereto).

[2] Defendant Ahmed filed a general complaint about the SAMs, without specifying any specific restrictions to which he was objecting to, on July 20, 2015, to which the BOP responded on August 19, 2015. (See Letter for Defendant Ahmed, dated July 20, 2015, attached hereto).

6

BOP required restrictions are precisely the kind of claims contemplated by the Administrative Remedy Program and hence they are more effectively and efficiently addressed in the first instance by the BOP. The exhaustion of administrative remedies is not a mere procedural hoop through which a defendant must jump. Rather, the administrative process established by the Administrative Remedy Program serves as a meaningful mechanism by which potential modifications to or clarifications of SAM restrictions may be implemented to resolve, clarify or limit conflicts.[3] In particular, here, such engagement with the BOP on a number of these requests prior to engagement with the Court likely would have provided defense counsel with answers to their various requests and would have served to narrow the concerns that are raised before this Court.

IX. The Defendant's Requests for SAMS Modification

As set forth at the outset, the defendants have requested the following modifications to the SAMs restrictions: (a) "[c]ontact visits between counsel and [the defendants];" (b) "[c]ontact visits between [the defendants] and extended family or friends who may possibly visit them;" (c) "housing [the defendants] on the same wing of the SHU and permitting some degree of contact between them and other inmates," (d) providing the defendants with "[a]ccess to the prison library so that they can access books that do not require weeks of waiting time," and (e) providing the defendants with "[t]he ability to request items from the commissary list available to the general population." ( Id. at ¶ 4). The defendants appear also to be requesting that the Court (f) modify any restrictions prohibiting the defendants from having "telephone calls with extended family. (Id. at ¶ 3). The government addresses these requests in turn below.

*(a) Contact visits between Counsel and the Defendants*

While the SAMs do not specifically prohibit "contact" during "Attorney-Client Privileged Visits," the SAMs provide that authorizing such contact is "at the discretion of the [BOP]." (See SAMs Memoranda, ¶ 1c). As a general matter, due to concerns on the part of the MCC regarding inmate, attorney and staff safety, as a result of at least one significant prior incident involving the stabbing of a staff member by a charged terrorist defendant, the MCC in its administrative discretion has determined that such visits are unauthorized in their facility. The government has discussed this request with Counsel for the BOP who has also advised that the Special Housing Unit ("SHU") in the MCC within which the defendants are incarcerated has no facilities available for contact visits involving defense counsel. In light of the above and the discretion afforded to the BOP by the Attorney General, as

---

[3] Although several district courts have held that a defendant can challenge SAMS directly with the federal court, the Second Circuit has held otherwise. See United States v. Yousef, 327 F.3d 56, 165 (2d Cir. ) (2003) ("Yousef must exhaust his administrative remedies under the Bureau of Prisons Administrative Remedy Program with regard to whatever special administrative measures are imposed on him."). The requirement for an inmate to exhaust administrative remedies under this statute has been upheld by the Supreme Court on two occasions and endorsed by other appellate courts that have considered the question. See Porter, 534 U.S. 516; Booth, 532 U.S. 731; accord United States v. Ali, 528 F.3d 210, 244 (4th Cir. 2008) ("The defendant must exhaust his administrative remedies before challenging the SAMs in federal court."); Yousef v. Reno, 254 F.3d 1214, 1221-22 (10th Cir. 2001). Thus, based on the holdings of the Supreme Court and the Second Circuit, as well as the plain language of the PLRA, the defendant must first seek all redress available from the Bureau of Prisons before bringing this challenge to the Court.

well as the apparent inability of the MCC to host such visits, the government defers to the BOP's determination in not accommodating this request.

*(b) Visits with Family and Friends*

The SAMS specifically contemplate visits by the defendants' immediate family. (See SAMs Memoranda, ¶ 3f ("Non-Legal Visits")). It is the government's understanding, based on conversations with counsel for the BOP, that there are no pending requests for visitors that have been made by the defendants under this provision within the SAMS. Should the defendants wish to conduct non-legal visits, they should contact the BOP directly with their specific requests, subject to the conditions set forth in the SAMs. Notably though, the SAMs specifically prohibit "any physical contact" between the defendants and such visitors "to protect against harm to visitors or staff" and such visits much be "monitored . . . in a manner that allows such visits to be analyzed for indications the visit is being used to pass messages soliciting or encouraging acts of violence or other crimes, or to otherwise attempt to circumvent" the SAMs. (See SAMs Memoranda, ¶ 3f, iii, (3) ("Non-Legal Visits")). Given the SAM's restriction as implemented by the Attorney General, and the restriction's relationship to an appropriate concern under 28 C.F.R. § 501.3 (a), the government cannot accommodate this request, in part because of the difficulty in monitoring conversations during social contact visits. [4]

