**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**

      -against-                            No. 12 Cr. 661 (JG)

**ALI YASIN AHMED,**
**MAHDI HASHI,**
**MOHAMED YUSUF,**

               *Defendants.*

-------------------------------------------------------X

**<u>DEFENDANTS' JOINT SENTENCING MEMORANDUM</u>**

## TABLE OF CONTENTS

I.     THE OFFENSE CONDUCT ........................................................................................ 1

II.    THE PLEA AGREEMENT ...................................................................................... 1

III.   JOINT OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT ................. 1

   A.   Paragraphs Relating to "Extradition" (Page 1, 2, ¶ 83, ¶ 93, ¶ 96) ........................ 1

   B.   Paragraphs Relating to Race (Page 2) ................................................................ 2

   C.   Probation's statement of the time period encompassed by the offense to which our clients pled guilty should be amended so that it is consistent with the indictment. ..................... 2

   D.   The sections entitled "Background" and "Al-Shabaab's Recruitment and Use of Foreign Fighters" (¶ 2-9), are misleading, irrelevant, and inflammatory, and should be stricken from the PSR. ............................................................................................................................ 3

   E.   Specific Objections to Paragraphs 2-9 ............................................................... 6

   F.   Objections shared by Ahmed and Yusuf (¶¶ 11-19) .............................................. 7

   G.   Information relating to defendants' departure from Somalia and their future plans is derived from statements made by the defendants after they were arrested in Djibouti and subjected to torture and are thus unreliable. The government has acknowledged and conceded that this information cannot be used for any purpose and it should be stricken from the PSR (page 2, ¶ 25, ¶ 26) .......................................................................................................... 10

   H.   Remaining Joint Objections (¶¶ 26-27 and following) ......................................... 11

IV.   AN ANALYSIS OF CERTAIN ISSUES TO BE CONSIDERED FOR ALL DEFENDANTS UNDER 18 U.S.C. § 3553(a) .............................................................................................. 13

   A.   A Brief History of Somalia ............................................................................. 13

      1)   Ethiopia and Somalia .............................................................................. 17

      2)   Illegal Means and Methods of Warfare, 2006-2008 .................................... 19

   B.   Torture And Punishing Conditions Endured By Defendants Since Their Arrest ......... 22

      1)   Conditions in Djibouti ............................................................................ 23

      2)   Solitary Confinement ............................................................................. 28

   C.   An Analysis of Sentences Received by Similarly Situated Defendants ................... 43

      1)   Cases Surveyed .................................................................................... 45

      2)   Comparable Material Support Sentences in the Second Circuit (Table A-1) ...... 45

      3)   Comparable al-Shabaab Sentences in All Circuits (Table A-2) ....................... 46

      4)   Analysis of Select Military Commission Cases ............................................ 50

      5)   Conclusion ........................................................................................... 51

   D.   The Terrorism Enhancement Drives The Guideline Sentence To The Statutory Maximum; The Enhancement Does Not Adequately Account For The Particular Circumstances Of The Case, And Leads To A Sentencing Recommendation That Is Greater Than Necessary ............... 52

I.        **THE OFFENSE CONDUCT**

On May 12, 2015, the defendants entered guilty pleas to Count 1 of a five-count

indictment. As the defendants acknowledged before this Court, between December, 2008 and

August, 2012, they agreed with others to provide material support to al-Shabaab, which they

knew to be a designated foreign terrorist organization.

II.       **THE PLEA AGREEMENT**

The defendants agreed to plead guilty to conspiracy to provide material support to a

foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). This count carries a range

of imprisonment from 0 to 15 years. The plea agreement assumes a guideline calculation largely

driven by the Terrorism Enhancement set forth in Guidelines Section 3A1.4(b). This results in an

advisory Guidelines sentencing range of 360 months to life. Because the statutory maximum

sentence is 15 years, pursuant to 18 U.S.C. § 2339B(a), the defendants' effective applicable

advisory Guidelines range is 15 years. Nothing in the agreement precludes the defendants from

presenting information to the Court relevant to sentencing under 18 U.S.C. §3553(a) that would

justify a variance from the applicable Guideline sentence.

III.      **JOINT OBJECTIONS TO THE PRE-SENTENCE INVESTIGATION REPORT**

Each defendant has prepared individual objections to the Presentence Investigation

Report ("PSR") that will be submitted as part of his individual sentencing submission. This joint

submission is limited to objections that are shared by all three defendants.

A.  **Paragraphs Relating to "Extradition" (Page 1, 2, ¶ 83, ¶ 93, ¶ 96)**

The PSR incorrectly states that the defendants were extradited to the United States.  In

fact, they were arrested and taken into custody in Djibouti. After several months in a Djiboutian

prison, the defendants were handed over to United States officials and transported to the United

States. As such, the following pages and paragraphs should be amended:

p. 1: "Arrest Date: ….he was extradited to the United States on November 15, 2012"

p. 2: "Immigration Status: …extradited in for prosecution"

¶ 83 (Yusuf and Ahmed); ¶ 84 (Hashi): "…He was extradited to the United States for
prosecution of the instant offense."

¶ 93 (Yusuf); ¶ 95 (Ahmed); ¶ 98 (Hashi): "… he was extradited to the United States on
November 15, 2012"

¶ 96 (Ahmed): "… subsequently extradited to the United States."

**B. Paragraphs Relating to Race (Page 2)**

On page 2 of the PSR, our clients are identified as follows:

"Race: Black or African American."

The defendants are Somali; they do not identify as Black, and are certainly not African

American. If it is necessary to categorize our clients in this way, we therefore ask that "Race" be

changed to "Ethnicity" and that our clients be identified as "Somali".

**C. Probation's statement of the time period encompassed by the offense to which our
clients pled guilty should be amended so that it is consistent with the indictment.**

Probation refers to the time period of the offense as "between April 2008 and August

2012. (*See e.g*., ¶ 1 of Mr. Ahmed's PSR.) These dates are approximations, not fixed dates

signaling the precise beginning and ending of our clients' offense conduct. This should be

amended so that it is consistent with Count I of the indictment. ("In or about and between April

2008 and August 2012, both dates being approximate and inclusive…")

**D.  The sections entitled "Background" and "Al-Shabaab's Recruitment and Use of Foreign Fighters" (¶ 2-9), are misleading, irrelevant, and inflammatory, and should be stricken from the PSR.**

The defendants object to the inclusion of the "Background" section (¶¶ 2-5) and the section entitled "Al-Shabaab's Recruitment and Use of "Foreign Fighters" (¶¶ 6-9) under the heading "Offense Conduct".  For the most part (and without identifying the source of the information), these sections, which are identical in all three PSRs, purport to describe and characterize the conduct, aspirations, targets, tactics, and relationships of al-Shabaab and of mostly unidentified individuals purportedly associated with al-Shabaab.  These paragraphs are misleading, irrelevant, and inflammatory.

Paragraphs 2-9 are misleading because, apparently relying on submissions from the government, they treat al-Shabaab as a monolithic organization and suggest that every person associated with al-Shabaab (including the defendants) shared the same clearly stated objectives and agenda. This characterization is unsupported by any facts. *See generally* Michael Taarnby and Lars Hallundbaek, *Al-Shabaab: The Internationalisation of Militant Islamism in Somalia and the Implications for Radicalisation Processes in Europe.*[1] In 2010, after conducting extensive fieldwork in Somalia, Taarnby and Hallundbaek reported:

> When analysts speak of al-Shabaab as a single, unified entity, this interpretation is quite misleading. Several militant Islamist groups active in Somalia today have joined forces in a larger movement known as the Hizb al-Islamiyya, however, the most significant of these groups is al-Shabaab. In late 2009, al-Shabaab was composed of 12 different groups who used the al-Shabaab label. Some were hardcore Jihadis and very ideologically committed, while others were much less religious and much more opportunistic. The leadership is decentralised but supported by religious figures at the local level who interpret Sharia concepts and practice. This would explain the lack of a single doctrinal blueprint for the movement, and there is a remarkable historical parallel to Al-Ittihad which was very secretive in its dealings, especially its leadership decision making. Its organizational structure was highly compartmentalized, and this may have worked against al-Ittihad in the sense that some branches may not have known what other

---

[1]  This report is available in its entirety at http://bit.ly/1PUBgVw.

branches were doing. Decentralized initiatives may well have been the order of the day, instead of a clear chain of command. This organizational fragmentation has produced a horizontal structure which is resilient, yet impedes the consolidation of the movement's potential gains.

This situation has resulted in a high state of fluidity and opportunism and at times even leading to defections. Currently, there is serious internal disagreement on a range of topics, such as the role of women, the banning of Khat, judicial procedures, and the nature of the armed struggle. Speaking of al-Shabaab as a terrorist organization in the singular is highly misleading; instead it makes much more sense to consider al-Shabaab as a very dynamic movement that is fragmented from within. This slightly confusing situation is also reflected in the nature of the movement's leadership that by some have been characterised as being in a state of flux.  While Sheikh Ahmed Abdi Godane, known as Abu Zubeir, remains the figurehead, persistent rumours concerning his actual control over al-Shabaab testify to a wide range of stakeholders as opposed to a classical organizational hierarchy.

*Id.* at 13.

Paragraphs 2-9 are also misleading as they suggest that al-Shabaab is alone in committing conduct abhorred in the West such as targeting of journalists and foreign aid workers in Somalia. *See e.g.*, Amnesty International, Public Statement, October 26, 2007[2] ("The TFG must also put an end to its practices of repeated closure of media houses and arrests of journalists by its security forces.  Such actions have created an environment where attacks against journalists by the TFG security forces and armed opposition groups – in reprisal for their reporting – have become commonplace.  Intimidation of journalists has become a stratagem by all parties to the conflict in Somalia…. This growing insecurity is not only faced by journalists.  The extraordinary raid on the UN compound in Mogadishu by over 50 officers of the TFG's National Security Service on 17 October and the arbitrary detention of Idris Osman, the local director of the UN World Food Program from 17 to 23 October, was a flagrant disregard for the rights of humanitarian workers, acting in the best interests of the most vulnerable populations, displaced by the ongoing internal conflict in Mogadishu.")

---

[2] Available at http://bit.ly/1XopFNH

Nor is al-Shabaab alone in advocating adherence to Sharia law.  Indeed, Sharia law is central to the *Provisional Constitution of the Federal Republic of Somalia* (adopted on August 1, 2012).[3]  As explained (at p. 8) of the UN's *Guidebook to the Somali Draft Provisional Constitution* (presented to the people of Somalia in July 2012)[4]:

> The draft Provisional Constitution is based on the foundation laid by the holy Quran and Sunna. It promotes the higher objectives of Shari'ah and social justice – see Article 3 (1). The draft Provisional Constitution adopts a special provision to the effect that parliament may not pass any law that contravenes the general principles of Shari'ah – see Article 2 (3). The courts have the power to strike down any law on the basis that it is contrary to the Shari'ah and thus to the Constitution – see Article 109 C (1) (a) and (b). The draft Provisional Constitution reaffirms Islam to be the state religion of Somalia – see Article 2 (1). In line with Shari'ah, the Constitution explicitly prohibits the propagation of other religions in Somalia – see Article 2 (3).

Paragraphs 2-9 are largely irrelevant because (with the exception of ¶ 9[5]), in that it describes conduct, aims, objections, tactics, links, strategies and proclamations that do not involve any of the defendants. There is no evidence that Mr. Ahmed, Mr. Hashi, or Mr. Yusuf was aware of these matters, and, in the absence of such evidence, they have no bearing on any factor the Court must consider in determining the particular sentence to be imposed.

Finally, ¶¶ 2-9 are inflammatory and prejudicial.  Through "guilt by association," but not an iota of evidence, the defendants are tarred with atrocities like the 2010 bombing attacks in Kampala, Uganda (planned and executed by this government's own witness █████ ███████, who confirmed that defendants had nothing to do with the attack), and the 2013 attack on the Westgate Mall in Nairobi (which occurred while the defendants were sitting in solitary under SAMs in the MDC and MCC).

---

[3] Available at http://bit.ly/1LE9toh
[4] Available at http://bit.ly/1NaHoqN
[5] To the extent that ¶ 9 describes conduct that is attributed to defendant Yusuf, any description of this conduct is more appropriately included in the section of the PSR addressing Mr. Yusuf's conduct, under the section entitled "The Defendant's Participation".

Paragraphs 2-9 are harmful to the defendants not only in connection with sentencing, but also after sentencing as the PSR follows them and will be used by the Bureau of Prisons in connection with decisions "on such matters as institution assignment, eligibility for programs, or computation of salient factors." *United States v. Arevalo*, 628 F.3d 93, 98 (2d Cir. 2010) (quoting The Advisory Committee Notes to the 1983 amendments to Rule 32, Fed. R. Crim. P.). There is no legitimate reason for these paragraphs to remain in the PSR. Accordingly, ¶¶ 2-9 should be stricken from our clients' PSRs.

### E.  Specific Objections to Paragraphs 2-9

The defendants object generally to ¶¶ 2-9, and specifically to the unsubstantiated, imprecise, and indefinite adjectives and adverbs that permeate it including: ¶ 3 ("regularly," "frequently"); ¶ 4 ("numerous"); ¶ 5 ("strong"); ¶ 6 ("aggressively", "distinct"); ¶ 8 ("significant," "heavily"). While the defendants are, for the most part, in no position to either affirm or dispute the accuracy of these paragraphs, we object to the mention of beheadings. Specifically, in ¶ 3 of the PSR, Probation notes that "Al-Shabaab frequently beheaded TGF and AMISOM fighters, to instill fear in their adversaries." There is no evidence that, during the life of the charged conspiracy, any defendant was connected to any beheadings on the battlefield. In the absence of such a connection, the assertions are irrelevant and inflammatory and should be stricken.

Further, we object to the suggestion, in ¶¶ 4 and 6, that the defendants were part of a group (foreign fighters) that specifically targeted the United States, or *any* country outside of Somalia. Specifically, ¶4 states that "After an al-Shabaab member was killed by what al-Shabaab believed to be a U.S missile strike in May 2008, al-Shabaab leaders declared that muhajireen

[foreign fighters] would 'hunt the U.S. government'…";[6] and   ¶6 states that that "foreign fighters, with their foreign passports, were given combat training in Somalia and then sent elsewhere in support of external terrorist plots against Western countries and their allies in the region." These paragraphs, too, are unfairly prejudicial and inflammatory. As there is no evidence that any of these defendants had any such intention or plans, these paragraphs should be stricken.

### F.  Objections shared by Ahmed and Yusuf (¶¶ 11-19)

The following objections are shared by Mr. Ahmed and Mr. Yusuf.[7] Much of conduct ascribed to Mr. Ahmed and Mr. Yusuf in these paragraphs was ostensibly derived from the testimony of ████████████ and ████████████ who testified at Rule 15 depositions in February of this year. We object to assertions in the PSR based on this testimony as misleading and/or unreliable. To the extent that any of information contained in these paragraphs was derived from our clients' involuntary statements, or from any other witness whom the defendants have not had the opportunity to cross-examine, we object to its inclusion on those bases.