*(c) Permitting Contact between the Defendants and Other Inmates*

The SAMS specifically prohibit the contact and housing arrangements requested by the defendants. (See SAMs Memoranda, ¶ 3f ("Non-Legal Visits")). Given the SAMs restriction as implemented by the Attorney General, and the restriction relates to an appropriate concern under 28 C.F.R. § 501.3 (a), the government cannot accommodate this request.

*(d) Access to the Prison Library*

The defendants request that the SAMs be modified to allow the defendants access to the prison library. As a general matter, the SAMs require that "[i]n order to avoid passing messages/information from inmate to inmate, the inmate shall not be allowed to share books with any other inmates." (See SAMs Memoranda, ¶ 9). Given the SAMs restriction as implemented by the Attorney General, and the restriction's relationship to an appropriate concern under 28 C.F.R. § 501.3 (a), the government cannot accommodate this request.[5] The reason is essentially because shared library books present a credible risk of passed communications, which is what the SAMs are intended to prevent.

---

[4] The courts have long recognized the concern about passing messages to third parties as a legitimate justification for special administrative measures under 28 C.F.R. § 501.3 (a). See Safely, 482 U.S. at 93 ("In any event, prisoners could easily write in jargon or codes to prevent detection of their real messages."); United States v. Hammoud, 381 F.3d 316, 334 (4th Cir. 2004) ("A conversation that seems innocuous on one day may later turn out to be of great significance, particularly if the individuals are talking in code."); United States v. Johnson, 223 F.3d 665, 673 (7th Cir. 2000) ("And we know that anyone who has access to a telephone or is permitted to receive visitors may be able to transmit a lethal message in code."); United States v. Salameh, 152 F.3d 88, 108 (2d Cir. 1998) ("Because Ajaj was in jail and his telephone calls were monitored, Ajaj and Yousef spoke in code when discussing the bomb plot."); United States v. Ali, 396 F.Supp.2d 703, 709 (E.D.VA 2005) (taking note that "al-Qaeda trains its followers to use a variety of means to communicate with their confederates from prison").

[5] Notably though, the inmate "may have access to all books that do not facilitate criminal activity or present a substantial threat to national security or the security, discipline, or good order of the institution." Id. Here the defendants also claim that certain books, specifically "biographies of John Gotti

*(e) Commissary Requests*

   Commissary restrictions are not governed by SAMs, but are controlled by the BOP at its discretion. Counsel for the BOP has advised that various requests have previously been made by the defendants for access to certain items in the general commissary, and the SHU commissary has been expanded as a result. Counsel for the BOP has also advised that the defendants may make specific requests to the warden of the MCC and their requests will be addressed on a case by case basis.

*(f) Requests for Telephonic Contact with Extended Family*

   Non-legal telephonic contact is restricted in some respects under the SAMs. (See SAMs Memoranda, ¶ 3). Notably though, "[r]equests for additional non-legal contact [outside of immediate family members] may be submitted and will be considered on a case-by-case basis." (See Id. ¶ 3, fn 7). Counsel for the BOP has advised that there no pending requests by the defendants for additional telephonic contacts and, as set forth in the SAMS, such requests will be considered on a case-by-case basis.

## CONCLUSION

   For the foregoing reasons, the defendants should direct specific requests to the BOP, who may accommodate them to the extent that the requests are not irreconcilable with the express terms of the SAMs. The government will further address the issues raised above, to the extent helpful, at the upcoming status conference.

            Respectfully submitted,

            KELLY T. CURRIE
            Acting United States Attorney

By:  __/s/_____
    Shreve Ariail
    Seth D. DuCharme
    Richard M. Tucker
    Assistant U.S. Attorneys

cc: All defense counsel of record, via ECF

---

and Whitey Bulger," have been "rejected," by the BOP. (Def. Sept. 10, 2105 Letter, fn. 2. BOP counsel has advised the government that no administrative complaint appears to have been filed regarding this matter.