- ¶11: "…Ahmed and Yusuf were part of a growing group of young men in Sweden, who were seeking to leave the country to join various terrorists groups.  Many of these young men lived in Rinkeby, an impoverished and largely immigrant community located in the Northern part of the country."

  Mr. Yusuf and Mr. Ahmed dispute that either was part of any such group.

---

[6] Furthermore, this declaration appears to be incorrectly quoted, or at least, inconsistent with past government representations. On page three of its April 5, 2013 discovery letter, the government stated that this declaration was about **mujahideen** (fighters, generally) and not **muhajireen** (foreign fighters specifically).

[7] Mr. Hashi does not join in these objections, as they do not pertain to his conduct or relate to facts about which he has personal knowledge. However, should the Court correct Mr. Ahmed and Mr. Yusuf's PSRs on the basis of these objections, Mr. Hashi asks that the same corrections be made to his PSR.

- ¶12: "Ahmed and Yusuf sought to contact high-ranking members of al-Shabaab, including Swedish national Yassin Yare….and…Osman Yasmin Ahmed…who had been fighting for years with al-Shabaab."

  There is no evidence that Osman Yasmin was a member of al-Shabaab (high-ranking or otherwise) or that he had been fighting for years with al-Shabaab. *See also* ¶¶ 15 and 22 of Mr. Yusuf's PSR, and ¶¶ 15, 28, and 34 of Mr. Ahmed's PSR, in which this assertion is repeated. There is also no evidence that Yassin Yare was a "high ranking member" of al-Shabaab. ███████████████ testified that ████████ █████████████████████████████████████████████████████ ████████████. (*See Selected pages from th* ████████████ ████████████████████████████████████████ attached as part of the Defendant's Appendix of Exhibits , at A8-A10.)

- ¶13: This paragraph summarizes purported telephone calls between Mr. Ahmed and Mr. Yusuf that took place in Sweden in 2008. According to the government, the original audio of these calls was destroyed pursuant to Swedish privacy law. The government has provided defense counsel with purported English-language summaries of these calls. We object to the inclusion of information derived from these summaries. Since neither the original audio nor word-for-word transcripts of these calls exist, and since counsel has no information as to who prepared the summaries and under what conditions and pursuant to what instructions they were prepared, there is no way to see the context in which the statements were made, or to otherwise effectively challenge their characterization.

- ¶14: "Upon their arrival in Somalia in late 2008…" For accuracy, we ask that "late 2008" be changed to "December 2008".

- ¶14: According to the PSR, the religious instruction Mr. Ahmed and Mr. Yusuf received from Yassin Yare included "lessons taught regarding al-Qaeda doctrine."

  Mr. Ahmed and Mr. Yusuf object to this characterization of Yare's teachings as Al Qaeda doctrine (which suggests that Yare gave instruction on spreading jihad around the world and fighting beyond Somalia) as a strained interpretation of ████████ hearsay-based and ambiguous testimony. When asked if Mr. Yare gave counsel on how the "muhajireen were to implement Shariah law around the world," ████████████████████ ██████████ (*See* ██████████ at A11-A13.) ████████████ whose credibility defendants vigorously challenged.

---

[8] Citations to pages in the Appendix of Exhibits are to "A#". We have endeavored to keep the documents included in our Appendix to the bare minimum, and whenever possible, have cited to docket #s and weblinks as an alternative to providing physical copies. We would be happy to provide the Court with hard copies of all cited documents upon request.

- ¶14: "Yare, whom Ahmed and Yusuf knew from Sweden, was in telephonic contact with fellow Swedish co-conspirator Bille Ilyas Mohamed and sought to recruit him to join Yusuf and Ahmed in Somalia. During a recorded conversation on February 2, 2009, Yare and Mohamed discuss the fact that Yusuf had arrived in Somalia and, about halfway through their conversation, Yusuf joined the telephone call and requested that Mohamed bring various items when he traveled to Somalia. Mohamed was later intercepted by Swedish authorities, after he traveled and trained with al-Shabaab, and later returned to Sweden, discussing his plans to carry out a suicide attack in Sweden. Mohamed was convicted in 2010, after trial for conspiracy to commit terrorism, but his conviction was overturned by an appellate court. Mohamed was more recently reported to have traveled to Syria to join the designated terrorist organization ISIS."

  Mr. Ahmed and Mr. Yusuf object to the entire quoted portion. First, there is no evidence that Yare sought to recruit Mohamed so that he could join with either Mr. Ahmed or Mr. Yusuf. Further, while someone who identifies as "Yusuf" joins the call, this "Yusuf" is not a defendant in this case. The government's own evidence at the Rule 15 Deposiiton was that, Mr. Yusuf went by the name "Hudeyfa" and was not called "Yusuf" while in Somalia. Because this call in no way involves any of the defendants in this case, it is simply not relevant. The paragraph then goes even further afield, including allegations that Mohamed planned to carry out a suicide attack in Sweden, or recent reports that he went to Syria to join ISIS. There is no evidence the defendants were privy to these conversations or related in any way to Mohamed's Syrian travel.  The information has no bearing on the nature and circumstances of the offense for which the defendants are being sentenced or to the defendants' history and characteristics.  It has no place in the PSR, and should be stricken whether or not it is accurate.

- ¶ 16 "…al-Shabaab's military leadership tended to use muhajireen for different types of missions from the ansari, given that the foreign fighters' training left them better suited to certain types of urban combat and other special operations. By the middle of 2009, --- there were approximately 60 to 70 al-Shabaab foreign fighters, including Ahmed and Yusuf, operating in and around Mogadishu."

  The defendants object to the accuracy of the first sentence, and the suggestion of the paragraph that they were part of some sort of elite group of fighters.  Several thousand people – both native and foreign – received training and, so far as the defendants know, all received the same kind of training. If there was an elite fighting force, neither Ahmed or Yusef were members of that force.

- ¶ 17: "Al-Shabaab fighters decapitated TFG soldiers, leaving the soldiers' bodies on the battlefields with their severed head resting on their chests. A Minneapolis foreign fighter with whom Ahmed and Yusuf trained, and with whom Yusuf was extremely close, Salam Hussein Ali, also known as "Uhud" or "Uhudin" was involved in such an attack in Karan in 2009, in which he and a group of other foreign fighters gruesomely decapitated a captured TFG soldier."

  This objection is similar to our specific objection to ¶ 3 above, which also discusses al-

Shabaab's alleged penchant for beheading opponents on the battlefield. There is no evidence that, during the life of the conspiracy alleged against these defendants, that either  Mr. Ahmed or Mr. Yusuf was aware of – or connected to – beheadings committed by Salam Hussein Ali.  The fact that this person may have been involved in an attack in which a TFG soldier was beheaded is irrelevant and inflammatory and should be stricken.

- ¶ 18: "During the battles, both Ahmed and Yusuf regularly discharged AK-47 machine guns."



We object to this statement, as it is unsupported. ████████████ testified that ██ ████. (*See* ██████. at A17-A19.) Similarly, ████████████ testified that ███████. (*See* ███. at A14-A17.)

- ¶ 19: "Despite Yusuf's injury, Yusuf and Ahmed both continued to fight alongside of al-Shabaab's foreign fighters."

We object to this unsupported assertion about Mr. Ahmed's and Mr. Yusuf's continuing activities. Neither of the witnesses who testified in foreign depositions reported observing either Mr. Ahmed or Mr. Yusuf engaged in any fighting after the Karan District battles in the summer of 2009 when Mr. Yusuf was injured.

**G. Information relating to defendants' departure from Somalia and their future plans is derived from statements made by the defendants after they were arrested in Djibouti and subjected to torture and are thus unreliable.  The government has acknowledged and conceded that this information cannot be used for any purpose and it should be stricken from the PSR (page 2, ¶ 25, ¶ 26)**

As recognized in the PSR as a factor that may warrant departure, the defendants were

subjected to "extremely harsh prison conditions in Djibouti." (See e.g., ¶ ¶ 83 and 111 of Mr.

Yusuf's PSR.)  There was substantial pre-trial litigation concerning the torture of Mr. Ahmed,

Mr. Hashi, and Mr. Yusuf after they were arrested in Djibouti in August 2012.  The defendants

moved to suppress all so-called "torture statements" and all evidence derived from torture

statements on several grounds including Article 15 of the United Nations Convention Against

Torture and Other Cruel, Inhuman Or Degrading Treatment, which requires each party state to

ensure that any statement made as a result of torture "shall not be invoked as evidence in any

proceedings."  In its filings with the Court, the government implicitly acknowledged both the

torture and its obligations under Article 15, and assured the Court that it would not seek to offer any evidence at trial derived from the torture statements. There is no exception in Article 15 for the use of statements made as a result of torture in connection with sentencing.

The following information was induced by torture, cannot be traced to any legitimate source, and should be stricken from the PSR:

- Our clients' purported aliases, listed on page 2 of each PSR, in the section "Identifying Data." For Mr. Ahmed, we object to the use of the alias Ismail; for Mr. Yusuf, we object to the use of the alias Mohammed Abdulkadir; and for Hashi, we object to the use of the alias "Talha".

- All of ¶ 25, which begins with the assertion that Mr. Ahmed, Mr. Hashi and Mr. Yusuf "attempted to travel together to Yemen by way of Djibouti." The remainder of the paragraph purports to relate information about the defendants' plans gleaned from "an individual who was known to facilitate travel through Djibouti to Yemen." The defendants maintain that this individual was also the victim of torture. According to Mr. Ahmed, who shared a prison cell with this individual in Djibouti, the man was electrocuted and beaten almost to death by his Djibouti captors. Because the source of the information is himself a torture victim whom the defendants have had no opportunity to cross-examine, we object to this paragraph in its entirety.

- ¶ 26 in each PSR purportedly relates each defendant's alleged plans to travel to Yemen, and includes that they were on their way "to join Al Qaeda." We object to the entirety of the paragraph (except the fact that each defendant "was arrested in East Africa on August 5, 2012" and "On November 12, 2012, he was … flown to the Eastern District of New York.")

## H. Remaining Joint Objections (¶¶ 26-27 and following)

- In addition to the objections to ¶ 26 raised *supra*, we object to the remainder of ¶ 26 and to ¶ 27, which relate to an individual by the name of Imran Hersi. ¶ 26 makes note of affidavits signed by our clients acknowledging that they had $300 in their possession that was transferred to them by "Imran Hersi in the United Kingdom"; and in ¶ 27, Probation details certain items found on Mr. Hersi's laptop in London (recorded lectures by Anwar Al-Aulaqi and instructions on how to build an improvised explosive device). Our clients signed these affidavits immediately upon arriving in the United States, – as a condition precedent to having said funds deposited in their commissary accounts – and it is impossible to discount the fact that they were fresh from months of torturous and horrific conditions – and still had no idea why it was that they were being flown halfway across the world to a country none had ever sought to visit – or thought about at all. Further, there is no evidence that our clients had any knowledge of – or contact with – the materials on Mr. Hersi's laptop, and therefore no legitimate reason to include this

11

information in the PSR other than to inflame and prejudice the Court.

- With respect to the above objections to ¶¶ 26-27, each defendant's PSR also includes corresponding sections for each client's co-defendant, to which we object on the same basis. (In Ahmed's PSR, these are ¶¶ 32-33 for Yusuf, and ¶¶ 38-39 for Hashi; in Yusuf's PSR, these are ¶¶ 32-33 for Hashi and ¶¶ 50-51 for Ahmed; and in Hashi's PSR these are ¶¶ 50-55 for Yusuf and ¶¶ 44-49 for Ahmed.)

- The defendants' PSRs (*see* Ahmed PSR ¶ 41; Yusuf PSR ¶ 35; Hashi PSR ¶ 29) relate an interview with Mr. Hashi, in which Mr. Hashi purportedly advised that between May of 2007 and May of 2008, he  "lived in Damascus with two other Somali males named "Ismail" and "Yusef," (aliases of Ahmed and Mohamed Yusuf, respectively)…" Mr. Yusuf has never visited Syria, and Mr. Ahmed traveled there once with his mother, in the summer of 2000 when he was fifteen years old – most certainly not at the time to which Mr. Hashi refers. Further, as discussed *supra*, we object to use of Mr. Ahmed's purported alias on the grounds that this information was derived from statements that are the product of torture. Finally, there is no evidence – derived from torture or otherwise, that Yusuf used the alias "Yusef," which is not even an alias, but, rather, a similarly spelled (but different) last name.

- The defendants' PSRs further detail the conduct of Mohamed Sakr and Bilal al-Berjawi, individuals that Mr. Hashi purportedly met with in London in 2008, and then go another degree further afield, identifying others who had opinions about Sakr and Berjawi and the contents of those opinions, as well as the conduct of possible peers or associates. (*See* Hashi PSR ¶¶ 29-33; Ahmed PSR ¶¶ 41-45; Yusuf ¶¶ 24, 35-39)  This information is so attenuated that its inclusion borders on the ridiculous. There is no evidence that Mr. Ahmed or Mr. Yusuf ever met Sakr or al-Berjawi or knew anything about their opinions, and to the extent that Mr. Hashi may have met with them, their conduct cannot be attributed to Ahmed and Yusef and is irrelevant to this Court's sentencing determination. The fact that a member of the Somali mission to the UN rejoiced in Berjawi's death, or that the posthumous autobiography of a member of al Shabaab's "external operations network" linked Sakr to "Jihadi John" is beyond attenuated and immaterial to our clients, their conduct, and the formulation of an appropriate sentence in this case. The only conceivable reason to include this level of detail on Sakr and Berjawi, or "Jihadi John" and his involvement in ISIS beheadings, is to inflame and unfairly prejudice the Court.

- ¶ 60:  "The offense involved the provision of material support and resources ([the defendant] himself) with intent, knowledge, and reason to believe [the defendant] would be used to commit or assist in the commission of a violent act (murder); therefore, an enhancement is warranted per Guideline 2M5.3(b)(1)(E)." The defendants object to the parenthetical "(murder)" as unnecessarily inflammatory.  They do not dispute the 2-point increase in offense level for a "violent act."

We have no further joint objections to the defendants' PSRs. The defendants' individual

objections will be submitted separately. To extent that that any of the defendants' objections –

either individual or joint – are sustained by this Court, we ask that the same corrections be made to the PSRs for all three defendants as appropriate.

## IV.   AN ANALYSIS OF CERTAIN ISSUES TO BE CONSIDERED FOR ALL DEFENDANTS UNDER 18 U.S.C. § 3553(a)

As mentioned *supra*, nothing in the plea agreement executed by the parties precludes the defendants from presenting information to the Court relevant to sentencing under 18 U.S.C. §3553(a) that would justify a variance from the applicable guideline range. We have identified a number of matters that we respectfully ask the Court to consider in arriving at the appropriate sentence, and which, we submit, call for a sentence below the recommended guideline sentence.

### A.  A Brief History of Somalia

First, we ask Your Honor to consider the circumstances that led these defendants to return to their homeland and join in the civil war that has torn their country apart since 1991. We ask that the following be included in the PSR to replace the "Background" section to which defendants object.  The material in this section is based largely on testimony that the government's own expert Matt Bryden provided in *U.S. v. Mahamud Said Omar*, 09 Cr. 242 (D. Minn.):

Testifying as a government expert, Matt Bryden,[9] a scholar who writes extensively on the

---

[9] Matt Bryden, noticed as an expert by the government in its case-in-chief, is currently the director of Sahan Research, a think tank located in Nairobi, Kenya. Previously, he served as coordinator of the UN Monitoring Group on Somalia and Eritrea (2008–2012), as director for the Horn of Africa at the International Crisis Group (2004–2006), and as coordinator of the Somali Programme at Interpeace (1996–2002). Mr. Bryden is a graduate of McGill University. He is the author of numerous reports and articles on Somalia and the Horn of Africa, and is editor of *Rebuilding Somalia: Issues and Possibilities for Puntland* (Haan Publishing, 2001) and *Rebuilding Somaliland: Issues and Possibilities* (Red Sea Press, 2005).

chaos in Somalia, explained that modern Somalia's story begins in 1960, when it achieved independence from the United Kingdom in the North and Italy in the South. . (*See Selected pages from the Testimony of Matt Bryden at U.S. v. Mahamud Said Omar, 09Cr. 242 (D. Minn)*, October 2, 2012, hereinafter "Bryden Tr.", at A29-A30.)

Somalia is located on the Horn of Africa, a region in the northeastern part of the African continent that also includes Ethiopia, Eritrea, Djibouti and Sudan. (*See* Bryden Tr. at A26.) The Horn of Africa is one of the poorest regions of the world as well as one the most prone to violence and war. As a result of the poverty and conflict that plague the region, these nations have a very low rate of economic development. (*See* Bryden Tr. at A62.)

Between 1960 and 1969, newly independent Somalia was viewed as a struggling democracy known as the United Republic of Somalia. In 1969, however, Mohamed Said Barre, a military dictator, led a military coup and overthrew that fledgling government.  (*See* Bryden Tr. at A33.) From 1969 until 1991, fighting and rebellion was a part of everyday life in Somalia. Ultimately, Barre was driven out of Mogadishu, the capital. (*See* Bryden Tr. at A33-A34.) What followed, tragically, was more than two decades of chaos – triggered by political unrest, opportunism, corruption, famine and drought. According to the government's expert, Somalia, though it had transient periods of calm, basically existed without a functioning government and in a constant state of civil war from 1991-2012.[10] (*See* Bryden Tr. at A34.)  Between 1991 and

---

[10] In 2012, Somalia completed its political transition with the election of a new federal parliament and speaker, the national constituent assembly's adoption of a provisional constitution, the election of a new president, President Hassan Sheikh Mohamud, and the naming of a new prime minister and cabinet. The United States formally recognized the new government on January 17, 2013. Nevertheless, conflict is ongoing; in its 2015 World Report, Human Right Watch reports that "The warring parties in Somalia's long-running armed conflict continue to displace, kill, and wound civilians. Restrictions on humanitarian access exacerbate the human rights and humanitarian crises." *See* https://www.hrw.org/world-report/2015/country-chapters/somalia

1992, during a four month period, it is estimated that approximately 25,000 Somalis had been killed, 1.5 million had fled the country and more than 2 million had been displaced by political upheaval. [11]

In 1992 the United Nations attempted to fly food into famine-affected zones, and deployed a small peacekeeping force (UNOSOM) which was ultimately supported by some 30,000 U.S. troops. (*See* Bryden Tr. at A35.) After the famine was largely eliminated and the U.S. handed over leadership to UNOSOM, the effort came to a crashing halt when one of the principal militias killed more than two dozen Pakistani soldiers and 18 U.S. soldiers in the infamous "Black Hawk Down" incident in 1995. (*See* Bryden Tr. at A35-36.)

UNOSOM's departure from Somalia led to a period of international disengagement and a decline in foreign aid. From 1995-2000, local political processes were dominated by clan-based factions.[12]  In 2000, the Transitional National Government ("TNG") was established in neighboring Djibouti. (*See* Bryden Tr. A36.)  As a government in exile, the TNG was never widely accepted by the Somali people, faced constant opposition, and was never able to rule effectively.[13] In 2004, a second attempt at a unified ruling government was undertaken, again in exile.  This new government was call the Transitional Federal Government ("TFG") and its seat of governance was in Kenya. (*See Id.*)  Both the TNG and the TFG were governments formed in exile because, according to Bryden, there was no location within the territorial boundaries of

---

[11] Sally Healy and Mark Bradbury, *Endless War: A Brief History of the Somali Conflict* (2010), available at http://www.c-r.org/accord-article/endless-war-brief-history-somali-conflict. This figure does not include those Somalis who died of starvation or other causes related to civil unrest.

[12] *Id.*

[13] See Amy McKenna, *The History of Central and Eastern Africa*, 165; P.T. Leeson, *Better off stateless: Somalia before and after government collapse*,  & Michelle Pearse, Journal of Comparative Economics 35 (2007) 707, http://www.peterleeson.com/Better_Off_Stateless.pdf

Somalia that was considered safe for delegates to come together to form a government. (*See* Bryden Tr. A36-A37.) The TFG, widely suspected to be the proxy of Ethiopia, was similarly rejected by the Somali people.[14] In the eyes of most Somalis, who abhorred and had fought off Ethiopian aggression before, the TFG was never accepted as a duly authorized government or ruling body. (*See* Bryden Tr. at A58-A59.) Nonetheless, the TFG was recognized internationally as a legitimate interim government and was permitted to take Somalia's seats in international organizations like the African Union and the United Nations. (*See* Bryden Tr. at A37.)

The TFG government was plagued with corruption and misappropriation. A leaked 2012 report by the United Nation's Monitoring Group on Somalia and Eritrea – of which Matt Bryden served as coordinator –  estimated that at least $7 of every $10 dollars of Somalia's revenue was misappropriated by officials of the TFG between 2009 and 2010 and was never used for public purposes.[15] (*See* Bryden Tr. at A27-A28; A31.)  According to a 2013 article in the Wall Street Journal, Somalia's Central Bank is described more as a "slush fund" than a bank, with 80% of its public money being withdrawn for private purposes, and 33% of all foreign aid unaccounted for.[16] The largest documented case of corruption was that of Finance Minister Shir Ahmed Jumcaale, who withdrew $80 million and could not (or would not) explain where any of the money had gone.[17](*See* Bryden Tr. at A59-60.)

The TFG's predatory actions against the people of Somalia were not limited to pillaging the country's financial resources; according to Bryden, "there are very credible cases of the use

---

[14]  See István Tarrósy, Loránd Szabó, Göran Hydé, *The African State in a Changing Global Context: Breakdowns and Transformations*, 58
[15] Report available at http://www.somaliareport.com/downloads/UN_REPORT_2012.pdf
[16] Heidi Vogt, *U.N. Says Corruption Rampant in Somalia*, The Wall Stret Journal (July 17, 2013), http://www.wsj.com/articles/SB10001424127887324448104578612053972350748
[17] *See Id*.

of physical torture" by TFG agents against the Somali people. (*See* Bryden Tr. at A60.) Further, efforts to support development of a strong democratic Somalia have been met with resistance from within. As coordinator of the United Nations Somalia-Eritrea Monitoring Group from 2008-2012, Bryden personally documented massive violations of a U.N. arms embargo, in which the TFG profited off an illegal arms trade, putting weapons directly into the hands of their opposition. (*See* Bryden Tr. at A64-A65.)  And as recently as August of 2012, the U.S. Embassy issued a statement  echoing concerns voiced by the African Union and the United Nations over "multiple credible reports of intimidation and corruption" in the selection of Somalia's new 275-member parliament.[18] Irrespective of these reports, the U.S. formally recognized the new government on January 17, 2013.[19] However, to this day, there is no U.S. Embassy in Somalia.[20] Further, according to the 2015 World Report by Human Rights Watch, "warring parties in Somalia's long-running armed conflict continue to displace, kill, and wound civilians."[21] Human rights violations are perpetrated by all parties to the conflict, including Somali government security forces, African Union (AU) troops, and allied militias.[22]

### 1) Ethiopia and Somalia

To add to Somalia's troubles is the ever-present threat of being overtaken by Ethiopia. The two countries have been involved in a territorial and political dispute since at least 1948,

---

[18] Jason Straziuso, U*.S., U.N. concerned over corrupt Somali transition*, The Washington Times (August 14, 2010), http://www.washingtontimes.com/news/2012/aug/14/us-un-concerned-over-corrupt-somali-transition/
[19] *See* the State Department *Fact Sheet on U.S. Relations with Somalia*, available at http://www.state.gov/r/pa/ei/bgn/2863.htm
[20] *Id.* Pursuant to the U.S. State Department, the U.S. Embassy in Somalia was closed in 1991 and there is currently "no fixed timeline" for reopening it.
[21] *See* Human Rights Watch World Report 2015 – Somalia, available at https://www.hrw.org/world-report/2015/country-chapters/somalia
[22] *See* Id.

when the British began "returning" disputed lands inhabited by ethnic Somalis to Ethiopia.[23]

Clashes over the disputed region include (but are not limited to): (1) a border dispute in the early

1960s after Somalia's independence, (2) the Ogaden War (1977-1978), (3) a border war between

the two countries in 1982, and (4) cross-border warfare from 1998-2000.

In 2006, Ethiopia again invaded Somalia, this time at the invitation of the TFG

government to challenge the Islamic Court Union (ICU), a movement based on a coalition of

sharia courts, in this Muslim nation. According to Bryden, as these courts grew, three or four out

of approximately twelve courts in Mogadishu became associated with "the most hard line

version of Islamic law and had emerged as the core of a jihadist militia, which became later al-

Shabaab." (*See* Bryden Tr. at A38.) However, Bryden also acknowledged that the ICU was

popular with the local Somali population because they achieved a degree of law and order in

previously lawless areas.  (*See Id*.) Similarly, Human Rights watch has credited the ICU "with

bringing unprecedented stability to a city plagued by lawlessness and extreme violence." [24]

The ICU's dominance was clearly a threat to the TFG, which was already struggling to

build both international support and popular legitimacy. Ethiopia's reasons for joining the

invasion are far murkier. According to Human Rights Watch,

> Although the campaign was conducted in the name of fighting international
> terrorism, Ethiopia's actions were rooted in its own regional and national security
> interests, namely a proxy war with Eritrea and concern over Ethiopian armed
> opposition movements supported by Eritrea and the ICU.[25]

Similarly, Bryden acknowledges that the 2006 Ethiopian invasion was rooted in its own self-

---

[23] *See* Human Rights Watch, Collective Punishment: War Crimes and Crimes against Humanity
in the Ogaden area of Ethiopia's Somali Regional State, 1-56432-322-6, June 2008, at p. 15,
available at http://bit.ly/1N9dqoK

[24] *See* Human Rights Watch, *Shell Shocked: Civilians Under Siege in Mogadishu*, vol. 19, no.
12(A), August 2007, at p. 3, available at http://bit.ly/1HKOrAl

[25] *Id*. at 4.

interest. (*See* Bryden Tr. at A39-A40.)

According to Bryden, the Ethiopian invasion outraged the majority of the Somali diaspora, which supported the resistance movement in challenging Ethiopia. (*See* Bryden Tr. A42-A43.) In response, Somalis in the United States and elsewhere held a series of conferences throughout the fall of 2007 to try to organize opposition to the TFG and the Ethiopian troops. These conferences included former political figures, members of the ICU, former TFG members, political activists, and regular citizens. (*See* Bryden Tr. A66-A67. At the same time, al-Shabaab began to emerge as one of the groups opposing Ethiopian intervention. According to Bryden,

> [A]l-Shabaab had begun to emerge under the name al-Shabaab and as an increasingly autonomous force already before the Ethiopian intervention in 2006. When Ethiopia intervened, the resistance took on the form of what at the time I called a complex insurgency, where a combination of clan based militias, various Islamist militias, including those affiliated with the mainstream of the Islamic Courts and al-Shabaab as the most militant group, together opposed Ethiopian intervention.

(*See* Bryden Tr. at A43.)

### 2) Illegal Means and Methods of Warfare, 2006-2008

Before our clients made the decision to travel to Somalia to join al-Shabaab, illegal means and methods of warfare, resulting in widespread casualties and massive human rights violations, were used by all parties to the conflict. In 2008, Amnesty International published a report entitled "Routinely Targeted: Attacks on Civilians in Somalia."[26] The report estimated that 6,000 civilians were killed in fighting in the capital Mogadishu and across southern and central Somalia in 2007, that over 600,000 Somali civilians were internally displaced from and around Mogadishu, and that 335,000 Somali refugees fled Somalia in 2007. The report

---

[26] Amnesty International, *Routinely Targeted: Attacks on Civilians in Somalia*, AFR 52/006/2008 at p. 1, available at http://bit.ly/1MAb0Mu

established "patterns of violations of human rights and international humanitarian law including rape and unlawful killings of civilians in neighbourhoods of Mogadishu by all parties to the conflict in Somalia, most notably TFG and Ethiopian forces."[27] The report also outlined human rights violations committed by armed groups, which included remnants of the ICU, and al-Shabaab (which the report refers to as the "radical Shabab youth militia"), as well as clan, sub-clan and local political leaders and militias.[28]

Investigation done by Human Rights Watch, based on dozens of eyewitness accounts gathered in a six-week research mission to Kenya and Somalia in April and May of 2007, as well as subsequent interviews in June and July of that year, supports Amnesty International's conclusions, finding that "illegal means and methods of warfare" were "used by all of the warring parties," resulting in "catastrophic toll on civilians in Mogadishu."[29] Specifically, Human Rights Watch reported that the Ethiopian forces, which may have included as many as 30,000 troops,  "routinely and repeatedly fired rockets, mortars, and artillery in a manner that did not discriminate between civilian and military objectives or that caused civilian loss that exceeded the expected military gain," "appeared to conduct deliberate attacks on civilians, particularly attacks on hospitals", and "committed pillaging and looting of civilian property, including of medical equipment from hospitals", and that TFG forces had "committed mass arrests and have mistreated persons in custody", "failed to provide effective warnings when alerting civilians of impending military operations, committed widespread pillaging and looting

---

[27] *Id*. at p. 8.
[28] *Id*. at p. 13.
[29] *See* Human Rights Watch, *Shell Shocked: Civilians Under Siege in Mogadishu*, vol. 19, no. 12(A), August 2007 at  p. 5, available at http://bit.ly/1HKOrAl

of civilian property, and interfered with the delivery of humanitarian assistance."[30]

Human Rights Watch also reports al-Shabaab's share of atrocities, both prior to the defendants' decision to join, and after. According to Human Rights Watch's 2007 report, the "insurgency," which at the time included al-Shabaab, members of the Hawiye clan militia, and a third group of "disgruntled fighters and nationalists who opposed Ethiopian involvement in Somalia's affairs,"

> routinely deployed their forces in densely populated civilian areas
> and often launched mortar rounds in "hit-and-run" tactics that placed civilians at
> unnecessary risk. The insurgency possibly used civilians to purposefully shield
> themselves from attack. They fired weapons, particularly mortars, in a manner
> that did not discriminate between civilians and military objectives, and they
> targeted TFG civilian officials for attack. In at least one instance, insurgent forces
> executed captured combatants in their custody, and subjected the bodies to
> degrading treatment.[31]

Further, according to Bryden, al-Shabaab distinguished itself from other groups opposing Ethiopia in that members of al-Shabaab (1) used assassination as a tactic, and as early as 2007 and 2008, was assassinating government figures, elders, civil society figures, students, journalists and aid workers (*See* Bryden Tr. at A45-A46); (2) used improvised explosive devices or IEDS (*See* Bryden Tr.at A52-A53); (3) had been orchestrating suicide bombings since possibly as early as 2006, and definitely in 2007 and 2008 (*See* Bryden Tr. at A53-A57); (4) saw its designation as an FTO in early 2008 as a badge of honor (*See* Bryden Tr. at A44); and (5) sought to bring their own form of Islamic government to Muslims everywhere, and believed that violence against governments that weren't sufficiently Islamic was justified. (*See* Bryden Tr. at A48-A51.)

This extremely brief history of Somalia is not meant to be definitive; rather, it is offered so that the Court may view our clients' decisions to travel to Somalia and join al-Shabaab in the

---

[30] *Id.* at pp. 5-26, 27.

[31] *Id*.

context of Somalia's chaotic and war-torn past, and the recent – and still ongoing – civil war that has defined Somalia's present: a war in which all sides have committed horrendous atrocities, and where – before our clients chose to travel there – an estimated 6,000 civilians had already been killed, 600,000 Somali civilians had been internally displaced, and 335,000 refugees had fled the country

### B. Torture And Punishing Conditions Endured By Defendants Since Their Arrest

This Court should consider the extraordinarily harsh and punishing conditions that the defendants have endured and - will continue to endure at the very least until April, 2016 - in fashioning a sentence that is sufficient, but not greater than necessary, to meet the goals of sentencing set forth in 18 U.S.C. § 3553(a). The Guidelines do not account for those conditions, which include beatings with computer cables by practiced torturers, imprisonment for months in stultifying heat, no water except from their cell's toilet and threats of rape by secret police. Since their arrival on U.S. soil over three years ago, the defendants have been neglected by the Bureau of Prisons ("BOP") and hermetically sealed away from human contact and from the outside world.  Should the defendants serve a Guidelines sentence, as currently calculated, their punishment, served in isolation, will be significantly more onerous than a corresponding sentence served by an inmate in general population.  By the time their isolation is over, the defendants will likely have suffered a "social death," making their reintegration into society exceedingly painful. Accordingly, the defendants' conditions of confinement, both before and after sentencing, clearly serve as bases for the Court to grant a significant variance or departure from the estimated Guidelines range.

In *United States v. Carty*, the Second Circuit recognized that pre-sentence confinement conditions are a permissible basis for downward departures. 264 F.3d 191, 196 (2d Cir. 2001)

(*per curiam*). And several district courts in this district, both before and after *Carty*, have based downward variances and departures on the condition of pre-sentence confinement.[32] Most recently, in *United States v. Babafemi*, No. 13-CR-109 (JG) (E.D.N.Y.), this Court accounted for the conditions of a defendant's presentence confinement in Nigeria in fashioning his sentence pursuant to 18 U.S.C. § 3553(a), finding that Mr. Babafemi's experience "warrant[ed] favorable consideration," Sentencing Tr. 32, *United States v. Babafemi*, No. 13-CR-109 (JG) (E.D.N.Y. Aug. 12, 2015).

### 1) Conditions in Djibouti

In conjunction with a joint Rule 12(b)(3) motion to suppress their statements and the fruits of such statements, each defendant submitted an affidavit describing the horrific conditions of his custody in Djibouti. The facts as stated in these affidavits have never been disputed by the government. Indeed, before Judge Townes ruled on the motion to suppress, the government agreed not to introduce the defendants' statements or any evidence derived from those statements

---

[32] In *Carty*, the defendant was detained for eight months in a Dominican prison, where he was held in an unlit, four-by-eight-foot cell with three or four other inmates, had no access to running water, paper, pens, newspaper, or radio, and was allowed only one phone call per week. *Carty*, 263 F.3d at 193. The court of appeals held that such "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." *Id.* at 196.

In *United States v. Castellanos*, the defendant was imprisoned at the notorious Combita Prison in Tunja, Colombia, before he arrived in the United States. *United States v. Castellanos*, No. 03-CR-156, 2006 WL 3016313 (S.D.N.Y. Oct. 23, 2006) (Sweet, J.). On the basis of the conditions of the defendant's pre-sentence detention at Combita, Judge Sweet found the mandatory minimum sentence to be sufficient to achieve the purposes of sentencing. *Id.*; *see also United States v. Torres*, No. 01-CR-1078, 2005 WL 2087818 at *2 (S.D.N.Y Aug. 30, 2005) (McKenna, J.) (departing downward by one level "because of the harsh conditions of defendant's pretrial detention while at Combita"); *United States v. Behr*, No. 03-CR-1115, 2006 WL 1586563 at *5 (S.D.N.Y. June 9, 2006) (Sweet, J.) (the defendant was housed at the Metropolitan Correction Center ("MCC") for twenty-nine months; court noted that the MCC was "not designed for long-term stays," "house[d] criminals of all types of offenses together in 26-bed dormitories," and was "overcrowded, unsanitary, and lack[ed] certain facilities," and imposed a non-Guidelines sentence of time-served).

for any purpose. The defendants rely on their sworn statements from those affidavits here.

The defendants were arrested together on August 5, 2012, in Djibouti by men claiming to be Djiboutian law enforcement. They were taken to a government compound and placed in small cells measuring roughly 200 square feet and holding four or five other men. Ahmed Aff. ¶ 2 (available at Dkt # 100); Yusuf Aff. ¶¶ 2, 4 (available at Dkt # 101); Hashi Aff. ¶¶ 2, 4 (available at Dkt #99). They were kept under shockingly inhumane conditions by callous and sadistic jailors from the moment the Djiboutians arrested them. Upon information and belief, the captors were likely agents of Djibouti's security police, also known as the "SDS," and the government compound was their headquarters. *See* Ahmed Aff. ¶ 4; *see also* U.S. State Dep't, *Country Report on Human Rights Practices for 2013: Djibouti* 3, 12 ("2013 State Dep't Rep.").[33]

In their affidavits, the defendants stated that, during their time in Djiboutian captivity, they were held *incommunicado* from their families and from representatives of their countries of residence. Ahmed Aff. ¶¶ 3, 9; Yusuf Aff. ¶ 9. The Djiboutians kept them in "suffocatingly" hot cells—clothed in the same dirty t-shirts and underpants for the duration of their captivity—and denied them food and water. Ahmed Aff. ¶ 2; Yusuf Aff. ¶¶ 3-4; Hashi Aff. ¶ 4. They witnessed the torture of others, and Mr. Ahmed and Mr. Yusuf were themselves tortured. Ahmed Aff. ¶ 5; Yusuf Aff. ¶ 6; Hashi Aff. ¶ 6. Their detention was apparently indefinite and without recourse. Ahmed Aff. ¶ 3; Yusuf Aff. ¶ 9. During the entirety of their confinement in Djibouti, they were never formally charged, never met with attorneys and did not know if there were any charges pending against them. Yusuf Aff. ¶¶ 11, 13.

In his affidavit, Mr. Ahmed stated that his cell was unbearably hot and had only one toilet and one mattress, notwithstanding that his cell housed between from four to five men at various

---

[33] Available at http://1.usa.gov/1L6Up3y.

times. Ahmed Aff. ¶ 2. The temperature outside averaged eighty-eight degrees during the time of

his incarceration. However, there was no water in his cell and Mr. Ahmed and his cellmates were

left to drink from the toilet if they wanted to survive the heat. Ahmed Aff. ¶¶ 2, 6. Drinking toilet

water made Mr. Ahmed violently ill. Ahmed Aff. ¶ 6. He had trouble urinating and experienced

intense stomach pain. Ahmed Aff. ¶ 6.[34]

The Djiboutian guards menaced Mr. Ahmed, threatening to "take away [his] manhood"

and asserting: "Human rights don't exist here." Ahmed Aff. ¶ 4. Soon after Mr. Ahmed arrived at

SDS headquarters, the Djiboutians made good on their threats:

> Over a series of nights, I was blindfolded and taken out of my cell and threatened
> with torture, and severely tortured, when I refused to answer their questions. After
> several days of this physical and mental abuse, I came to recognize my abusers
> from their voices, and at some point, they dispensed with the blindfolds
> altogether. The Djiboutians slapped me, punched me, kicked me, and beat me
> with computer cables. At one point, computer cables were wrapped around my
> legs and I was hung upside down from the back of a door, beaten mercilessly and
> threatened with rape. With the exception of interrogation sessions, I was never
> permitted to leave the cell.

Ahmed Aff. ¶ 5. Mr. Hashi witnessed one such episode: "I watched as the Djiboutian agents

hung Ahmed upside down from his ankles. He was gagged, blindfolded and beaten." Hashi Aff.

¶ 5. Mr. Ahmed also observed and learned about the torture of others at the hands of the same

captors:

> In addition to my own torture, I saw other men tortured, including one who was
> raped with a 2-liter soda bottle and another who was beaten until he defecated on
> himself. One of the men in my cell had been electrocuted until he agreed to talk
> and could barely move. He was brought to the cell after a hospital stay, covered in
> bruises and scars.

*Id.*

---

[34] Upon information and belief, this was also when he also contracted tuberculosis, which, as
addressed in Mr. Ahmed's individual sentencing memorandum, was only diagnosed and treated
after months of suffering at the MDC in Brooklyn.

In his affidavit, Mr. Yusuf stated that the Djiboutians first beat him while interrogating him a few days after they took him into custody. Yusuf Aff. ¶ 6. According to Mr. Yusuf, he refused to answer questions about whether he was a member of Al Shabaab, which led the captors to begin hitting him. *Id.* Mr. Yusuf's continued silence prompted the Djiboutians to escalate their attack:

> [T]hey took a thick cable and hit me in the ribs, chest and legs. They threatened to continue this treatment if I did not tell them the "truth" and threatened to shock me with electrical current and to force a soda bottle into my anus until I "cooperated". I was terrified because the men in the cell with me had warned me that this type of torture was common in Djibouti, and that they themselves had often heard of or been subjected to its use.

*Id.* The ordeal stopped after about two and one-half hours. Yusuf Aff. ¶ 7. As the Djiboutians led Yusuf back to his cell blindfolded, they threatened him that the beatings would continue and that the torture would become worse. *Id.*

Finally, Mr. Hashi described the conditions he endured and the torture he witnessed while he was held at SDS headquarters. During interrogation sessions, the Djiboutians threatened Mr. Hashi with physical abuse and rape if he did not cooperate. Hashi Aff. ¶¶ 7, 8. The Djiboutians told Mr. Hashi that Messrs. Ahmed and Yusuf were being raped and beaten. Hashi Aff. ¶ 7. Mr. Hashi witnessed the Djiboutians beat another inmate for hours. Hashi Aff. ¶ 6. The inmate was naked from the waist down, and the Djiboutians repeatedly punched and kicked him in his testicles. Hashi Aff. ¶ 6.

The overt threats of torture abated when the defendants began meeting with unidentified U.S. agents, which, for Mr. Ahmed and Mr. Yusuf, was on August 24, 2012, and for Mr. Hashi, August 25. Yusuf ¶ 9; Ahmed Aff. ¶ 6; Hashi Aff. ¶ 9. But, in most respects, the conditions of the defendants' confinement remained the same even after they began meeting with the Americans. Yusuf Aff. ¶ 11. Every day that the defendants met with U.S. agents, they were

26

transported—always blindfolded— to and from their cells. Ahmed Aff. ¶¶ 6, 9; Yusuf Aff. ¶ 11.

The defendants believed that there was a good chance that, even after meeting with the

Americans, they would still be tortured or die at the hands of the Djiboutians. Ahmed Aff. ¶ 6;

Yusuf Aff. ¶ 12; Hashi Aff. ¶ 11. This concern was reinforced at each meeting with the

unidentified Americans, since each meeting was attended by a member of the Djiboutian Secret

Police. The message was loud and clear – cooperate with these unidentified Americans because

you are still being returned to us at the end of every day. Indeed, even after meeting with the

Americans, Mr. Yusuf was hospitalized for chest pains, headaches and dizziness because of the

conditions of his confinement. Yusuf Aff. ¶ 12. The defendants were kept in Djiboutian custody

until November 14, 2012, when they were officially transferred to American custody. Ahmed

Aff. ¶ 3; *cf.* Hashi Aff. ¶ 11 (stating that his final meeting with FBI agents was on November 13).

Notwithstanding repeated requests for lawyers, defendants were told by their captors and by the

Americans that no lawyers were "available" at that time.[35]

The conditions in which the defendants were kept in Djibouti were inhumane.  The

facilities were far worse, in many ways, than those described in other cases in this circuit in

which defendants had been detained abroad. The overcrowding – one mattress per four or five

---

[35] The defendants' accounts of their experiences are corroborated by the U.S. State Department's Country Reports on Human Rights Practices for 2013 and 2014. The State Department's 2013 report documented the arrest and detention by SDS agents of Mohamed Daher Robleh, a Muslim activist who was later stripped of his Djiboutian citizenship. According to the report, SDS agents held Mr. Robleh for six days at SDS headquarters without contact with his lawyer or his family and for a further two days after that initial six-day stint. 2013 State Dep't Rep. at 3. Mr. Robleh reported that "SDS agents beat him with wooden and plastic sticks on the ears, head, arms, legs, and feet; threatened his life; and kept him awake for days." *Id.* In 2012, the State Department's reported that a journalist critical of the ruling government "was abducted, blindfolded, stripped naked, and beaten on his feet for 24 hours for criticizing the security services." U.S. State Dep't, *Country Report on Human Rights Practices for 2012: Djibouti* 2, http://1.usa.gov/1i4wkif. The State Department's 2014 report described two "accidental deaths" in Djiboutian prisons in 2013: "one from electrocution and one from excessive heat." U.S. State Dep't, *Country Report on Human Rights Practices for 2014: Djibouti* 4, http://1.usa.gov/1VS95af.

detainees – in the Djiboutian cells matched that in other cases in which overcrowding was a mitigating factor. And the defendants did not have adequate access to food or water. Finally, the defendants experienced extreme neglect, torture and the threat of sexual violence at the hands of their Djiboutian captors. At no time were they offered an opportunity to speak with an attorney, and their access to attorneys did not improve once the Americans were on the scene. Indeed, Mr. Ahmed requested an attorney and was told that none was available. Ahmed Aff. ¶ 8.

When the Court determines its sentence, it should account for the defendants' harrowing experience in custody. If sentences for similar offenses are meant to be comparable, *see* 18 U.S.C. § 3553(a)(6), the defendants' sentences should reflect that their pretrial detention has been far more harrowing than that experienced by comparable defendants who engaged in similar conduct.

### 2)  Solitary Confinement

Since their arrival in the EDNY in 2012, these young men have been housed in solitary confinement in the Special Housing Unit ("SHU") of the Metropolitan Detention Center in Brooklyn or the Metropolitan Correctional Center in Manhattan. Since 2013, they have been subject to Special Administrative Measures ("SAMs"), requiring continuing solitary confinement and resulting in further restrictions, the most notable being that all counsel visits be non-contact. By the time of their sentencing hearing, the defendants will have been kept in solitary confinement for three years. Unless the SAMs are lifted or are modified, the defendants will serve their entire sentences in solitary confinement.

As set forth below, social science studies, case law and, increasingly, the American populace recognize that indefinite or long-term solitary confinement is every bit as agonizing as physical torture. The mental imprint left by prolonged solitary confinement is nearly identical to

that left by physical torture.[36] The Guidelines do not adequately account for these conditions. However, the Court should take them into account when determining the appropriate sentence because, as explained below, every day spent in indefinite, long-term, solitary confinement is more agonizing, dehumanizing and punishing than a day served in the general population.

### a) Case Law

Courts of this circuit have noted that long-term or indefinite solitary confinement has devastating effects on the mind. *See, e.g.*, *United States v. Bout*, 860 F. Supp. 2d 303, 308-09 (S.D.N.Y. 2012) (Scheindlin, J.) (internal quotation marks omitted) (noting that "[s]olitary confinement is generally intended as short term housing" and that "it is well documented that long periods of solitary confinement can have devastating effects on the mental well-being of a detainee"). Accordingly, excessive solitary confinement has been used by the courts of this circuit as a basis to vary or depart from the Guidelines. In *United States v. Brooks*, No. 07-CR-187 (E.D.N.Y. Oct. 23, 2008) (Sifton, J.), the defendant was restricted to his cell in the SHU at the MDC for ten months. The defendant was locked in his cell for twenty-three hours a day and allowed only one hour per day of outdoor exercise in a cage. He had no contact with other inmates and had restricted commissary, family and religious visiting. He reported that solitary confinement "was the equivalent of *'no touch torture*,' was stressful, depressing, and has caused him to suffer from memory loss." *Id.* (emphasis added). No psychiatric evaluation was ordered. Rather, in granting the defendant's motion for a reduction in sentence pursuant to Rule 35 of the Federal Rules of Criminal Procedure, Judge Sifton relied on psychological studies. *Id.* Judge Sifton found that, even without a psychiatric evaluation, the ten months the defendant had spent

---

[36] *See* Expert Report of Dr. Terry Kupers ("Kupers Report") submitted on behalf of plaintiffs, inmates in solitary confinement in Pelican Bay, in *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.) at 45, available at http://bit.ly/1Ys6N2I

in solitary confinement had had a profound impact on the defendant's mental health.

Accordingly, compared to the MDC's general population, the conditions of the defendant's

confinement "were severe and fell upon him in a disproportionate manner relative to the MDC

general population." *Id.*

### b)  Recent Calls for Limiting Solitary Confinement

In July of this year, President Obama reported that he had asked the Attorney General to

review the overuse of solitary confinement in American prisons, stating:

> The social science shows that an environment like that is often more likely to
> make inmates more alienated, more hostile, potentially more violent. Do we really
> think it makes sense to lock so many people alone in tiny cells for 23 hours a day,
> sometimes for months or even years at a time? That is not going to make us safer.
> That's not going to make us stronger. And if those individuals are ultimately
> released, how are they ever going to adapt?[37]

One of the most unexpected criticisms of solitary confinement came from former New

York City Correction and Police Commissioner Bernard Kerik. Mr. Kerik experienced first-hand

the ravages of solitary confinement. Mr. Kerik was told by prison officials that they were placing

him in solitary confinement for his own protection, and he remained in isolation for ninety days.

Describing isolation for administrative purposes as cruel and unusual punishment, said:

> It is mind-altering. . . . You hallucinate; you talk to yourself. No one understands
> what it's like until you've been there, and we, in this country, use it way too much.
> . . . You create monsters in prison, and sometimes we forget they've got to go
> back to society. Most people that are in prison are returning back to society. Do
> we want them returning back to society warped?[38]

In *Davis v. Ayala*, decided earlier this year, Justice Kennedy wrote separately, calling for

---

[37] *See* President Barack Obama, Remarks at the NAACP Conference (July 14, 2015),
https://www.whitehouse.gov/the-press-office/2015/07/14/remarks-president-naacp-conference.
[38] *See* Bernard Kerik on *America's Forum* (Newsmax TV broadcast Apr. 1, 2015),
http://www.newsmax.com/Newsmax-Tv/bernard-kerik-solitary-cruel-
unusual/2015/04/01/id/635837/#ixzz3kcU7oy5D.

review of the widespread practice of keeping prisoners in extended solitary confinement. *Davis v. Ayala*, slip op., No. 13-1428, 576 U.S. __ (2015) at *4 (Kennedy, J., concurring). Noting that the prisoner in that case had likely been held virtually incommunicado in a cell the size of a parking space for twenty-three hours a day for twenty years, Justice Kennedy wrote:

> There is no accepted mechanism . . . for [courts] to take into account, when sentencing a defendant, whether the time in prison will or should be served in solitary. So in many cases, it is as if a judge had no choice but to say: "In imposing this capital sentence, the court is well aware that during the many years you will serve in prison before your execution, the penal system has a solitary confinement regime that will bring you to the edge of madness, perhaps to madness itself." Even if the law were to condone or permit this added punishment, so stark an outcome ought not to be the result of society's simple unawareness or indifference.

*Id.* at *3; *cf. Furman v. Georgia*, 408 U.S. 238 (1972) (Marshall, J. concurring) ("[W]hether or not a punishment is cruel and unusual depends, not on whether its mere mention 'shocks the conscience and sense of justice of the people,' but on whether people who were fully informed as to the purposes of the penalty and its liabilities would find the penalty shocking, unjust, and unacceptable.").

These calls for reform echo the conclusions of the international community regarding solitary confinement. The United Nations Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("Special Rapporteur") concluded that the use of solitary confinement is acceptable in only "very exceptional cases, for as short a time as possible, and only as a last resort."[39] The Special Rapporteur concluded that international law—the International Covenant on Civil and Political

---

[39] See *E.g.*, Juan E. Méndez (Sp. Rapporteur of Hum. Rts. Council on Torture), *Interim Report of the Special Rapporteur of the Human Rights Council on Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*, U.N. Doc. A/66/268 (Aug. 5, 2011), available at http://bit.ly/1NqohLd (quoting "Istanbul Statement on the Use of and Effects of Solitary Confinement," *Torture*, Vol. 18, No. 1, 2008, 66).

Rights ("ICCPR") and the Convention Against Torture ("CAT"), in particular—prohibits prolonged solitary confinement, that prolonged solitary confinement constitutes torture or cruel and inhuman punishment and that even fifteen days in solitary confinement constitutes a human rights violation. *Id.* at 19-25.[40]

The Special Rapporteur's findings have been used to fight extradition to the United States because of the risk that the defendant will become a prisoner at the Administrative Maximum Penitentiary ("ADX") in Florence, Colorado, the only supermax prison in the United States. This year, Ireland's High Court refused to extradite Ali Charaf Damache to the Eastern District of Pennsylvania where he would have been tried for conspiring to provide material support to terrorists.[41] The court based its refusal to extradite on the fact that, if convicted, Mr. Damache would likely have served his sentence at the ADX. *Id.* at ¶ 11.11. After an exhaustive review of the conditions at the ADX, the court found that prisoners there lived in almost-total social isolation for years, which it concluded was "inhuman and degrading treatment." *Id.*

Indeed, the practice of prolonged solitary confinement is so odious and so indiscriminately widespread in the United States that an influential group of architects are lobbying the American Institute of Architects to revise its ethics code to prohibit architects from

---

[40] The CAT defines torture as:

> any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity.

CAT, art. 1, para. 1; *see* S. Exec. Doc. No. 100-20, Resolution of Advice and Consent to Ratification (Oct. 27, 1990), available at http://1.usa.gov/1PMqMaJ

[41] *Att'y Gen. v. Damache* [2015] IEHC 339 (H. Ct.) (Ir.), available at http://bit.ly/1OqoeMo

designing spaces that will be used for solitary confinement.[42] The group concluded, after reviewing the Special Rapporteur's report among other sources, that it is unethical to facilitate human torture.[43]

### c) Support in Social Science

Observational studies practically unanimously demonstrate the damage that prolonged stays in solitary confinement do to the mind—sometimes permanently. The Center for Constitutional Rights ("CCR") recently settled its class-action lawsuit against California state officials, which it filed on behalf of inmates at Pelican Bay State Prison who had spent more than ten years in solitary confinement claiming that their prolonged isolation violated their Eighth Amendment rights. *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.)[44] As part of that lawsuit, the CCR relied on reports by mental health experts showing not only the intense deleterious effects of prolonged solitary confinement on both mental and physical health, but also that, like post-traumatic stress disorder, these effects persist long after the inmate is released from solitary and, indeed, may be irreversible.

Dr. Terry Kupers, a psychiatrist with an expertise in studying prisoners, interviewed twenty-four prisoners or ex-prisoners who spent ten or more years at the Pelican Bay SHU.[45] According to Dr. Kupers, the effects of solitary confinement persisted long after the inmates

---

[42] *See* Letter from Bd. of Dirs. of Architects/Designers/Planners for Soc. Resp. to its members 2-3, Aug. 1, 2014, available at http://bit.ly/1TcP7Fl

[43] *Id.* at 1-1.

[44] On September 1, 2015, the parties notified the court that they had reached a settlement. Paige St. John, *California agrees to move thousands of inmates out of solitary confinement*, L.A. Times (Sep. 1, 2015), http://www.latimes.com/local/lanow/la-me-ln-california-will-move-thousands-of-inmates-out-of-solitary-20150901-story.html. Pursuant to the agreement, California will transfer nearly 2,000 inmates out of solitary confinement and into the general population and will end the practice of keeping inmates in isolation based on gang membership. *Id.*

[45] *See* Kupers Report at 2, available at http://bit.ly/1Ys6N2I

were released from solitary confinement. Through Dr. Kupers's interviews, he identified a syndrome found in 100 percent of the prisoners he interviewed that he termed SHU Post-Release Syndrome.[46] Dr. Kupers found that, even after being released, the prisoners reported the same symptoms that would have afflicted them in the SHU: "intense anxiety, disordered thinking and paranoia, problems concentrating, problems with memory, compulsive acts, despair, suicidal thoughts or actions, severe insomnia, nightmares, . . . [a] tendency . . . to numb their feelings and isolate themselves even more than SHU confinement required, and . . . mounting despair."[47] But these prisoners suffered from symptoms that emerged only *after* being transferred out of the SHU.[48] Those symptoms included:

- Disorientation immediately following release.

- Anxiety in unfamiliar places and with unfamiliar people, and the daily life events that had been ordinary prior to SHU confinement become unfamiliar events following release from SHU.

- A tendency to retreat into a circumscribed, small space, often a bedroom or cell.

- A tendency to greatly limit the number of people one interacts with, usually limited to close family members and a few friends.

- Hyperawareness of surroundings, for example a need to sit facing the door to a room or with one's back to a wall.

- Heightened suspicion of everyone who comes close, especially strangers.

- Difficulty expressing feelings.

- Difficulty trusting others, even one's spouse or first degree relative.

- Problems with concentration and memory, beginning in the period of SHU confinement and continuing after release, making it difficult to accomplish tasks and to work.

---

[46] *See* Kupers Report at 42.
[47] *See* Kupers Report at 42.
[48] *See* Kupers Report at 42-46.

- A sense of one's personality having changed. The most often reported form of this change is a change from a relatively outgoing, friendly individual with a sense of humor prior to SHU confinement, to a more serious, guarded, and inward individual following release from the SHU.

- In some but certainly not all cases, there is a tendency to resort to alcohol and illicit substances to lessen the pain and make the confusion and anxiety more bearable.[49]

These symptoms persist for years later and are also characteristic of post-traumatic stress disorder.[50]

Dr. Craig Haney evaluated prisoners housed in the Pelican Bay SHU *and* surveyed the studies conducted on populations of prisoners kept in prolonged solitary confinement. He concluded that such confinement placed prisoners at grave risk of psychological harm.[51] With respect to Dr. Haney's meta-analysis of the scientific literature, he concluded:

> There are numerous empirical studies that report "robust" findings—that is, the findings have been obtained in studies that were conducted by researchers and clinicians from diverse backgrounds and perspectives, were completed and published over a period of many decades, and are empirically very consistent.
>
> . . .
>
> In addition, the empirical conclusions are theoretically sound. That is, there are straightforward scientific explanations for the fact that long-term isolation—the absence of meaningful social contact and interaction with others— and the other severe deprivations that typically occur under conditions of isolated or solitary confinement have harmful psychological consequences. Social exclusion and isolation from others is known to produce adverse psychological effects in contexts other than prison; it makes perfect theoretical sense that this experience produces similar negative outcomes in correctional settings, where the isolation is so rigidly enforced, the social opprobrium that attaches to isolated prisoners can be extreme, and the other associated deprivations are so severe.[52]

---

[49] *See* Kupers Report at 44-45.

[50] *See* Kupers Report at 45.

[51] *See* Expert Report of Craig Haney ("Haney Report"), submitted on behalf of plaintiffs, inmates in solitary confinement in Pelican Bay, in *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.) at 9, available at http://bit.ly/1MPjP2Q

[52] *See* Haney Report at 9-10.

According to empirical research, isolated prisoners are at risk of "sometimes irreversible harm, including loss of psychological stability, impaired mental functioning, self mutilation, and even death."[53]

Dr. Haney's study of the Pelican Bay inmates confirmed his survey of previous studies. Dr. Haney found that long-term isolation had produced changes that were "qualitatively different" from changes caused by short-term isolation:

> It has forced these prisoners to truly become—not just to more briefly endure being—asocial and alone. Prisoners in [Pelican Bay's SHU] have been subjected to a form of "*social death*" that has undermined and even destroyed their relationships with others, and damaged their ability to function as social beings.

> The passage of time has not ameliorated or desensitized them to the pain they are experiencing but, if anything, has deepened the sense of loss and the realization that can never fully recover much of what has been taken from them. In a very real and fundamental way, they have undergone a transformation in their personalities as a result of the conditions of isolated confinement and social exclusion to which they have been subjected. At a basic level, they are no longer people who can comfortably and normally interact with, relate to, or care about other human beings.[54]

Although the prisoners Dr. Haney studied at Pelican Bay had endured solitary confinement for ten years, "the American Psychiatric Association defined 'prolonged segregation' as segregation lasting for four weeks or longer (which the APA also said 'should be avoided' for the seriously mentally ill)."[55]

Dr. David Matthew D. Lieberman is a professor of psychology, psychiatry and biobehavioral sciences at University of California, Los Angeles, focusing on "the intersection of social psychology and neuroscience and my early research is often associated with the founding

---

[53] *See* Haney Report at 102.
[54] *See* Haney Report at 103-04 (emphasis added).
[55] *See* Haney Report at 11.

of the field of *social cognitive neuroscience*."[56] Dr. Lieberman drew a connection between

prolonged isolation and *physical* health: "[A] lack of social connection and social support have

been examined as risk factors for morbidity (i.e. death) and were found to be a greater health risk

than smoking 15 cigarettes a day or continuing to smoke after a diagnosis of cardiac heart

disease."[57]

Louise C. Hawkley, an expert at the University of Chicago "in social isolation and

loneliness and their effects on physical and mental health and well-being,"[58] also found a

connection between social isolation and physical health. According to Ms. Hawkley, "a person

placed in the SHU as opposed to the General Population has a significantly greater chance of

developing hypertension, particularly at a relatively young age, with the associated serious health

risks of deadly heart disease associated with hypertension."[59] Ms. Hawkley studied data on 939

Pelican Bay prisoners and found that "18.4% of the GP population (78/425 prisoners) and 48.4%

of the SHU population (249/514 prisoners) have hypertension. In other words, the SHU

population has a 4.2 times greater odds of having hypertension than the GP population."[60]

Dr. Dacher Keltner is a professor of positive psychology at the University of California,

Berkeley, whose research focuses on "the mechanisms of social interactions – touch, facial

expression, and human voice – and how these mechanisms contribute to the individual's social

---

[56] *See* Expert Report of David Matthew D. Lieberman ("Lieberman Report"), submitted on behalf of plaintiffs, inmates in solitary confinement in Pelican Bay, in *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.) at 1, available at http://bit.ly/1Ysbtpp
[57] *See* Lieberman Report at 4 (internal citation omitted).
[58] *See* Expert Report of Louise Hawkley ("Hawkley Report"), submitted on behalf of plaintiffs, inmates in solitary confinement in Pelican Bay, in *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.) at 1, available at http://bit.ly/1kRTmuG
[59] *See* Hawkley Report at 4.
[60] *See* Hawkley Report at 10 (internal citation omitted).

adjustment and mental and physical health."[61] According to Dr. Keltner:

> The science is clear: depriving humans of the ability to touch another human being denies them a basic form of social interaction critical to the functions of soothing in response to stress, creating a sense of safety, and fostering cooperation. Denying people the opportunity for caring touch deprives them of one of the most ennobling sources of purpose and meaning in human social life – contact and affection with family and community. Deprivation of this essential bonding opportunity strips individuals of their sense of social support, setting in motion patterns of chronic stress and distrust, which in turn often directly contribute to greater ill will and hostility.[62]

Like Dr. Lieberman and Ms. Hawkley, Dr. Keltner drew a connection between extreme isolation and physical health: "These cumulative effects of touch deprivation – the physical manifestation of social support – will contribute to chronically high levels of stress and cortisol, which have well established links to the acceleration of multiple health problems and disease, as well as mental health difficulties."[63] Dr. Keltner concluded: "Touch deprivation only amplifies the pronounced problems of social isolation."[64]

### d) Additional Considerations for Those Convicted of Federal Terrorism Charges

The defendants have been held in solitary confinement by the BOP for three years.[65] The

---

[61] *See* Expert Report of Dacher Keltner ("Keltner Report"), submitted on behalf of plaintiffs, inmates in solitary confinement in Pelican Bay, in *Ashker v. Brown*, No. 09-CV-5796 (N.D. Cal.) at 1, available at http://bit.ly/1TcRyYA

[62] *See* Keltner Report at 15 (footnote omitted).

[63] *Id.*

[64] *Id.*

[65] Charles Samuels, the director of the Federal Bureau of Prisons ("BOP") recently testified before the Senate Committee on Homeland Security and Governmental Affairs that the BOP does not "practice" solitary confinement and that, unless there is "good evidence to believe that the individual could cause harm to another individual and/or if we have our medical or mental health staff given an evaluation that it would be a benefit to the individual to be placed in a cell alone," it does not place individuals in a cell alone. Emma Roller, *The Problem with Defining 'Solitary Confinement,'* National Journal (Aug. 4, 2015), http://www.nationaljournal.com/congress/2015/08/04/Problem-With-Defining-Solitary-Confinement. The defendants have been held in solitary confinement by the BOP for three years without cellmates and without the findings the director testified were necessary.

defendants' isolation is mandated by SAMs memoranda signed by the Attorney General and the Deputy Assistant Attorney General.[66] SAMs present another level of restriction and isolation beyond solitary confinement.

With the exception of Mr. Ahmed, who was held in isolation at the MDC until the eve of trial, the defendants have been housed on the MCC's 10-South unit, a SHU. As discussed below, 10-South is unduly punitive, and the BOP's treatment of the defendants has amounted to neglect on occasion. The defendants' experience on 10-South has been corroborated by Human Rights Watch.[67]

The government made clear at the conference held to discuss the SAMs on October 1, 2015, that the current version of the SAMs will remain in effect until April 2016 and may well be renewed year after year throughout the duration of the defendants' sentences.  Because the defendants will be subject to the SAMs after they are sentenced, the BOP will likely designate them to one of three facilities: the ADX, the United States' only supermax prison, or one of the two severely restrictive Communication Management Units ("CMUs") in either Marion, Illinois, or Terre Haute, Indiana.[68] This is an additional factor for the Court to consider in fashioning a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing.

The ADX, sometimes known as the Alcatraz of the Rockies, has been described by one

---

[66] Although the Attorney General is supposed to impose SAMs on a case-by-case basis, as a practical matter, SAMs seem to be reflexively imposed on Muslims accused or convicted of terrorism charges. *See* Human Rights Watch, *Illusion of Justice: Human Rights Abuses in U.S. Terrorism Prosecutions* ("*Illusion of Justice*") 143-44 & n.641 (July 2014), available at http://bit.ly/1MAox6G

[67] *See Illusion of Justice* at 116-17. Mr. Ahmed's experience in the SHU at MDC was even more horrific than described with respect to MCC, and is discussed in greater detail in his separate submission.

[68] *See Illusion of Justice* at 134-35.

its former wardens as a "clean version of hell."[69] Human Rights Watch, in conjunction with

Columbia Law School's Human Rights Institute, reported on life at the ADX:

> For two days a week, a typical ADX prisoner spends the entire day secluded to his single cell, which measures between 75 and 87 square feet, depending on the unit. He is deprived of almost all human contact during these periods, except for perfunctory, impersonal exchange with correctional staff. On the other days, the prisoner remains confined this way for 22 or 23 hours a day, but is given an hour of indoor recreation, alone in a room completely bare but for a pull-up bar; or an hour of outdoor recreation, in a cement enclosure so small that he is only able to take a few steps in each direction.[70]

Inmates at the ADX who are subject to SAMs are housed in the Special Security Unit,

known as "H Unit."[71] Inmates housed on H Unit are  held in solitary confinement for twenty-two

to twenty-four hours per day and they receive half the amount of out-of-cell recreation as do

inmates in the ADX's general population.[72] When they are allowed recreation time, "inmates

pace alone in an outdoor cage, or an indoor room slightly bigger than their cell."[73] The cells on H

Unit are so small that inmates "reportedly eat their meals within an arm's length from their

toilet."[74] One inmate described "'non-stop hunger strikes' at the H Unit since 2002, when it was

created."[75]

The CMUs are not as suffocating as the ADX. But "other than ADX, the CMUs are the

most restrictive facilities in the federal system." *Rezaq v. Nalley*, 677 F. 3d 1001, 1009 (10th Cir.

2012). CMU inmates "are constantly surveilled and their communication with the outside world

---

[69] *See Illusion of Justice* at 135 (internal quotation marks omitted).
[70] *See Illusion of Justice* at 135-36.
[71] *See Illusion of Justice* at 146.
[72] *Id.*
[73] *Id.*
[74] *Id.*
[75] *See Illusion of Justice* at 147.

is heavily restricted (including with their families)."[76] According to one former CMU inmate:

> The recreation area at the Marion CMU is "all kennels on concrete," . . . . In the recreation area, "the ceiling was a chain-link fence and dome of razor wire. So there was open sky but there was razor wire and dead birds between you."[77]

The CMUs' restrictiveness presents obstacles to inmates seeking medical treatment, legal materials or work and education programs.[78]

### e) Analysis

In the last three years, the defendants have had no physical contact with anyone except when they are shackled by BOP staff or the U.S. Marshals. If the SAMs are not lifted or modified, they will be held in this extraordinary condition for the duration of their sentences. Were the Court to sentence the defendants to statutory maximum, they would likely be held in extreme isolation for fifteen years. At that point, according to all of the experts who have addressed the effects of solitary confinement, the defendants will likely be irretrievably broken. Moreover, it is impossible to say what damage has already been wrought since many symptoms of extreme isolation do not emerge until *after* the inmate has reintegrated into the community.[79]

Prolonged solitary confinement in this case will likely leave the defendants shells of their former selves, especially in light of the extreme social isolation that the SAMs ensure. Because of the SAMs and because their families live in other countries, with one exception, the defendants' families and friends have not visited them.[80] Mr. Ahmed was housed until recently at the SHU at the MDC in Brooklyn – which also housed inmates who were there because of disciplinary segregation. Because of his SAMs status, Mr. Ahmed was housed on a tier that had

---

[76] *See Illusion of Justice* at 138.[76]
[77] *See Illusion of Justice* at 139.
[78] *Id.*
[79] *See* Kupers Report, *supra*, at 42-46.
[80] Mr. Yusuf's brother traveled from Sweden to visit him at the MCC earlier this year.

no other inmates – he was completely alone. The MDC's provisions under the SAMs were ad hoc and Mr. Ahmed suffered from severe neglect, such as receiving meals long after the other SHU inmates were served – if then – and not having his medical needs met.

The defendants, whether at the MCC or MDC, have experienced other forms of deprivation reserved only for short-term stays in the SHU. They have had access only to the SHU commissary list, which the BOP severely limits for punitive and safety reasons. Additionally, the BOP interprets "outside" recreation for SHU inmates to mean out-of-cell recreation, meaning that, during their "recreation" time, the defendants are shuttled – alone -- from one cage to another. The BOP's interpretation of the SAMs also means that the defendants have been prohibited from reading spy novels, thrillers that in any way involved stories about the U.S. government, and most recently, books about anyone who had ever been housed in a BOP facility. Not even attorney visits can do much to assuage the devastating effects of solitary confinement since attorney and client remain in separate cages, divided by a mesh grate which makes eye contact impossible.

The defendants have spent the last three years sealed away from the all human contact – save for counsel visits, brief transactional interactions with the BOP staff when they are fed or moved to a different cell for recreation, and  15 minutes a month when they are permitted to speak on a monitored and recorded call with family. Except for the time the defendants spent in custody in Djibouti, the BOP will credit them with their presentence confinement. But for jail computation time, the BOP will count their time in solitary confinement in the same way as it counts a stay in general population. The extraordinary harshness of their confinement will not be considered without recognition by the Court that this sort of incarceration warrants – at the very least – additional credit towards their ultimate sentence. Justice requires that the defendants'

torture, followed by years of uninterrupted solitude, be taken into account by the Court in fashioning a just sentence.[81]

For the foregoing reasons, the Court should grant a substantial downward variance, recognizing that the defendants have already been punished by the extreme conditions of their defendants' post-arrest confinement and that, because of the SAMs, they will continue to serve their sentence under these torturous conditions.

### C.  An Analysis of Sentences Received by Similarly Situated Defendants

In sentencing Mr. Ahmed, Mr. Yusuf, and Mr. Hashi, this Court must also consider the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct. *See* 18 U.S.C. § 3553(a)(6). A review of the sentences that are generally imposed in "material support" cases in the Second Circuit and across the country demonstrates that individuals convicted of the same offense as the defendants largely receive sentences below the statutory maximum and applicable advisory guidelines range of 180

---

[81] We also request that the Court account for the three-plus months the defendants spent in custody in Djibouti. To be clear, this consideration is distinct from the departures or variances that the defendants request based on the *conditions* of that period of confinement. The BOP likely will not credit the defendants with this time. 18 U.S.C. § 3585(b); *Reno v. Koray*, 515 U.S. 50, 58 (1995) (construing § 3585's use of the phrase "official detention" and holding that credit is available only for time spent in "a correctional facility designated by the Bureau for the service of federal sentences"). But the defendants' time in Djiboutian custody was time spent awaiting their removal to the United States and their trial in this case nonetheless. The defendants were not charged, tried or sentenced by Djiboutian authorities, and, as set forth supra, they began meeting with U.S. federal agents fewer than twenty days into their three-month and eleven-day period of incarceration. Accordingly, they were, for all intents and purposes, in custody "as a result of the offense for which th[is] sentence [will be] imposed." § 3585(b)(1). The Court cannot direct the BOP to start the sentence from August, 2012; however, it has the discretion to account for the time spent in custody in Djibouti in fashioning a just sentence. *See United States v. Montez-Gavira*, 163 F.3d 697, 701-02 (2d Cir. 1998) (Circuit holds that district court exceeded it authority when it deemed defendant's sentence to have begun when INS lodged its detainer (since BOP, and not the courts, determines when a sentence starts and whether the defendant should receive credit for any prior time spent in custody), but also holds that, as an alternative to direct credit, the district court could have chosen to exercise its discretion to grant a downward departure for uncredited incarceration under § 5K2.0).

months.

As a starting point, from September 2001 through July 2007, 108 defendants were charged with at least one count of violating 18 U.S.C. § 2339B.[82] Thirty of those defendants proceeded to sentencing.[83] The mean sentence of these thirty defendants was either 122.73 months or 118.73 months.[84]  For the 23 defendants who, like the defendants here, entered guilty pleas, the mean sentence was either 107.91 months or 102.70 months.[85] For the 12 defendants who specifically pleaded guilty to conspiracy to provide material support – the charge to which Mr. Ahmed, Mr. Yusuf, and Mr. Hashi have pled – the mean sentence was 82.83 months.[86] And in 2012, the United States Sentencing Commission reported that the average  sentence imposed between 2008 and 2012 for providing material support to designated foreign terrorist organizations or for terrorist purposes was 111 months, an average that makes no distinction between defendants who pled guilty and those who were convicted after trial.[87]

In addition, we conducted our own analysis of the sentences received by defendants convicted of material support in the Second Circuit, including, wherever possible, the details of the underlying offenses. We have also reviewed sentences received by other defendants convicted of providing material support to al-Shabaab specifically, both in the Second Circuit and

---

[82] *See* Robert Chesney, *Federal Prosecution of Terrorism-Related Offenses: Conviction and Sentencing Data in Light of the "Soft Sentence" and "Data Reliability" Critiques*, 11 Lewis and Clark L. Rev. 851, 884 (2007) ("Chesney Analysis"), available at http://bit.ly/1R4Hf9H
[83] *See Chesney Analysis* at 885.
[84] *See Chesney Analysis* at 886, T.7.Two means are calculated because some defendants received different sentences on two separate counts of violating 2339B. The first mean is calculated using the high sentence; the second is calculated using the low sentence. *Id.*
[85] *See Chesney Analysis* at 886, T. 8.
[86] *See Chesney Analysis* at 888.
[87] *See* United States Sentencing Commission, Quick Facts:  Offenses Involving National Defense (2012), at p. 2, available at http://bit.ly/1HkM5xv

elsewhere.  After a survey of such cases, it is clear that a fifteen-year sentence is far in excess of the range of sentences regularly imposed on defendants  similarly situated to Mr. Ahmed, Mr. Mohamed, and Mr. Yusuf, and higher than the sentences received by many defendants convicted of multiple,  serious terrorism-related charges.

### 1)   Cases Surveyed

This analysis focuses on defendants who were charged  with providing or attempting or conspiring to provide material support to a foreign terrorist  organization who either (1) faced maximum sentences of 180 months, or (2) faced sentences greater than 180 months as a result of additional charges, but despite their greater exposure, were sentenced to less than 180 months.[88]

### 2)   Comparable Material Support Sentences in the Second Circuit (Table A-1)

Table A-1 contains all cases surveyed in the Second Circuit. Of the 36 cases, we identified 27 defendants, primarily in the Eastern and Southern Districts of New York, who were facing a maximum sentence of 180 months as a result of a guilty plea or a conviction after trial of a single count of either 18 U.S.C. §§ 2339A or 2339B.  (*See Table A-1* at A69-A73.) Of these 27 defendants, six, or approximately 22 percent, received the maximum sentence, with the remaining 78 percent receiving sentences below the statutory maximum. Of the 21 defendants who received sentences below the maximum, the average sentence was 84.81 months, or approximately 7 years. The average sentence received by all 27 defendants was 105.96 months.

Of the nine remaining defendants surveyed, seven pled guilty to additional crimes and therefore had higher maximum sentences, ranging up to life imprisonment, and received sentences ranging from 72 to 180 months. These defendants were selected because it is clear, based on their

---

[88] We have endeavored, based on the  information available to us, to exclude defendants who received downward departures under  USSG 5K1.1 for providing substantial assistance to the government.

overall sentences, that they received less than the statutory maximum for their 18 U.S.C. §§ 2339A or 2339B convictions.  The remaining two defendants were permitted to plead guilty to two 18 U.S.C. § 371 conspiracies, and therefore had maximum sentences of 120 months. These defendants received sentences of 111 months and 12 months and 1 day.

The analysis of sentences commonly received by defendants convicted of a single count of material support demonstrates that the average sentence in these cases is far below the 15-year applicable advisory guidelines range and statutory maximum.

### 3)   Comparable al-Shabaab Sentences in All Circuits (Table A-2)

Table A-2 contains all al-Shabaab cases surveyed, within the Second Circuit and elsewhere. (*See Table A-2* at A74-A76.)  We have identified 12 al-Shabaab cases in which the defendants were either convicted of a single count of material support and therefore faced a maximum sentence of 180 months, or were convicted of material support in addition to other offenses, but received a sentence of 180 months or below.  In addition to these 12 cases, we also considered *U.S. v. Mohamed Ibrahim Ahmed*, 10 Cr. 131 (PKC), a case in the Southern District of New York where the defendant was permitted to plead guilty to two 18 USC 371 conspiracies, and therefore faced a maximum of 120 months. When all 13 cases are taken into consideration, the average sentence received was 129.9 months; when the case of Mohamed Ibrahim Ahmed is removed from the calculation, the average sentence was 131.5 months.  Three of these cases, which serve as helpful points of comparison in considering the appropriate sentences for the defendants in this case, are analyzed below.

- Case: *United States v. Mohamed Ibrahim Ahmed*, 10 Cr. 131 (PKC)
  (SDNY) Judge: P. Kevin Castel
  Nature of offense: The defendant traveled to Somalia to receive "jihad" training in weapons and explosives at an al-Shabaab camp, and provided a total of 3,000 Euros to al- Shabaab, a designated foreign terrorist organization.
  Convicted of: 18 USC 371 (conspiracy to provide material support to a foreign terrorist organization), 18 USC 371 (conspiracy to receive military-type training from a foreign terrorist organization)
  Length of sentence imposed: 111 months (9 years)

In *United States v. Ahmed*, *supra*, the defendant pled guilty to two counts of 18 U.S.C. § 371 for a conspiracy to provide material support to al-Shabaab and a conspiracy to receive military training from al-Shabaaab. According to the government's sentencing submission, in January 2009, the defendant left Sweden and traveled to Somalia, Nigeria and Mali to train and fight with al-Shabaab. During six weeks in Kimayayo and Baraawe at "immigrant houses" for jihadists, the defendant

> received bomb-making instructions from an al Shabaab explosives expert, and obtained from this explosives expert written instructions, containing, among other things, formulas for making explosives and bomb-use schematics. The defendant also admitted that he purchased an AK-47 rifle, two grenades, an operator vest, and additional magazines, while in Baraawe, to be used in future training and fighting for al Shabaab. The defendant also admitted to donating 3,000 Euros to al Shabaab while in Somalia, given in two installments to the managers of the immigrant houses where the defendant stayed.[89]

Upon his arrest in Nigeria, authorities seized explosive schematics and bomb-making instructions and an al Qaeda training manual. During post arrest interviews, the defendant admitted that he knew that al-Shabaab intended to cause harm to the United States, and that the aircraft of an American Congressional delegation was a legitimate target.[90] The defendant also had a significant criminal history, including a 1994 conviction for robbery and a 2004 conviction for forgery, and

---

[89] *See* Government Sentencing Memorandum in *United States v. Mohamed Ibrahim Ahmed*, 10 Cr. 131 (PKC) (SDNY), Dkt #95, pp. 4-5.
[90] *See* Id. at 5.

had admitted to years of ongoing (and unapprehended) credit card fraud.[91]

Because the defendant was permitted to plead guilty to two 371 conspiracies, his statutory maximum and advisory guidelines sentence was 120 months, which the government argued was the appropriate sentence. In support of its argument, the government noted the "extraordinary need for individual deterrence in this case, noting the defendant's prior criminal convictions, as well as the notable fact that his "travels to Africa to obtain terrorist training from al-Shabaab were the second time that the defendant left his home to obtain training in terrorism" as the defendant also studied at a training camp in Khalden, Afghanistan.[92] The district court sentenced Mr. Ahmed to a non-guidelines sentence of 111 months.

- Case: *United States v. Nima Ali Yusuf*, 10 Cr. 4551 (S.D. Cal. 2012) Judge: Barry Ted Moskowitz
  Nature of offense:  The defendant recruited and encouraged other Americans to engage in  jihad on behalf of al-Shabaab and to "kill infidels everywhere."
  Convicted of: 18 USC 2339B
  Length of sentence imposed: 96 months (8 years)

In *United States v. Yusuf*, *supra*, the defendant pled guilty to one count of 18 U.S.C. § 2339B for providing material support to al-Shabaab. Ms. Yusuf was an American citizen from Somalia, who had been granted asylum in the United States, and had taken advantage of all the opportunities and benefits available in this country while living in Minnesota and then California. Ms. Yusuf helped to recruit and encourage other Americans to engage in jihad on behalf of al-Shabaab against the Transitional Federal Government in Somalia. Ms. Yusuf directly funded and encouraged four persons she knew from Minnesota, who had previously left for Somalia, to continue to fight for al-Shabaab, paying them money and monthly stipends, and

---

[91] *See* Id. at 6.
[92] *See* Id. at 7.

trying to obtain a laptop and video recorder so they could record statements encouraging others to wage jihad. (See *Selected pages from the Sentencing Transcript of Nima Ali Yusuf,* 10 Cr. 4551 (S.D. Cal. 2012), hereinafter "Yusuf Tr.", at A79-A80; A84.) She also tried to convince a U.S. resident in San Diego to go to Somalia and fight with. (*See* Yusuf Tr. at A80*.)* Most of Ms. Yusuf's payments and encouragement went to Abdisalan Hussein Ali, who blew himself up after recording an English audiotape encouraging others in America to wage jihad. (*See* Yusuf Tr. at A81-A83; A87-A89.) Despite Ms. Yusuf's whole-hearted support for al-Shabaab and efforts to recruit Americans to fight, the Hon. Judge Barry Ted Moscowitz sentenced Ms. Yusuf to eight years in prison, rather than the 15-year maximum or the 10-year sentence advocated by the government.

- Case: *United States v. Omer Abdi Mohamed*, 09 Cr. 352 (D. Minn.) Judge: Michael J. Davis
  Nature of offense: Mohamed allegedly helped Somali-American men travel from Minnesota to Somalia to join al-Shabaab, an Islamist group on the government's terrorist  list. Initially charged with conspiracy to murder, kidnap, or maim overseas.
  Convicted of: 18 USC 2339A
  Length of sentence imposed: 144 months (12 years)

In *United States v. Mohamed*, *supra*, the defendant pled guilty to one count of 18 U.S.C. § 2339A for providing material support to al-Shabaab. Mr. Mohamed was a leader of a group that "assisted men from Minnesota with traveling to Somalia, so that the men could fight against Ethiopian troops who were in Somalia assisting the Transitional Federal Government."[93] In this regard, Mr. Mohamed arranged and attended secret meetings in which he encouraged men to fight, including preaching that fighting was a religious obligation that they must satisfy, sharing lectures on jihad by Anwar al-Al-Awlaki, and helped facilitate and

---

[93] *See* Government's Position with Respect to Sentencing in *United States v. Omer Abdi Mohamed*, 09 Cr. 352 (D. Minn.), Dkt #168, p. 2.

organize their travel.[94] While the defendant was a "leader and organizer" of these recruitment activities, and government asked the district court to impose a guideline sentence of 180 months, Mr. Mohamed was sentenced to 144 months.

### 4) Analysis of Select Military Commission Cases

Finally, in addition to the material support cases analyzed above, the sentences received by two defendants who were sentenced by military commissions – David Hicks and Salim Hamdan – are instructive.

David Hicks entered a plea of guilty in 2007 to one count of material support for terrorism, in violation of 10 U.S.C. § 950v(25). He admitted to training in al Qaeda camps for several months, learning various guerilla warfare tactics, and receiving instruction in the use of weapons.[95] Additionally, Hicks personally asked Osama bin Laden for training materials in English[96], conducted surveillance on the American Embassy in Kabul[97], and fought against coalition forces in Afghanistan.[98] After Hicks admitted to being an "alien unlawful enemy combatant" as defined by the Military Commissions Act, 10 U.S.C. § 948(c),[99] the military commission recommended a sentence of seven years for Hicks,[100] all but nine months of this sentence were suspended, and Mr. Hicks promptly returned home to Australia.

Salim Hamdan was convicted by a military commission of providing material support for

---

[94] *See* Id. at 3-7.
[95] *See* Stipulation of Fact, *United States v. Hicks* ("Hicks Stipulation"),  ¶¶ 27-34, available at http://bit.ly/1R504K3
[96] *See* Hicks Stipulation at ¶ 30.
[97] *See* Hicks Stipulation at ¶ 33.
[98] *See* Hicks Stipulation at ¶¶ 37-45
[99] *See* Hicks Stipulation at ¶ 3.
[100] *See* United States v. Hicks, Appendix A to Offer for a Pretrial Agreement, ¶ 1a, available at http://bit.ly/1I8VlVG

terrorism under 10 U.S.C. § 950v(25). The factual basis for this conviction were allegations that, from February 1996 to November 2001, Hamdan provided personnel – i.e., himself – to al Qaeda; he trained at al Qaeda camps, served as a driver for Osama Bin Laden and other al Qaeda members, and transported weapons for al Qaeda. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 570 (2006). Hamdan was sentenced by the commission to 66 months of confinement, and was credited with over 61 months for time spent during pretrial detention at Guantanamo.[101] He, too, went home immediately.

### 5) Conclusion

A review of (1) the mean sentence received by defendants who pled guilty to material support between September 2011 and July 2007 (82.83 months); (2) the average sentence received by defendants convicted of material support  - either after trial or guilty plea - between 2008 and 2012 (111 months); (3)  the average sentence received by defendants in the Second Circuit who pled guilty to one count of material support under  either 18 U.S.C. §§ 2339A or 2339B (105.96 months); (4) the average sentence received by defendants in all circuits convicted of one count of providing material support to al-Shabaab  (129.9 months); and (5) the time-served sentences imposed for defendants convicted of material support in military cases, effectively demonstrates that district courts exercise wide discretion when sentencing defendants convicted of material support, and that a guidelines sentence of 180 months would be wildly disproportionate here. To avoid unwarranted sentencing disparities among these defendants and other defendants who have been convicted of similar crimes, and in some instances, arguably more advanced criminal activities, Mr. Ahmed, Mr. Mohamed, and Mr. Yusuf, should similarly receive sentences

---

[101] *See* United States v. Hamdan, P-009, Defense Opposition to Prosecution's Motion for Reconsideration, Oct. 10, 2008, available at http://bit.ly/1NNHpwW

well below the applicable advisory range. *See* 18 U.S.C. § 3553(a)(6).

   **D.  The Terrorism Enhancement Drives The Guideline Sentence To The Statutory Maximum; The Enhancement Does Not Adequately Account For The Particular Circumstances Of The Case, And Leads To A Sentencing Recommendation That Is Greater Than Necessary**

   Probation recommended a 177-month sentence based on the 180-month sentence fixed by the Sentencing Guidelines minus 3 months for the time the defendants endured harsh prison conditions and beatings in Djibouti.  The Guideline term was driven largely by the application of U.S.S.G. § 3A1.4, the "Terrorism" enhancement. Were it not for the enhancement, the applicable guideline range would have been 57-71 months.[102]

   The Court is obliged to consider the suitability of the Guidelines sentencing range under 18 U.S.C. § 3553(a)(4).  It should consider a significant downward variance from the guideline sentence here because the terrorism enhancement is a one-size-fits-all provision that does not account for the particular circumstances of this case: The defendants demonstrated no animus toward or intent *vis a vis* the United States government or its citizens, and committed no conduct in or touching upon the United States.  Instead, the defendants' conduct was directed at military forces that invaded their already ravaged homeland and were committing atrocities against the people there.[103]  The foreign forces were acting on behalf of a government that was formed in

---

[102] The enhancement produced a guideline range of 360 months to life; since this exceeded the maximum sentence for the offense, the guidelines were capped at 180 months.  In the plea agreements, the government "estimated" the same guideline sentence predicated on the terrorism enhancement, and the defendants stipulated to the calculation. As noted above, the plea agreements do not preclude from presenting information to the Court relevant to sentencing under 18 U.S.C. §3553(a) that would justify a variance from the applicable Guideline sentence.

[103] While the PSR (¶ 17) ascribes "terrorist tactics" only to al-Shabaab, numerous reports by both international human rights organizations and the U.S. Department of State document the commission of atrocities and abuses by AMISOM, TGF and Ethiopian forces.  See e.g., Human Rights Watch, April 19, 2010, *Harsh War, Harsh Peace, Abuses by al-Shabaab, the Transitional Federal Government, and AMISOM in Somalia*; Human Rights Watch 2007, *Shell-Shocked:*

exile without either the clear support of the Somali people or the official recognition of the United States. Furthermore, a variance from the applicable guideline range is justified because the criminal history category VI established by the terrorism enhancement over-represents the seriousness of the defendants' past criminal conduct and the likelihood that they will commit other crimes. Finally, as argued above, the torture and extremely restrictive conditions of their post-arrest (and likely post-sentence) confinement have already brought about a significant increase in both punishment and deterrence – both general and individual.

The Guideline terrorism enhancement applies "if the offense is a felony that involved, or was intended to promote, a federal crime of terrorism."   The definition of "federal crime of terrorism" is found in 18 U.S.C. § 2332b(g)(5).[104]

18 U.S.C. § 2332b(g)(5) provides that, as used in 18 U.S.C. § 2332b(f) (a subdivision providing the Attorney General with "primary investigative responsibility for all Federal crimes of terrorism"), "Federal crime of terrorism" means:

> an offense that—
>
> (A) is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct; and
>
> (B) is a violation of [any one of many statutes, including 18 U.S.C. § 2339B].

Thus, under § 2332b(g)(5), a "federal crime of terrorism" is a crime directed against

---

*Civilians Under Siege in Mogadishu,* Volume 19, No. 12(a); Amnesty International January 2010, *Somalia: International Military Policing Assistance Should Be Reviewed*; Amnesty International March 2010, *No End in Sight: The Ongoing Suffering of Somalia's Civilians*; Amnesty International June 2008, *Routinely Targeted Attacks on Civilians in Somalia*;  Amnesty International Public Statement April 4, 2007, *Somalia: Fears of resumption of conflict in Mogadishu; 400 civilians killed and thousands fleeing;* Country Reports On Human Rights Practices for 2011, Somalia, United States Department of State.

[104] *See* U.S.S.G. § 3A1.4 cmt. n.1.

government. The problem with the terrorism enhancement is that it makes no distinction between crimes directed at the United States (and/or its citizens) and crimes directed at foreign governments or the unofficial "government" of a failed state.

We have a special interest in protecting institutions and personnel associated with the United States government from acts of terrorism (especially acts of terrorism conducted in retaliation against the conduct of the United States government in its "war on terror"), and, as with punishments for crimes like treason and espionage, an interest in punishing more severely (and bearing the costs of prosecuting and punishing more severely) those who target our federal institutions and personnel.  See *Kennedy v. Louisiana*, 554 U.S.  407, 437 (2008) (expressly reserving the right to uphold heightened penalties for, inter alia, terrorism, which it described as an "offense[] against the State").   However, here, there is no evidence that, when acting in connection with al-Shabaab, any of these defendants acted with the specific intent to influence, affect, intimidate, coerce or retaliate against conduct of the *United States* government.[105]  Rather, the defendants' conduct was directed at fighting a civil war waging in the failed state of Somalia.

We may also have interests in protecting governments abroad, but there must be room for consideration of the complex historical, political, and religious circumstances at play in a case

---

[105] Just as the government has done in numerous submissions since the inception of this prosecution, the PSR (¶ 4) calls attention to public statements against the United States government reportedly made by unidentified individuals associated with al-Shabaab – in particular, anonymous statements following "what al-Shabaab believed to be a U.S. missile strike in May 2008" and claims of responsibility for "mortar attacks against a U.S. Congressman" in 2009. Even if there were evidence that these unidentified speakers were co-conspirators of the defendants (which there is not), the Second Circuit has made it plain that a co-conspirator's intentions and calculations cannot be imputed to the defendant for purposes of satisfying section 3A1.4.  See *United States v. Stewart,* 590 F.3d 93, 138-99 (2d Cir. 2009) (Court rejects government's argument that "it was reasonably foreseeable to Yousry that his –co-conspirators were acting in a manner `calculated to influence or affect the conduct of government,' so that the requirement of section 2332b(g)(5)(A) is satisfied," holding, "We cannot conflate Yousry's acts with his co-defendants' mental states.")

involving a foreign government.  The guidelines don't allow for such consideration.  The terrorism enhancement guideline makes no distinction between crimes directed against the United States government and crimes involving only foreign governments[106].

It does not appear that, in adopting the definition of "federal crime of terrorism" found in 18 U.S.C. § 2332b(g)(5), the Sentencing Commission considered whether the word "government" in that provision of §2332b refers to the government of the United States or to any government anyplace in the world, and, if the latter, whether the same enhancement should apply whether the target government was domestic or foreign, whether the government was officially recognized or not officially recognized, and whether or not any of the defendant's conduct occurred in or touched the United States.

18 U.S.C. § 2332b(g)(5) is a subdivision of 18 U.S.C. § 2332b. A close reading of 18 U.S.C. § 2332b suggests that, when Congress used the term "federal crime of terrorism" in that statute, it had the interests of the United States and the government of the United States in mind.

18 U.S.C. § 2332b asserts federal jurisdiction over violent conduct "transcending national boundaries" that violates state or federal law and that seriously harms or risks serious persons and property inside the United States and the personnel and property of the United States.  See 18 U.S.C. §§ 2332b(a), 2332 (b)(1)(C), 2332b(b)(1)(D).  The statute requires that the transcending conduct be committed in a circumstance that provides the basis for federal jurisdiction.  *See* 18 U.S.C. § 2332b(b).  The circumstances are enumerated in §2332(b)(1) and include not only such staples as the use of the mails and an effect on interstate or foreign

---

[106] The Second Circuit has approved the application of the terrorism enhancement in cases involving a foreign government without discussing the significance of the fact that the United States government was not involved. (See, e.g., *United States v. Stewart*, 590 F.3d 93 (2d Cir. 2009), and *United States v. Awan*, 607 F.3d 306, 317-8 (2d Cir. 2010); in both cases, unlike here, defendants engaged in the offense conduct inside the United States. )

commerce, but also that the "victim, or the intended victim, is the United States Government, a member of the uniformed services, or any official, officer, employee, or agent of the legislative, executive, or judicial branches, or of any department or agency, of the United States." 18 U.S.C. §2332b(b)(1)(C).  Under § 2332b(f), the Attorney General is given "primary investigative authority" not with respect to all violations of § 2332b, but with a special subset of federal crimes: "all Federal crimes of terrorism"  (defined in § 2332b(g)(5)), and specific violations of Title 18 that, for the most part, involve attacks on U.S. government officials, U.S. government property, U.S. fortifications and U.S. energy facilities.

Given the § 2332b's focus on conduct occurring beyond the nation's borders but aimed at harming U.S. government personnel and/or property and the country at large, it is arguable that, when Congress used the word "government" in its definition of the term "Federal crimes of terrorism" in § 2332b, it meant to refer to the government of the United States, not any government in the world.  But even if Congress meant the latter, there is no indication the Sentencing Commission considered applicability of the same enhancement that would apply in a case of terrorism against the U.S. to cases where, as here, the defendants had no contacts with or aims directed against the United States.

The defendants' offense conduct occurred entirely outside the United States. It did not involve targets or victims from or in the United States.  It was not directed at the United States government, U.S. government personnel or members of our armed forces.  The defendants were fighting in a civil war in Somalia against military forces from neighboring countries.  There was no government in Somalia at the time.  It was a failed state.[107] While the forces engaged in the battles in Mogadishu in which defendants fought in 2009 were acting on behalf of an entity

---

[107]  The PSR states, at p. 20 n. 2, "Effectively, Somalia has lacked a government since 1991."

called the TFG (Transitional Federal Government), the United States did not recognize the TFG

as the government of Somalia.  It did not recognize a government in Somalia until January 17,

2013 –months after the defendants' arrest and indictment in this case. See

http://www.state.gov/r/pa/ei/bgn/2863.htm; *Zivotofsky v. Kerry*, 135  S.Ct. 2076 (2015) (power

to recognize a foreign state and its territorial bounds resides in President alone).

      The defendants may have had the intent to repel and "retaliate" against the governments

of Ethiopia, Burundi, Kenya and Uganda, the countries that sent troops into Somalia during the

period of the conspiracy, but (in the words of the policy statement found in U.S.S.G. § 5K2.10)

the wrongful conduct of these troops "contributed significantly to provoking the offense

behavior." Likewise, individuals from all sides committed atrocities, though there is no evidence

that the defendants committed atrocities or harmed any civilians. These circumstances ought to

be factored into the analysis of the suitability of the guidelines range as a measurement of the

severity of their offense and the length of the sentence needed to provide just punishment, and

favor a downward variance.

      The defendants' lack of specific intent to harm the United States or its citizens, their lack

of conduct in the United States, and the complicated geopolitical context in which they acted

makes their conduct no more and/or less serious than the conduct in several of the cases listed in

the footnote below in which the sentencing court either nullified or substantially reduced the

impact of the terrorism enhancement when it imposed sentence. [108]  A downward variance is

---

[108] See *United States v. Thavaraja,* 740 F. 3d 253 (2d Cir. 2014) (defendant was the principal procurement officer for LTTE, a foreign terrorist organization in Sri Lanka, and in that capacity, not only purchased at least $20 million worth of military-grade weapons and materials used to make suicide bombs but also played a role in scheme to bribe State Department officials; advisory guidelines 180 months; 108 month sentence imposed); *United States v. Amawi*, 695 F.3d 457 (6th Cir. 2012) (rejecting Government's appeal of sentences of 240 months, 144

appropriate here as well.

The guideline sentence, of course, is not presumptively reasonable.  This is particularly so when application of a guideline automatically results in the maximum sentence. The terrorism enhancement does not fit this case.  It leads to a guideline range that, before being capped, far exceeds the statutory maximum and, therefore, almost by definition fails to "`reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Kimbrough v. United States*, 522 U.S. 85, 109 (2007) (*quoting Rita v. United States*, 551 U.S. 338, 350 (2007)).

An enhancement that generates a 360-month to life sentencing range for a crime that carries a 15-year statutory maximum is decidedly unreasonable.  Since there is no indication that, in establishing the terrorism enhancement, the Commission took into account any "empirical data" or "national experience", the advice that the benchmark sentence is the maximum sentence ought to be rejected as a matter of policy.  Cf. *Kimbrough*, 522 U.S. at 109 ("In formulating Guidelines ranges for crack cocaine offenses, as we earlier noted, the Commission looked to the mandatory minimum sentences set in the 1986 Act, and did not take account of `empirical data

---

months, and 100 months for three defendants found guilty of conspiracy to kill and maim persons outside United States, conspiracy to provide material support to terrorists in furtherance of killing of U.S. nationals, and distributing information regarding manufacture of explosives, destructive devices, and weapons of mass destruction, where Guidelines range was life in prison); *United States v. Stewart*, 686 F.3d 156, 159-61 (2d Cir. 2012) (affirming sentence of 120 months for former defense attorney convicted of conspiring to defraud United States, providing and concealing material support to a conspiracy to kill and kidnap persons in a foreign country, and making false statements, where Guidelines range was 360 months to life); *United States v. Warsame*, 651 F. Supp. 2d 978, 981 (D. Minn. 2009) (as here, advisory guideline sentence with terrorism enhancement 180 months for defendant who trained at terrorist camps, had access to al Qaeda leadership, and while maintaining communications with al Qaeda associates, entered and sought to establish residency in the U.S; court imposed 92 month sentence); *United States v. Benkhla*, 501 F.Supp. 2d 748 (E.D. Va. 2007) (guideline range of 210 - 262 months for defendant who gave false testimony to grand jury and FBI regarding participation in jihadist training camp; after court determines that both a departure and a variance were warranted, defendant sentenced to 121 months).

and national experience.'") (Citation omitted). Cf. *United States v. Ressam*, 679 F.3d 1069, 1107 (9th Cir. 2012) (Schroeder, J., dissenting), and *United States v. Jayyousi*, 657 F.3d 1085, 1133 (11th Cir. 2011) (Barkett, J., dissenting) (criticizing assumption that upon release from prison particular defendant would engage in future terrorist conduct as speculative, unwarranted, and without basis in the record including any empirical studies about recidivism).

The terrorism enhancement does not allow for particularized sentencing.  It effectively asks the Court to abdicate its role at sentencing and not consider, in addition to the circumstances that the defendants had nothing to do with any attack or planned attack on or in the United States or any intent to harm anyone from the United States, the defendants' lack of criminal history and their subjection to torture and solitary confinement since their arrests, that the defendants were motivated by nationalism not radical ideology or power or aggrandizement, that they played minor roles in the organizational hierarchy of al-Shabaab, and their relative lesser culpability compared to, for example, the government's witness █████████████  who admitted to █████████████████████████████████████████████████ (discussed in the PSR ¶ 7)█████████████████████████████████████████████████████ █████████████ and was not prosecuted at all by the United States.

The Court must fashion a sentence that is sufficient but not greater than necessary.   We urge the Court, after taking into account the other sentencing factors set forth in 18 U.S.C. § 3553(a)  (and discussed in other sections of this joint submission and the defendants' separate submissions), that a sufficient sentence is one that varies substantially from the 180-month guideline sentence calculated in the PSR.

Dated:        Brooklyn, New York
              November 30, 2015

                                    Respectfully submitted on behalf of all defendants,


                                    Susan G. Kellman
                                    Sarah Kunstler
                                    Ezra Spilke
                                    Attorneys for Ali Yasin Ahmed

                                    David Stern
                                    Jane Simkin Smith
                                    Attorneys for Mohamed Yusuf

                                    Mark DeMarco
                                    Karloff Commissiong
                                    Attorneys for Mahdi Hashi



cc:     AUSA Shreve Ariail
        AUSA Seth DuCharme
        AUSA Richard Tucker
        Annamartine Salick, DOJ
        USPO Jaime Turton
        Ali Yasin Ahmed
        Mohamed Yusuf
        Mahdi Hashi