UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X

UNITED STATES OF AMERICA


       -against-                          No. 12 Cr. 661 (JG)

ALI YASIN AHMED,
MAHDI HASHI,
MOHAMED YUSUF,

              *Defendants.*

--------------------------------------------------------X




## __APPENDIX OF EXHIBITS__

*Selected pages from* ███████████████████.………A1-A20

*Selected pages from the Testimony of Matt Bryden in U.S. v. Mahamud Said Omar, 09 Cr. 242 (D. Minn.),* October 2, 2012 ………………………………………………………….A21-A66

*Table A-1 – Comparable Material Support Sentences in the Second Circuit*………….A67-A71

*Table A-2 – Comparable al-Shabaab Sentences in All Circuits*………………………….A72-A74

*Selected pages from the Sentencing Transcript of Nima Ali Yusuf,* 10 Cr. 4551 (S.D. Cal. 2012)

....................................................................................................................................A75-87

UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

------------------------------------------------------------
                                 )

United States of America,    )   File No. CR-09-242
                            )       (MJD/FLN)
     Plaintiff,        )

vs.                       )   Minneapolis, Minnesota
                            )   October 2, 2012
Mahamud Said Omar,       )

     Defendant.        )
------------------------------------------------------------

BEFORE THE HONORABLE MICHAEL J. DAVIS and a Jury
UNITED STATES DISTRICT COURT JUDGE

**(TESTIMONY OF MATTHEW BRYDEN)**

Proceedings recorded by mechanical stenography;
transcript produced by computer.

```
1    APPEARANCES
         For the Plaintiff:          U.S. Attorney's Office
2                                    CHARLES J. KOVATS, JR., AUSA
                                     LEEANN K. BELL, AUSA
3                                    600 U.S. Courthouse
                                     300 South Fourth Street
4                                    Minneapolis, Minnesota 55415

5                                    U.S. Attorney's Office
                                     JOHN DOCHERTY, AUSA
6                                    Suite 404
                                     316 North Robert Street
7                                    St. Paul, Minnesota 55101

8                                    U.S. Department of Justice
                                     WILLIAM M. NARUS, ESQ.
9                                    Room 1746
                                     950 Pennsylvania Avenue NW
10                                   Washington, D.C. 20530

11       For the Defendant:          Felhaber, Larson, Fenlon & Vogt
                                     JON M. HOPEMAN, ESQ.
12                                   Suite 2200
                                     220 South Sixth Street
13                                   Minneapolis, Minnesota 55402

14                                   Gaskins, Bennett, Birrell, Schupp
                                     ANDREW S. BIRRELL, ESQ.
15                                   PAUL C. DWORAK, ESQ.
                                     Suite 2900
16                                   333 South Seventh Street
                                     Minneapolis, Minnesota 55402
17
         Court Reporter:             LORI A. SIMPSON, RMR-CRR
18                                   1005 U.S. Courthouse
                                     300 South Fourth Street
19                                   Minneapolis, Minnesota 55415

20       Interpreters:               Osman Omar
                                     Amal Ibrahim
21

22

23

24

25
```

<u>**I N D E X**</u>

PAGE

MATTHEW BRYDEN
   Direct Examination by Mr. Docherty       4
   Voir Dire Examination by Mr. Hopeman    41
   Continued Direct Examination by Mr. Docherty   42
   Cross Examination by Mr. Hopeman     105


GOVERNMENT EXHIBITS    REC'D
   1     8
   2     8
   3    22
   4    31
   5    98
   8    89
   9    42
   10   54
   11   89
   12   89

1    return to Ethiopia or to seek resettlement in third

2    countries of asylum.

3    Q.   And since then, Mr. Bryden, since your work as a refugee

4    officer in 1989, would it be accurate to say that you've

5    been continuously involved on a professional level with

6    issues concerning the Horn of Africa?

7    A.   That's correct.

8    Q.   And we'll go into a bit more detail, but first, what

9    exactly, sir, is the Horn of Africa?

10   A.   The Horn of Africa is the northeastern part of the

11   continent.  It's generally considered to include the

12   countries of Somalia, Ethiopia, Djibouti, Eritrea, and some

13   would say Sudan.

14   Q.   Okay.  Placing in front of you, Mr. Bryden, a document,

15   a single-page document marked for identification as

16   Government's Exhibit 1, does that show -- is that a map that

17   shows the Horn of Africa in the world?

18   A.   Yes, it is.

19   Q.   Is it accurate?

20   A.   Yes, it is.

21   Q.   Would it be helpful to you in explaining your testimony

22   to the jury?

23   A.   Yes, it would be.

24        MR. DOCHERTY:  Offer Government's 1, Your Honor.

25        MR. HOPEMAN:  No objection.

1    provides what is known as open source intelligence, that is,

2    what is publicly known, not what is classified or

3    confidential.

4            And the work of open source analysts is to look at

5    what is available in the media, on the Internet, what is

6    known as gray literature which is published by organizations

7    or academics, and to sift through it to come up with

8    information that is usable for the intelligence community

9    and for the government at large.

10   Q.   How long were you there?

11   A.   I believe approximately two years.

12   Q.   And what sorts of things did you -- you've described

13   what the Open Source Center does.  What did you do there

14   during your two years?

15   A.   I was an analyst, open source analyst, on Somalia and I

16   prepared and presented both reports and analysis on Somalia

17   for the U.S. Government.

18   Q.   At the outset of your testimony you said that you had

19   originally worked for an NGO and it was under contract to

20   the United Nations.  Recently have you had the opportunity

21   to work again for the United Nations?

22   A.   Yes, I have.

23   Q.   What did you do for the United Nations in your second

24   tour with them?

25   A.   I was -- most recently I served as coordinator of the

1    United Nations Somalia-Eritrea Monitoring Group.

2    Q.   Now, let's break that down.   The United Nations Somalia

3    and Eritrea Monitoring Group, first of all, what's the group

4    monitoring?

5    A.   The group monitors sanctions regimes on Somalia and

6    Eritrea.   On Somalia the sanctions regime is quite

7    extensive.   It includes an arms embargo on the importation

8    of weapons, equipment, ammunition to Somalia.   It includes a

9    prohibition on all threats to peace and security in Somalia,

10   so any group or individual that threatens peace and security

11   and specifically any group that threatens the Transitional

12   Government, the African Union peace-keeping force on the

13   ground, or the political process by force.   It includes

14   prohibition on the diversion of any humanitarian assistance,

15   on violations of international humanitarian law, and on

16   various forms of financing for al-Shabaab.

17   Q.   This what you call a monitoring regime, where do

18   these -- sorry, a sanctions regime -- where do these

19   sanctions come from, who put them in place?

20   A.   The sanctions are imposed by the United Nations Security

21   Council.

22   Q.   And the Security Council is what within the United

23   Nations?

24   A.   The Security Council is 15 member states, five permanent

25   members, the United States, Russia, China, the U.K., and

```
 1   France, and ten rotating members.

 2   Q.  And they vote on these sanctions?

 3   A.  They vote on these sanctions.  They are introduced by

 4   consensus and they are what is known as Chapter VII, which

 5   means that states are required to abide by them.

 6   Q.  So they're mandatory?

 7   A.  They're mandatory.

 8   Q.  Now, with the Somalia-Eritrea Monitoring Group, we have

 9   talked about the sanctions regime that the group monitored.

10   What was your role with the Monitoring Group, what was your

11   position?

12   A.  I had two functions with the Monitoring Group.  I was

13   the coordinator and I was also the regional specialist.

14   Q.  Regional specialist of what region?

15   A.  For the Horn of Africa.

16   Q.  How large a staff or how many other experts, would be a

17   better question, did the Monitoring Group have?

18   A.  In 2008 when I began the work there was a team of four

19   because the mandate was only to monitor an arms embargo in

20   Somalia.  By 2012 when I left we had a team of eight because

21   we had a much more extensive mandate, as I described, and

22   Eritrea had also been added to the mandate.

23   Q.  And this team of four at the beginning or eight at the

24   end, what sorts of expertise did those people bring to the

25   table?
```

1    A.  Most had investigative backgrounds.  We had former

2    police officers and serving police officers, former

3    intelligence officers, investigative journalists, and

4    finance experts.

5    Q.  And what was the end product of the Monitoring Group,

6    what was it supposed to do or what was its output supposed

7    to be?

8    A.  The Monitoring Group reports to the Security Council on

9    a monthly basis with monthly updates.  It provides a midterm

10   briefing every six months and at the end of each year, at

11   the end of each annual mandate, the Monitoring Group

12   presents a formal written report to the Security Council,

13   which is then published as a Security Council document.

14   Q.  And to give a sense of scale, the most recent Monitoring

15   Group report came out in July of this year?

16   A.  That's correct.

17   Q.  And approximately how many single-spaced pages was that

18   report?

19   A.  It was, in fact, two reports, one on Somalia and one on

20   Eritrea, and together they totaled close to 600 pages.

21   Q.  And what sorts of things would we find if we were to sit

22   down and read those 600 pages, what sorts of things are in

23   that report?

24   A.  Probably one-quarter would be, or less than a quarter,

25   would be reporting, a narrative on violations of the

1    sanctions regime of all kinds.  And the remainder would be

2    presentation of evidence to support those alleged

3    violations, including everything from registration of

4    weapons that had been identified in Somalia, photographs of

5    equipment and weapons that had entered in violation of the

6    arms embargo, information provided by member states,

7    telephone records, financial records, anything required to

8    back up the findings of the report.

9    Q.   And you were the coordinator of the group?

10   A.   That's correct.

11   Q.   What did you do between 2008 and 2012 as coordinator of

12   this Monitoring Group?

13   A.   I would lead the efforts of the team.  I contributed my

14   expertise as a regional expert to give context to their

15   work.  But my principal purpose was to guide and then to

16   verify the efforts of the investigators and to ensure that

17   their work met the evidentiary standards required by the

18   Security Council.

19   Q.   How did you and how did your staff go about getting the

20   information you needed in order to present evidence in these

21   big annual reports to the Security Council, what methods did

22   you use to get information?

23   A.   We interviewed sources from within Somalia.  Members of

24   the team would travel to Somalia and also, when possible, to

25   Eritrea.  We interviewed people outside the country, Somali

```
 1    A.  Yes, it would.

 2            MR. DOCHERTY:  Your Honor, I will offer

 3    Government's Exhibit Number 4.

 4            MR. HOPEMAN:  No objection.

 5            THE COURT:  Be admitted.

 6    BY MR. DOCHERTY:

 7    Q.  Mr. Bryden, what I propose to do is for us to just walk

 8    through recent Somali events using the timeline as a

 9    framework.

10            During the time of European colonization of

11    Africa, was Somalia colonized?

12    A.  Yes, it was.

13    Q.  Who colonized Somalia?

14    A.  The northern part was colonized by the British as

15    British Somaliland and the southern part by Italy.

16    Q.  And when you talk about the northern part, we were

17    talking earlier about Hargeisa and Bosaso and Somaliland and

18    Puntland.  How do those relate to the old British colonial

19    area?

20    A.  What I referred to as Somaliland was the former British

21    Somali protectorate.  Puntland came under Italian colonial

22    rule.

23    Q.  When was it that Somalia achieved its independence from

24    Britain and from Italy?

25    A.  In 1960.
```

1    Q.   And immediately after independence was Somalia a

2    democracy?

3    A.   Yes.  Somalia was a democracy for the first nine years

4    of its independence.

5    Q.   And on the timeline, the first entry, "United Republic

6    of Somalia formed as an independent nation from former

7    Italian and British colonies," and then the next one -- I

8    was going to ask:  In 1969 did something happen to bring an

9    end to Somali democracy?

10   A.   Yes, it did.  In an unrelated incident the president was

11   assassinated and shortly thereafter the military stepped up

12   to take power.

13   Q.   And when the military stepped up to take power in 1969,

14   who was it who eventually wound up in charge in Somalia?

15   A.   It was a military general named Mohamed Siad Barre.

16   Q.   Under Mohamed Siad Barre was Somalia still a democracy?

17   A.   No, it was a military dictatorship.

18   Q.   And without going into all of the events of that

19   dictatorship, did that eventually end?

20   A.   Yes.  It was brought down by a series of rebellions,

21   local rebellions across southern Somalia and northern

22   Somalia, and in 1991 Siad Barre was finally chased from

23   Mogadishu and the following year he was chased out of

24   Somalia.

25   Q.   So in 1991 who was it -- when you say Siad Barre was

1    chased out of Mogadishu, who was doing the chasing, who

2    chased him out?

3    A.   Directly the forces that unseated him in Mogadishu were

4    the forces of a militia known as the United Somali Congress

5    and its forces were headed by another general, Mohamed

6    Farrah Aidid, and it had other leaders, particularly Ali

7    Mahdi Mohamed who headed the movement, and who later

8    disputed amongst themselves as to who was in charge.

9    Q.   So after the United Somali Congress had chased Siad

10   Barre out of Mogadishu, what happened to the United Somali

11   Congress?

12   A.   It divided and went to war with itself.

13   Q.   And since 1991, when Siad Barre was chased out of

14   Mogadishu, has Somalia from that day to this had a

15   functioning central government?

16   A.   No.

17   Q.   After the United Somali Congress divided and went to war

18   with itself, was there further fighting over and above that?

19   A.   There has been a great deal of fighting in all parts of

20   Somalia since 1991 and since the civil strife within the

21   United Somali Congress.

22   Q.   What effect did all of this fighting have on the food

23   supply in Somalia?

24   A.   In the early 1990s the fighting, particularly in

25   southwest Somalia, led to a very serious famine and that was

1   compounded by drought.  And although Somalia has witnessed

2   recent cycles of drought since then, I think it's fair to

3   say that the conflict has meant that the economy and the

4   food supply has never fully recovered to prewar levels.

5   Q.  In 1992 were there and in the years following 1992 were

6   there efforts made by the international community to feed

7   Somalia?

8   A.  Yes.  In 1992 first the United Nations attempted to fly

9   food into the famine-affected zones.  And when that didn't

10   seem to be working, the United Nations attempted to deploy

11   peacekeepers, a small peacekeeping force.  That also didn't

12   seem to be effective and so the United States Government

13   decided to send over 30,000 soldiers to Somalia to

14   facilitate the relief efforts.

15   Q.  Did that work?

16   A.  It did alleviate the famine, yes.

17   Q.  But in 1995 did something occur to bring the U.S. effort

18   to a stop?

19   A.  Yes, it did.  Once the famine had been largely

20   eliminated, the United States handed over leadership of the

21   force to the United Nations and the mission of the force

22   became assisting in the restoration of a functioning

23   government.  That, of course, involved some very difficult

24   political dynamics.

25           And one of the principal militias in Mogadishu,

```
1    General Mohamed Farrah Aidid's militia, challenged the
2    United Nations, killed more than two dozen Pakistani
3    soldiers and then 18 American soldiers in the famous Black
4    Hawk Down incident and this led to the withdrawal first of
5    American forces and then of United Nations forces.
6    Q.   And on the timeline, blowing up or expanding, you've
7    written, "1992 to '95 United Nations peacekeeping mission
8    fails."   Is that what you have been testifying about for the
9    last few minutes?
10   A.   That's correct.
11   Q.   Since Black Hawk Down in 1995, have there been more
12   efforts to form a functioning central government in Somalia?
13   A.   Yes, there have been several.
14   Q.   Which two would you consider the most important?
15   A.   I would say the most important were the Arta Conference,
16   which took place in neighboring Djibouti, which established
17   what was known as the Transitional National Government
18   between 2000 and 2004.
19          And that was superseded by a conference in Kenya,
20   first at the town of Eldoret and then at Mbagathi, and that
21   conference formed the Transitional Federal Government in
22   2004, which remained the nominal government of Somalia until
23   August this year when it was replaced by the Federal
24   Government of Somalia.
25   Q.   Your testimony was that the Transitional National
```

1   Government was formed in Djibouti and the Transitional

2   Federal Government was formed in Kenya.  Why did these

3   governments have to be formed outside Somalia itself?

4   A.   Because the situation inside the country was considered

5   insecure and wouldn't have permitted a neutral meeting place

6   and a safe meeting place for delegates to come together and

7   form a government.

8   Q.   Did the Transitional Federal Government eventually leave

9   Kenya and sit in Somalia itself?

10   A.   In 2005.

11   Q.   When it was in existence, was the Transitional Federal

12   Government recognized as the legitimate government of

13   Somalia?

14   A.   It was recognized internationally as an interim

15   government and was permitted to take Somalia's seats in

16   international organizations, including the African Union and

17   the United Nations.

18   Q.   And was the Transitional Federal Government recognized

19   by the United States of America?

20   A.   As an interim authority, yes.

21   Q.   So the Transitional Federal Government was meant to be

22   leading to something else, something better?

23   A.   That's correct.

24   Q.   I want to talk with you now, Mr. Bryden, about the

25   origins of an organization called the Islamic Courts and

1   supported the establishment of other Islamic courts

2   associated with other sub-clans in Mogadishu -- first there

3   were three, Ifka Halan, Circolo, and the Milk Factory or

4   what was known as Warshadda Aanaha -- and also an Islamic

5   court associated with Hassan Dahir's sub-clan in the port

6   town of Marka.

7   Q.  So Mr. Aweys is an armed -- has an armed jihadi role,

8   correct?

9   A.  Correct.

10  Q.  And at the same time he's forming courts, correct?

11  A.  That's correct.

12  Q.  Okay.  Were these courts popular with the population?

13  A.  Yes, they started to gain some popularity because they

14  achieved a degree of local law and order in the

15  neighborhoods that they operated in in Mogadishu and in

16  Marka.

17  Q.  And at some point this -- did al-Shabaab emerge from

18  these Islamic courts and armed jihadi combination?

19  A.  Yes, it did.  And as the courts grew, and ultimately

20  there were in the range of 11 or 12 principal courts in

21  Mogadishu, it was clear that three, later four of them were

22  associated with the most hard-line version of Islamic law

23  and had emerged as the core of a jihadist militia, which

24  became later al-Shabaab.

25          The most prominent of these was the militia headed

1    by the militia of Ifka Halan Court, which was headed by Aden

2    Hashi Ayrow, who went on to become for some time

3    al-Shabaab's most prominent military commander.

4    Q.  All right.  So Aden Hashi Ayrow had a militia and that

5    militia was the militia of Hassan Dahir Aweys' most

6    hard-line court; fair?

7    A.  That's correct.

8    Q.  Okay.  Did these courts develop control, authority over

9    areas of Somalia?

10   A.  They did.  Notably in 2006, between mid 2006 and

11   December 2006, they controlled most of southern Somalia

12   south of the town of Gaalkacyo almost to the Kenyan border.

13   Q.  At some point did the Ethiopians become concerned about

14   the growing authority of the Islamic Courts?

15   A.  Yes, they did in late 2006 and this triggered a military

16   intervention.

17   Q.  What was it about these courts that was worrying the

18   Ethiopians?

19   A.  There were a number of issues that were of concern to

20   the Ethiopians.

21          One was that Hassan Dahir Aweys in particular had

22   declared that the Courts' jihad should extend into

23   Ethiopia -- into the Somali-inhabited parts of Ethiopia and

24   so threatened Ethiopian territory, integrity, and security.

25          Secondly, Ethiopia was already hostile to the

1    emergence of Islamist groups in Somalia and particularly the

2    jihadist strain represented by Hassan Dahir Aweys.  I should

3    note that it was Ethiopia that had dismantled al-Ittihad

4    al-Islam in '96 and '97 because they considered it a threat.

5    The Islamic Courts were also hosting and supporting rebel

6    groups that operated across the border from Somalia into

7    Ethiopia.

8              And then lastly, the Islamic Courts accepted

9    support from and briefly hosted military assistance and

10   advisors from Eritrea, and at that time and up to the

11   present Ethiopia and Eritrea had a very hostile relationship

12   and they saw the presence of Eritreans among the Islamic

13   Courts as a kind of proxy front in their conflict with

14   Eritrea.

15   Q.  So now in December of 2006 is the Transitional Federal

16   Government in power in Mogadishu?

17   A.  The Transitional Federal Government in 2006 was in

18   Baidoa, it was not based in Mogadishu.

19   Q.  But it was in Somalia?

20   A.  That's correct.

21   Q.  And at some point did the Transitional Federal

22   Government invite Ethiopian troops into Somalia?

23   A.  Yes, it did.

24   Q.  Can you tell us how that came about, please.

25   A.  Almost immediately after the establishment of the

```
 1    Transitional Federal Government, the first president of the

 2    government, which was known as the TFG for short, Abdullahi

 3    Yusuf Ahmed, traveled to Addis Ababa, where he called for

 4    foreign military support to return his government from Kenya

 5    to Somalia.  This was a very divisive move, but it was one

 6    that met with support from a number of governments.

 7             In late 2006, as the Islamic Courts expanded their

 8    control across southern Somalia, the regional organization

 9    for the Horn of Africa, an intergovernmental organization

10    known as IGAD, the Intergovernmental Authority on

11    Development, approved a military mission to restore -- to

12    protect the government and to train its security forces.

13             And in late 2006, I forget which month, United

14    Nations Resolution I believe 1725 was passed by the Security

15    Council approving the deployment of an IGAD military force

16    in support of the TFG, to protect it and train its security

17    forces.

18    Q.   Okay.  And did the Ethiopian forces then enter Somalia?

19    A.   They did in December 2006.

20    Q.   And did they fight the Islamic Courts?

21    A.   They did and they defeated them very quickly.

22    Q.   After they defeated them, did they remain inside

23    Somalia?

24    A.   Yes, they did, until 2009.

25    Q.   Was that also at the invitation of the Transitional
```

1    Federal Government?

2    A.   Yes, it was.

3    Q.   Why did they stay after they had defeated the Islamic

4    Courts?

5    A.   Because -- perhaps "defeat" was the wrong term.   They

6    dismantled and dispersed the Courts' forces, but the Courts'

7    fighters, together with other militias who opposed

8    Ethiopia's intervention, almost immediately launched a

9    resistance, an armed resistance, to Ethiopian presence in

10   Somalia and so Ethiopia found itself fighting an insurgency

11   in order to try to maintain the TFG in power and in a sense

12   became bogged down in an increasingly violent insurgency.

13   Q.   And how long did they stay?

14   A.   Until I believe February 2009.

15   Q.   And did al-Shabaab become active at this time?

16   A.   Yes, it did.

17   Q.   What were the political goals of al-Shabaab at this

18   time?  Well, let me back up and ask a different question.

19   The Ethiopian invasion was received how in the Somali

20   diaspora or the entrance of Ethiopian troops into Somalia

21   was received how in the Somali diaspora?

22   A.   Well, the diaspora was divided.   There were supporters

23   of the Transitional Federal Government who believed that the

24   Ethiopian intervention was a good thing.   In my assessment

25   that would have been a minority opinion.

1            Ethiopia has been perceived as hostile by many

2      Somalis for decades, if not longer, and so much of the

3      Somali diaspora was very angry and hostile to the Ethiopian

4      intervention and supported the resistance movement in

5      challenging Ethiopia.

6      Q.   And were there -- was there one group in this resistance

7      movement or multiple groups in this resistance movement?

8      A.   There were multiple groups.

9      Q.   And now the question that I originally started off with.

10     Was al-Shabaab active in Somalia at this time, late '06

11     onwards?

12     A.   Yes, it was.  al-Shabaab had begun to emerge under the

13     name al-Shabaab and as an increasingly autonomous force

14     already before the Ethiopian intervention in 2006.  When

15     Ethiopia intervened, the resistance took on the form of what

16     at the time I called a complex insurgency, where a

17     combination of clan based militias, various Islamist

18     militias, including those affiliated with the mainstream of

19     the Islamic Courts and al-Shabaab as the most militant

20     group, together opposed Ethiopian intervention.

21     Q.   Now, you said that there were multiple groups involved

22     in -- that shared the goal of the Ethiopians leaving Somalia

23     and I would like to talk about al-Shabaab and what

24     distinguishes it from other groups, if I could, for a few

25     minutes.

1    soliciting support for the group.

2    Q.  I have placed on the table in front of you a single

3    photograph marked as Government's Exhibit Number 10.  Is

4    that a larger single-page version of letter I on

5    Government's 15?

6    A.  Yes, it is.

7           MR. DOCHERTY:  Move the admission of

8    Government's 10, Your Honor.

9           MR. HOPEMAN:  I have no objection.

10           THE COURT:  10 will be admitted.

11   BY MR. DOCHERTY:

12   Q.  Mr. Bryden, was al-Shabaab designated as a Foreign

13   Terrorist Organization by the Government of the United

14   States?

15   A.  Yes, it was.

16   Q.  And how did you hear about that designation?

17   A.  The designation was officially issued and was something

18   that in my own work with the Monitoring Group we took note

19   of, although it didn't directly relate to our work.  It was

20   also carried in the media and al-Shabaab reacted to the

21   designation publicly.

22   Q.  How did al-Shabaab react to being designated?

23   A.  The statement I recall the best was a statement by the

24   then spokesman Mukhtar Robow, who welcomed the designation

25   as a badge of honor.

1   Q.   And was this designation also carried in the media in

2   East Africa?

3   A.   Yes, it was, widely.

4   Q.   And is that on the timeline at February 26, 2008?

5   A.   Yes, it is.

6   Q.   Going on with what it is that is distinctive about

7   al-Shabaab as compared to other groups that share the goal

8   of the Ethiopians leaving Somalia, did al-Shabaab use

9   assassination as a tactic in 2007 and 2008?

10   A.   Yes, it did.

11   Q.   What sorts of targets were there for al-Shabaab's

12   assassinations?

13   A.   There were multiple targets.   In addition to their

14   attacks on Ethiopian forces, they conducted attacks on

15   Transitional Federal Government officials, from the very

16   top, an attempt to assassinate -- several attempts to

17   assassinate the president and the prime minister, and also

18   moving down the scale to lower level officials, including at

19   one time the deputy mayor of Mogadishu, who was

20   assassinated, and what would be known as district

21   commissioners or local government officials and local

22   security officials in neighborhoods in Mogadishu.   Anyone

23   whom they considered to be an official of or a collaborator,

24   in their terms, of the Transitional Government was a

25   potential target for assassination.

56

1    Q.  So besides targeting Ethiopians, al-Shabaab also

2    targeted Somalis?

3    A.  Yes.  And I should add not just government officials.

4    They also targeted at times elders, civil society figures,

5    students.  They didn't limit themselves to government

6    targets.

7    Q.  Journalists?

8    A.  Journalists, yes.

9    Q.  Aide workers?

10   A.  Yes, aide workers were their first target.

11   Q.  Are you familiar with -- I'm going to use a term -- a

12   night letter?

13   A.  Yes, I am.

14   Q.  What's a night letter, Mr. Bryden?

15   A.  Well, I believe the term was borrowed from Afghanistan,

16   where it was first used, and it was used in Somalia to

17   relate to leaflets, often photocopied leaflets, that were

18   distributed to government officials or individuals who were

19   accused of collaborating with the government.

20           And it would usually warn them to cease and

21   desist, stop what they were doing, or they risk the

22   consequences.  The consequences could be explicit, you would

23   be killed, or it would simply say we will punish you.

24           And the same kind of tactic, the same messages

25   were also passed by mobile phones, not just in photocopied

1    pamphlets.

2          THE COURT:  Let's stop here.  We will take our

3    luncheon break.  We will begin again at 1:45, 1:45.  All

4    rise for the jury.

5       (Jury excused.)

6                         **IN OPEN COURT**

7                      **(JURY NOT PRESENT)**

8          THE COURT:  Counsel, is there anything that we

9    need to discuss before we adjourn again?

10         MR. DOCHERTY:  I don't believe so, Your Honor.

11   Thank you.

12         MR. HOPEMAN:  No, Your Honor.

13         THE COURT:  All right.  Have a good lunch.

14      (Lunch recess taken at 12:29 p.m..)

15                    *    *    *    *    *

16      (1:50 p.m.)

17                         **IN OPEN COURT**

18                       **(JURY PRESENT)**

19         THE COURT:  You may continue.

20   BY MR. DOCHERTY:

21   Q.  Good afternoon, Mr. Bryden.

22   A.  Good afternoon.

23   Q.  Before continuing I wanted to circle back and touch on a

24   couple of things left hanging from this morning.

25         First of all, when Ethiopian forces entered

1   Somalia, did the Islamic Courts Council issue any sort of

2   public statement or proclamation?  Let me ask the question a

3   different way.  I seem to have puzzled you.  Did the Council

4   of Islamic Courts seek action from the Muslim community?

5   A.  The Islamic Courts issued a statement denouncing the

6   intervention and calling for support, but essentially the

7   leadership dissolved several days later and so the statement

8   was, I think, not considered null and void, but there was

9   little opportunity to respond immediately.

10  Q.  What did they call -- what sort of action did they call

11  for?

12  A.  A jihad.

13  Q.  And let's talk about that word for a moment.  In your

14  time in the Horn of Africa, a largely Islamic population,

15  have you become familiar with jihad, the concept?

16  A.  Yes, I have.

17  Q.  And when the Council of Islamic Courts issues a call for

18  jihad, what are they calling for?

19  A.  They were calling for a holy war to defend Muslim land

20  from an incursion by a foreign and non-Muslim power.

21  Q.  And also before the noon break -- and I apologize if

22  this may be a little disjointed because these are sorts of

23  odds and ends -- you mentioned the words "Islamic caliphate"

24  and you mentioned that one of the things that al-Shabaab --

25  people within al-Shabaab sought was an Islamic caliphate.

1    Can you please explain what that term means.

2    A.   An Islamic caliphate would be a form of government for

3    the lands inhabited by Muslims, by the ummah, the Muslim

4    community.  The distinction here is between what the Courts

5    called for, which would have been considered a defensive

6    jihad, a legitimate defense of a Muslim land against a

7    foreign occupier and not a Muslim occupier, and the call to

8    establish the caliphate would go beyond the borders of

9    Somalia to any land inhabited by Muslims.

10   Q.   And what is a caliphate, what does that word mean?

11   A.   It's a reference to a historical Muslim concept, a

12   territory headed by a caliph who is a successor of the

13   tradition of the Prophet, a leader of the Muslim faith.

14   Q.   And so the restoration -- I mean, many of these

15   countries already have Islamic governments; is that correct?

16   A.   Many Muslim countries, territories do have Muslim

17   governments or Islamic governments, yes.

18   Q.   What would be different if there was a caliphate as

19   opposed to what there is now?

20   A.   Well, the caliphate as expressed by al-Shabaab and some

21   other internationalist jihadist movements is a projection of

22   their own form of Islamic government.  It means that they

23   don't recognize the governments in those Muslim lands as

24   being legitimate Muslim governments, including those

25   governments in Somalia.

```
 1    Q.  Now, before the lunch break you had talked about this

 2    concept of takfirism, the authority to designate Muslims as

 3    really non-Muslims.

 4          When you say that al-Shabaab does not recognize

 5    the governments of these other Islamic countries as truly

 6    Islamic, does that tie together with takfirism?

 7    A.  Yes, it does.  The two are closely related.

 8          Historically every Somali government prewar and

 9    most of the Somali authorities since the collapse of the

10    Barre regime have considered themselves to be legitimate

11    Muslim or Islamic governments.  That is to say that they

12    consider Islam to be the religion of the state, the

13    constitutions expressly -- since 1960 have expressly

14    considered Islam to be the state religion to ensure that

15    every law that is passed is consistent with Islamic law,

16    with Sharia law, and that any law that contradicts Sharia

17    law is null and void.

18          And so in a sense every authority, including the

19    Transitional Federal Government, the Transitional National

20    Government before it, the administrations in Somaliland,

21    Puntland, and other local administrations in Somalia, if

22    they have charters or constitutions, I think without

23    exception include this language and so would characterize

24    themselves as Islamic governments.

25          For al-Shabaab that was not sufficient.  They have
```

1     their own version and in a sense they would be

2     delegitimizing these other authorities in saying they're not

3     Islamic because they don't correspond to al-Shabaab's world

4     view.

5     Q.  What consequences would that have as far as making licit

6     the use of violence against those governments?

7     A.  It would legitimize the use of violence to overthrow an

8     unjust government or a government that called itself Muslim

9     but was not, in fact, Muslim -- there's a specific term that

10    they used for that -- or a government they would consider

11    apostate.

12    Q.  In September of 2006 -- last topic before we resume --

13    were there peace talks between the Council of Islamic Courts

14    and the Transitional Federal Government?

15    A.  Yes, there were.

16    Q.  Where were they held?

17    A.  They were held in Khartoum, the capitol of then Sudan.

18    Q.  And when were they held?

19    A.  They were held in late 2006.  I believe the month was

20    September.  I could be mistaken.  And they appeared to be

21    moving towards some kind of accommodation between the TFG

22    and the Islamic Courts.

23    Q.  And on your timeline I have blown up and put on the

24    screen, "September 2006 the CIC" -- that's Council of

25    Islamic Courts?

1    A.   That's correct, yes.

2    Q.   -- "and the TFG" --

3    A.   Yes.

4    Q.   -- "begin peace talks in Khartoum"?

5    A.   Yes.

6    Q.   And you say that those looked like they were going well?

7    A.   They had started on a positive note.  It would have been

8    impossible to say where they would have gone, but they

9    weren't given the opportunity to go to fruition.

10   Q.   Did al-Shabaab participate in those talks?

11   A.   No.

12   Q.   What was al-Shabaab's publicly-expressed attitude

13   towards those talks?

14   A.   al-Shabaab opposed those talks.

15   Q.   Okay.  And why was that?

16   A.   al-Shabaab considered the TFG to be collaborators or

17   what they termed puppets of the Ethiopian government and

18   that any authority or individual who cooperated with the

19   Ethiopians was a collaborator and, according to some Shabaab

20   leaders, by definition an apostate and apostasy is

21   punishable by death, so legitimizing violence.

22   Q.   Mr. Bryden, I am now going to resume where we were

23   before the noontime break.  We had talked about these night

24   letters, and the next technique that I wanted to cover with

25   you was improvised explosive devices or IEDs.  Do you know

1   what I am referring to when I use those terms?

2   A.  Yes, I do.

3   Q.  Can you explain to the jury what you mean by an IED.

4   A.  An IED is any explosive device that is, for want of a

5   better term, homemade, it's improvised.  There are multiple

6   forms of IEDs that have been used in Somalia and elsewhere

7   and they range from everything from remote-controlled

8   devices to victim-detonated devices, car bombs, suicide

9   bombs, a range of essentially homemade explosives.

10  Q.  In your experience working in the region and

11  particularly working in Somalia, what targets were there for

12  al-Shabaab IEDs?

13  A.  al-Shabaab has targeted a wide range of objectives with

14  IEDs, from the leaders of the Transitional Federal

15  Government, the president and prime minister and other

16  senior officials.  They have used IEDs against military

17  targets as well, against the Ethiopian forces when they were

18  in Somalia; against the peacekeeping forces of the African

19  Union; against low-level TFG officials; against civilian

20  targets, including students and members of parliament.  And

21  at times IEDs have detonated perhaps accidentally, but

22  killing people for whom there seem to be no real motivation

23  or purpose for killing.

24  Q.  In 2007 and 2008 did al-Shabaab use suicide bombs as a

25  tactic?

1    A.   Yes, they did.

2    Q.   When was the first suicide bombing attributable to

3    al-Shabaab?

4    A.   2006.

5    Q.   And who was the target of that suicide attack?

6    A.   The president of the Transitional Federal Government,

7    [indiscernible] Ahmed.

8          COURT REPORTER:   Could you say the name again

9    slower.

10         THE WITNESS:   Abdullahi Yusuf Ahmed.

11   BY MR. DOCHERTY:

12   Q.   What evidence do you use when you attribute this 2006

13   suicide bombing to al-Shabaab?

14   A.   There are a number of considerations.   First of all, no

15   other group in Somalia has used or claimed responsibility

16   for suicide bombs.   Shabaab is known to have used suicide

17   bombs.

18         That particular bombing, the individual who

19   perpetrated it, who missed his target, did not kill the

20   president, but did kill his brother, was rapidly identified

21   and initially associated by sources, that I spoke to at the

22   time, with al-Shabaab.   al-Shabaab then subsequently used

23   video footage of the bomber in its propaganda, a subsequent

24   propaganda video, identifying him by name.   And so the

25   association was made with al-Shabaab I think quite

1   logically.

2   Q.  All right.  And the target of this was President -- the

3   then President Abdullahi Yusuf Ahmed.  Was he an Ethiopian?

4   A.  No.

5   Q.  What was he?

6   A.  He was a Somali.

7   Q.  Since that -- and that 2006 suicide bomb attack, did

8   that come -- where did that come in relation to Ethiopian

9   troops entering Somalia?

10  A.  That was before the main offensive, but there were

11  Ethiopian troops present in Baidoa protecting the

12  Transitional Federal Government at the time.

13  Q.  But the one you were talking about before the noon break

14  where the Ethiopian troops came in in December and routed

15  the Courts in a few days, that had not happened?

16  A.  That had not yet happened.

17  Q.  Have there been other suicide bombings perpetrated by

18  al-Shabaab since this 2006 attempt on President Yusuf?

19  A.  Yes, there have been many.

20  Q.  I want to talk with you about a few of those.  Was there

21  an attack in April of 2007 at a hotel south of Mogadishu?

22  A.  In the southern part of Mogadishu, yes, there was.

23  Q.  And what was the target there?

24  A.  That was -- I believe you are referring to the

25  Ambassador Hotel and it was a hotel that was frequented by

```
 1    Transitional Federal Government officials.  Mainly members
 2    of parliament were staying there at the time.
 3    Q.  Was there an attack in April of 2008 against some
 4    Burundian soldiers?
 5    A.  Yes, there was.
 6    Q.  Can you tell us about what happened at this attack on
 7    the Burundian soldiers.
 8    A.  To the best of my recollection, the Burundian detachment
 9    had a separate camp from the main African Union force
10    headquarters.  They had recently deployed.  They were
11    staying at a location known as the Jaalle Siyaad Academy.
12    It was a former military academy.
13            On that occasion a bomber drove at high speed to
14    the gate of the academy in a pickup truck loaded with
15    explosives and detonated at the control point.  I don't
16    remember the exact figures.  I think one AU soldier was
17    killed and a number of civilians, plus a number of wounded.
18    Q.  Okay.  You mentioned a pickup truck.  What kind of
19    pickup truck was it, if you remember?
20    A.  I don't recall, but it was a pickup truck, which I think
21    is perhaps the only time I've heard of al-Shabaab using a
22    pickup truck for that kind of bombing.
23    Q.  And what evidence is there that al-Shabaab was behind
24    this suicide bomb attack in April of '08?
25    A.  There again, the bomber was identified and in two
```

1    thousand and -- well, immediately al-Shabaab published a

2    statement taking responsibility for the bombing, several

3    statements, in fact, the day of the attack and I believe the

4    day after.

5    Q.  All right.

6    A.  They identified the bomber by name.  And several years

7    later, in 2010, they published the video testimony of the

8    bomber prior to the attack.

9    Q.  You said that there had been several statements issued

10   by al-Shabaab.  Does al-Shabaab have a media wing?

11   A.  al-Shabaab does have a media wing.  It calls itself

12   al-Kataib, which means the brigades, and they have

13   disseminated their information, their communiqués through

14   various media.  They have spokesmen as well, first, as I

15   mentioned, Mukhtar Robow and subsequently Ali Mohamud Raghe

16   a/k/a Ali Dhere.  Others have also spoken on behalf of the

17   movement.

18          These communiqués or these statements are

19   published through their websites and they have a number of

20   websites, but these have changed over time.  And they are

21   also disseminated at times through jihadist media that are

22   associated not just with al-Shabaab, but with other foreign

23   jihadist groups.

24   Q.  What do you mean by that?  Is that a website shared in

25   common or --

```
1    A.   Yes, there were clashes.

2    Q.   So that's not on your chart?

3    A.   No.

4    Q.   There's been more violence than you show, is my point,

5    between Ethiopia and Somalia, right?

6    A.   Yes.

7    Q.   And then there was another war, the Ethiopia-Somali War,

8    from 1977 to 1978, right?

9    A.   Yes, the Ogaden War.

10   Q.   And the Somali military in '77 and '78 was badly

11   defeated by the Ethiopians, true?

12   A.   True.

13   Q.   And that was a source of humiliation for many Somalis?

14   A.   Yes, it was.

15   Q.   And, in fact, the conflict between the two peoples goes

16   back centuries?  Before you even start talking about the

17   formation of countries, there was conflict between ethnic

18   groups that you would now say are Somali and Ethiopian,

19   right?

20   A.   Roughly speaking, yes.

21   Q.   Now I would like to talk to you about the Transitional

22   Federal Government that was formed in 2004.  You've heard

23   the expression and I think you have written about it, that

24   bad government is better than no government.  You have

25   written that, right?
```

```
 1    A.   Actually I don't think --

 2    Q.   Actually it's the reverse, right?

 3    A.   I've said that at times Somalis would have preferred no

 4    government to bad government, yes.

 5    Q.   That's right.  That the government was so bad, that it

 6    was worse than no government at all, right?

 7    A.   Yes.

 8    Q.   And it was not a government elected by the Somali

 9    people, right?

10    A.   No.  It was a government formed in exile at a

11    conference.

12    Q.   And in the eyes of many, many, many Somalis, it just had

13    no legitimacy to begin with, right?

14    A.   Correct.

15    Q.   Now, there's a history in Somalia of the state being

16    predatory towards its citizens, true?

17    A.   Yes.

18    Q.   And this Transitional Federal Government was no

19    exception, right?

20    A.   Correct.

21    Q.   It was predatory toward its own citizens, right?

22    A.   Yes.

23    Q.   Meaning it took advantage of them every way it could?

24    A.   It didn't have the authority or the outreach to exploit

25    most of its own citizens.  It was mainly exploiting
```

1    international assistance.

2    Q.  So it stole the international assistance, right, and

3    appropriated it to itself?

4    A.  For its own purposes, yes.

5    Q.  And it also stole what tax money it could generate and

6    appropriated it to itself?

7    A.  Yes.

8    Q.  And it basically failed to meet the most basic needs of

9    the citizens of Somalia?

10   A.  True.

11   Q.  Do you know if it used torture to oppress the people?

12   A.  There are very credible cases of the use of torture by

13   some of its agents, yes.

14   Q.  Against the Somali people?

15   A.  Against some of the Somali people, yes.

16   Q.  During the years 2004 to 2008?

17   A.  Principally in the years 2007, 2008.

18   Q.  Physical torture?

19   A.  Yes.

20   Q.  For the purpose of bending people to their will?

21   A.  For the purposes of either extracting information or

22   payment.

23   Q.  And that Transitional Federal Government always refused

24   to engage in any kind of power sharing with any other groups

25   in that society, didn't it?

1  A.  Until late 2008 when the prime minister was changed and

2  then they engaged in a process of dialogue.  And in 2006, my

3  apologies, in 2006, as we noted, they engaged with the

4  Council of Islamic Courts in Khartoum.

5  Q.  They never ended up sharing power, did they?

6  A.  No, they didn't.  Well, they did in late 2008 and then

7  ceded power at the beginning of 2009.

8  Q.  Now, did the Ethiopian troops invade Somalia -- I think

9  they came in late in '06, you said, to protect the

10  government in Mogadishu, right, or was it Baidoa?

11  A.  No, they came in early it would have been in 2005, 2006

12  in small numbers to protect the government in Baidoa,

13  because it wasn't in Mogadishu, and then in late 2006 they

14  launched the main offensive all the way to Mogadishu.

15  Q.  Late 2006?

16  A.  December.

17  Q.  And, again, those troops were invited in by this corrupt

18  Transitional Federal Government?

19  A.  They were.

20  Q.  Which at the time was not even safe in its own country,

21  right?

22  A.  Correct.

23  Q.  And so it asked Ethiopia to invade and help take out the

24  competition, right?

25  A.  That's fair enough.

1    Q.   And the United States Government objected to the

2    invasion of Somalia by the Ethiopian troops, didn't it?

3    A.   I don't believe so.   I believe the United States

4    Government or at least the State Department indicated its

5    approval of the intervention.

6    Q.   Maybe I misunderstood something you wrote, then.   You

7    wrote a long paper in October of 2007 prepared for the

8    USAID.   Do you remember that?

9    A.   Yes, I do.

10   Q.   Maybe I am misunderstanding, but let me just show you

11   page 53.

12   A.   Yes.

13   Q.   Yes, the United States Government did object to the

14   Ethiopians invading Somalia, right?

15   A.   Parts of the U.S. Government did object and, as I have

16   written elsewhere, parts of the United States Government

17   approved.

18   Q.   In any event, the Ethiopians went in and had their own

19   reasons for it, right?

20   A.   They certainly did.

21   Q.   And you talked about it earlier and those reasons had to

22   do with their own self interests, true?

23   A.   In large part, yes.   Also because there was, in fact, an

24   assault.   There were assaults on Ethiopian and TFG positions

25   around Baidoa, which were the immediate trigger for the

Ethiopian intervention.

Q.   The Horn of Africa is one of the poorest regions in the world, right?

A.   Correct.

Q.   And it's also one of the most conflict prone?

A.   Yes, it is.

Q.   And by "conflict prone" we mean violence and war, right?

A.   Yes.

Q.   And as a result of all the conflict there, these nations have a very low rate of economic development, right?

A.   True.

Q.   In fact, none of them in 2007 was ranked higher than 148th among the countries in the world, true?

A.   I don't recall, but I believe that sounds about right.

Q.   I think it's in your report.

A.   I can't remember everything I have written over the years --

Q.   I know.

A.   -- I'm afraid, sir.

Q.   Nor can I, but I think it's in your report, isn't it?

A.   It may well be.

Q.   And Somalia, being part of the Horn, is also one of the most conflict-prone regions of the world, true?

A.   That's true.

Q.   I was interested to hear you talk about an arms embargo

1    that you were trying to enforce.  You were kind of standing

2    there like the little Dutch boy with your finger in the

3    dike, right?

4    A.  No, our job was not to enforce the embargo.

5    Q.  Anyone who wanted to enforce the embargo would have been

6    standing there with their finger in the hole in the dike,

7    right, trying to stop the overflow?

8    A.  Well, actually no.  That's the case, was that the arms

9    embargo wasn't respected by anybody, but the responsibility

10   for enforcement lay with member states and if the member

11   states in the region had enforced the embargo, they could

12   have been effective.  Our job was to call them out and

13   report to the Council that they were not honoring their

14   responsibilities.

15   Q.  And there were violations of the arms embargo by this

16   very Transitional Federal Government that we've been talking

17   about, right?

18   A.  That's partly true.  The government itself didn't often

19   import weapons for itself.  It was more that others

20   contributed weapons and it's the donors who are violating

21   the embargo.  But, yes, was the government party to

22   violations, I would say so.

23   Q.  It was turning a blind eye to people that got guns that

24   it saw as its friends?

25   A.  More than a blind eye.  It was soliciting weapons and

1    ammunition.

2    Q.   And then getting them into the hands of people who were

3    friendly to the government?

4    A.   And getting them into the hands of people who were

5    opposed to the government.   There was massive corruption in

6    which local commanders were just selling weapons into the

7    markets, which we documented in detail.

8    Q.   Oh.   So this government was profiting off the arms trade

9    itself?

10   A.   Yes, it was, or parts of it were.

11   Q.   In any event, there was easy availability of weapons in

12   Somalia in 2007, right?

13   A.   Absolutely.

14   Q.   AK-47s were readily available, right?

15   A.   Yes, they always have been.

16   Q.   How about automatic weapons?

17   A.   The AK-47 is an automatic weapon, but also heavier

18   weapons were available and different types of assault

19   weapons, like machine guns, medium machine guns, all

20   available.

21   Q.   Rocket-propelled grenades, all available?

22   A.   Readily available.

23   Q.   And the irony is we call them small arms, right?

24   A.   Small arms and [inaudible], yes.

25          COURT REPORTER:   I'm sorry.   Small arms and?

```
 1    A.  True.

 2    Q.  And some went to resistance against the Traditional --

 3    the Transitional Federal Government, right?

 4    A.  Yes.

 5    Q.  Now, in the fall of '07 there was a series of

 6    conferences among Somalis in the United States and elsewhere

 7    to try to organize opposition to the government and the

 8    Ethiopian troops, correct?

 9    A.  Yes, I'm aware of that.

10    Q.  And they attracted a lot of Somalis who weren't military

11    people, they weren't jihadists, they were just members of

12    Somali's civil society, right?

13    A.  That's true.

14    Q.  Former political figures, right?

15    A.  Yes.

16    Q.  Former members of the Council of Islamic Courts, right?

17    A.  Yes.

18    Q.  Former members of the Transitional Federal Government

19    itself, right?

20    A.  Quite possibly.

21    Q.  Former members of parliament?

22    A.  Yes.

23    Q.  And a lot of political activists, right?

24    A.  True.

25    Q.  So there's this huge group of legitimate Somali people
```

1    who want to get rid of the Transitional Federal Government?

2    A.   That's right.

3    Q.   And the result is there's clan resistance to the

4    government and there's nationalistic resistance to the

5    government and both of them take the form of fighters on the

6    ground at some point, right?

7    A.   That's right.

8    Q.   Now, Mr. Docherty asked you toward the end of your

9    direct examination, I think, which forces were fighting on

10   the ground against the government in Somalia in 2007, 2008

11   and I don't think you specified them.  Can you tell us who

12   they were, first among the clans.

13   A.   Well, as I said and you've rightly said, there were

14   three main parts to the resistance or three main

15   motivations.  There was the nationalist sentiment, there was

16   clan sentiment, and there was the Islamist and jihadist

17   sentiment.

18         The forces on the ground in 2007 and '08 began as

19   a kind of, at least from the outside, an amorphous

20   opposition that was called the resistance or the Muqawama

21   and within it it wasn't clear who was there.  All of these

22   elements were part of it.

23         During the course of 2007 the Muqawama started to

24   percolate into different parts.  There were the Shabaab, who

25   very clearly emerged as one actor.  There were forces loyal

1    that may be supportive of that letter.

2              MR. DOCHERTY:  Yes.  And I'll just --

3              THE COURT:  So we don't have to --

4              MR. DOCHERTY:  But the witness is on the stand

5    and --

6              THE COURT:  I understand that.  You may talk to

7    him on that point.  Make sure he understands the parameters

8    of what he should be looking for.  Don't do it narrow so

9    then we have to be jockeying back and forth all day

10   tomorrow.

11             MR. DOCHERTY:  No.

12             THE COURT:  I don't want that.

13             MR. DOCHERTY:  Okay.

14             THE COURT:  Okay.  Have a good evening.

15       (Court adjourned at 4:38 p.m.)

16                        *       *       *

17

18

19        I, Lori A. Simpson, certify that the foregoing is a

20   correct transcript from the record of proceedings in the

21   above-entitled matter.

22

23             Certified by:   *s/ Lori A. Simpson*

24                            Lori A. Simpson, RMR-CRR

25

TABLE A-1 - Comparabe Materials Support Sentences in the Second Circuit

| # | Year | Last Name | First Name(s) | Outcome | Convictions | Alleged Affiliation | Sentence | Max | Court | Judge | Allegations |
|---|------|-----------|---------------|---------|-------------|---------------------|----------|-----|-------|-------|-------------|
| 1 | 2015 | Hanafi | Wesam | Pleaded guilty | 18 U.S.C. 2339B, 18 U.S.C. 371 | al Qaeda | 180 | 240 | S.D.N.Y., 12 Cr. 162 (KMW) | Kimba M. Wood | See above. |
| 2 | 2014 | Viglakis | Ioannis | Pleaded guilty | 18 U.S.C. 2339B | FARC | 120 | 180 | S.D.N.Y., 12 Cr. 585 (KBF) | Katherine B. Forrest | The defendant allegedly offered to provide large quantities of lethal, military grade weapons to a DEA confidential source, who purported to represent the FARC. He then allegedly arranged for the successful delivery of three rocket-propelled grenade launchers ("RPGS") with six RPG grenades, to an undercover law enforcement agent in Athens, Greece, and later gave thousands of euros to the DEA source as a partial payment to the FARC to transport a multi-kilogram shipment of cocaine to Spain on his behalf. |
| 3 | 2013 | Ahmed | Mohamed Ibrahim | Pleaded guilty | 18 U.S.C. 371 (two counts) | al-Shabaab | 111 | 120 | S.D.N.Y. 10 Cr. 131 (PKC) | P. Kevin Castel | The defendant allegedly traveled from Sweden to Somalia to receive "jihad" trainingin weapons and explosives at an al Shabaab training camp, provided a total of 3,000 Euros to al Shabaab, purchased an AK-47 that he later provided to an al Shabaab commander, and traveled to Mali in search of further terrorist training. |
| 4 | 2011 | Banol-Ramos | Yarlei | Pleaded guilty | 18 U.S.C. 2339B | FARC | 180 | 180 | S.D.N.Y., 09 Cr. 498 (WHP) | William H. Pauley III | The defendants were arrested armed with a machine gun, at sea in a boat full of military supplies including explosives, after a shootout with the Panamanian National Police ("PNP"). The Firefight occurred after the PNP attempted to render aid to the boad, which had become stranded traveling to a narcotics transaction involving the sale by the FACR of approximately one ton of cocaine. |
| 5 | 2011 | Ibarguen-Palacio | Jorge | Pleaded guilty | 18 U.S.C. 2339B | FARC | 130 | 180 | S.D.N.Y., 09 Cr. 498 (WHP) | William H. Pauley III | See above. |
| 6 | 2014 | Nayyar | Patrick | Convicted after trial | 18 U.S.C. 2339B (two counts), 50 U.S.C. 1705(a) (two counts), 18 U.S.C. 922(g) | Hizballah | 180 | 900 | S.D.N.Y., 09 Cr.1037 (RWS) | Robert W. Sweet | Nayyar, a New York City resident, allegedly made plans with a confidential information to acquire various weapons and other military materials, including sniper rifles, missles, vehicles, bullet proof vests, and night vision goggles, with Nayyar agreed to sell to Hizbalah through a CI. On one occasion, Nayyar allegedly gave the CI a handgun and a box of ammunition in exchange for $1000. |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 7 | 2012 | Issa | Omar | Pleaded guilty | 18 U.S.C. 2339B | Al Qaeda, Al Qaeda in Iraq, Magred ("AQIM"), and the FARC | 57 | 180 | S.D.N.Y., 09 Cr. 1244 (LAP) | Loretta A. Preska | The defendants were charged in connection with their alleged agreement to transport cocaine through West and North Africa with the intent to support the drug trafficking activities of Al Qaeda, Al Qaeda in Iraq, Magred ("AQIM"), and the FARC. |
| 8 | 2012 | Toure | Harouna | Pleaded guilty | 18 U.S.C. 2339B | Al Qaeda, Al Qaeda in Iraq, Magred ("AQIM"), and the FARC | 63 | 180 | S.D.N.Y., 09 Cr. 1244 (LAP) | Loretta A. Preska | See above. |
| 9 | 2012 | Abdelrahman | Idriss | Pleaded guilty | 18 U.S.C. 2339B | Al Qaeda, Al Qaeda in Iraq, Magred ("AQIM"), and the FARC | 57 | 180 | S.D.N.Y., 09 Cr. 1244 (LAP) | Loretta A. Preska | The defendants were charged in connection with their alleged agreement to transport cocaine through West and North Africa with the intent to support the drug trafficking activities of Al Qaeda, Al Qaeda in Iraq, Magred ("AQIM"), and the FARC. |
| 10 | 2011 | Cordoba-Bermudez | Juanito | Pleaded guilty (Pimentel letter) | 18 U.S.C. 2339B | FARC | 180 | 180 | S.D.N.Y, 08 Cr. 1290 (DC) | Denny Chin | The Indictment recounts multiple discussions among various co-defendants, including CORDOBA-BERMUDEZ, regarding FARC logistics, supplies and weapons, as well as the seizures by authorities of a variety of weapons and materiel in 2008. These discussions occurred in the aftermath of a February 22, 2008, attack by five FARC guerillas on a Panamanian police patrol boat, and their subsequent capture in possession of substantial FARC weaponry and material. |
| 11 | 2012 | Yousef | Jamal | Pleaded guilty | 18 U.S.C. 2339B | FARC | 144 | 180 | S.D.N.Y. 08 Cr. 1213 (JFK) | John F. Keenan | The defendant, who had a history of trafficking in drugs, weapons, and fake travel documents, allegedly conspired to provide an arsenal of military-grade weapons to the FARC in exchange for a large shipment of cocaine. |
| 12 | 2010 | Alishtari | Abdul Tawala Ibn Ali | Pleaded guilty | 18 U.S.C. 2339C, 18 U.S.C. 1349 | Unspecified | 121 | 300 | S.D.N.Y., 07 Cr. 115(AKH) | Alvin K. Hellerstein | The defendant, a former bank underwriter and resident of Ardsley, New York, allegedly facilitated the transfer of $152,5000, believing that the funds would be used in Afghanistan and Pakistan to help train terrorists and provide them with military equipment. |
| 13 | 2009 | Iqbal | Javed | Pleaded guilty | 18 U.S.C. 2339B | Hizballah | 69 | 180 | S.D.N.Y., 06 Cr. 1054 (RMB) | Richard M. Berman | The defendants, residents of NY and NJ, allegedly provided satellite television services to al-Manar, a TV station operated by Hizballah. |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 14 | 2009 | Elawal | Saleh | Pleaded guilty | 18 U.S.C. 2339B | Hizballah | 17 | 180 | S.D.N.Y., 06 Cr. 1054 (RMB) | Richard M. Berman | See above. |
| 15 | 2010 | Hashmi | Syed | Pleaded guilty | 18 U.S.C. 2339B | al Qaeda | 180 | 180 | S.D.N.Y., 06 Cr. 442 (LAP) | Loretta A. Preska | Hashmi, a Pakistani-born U.S. citizen who was raised in Queens, NY, allegedly helped deliver protective clothing and night vision goggles to an Al Qaeda military commander and helped buy a plane ticked to Pakistan to engage in jihad. |
| 16 | 2007 | Shah | Tarik Ibn Osman | Pleaded guilty | 18 U.S.C. 2339B | al Qaeda | 180 | 180 | S.D.N.Y., 05 Cr. 673 (LAP) | Loretta A. Preska | The defendants allegedly conspired to provide material support to al Qaeda. Shah, a U.S. citizen and NYC resident, was a martial arts instructor who allegedly urged many of his students to prepare for violent jihad and expressed willingnes to recruit others to start a homegrown cell. Brent trained with Shah and attended a Lashkar-e-Taiba training camp in Pakistan. Sabir attempted to provide medical support to wounded jihadists. |
| 17 | 2007 | Brent | Mahmud Farouq | Pleaded guilty | 18 U.S.C. 2339B | al Qaeda | 180 | 180 | S.D.N.Y., 05 Cr. 673 (LAP) | Loretta A. Preska | See above. |
| 18 | 2010 | Yogarasa | Nadarasa | Pleaded guilty | 18 U.S.C. 2339B (two counts) | LTTE | 168 | 360 | E.D.N.Y., 06 Cr. 615 (RJD) | Raymond J. Dearie | Defendants conspired to buy weapons for the LTTE from an FBI agent positing as an arms dealer. Yogarasa introduced Sarachandran to the arms dealer, and was present at meetings where they discussed the purchase of shoulder-fired missles and AK-47s. |
| 19 | | Thavaraja | Pratheepan | Pleaded guilty | 18 U.S.C. 2339B | LTTE | 108 | 180 | E.D.N.Y., 06 Cr. 616 (RJD) | Raymond J. Dearie | Defendants allegedly raised millons of dollars to support the LTTE. Thavaraja was allegedly a principal arms and explosives agent for the LTTE. The goup allegedly bribed informants posing as State Department officials in an attempt to get the LTTE taken off of the list of designated terrorist organizations. |
| 20 | 2012 | Kandasamy | Karunakaran | Pleaded guilty | 18 U.S.C. 2339B, 18 U.S.C. 371 (conspiracy to bribe public officials) | LTTE | 72 | 240 | E.D.N.Y., 06 Cr. 616 (RJD) | Raymond J. Dearie | See above. |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 21 | 2011 | Vinayagamoorthy | Murgesu | Pleaded guilty | 18 U.S.C. 2339B | LTTE | 63 | 180 | E.D.N.Y., 06 Cr. 616 (RJD) | Raymond J. Dearie | See above. |
| 22 | 2010 | Patpanathan | Vijayshanthar | Pleaded guilty | 18 U.S.C. 2339B | LTTE | 67 | 180 | E.D.N.Y., 06 Cr. 616 (RJD) | Raymond J. Dearie | See above. |
| 23 | 2013 | Sriskandarajah | Suresh | Pleaded guilty | 18 U.S.C. 2339B | LTTE | 24 | 180 | E.D.N.Y., 06 Cr. 616 (RJD) | Raymond J. Dearie | See above. |
| 24 | 2010 | Socrates | Nachimuthu | Pleaded guilty | 18 U.S.C. § 371 (2 counts, conspiracy to bribe public officials) | LTTE | 12 | 120 | E.D.N.Y., 06 Cr. 616 (RJD) | Raymond J. Dearie | See above. |
| 25 | 2012 | Mylvaganam | Ramanan | Pleaded guilty | 18 U.S.C. 2339B | LTTE | 72 | 180 | E.D.N.Y., 06 Cr. 616 (RJD) | Raymond J. Dearie | See above. |
| 26 | | Nur | Abdul Hameed | Pleaded guilty | 18 U.S.C. 2339B | Unspecified | 180 | 180 | E.D.N.Y., 07 Cr. 543 (DLI) | Dora L. Irizarry | Defendant was allegedly a member of a conspiracy to commit a terrorist attack at John F. Kennedy International Airport in Queens, New York, by exploding fuel tanks and the fuel pipeline under the airport. |
| 27 | | Al-Moayad | Mohammed Ali | Pleaded guilty | 18 U.S.C. 2339B | al Qaeda, Hamas | 80 | 180 | E.D.N.Y., 03 Cr. 1322 (DLI) | Dora L. Irizarry | Defendants were accused of supplying money, recruits, weapons, and communications equipment to al Qaeda and Hamas. Mr. al-Moayad was alleged to have given al Qaeda $20 million before the 9/11 attacks. |
| 28 | | Zayed | Mohamed Mohsen | Pleaded guilty | 18 U.S.C. 2339B | al Qaeda, Hamas | 80 | 180 | E.D.N.Y., 03 Cr. 1322 (DLI) | Dora L. Irizarry | See above. |

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 29 | | Aref | Yassin Muhiddin | Convicted after trial | 18 U.S.C. 1956; 18 U.S.C.922 (a)(1) (2 counts);18 U.S.C. 2339A and 18 U.S.C. 2339B (multiple counts), and 18 U.S.C. 1001 | JEM | 180 | Life | N.D.N.Y., 04 Cr. 402 (TJM) | Thomas J. McAvoy | The indictment charged Aref and Hossain, Albany residents, with agreeing to participate in a scheme to launder money from the sale of a shoulder-fired missile to terrorist group JEM for use in an imminent terror attack in New York. |
| 30 | | Hossain | Mohammed Mosharref | Convicted after trial | 18 U.S.C. 1956 (1 count); 18 U.S.C. 922(a)(1) (10 counts), 18 U.S.C. 2339A (8 counts), 18 U.S.C. 2339B (8 counts), 18 U.S.C. 1546 (1 count), 18 | JEM | 180 | Life | N.D.N.Y., 04 Cr. 402 (TJM) | Thomas J. McAvoy | See above. |
| 31 | 2003 | al Bakri | Mukhtar | Pleaded guilty | 18 USC 2339A | al Qaeda | 120 | 180 | W.D.N.Y., 02 Cr 214 (WMS) | William M. Skretny | al Bakri and others allegedly traveled to Pakistan, and then attended an al Qaeda training camp in Afghanistan. They received firearms and tactical training, heard lectures justifying martyrdom, and attended a speech delivered by Osama bin Laden, urging attacks on the United States. At the time they were arrested in the U.S., authorities found a gun, a document that made reference to a future terror operation. |
| 32 | 2003 | Goba | Yahya | guilty | 18 USC 2339A | al Qaeda | 120 | 180 | 214 (WMS) | Skretny | See above. |
| 33 | 2003 | Alwan | Sahim | guilty | 18 USC 2339A | al Qaeda | 114 | 180 | 214 (WMS) | Skretny | See above. |
| 34 | 2003 | Galab | Faysal | guilty | 18 USC 2339A | al Qaeda | 84 | 180 | 214 (WMS) | Skretny | See above. |
| 35 | 2003 | Mosed | Shafal | guilty | 18 USC 2339A | al Qaeda | 96 | 180 | 214 (WMS) | Skretny | See above. |
| 36 | 2003 | Taher | Yasein | guilty | 18 USC 2339A | al Qaeda | 96 | 180 | 214 (WMS) | Skretny | See above. |

TABLE A-2 - Comparable al-Shabaab Sentences in All Circuits

| # | Year of Sentence | Last Name | First | Outcome | Convictions | Sentence | Max | Court | Judge | Allegations |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2015 | Ibrahim | Abdinassir | Pleaded guilty | 18 U.S.C. 2339B, 18 U.S.C. 1546(a) (false statement in an immigration matter) | 180 | 480 months | W.D. Texas, 14 Cr. 99 (XR) | Xavier Rodriguez | Ibrahim admitted that from about May 18, 2010, to about Jan. 31, 2014, he knowingly conspired to provide material support and resources, specifically sending e-mails from the U.S. enlisting support for al-Shabaab and making a cash payment to a known member of al-Shabaab for the benefit of the organization. Ibrahim knew at the time that al-Shabaab was designated by the United States as a foreign terrorist organization. Ibrahim also pleaded guilty to making a false statement in an immigration matter. |
| 2 | 2014 | Kauser Mohammed | Gufran Ahmed | Pleaded guilty | 18 U.S.C. 2339B | 180 | 180 months | S.D. Fla, 13 Cr. 20364 (UU) | Ursula Ungaro | The charges allege that Mohammed sent a series of wire transfers to coconspirator Mohamed Hussein Said for the purpose of supporting al-Shabaab, and to an individual whom he believed was a terrorist fundraiser, recruiter, and supplier for the purpose of supporting al-Qaeda and AQI/al-Nusrah Front. In addition, Mohammed agreed to support al-Qaeda and AQI/al-Nusrah Front by recruiting individuals to fight in the conflict in Syria. Mohammed earmarked certain of his financial contributions for the purpose of buying weapons and funding attacks on United States citizens or the United Nations. |
| 3 | 2014 | Baxam | Craig | Pleaded guilty | 18 U.S.C. 1519 (destruction of records to impede a terrorism investigation) | 84 | 240 months | D. Md, 12 Cr. 121 (JFM) | J. Frederick Motz | The defendant admitted to traveling to Africa to try to join the terrorist group al-Shabab and trashing his home computer so federal investigators could not track him. |
| 4 | 2013 | Ahmed | Mohamed Ibrahim | Pleaded guilty | 18 U.S.C. 371 (two counts) | 111 | 120 months | S.D.N.Y. 10 Cr. 131 (PKC) | P. Kevin Castel | The defendant allegedly traveled from Sweden to Somalia to receive "jihad" trainingin weapons and explosives at an al Shabaab training camp, provided a total of 3,000 Euros to al Shabaab, purchased an AK-47 that he later provided to an al Shabaab commander, and traveled to Mali in search of further terrorist training. |
| 5 | 2013 | Mohamed | Omer Abdi | Pleaded guilty | 18 U.S.C. 2339A | 144 | 180 months | District of Minnesota, 09 Cr. 352 (MJD) | Michael J Davis | Mohamed allegedly helped Somali-American men travel from Minnesota to Somalia to join al-Shabaab, an Islamist group on the US government's terrorist list. Plead guilty to providing support and resources knowing that said resources were to be used to carry out a conspiracy to murder, kidnap, maim or injure persons in another country. |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 6 | 2013 | Hassan | Hawo Mohammed | Convicted after trial | 18 U.S.C. 2339B, 18 U.S.C. 1001 (2 counts) | 120 | 300 months | District of Minnesota, 10 Cr. 187 | Michael J Davis | Evidence presented at trial proved that the defendant provided support to al-Shabaab from September 17, 2008, through July 19, 2009. Specifically, Hassa and others raised money for the terrorist organization by soliciting funds door-to-door in Somali neighborhoods in Minneapolis, Rochester, and other cities in the U.S. as well as in Canada. Hassan also obtained funds by participating in teleconferences that featured speakers who encouraged listeners to make donations in support of al-Shabaab. |
| 7 | 2013 | Moalin | Basaaly | Convicted after trial | 18 U.S.C. 2339A (2 counts), 18 U.S.C. 2339B (2 counts), 18 U.S.C. 1956 | 180 | 960 months | S.D. Cal, 10 Cr. 4246 (JTM) | Jeffrey T. Miller | Moalin was convicted after trial along with three co-conspirators of a conspiracy to send money from San Diego to Somalia to help al-Shabaab. Moalin received the longest sentence, according to U.S. District Judge Jeffrey T. Miller, because he attempted to not only send money to the group but also to provide a house in Mogadishu to a terrorist leader. |
| 8 | 2013 | Mohamud | Mohamed | Convicted after trial | U.S.C. 2339B (2 counts), 18 U.S.C. 1956 | 156 | 780 months | S.D. Cal, 10 Cr. 4246 (JTM) | Jeffrey T. Miller | See above. |
| 9 | 2013 | Doreh | Issa | Convicted after trial | U.S.C. 2339B (2 counts), 18 U.S.C. 1956 | 120 | 780 months | S.D. Cal, 10 Cr. 4246 (JTM) | Jeffrey T. Miller | See above. |
| 10 | 2014 | Mohamud | Ahmed | Convicted after trial | 18 U.S.C. 2339A, 18 U.S.C. 2339B, 18 U.S.C. 1956 | 60 | 560 months | S.D. Cal, 10 Cr. 4246 (JTM) | Jeffrey T. Miller | See above. Mohamud was working as a cab driver in Anaheim, California at the time of his arrest and played the role of money collector for the group. |
| 11 | 2012 | Yusuf | Nima Ali | Pleaded guilty | 18 U.S.C. 2339B | 96 | 180 months | S.D. Cal., 10 Cr. 4551 (BTM) | Barry Ted Moskowitz | The defendant recruited and encouraged other Americans to engage in jihad on behalf of al-Shabaab and to "kill infidels everywhere." |
| 12 | 2012 | Yusuf | Mohamud | Pleaded guilty | 18 U.S.C. 2339B (4 counts) | 140 | 720 months | E.D.Mo, 10 Cr. 547 (HEA) | Henry E. Autrey | According to court documents, between February 2008 and July 2009, Yusuf conspired with others to provide money to al Shabaab. Yusuf admitted to soliciting money from inside and outside the Eastern District of Missouri and coordinating the transfer of the money to al Shabaab using fake names, telephone numbers and money transfer businesses in the U.S. |
| 13 | 2012 | Masri | Shaker | Pleaded guilty | 18 U.S.C. 2339B | 118 | 180 months | N.D. Ill, 10 Cr. 655 (SJC) | Sharon Johnson Coleman | In July of 2010, Masri allegedly told a government informant that he had decided to take part in a jihad in Somalia or Afghanistan and to volunteer for a suicide mission to blow up American soldiers. The informant told Masri he would help pay for his trip, provided they went together. Masri agreed. They planned a trip from Chicago to Somalia via Los Angeles and Mexico, according to court documents. |

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA,        )
                                 )
                     Plaintiff,  ) Case No. 10cr4551BTM
                                 )
             vs.                 )
                                 )
NIMA ALI YUSUF,                  )
                                 )
                     Defendant.  )
                                 ) San Diego, California
                                 )
                                 ) December 11, 2012
                                 )
                                 )
                                 )

Sentencing

BEFORE THE HONORABLE BARRY TED MOSKOWITZ
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:            Laura E. Duffy
                             Sabrina L. Feve
                             John N. Parmley
                             Assistant United States
                             Attorneys
                             880 Front Street
                             San Diego, CA 92102


For the Defendant:           Charles L. Rees
                             424 F Street #D
                             San Diego, CA 92101

                             Charles D. Swift
                             1809 Seventh Avenue, #1108
                             Seattle, WA 98101

| | |
|---|---|
| 1 | *Official Reporter:*     Barbara Harris CM/RPR/CRR |
| | 400 W. Broadway |
| 2 | San Diego, CA 92101 |
| | 619-990-3116 |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | San Diego, California  -  December 11, 2012 |
| 8 | |
| 9 | THE CLERK:  Calling calendar matter number 2, |
| 10 | 10cr4551, United States of America vs. Nima Ali Yusuf. |
| 11 | MR. REES:  Good morning, your Honor.  Charles Reese |
| 12 | on behalf of Ms. Yusuf. |
| 13 | MR. SWIFT:  Good morning, your Honor.  Charles |
| 14 | Swift on behalf of Ms. Yusuf. |
| 15 | MS. FEVE:  Good morning, your Honor.  Sabrina Feve |
| 16 | on behalf of the United States. |
| 17 | MR. REES:  I'm going to just step out to let people |
| 18 | know to come in. |
| 19 | THE COURT:  Anymore people?  Is that everybody?  Do |
| 20 | you have everybody in? |
| 21 | MR. REES:  It is, your Honor. |
| 22 | THE COURT:  Okay.  I want to thank you for giving |
| 23 | me some extra time.  I wanted to look at some cases this |
| 24 | morning, and hopefully it will be helpful to our discussion. |
| 25 | Now, she pled guilty -- why doesn't everybody have |

19:02:28 (line 10)
19:02:46 (line 15)
19:05:22 (line 20)
19:05:43 (line 25)

```
 1   Category VI.
 2               MR. REES:  Yes.
 3               THE COURT:  Do the parties agree that under 3A1.4
 4   that this offense certainly is a felony and that it involved
 5   or was intended to promote a federal crime of terrorism?            19:09:28
 6               MR. REES:  Correct.
 7               THE COURT:  And so that would be a plus 12?
 8               MR. REES:  Yes, your Honor.
 9               THE COURT:  Let me just have a second.  I want to
10   look at something.  And of course minus three for accepting         19:09:48
11   responsibility.
12               Can we go over exactly what the defendant did, and
13   I want the parties to focus.  Perhaps they agree.  The
14   government has to establish, and the parties agree that they
15   have, but I just want to make sure I understand the factual         19:10:48
16   context, that there was a conspiracy to provide material
17   support to a foreign terrorist organization.
18               And so the support was, my understanding, was in
19   two ways.  One was seeking to recruit a person?
20               MS. FEVE:  Well, your Honor, the conspiracy was to      19:11:11
21   provide money and personnel.  There were multiple ways in
22   which the conspirators provided personnel.
23               THE COURT:  Just one second.  Do you want to bring
24   the jury?  Okay.  Just hold on.
25          (The jury in another matter entered after a break.)         19:11:24
```

7

```
 1            THE COURT:  One of the jurors' phones.  Okay.  They

 2   place them all in the basket there.  Okay.  So go ahead.

 3            MS. FEVE:  So, your Honor, the conspiracy was to

 4   provide both money and personnel.  In this case the money is

 5   set forth in the plea agreement, itemizing the transfers          19:12:37

 6   during the period in question.

 7            In terms of the personnel, Ms. Yusuf was conspiring

 8   to provide both the fighters themselves by supporting them,

 9   so that would be the four men featured in the plea agreement,

10   Mohamed Abdullahi Hassan, Abdisalan Hussein Ali, Cabdulaahi      19:12:49

11   Ahmed Faarax, and Abdiweili Yassin Isse, as well as her

12   attempt to procure and solicit yet another fighter, an

13   individual based here in San Diego who she repeatedly

14   contacted in conjunction with efforts by Faarax to try and

15   get him to go to Somalia to fight for al-Shabaab there.          19:13:11

16            THE COURT:  Can we focus on the money.  In

17   reading -- no doubt you read the defendant's papers and the

18   letter from the Imam.

19            MS. FEVE:  Yes, your Honor.

20            THE COURT:  The affidavit.  There seems --            19:13:26

21            MS. FEVE:  Yes.

22            THE COURT:  There seems to be a suggestion that she

23   was providing charitable money to the people that she knew

24   from Minneapolis and perhaps was not then providing the

25   material support to a terrorist organization, because none of    19:13:46
```

A78

1   the money went directly to the organization, it went to the

2   individuals; right?

3          MS. FEVE:   It went to the fighters who were there

4   fighting for that organization and whose 24/7 activities were

5   being conducted on behalf of that organization.                     19:14:00

6          And perhaps the best example of the purposeful

7   nature of their being in Somalia is the case of Abdisalan

8   Hussein Ali, whose nom de guerre was Uhud and who Ms. Yusuf

9   referred to -- refers in passing in the presentence report,

10  and he has been one who is prominently featured in the New      19:14:18

11  York Times and other newspapers as having blown himself up in

12  martyrdom operation conducted on behalf of al-Shabaab for

13  which prior to blowing himself up he recorded an audio

14  recording that was posted extorting others in America, which

15  was delivered in English, to go to Somalia to wage jihad in    19:14:38

16  the name of al-Shabaab.

17          So the reason they were there was not to visit

18  family, it was not to make a new life for themselves, it was

19  to fight for al-Shabaab with the purpose of toppling the

20  transitional federal government and killing, maiming, and      19:14:53

21  harassing African peace keeping troops.

22          THE COURT:  So your position, maybe the defense

23  does not dispute this, is by providing support to the

24  fighters there.  They were providing support to the terrorist

25  organizations.                                                  19:15:10

1        MS. FEVE:  Yes.

2        THE COURT:  They don't have to make a check payable

3   to al-Shabaab.

4        MS. FEVE:  No.  They could, I guess, your Honor.

5   I'm not sure what the banking situation was in Somalia at          19:15:16

6   that point, but it seems like from what we know she is

7   sending money to a war ravaged country where $50 goes a very,

8   very long way, and she has committed sending $50 once a month

9   to this man who goes by Uhud because he has said, "I am going

10  on a mission.  I have a difficult task.  I need your                19:15:37

11  support."

12       And she has said, "I am going to do this."  She

13  doesn't say, "I am going to help widows or orphans or pay a

14  debt to you."

15       She says, "I am going to support you."                         19:15:46

16       And throughout her conversations, which feature

17  repeated discussions of martyrdom and how he is going to

18  martyr himself and how she is jealous because she wants to

19  martyr herself.

20       The conversation keeps going back to her supporting          19:15:59

21  him going on this mission which we now know unequivocally was

22  to martyr himself in the course of killing other people.

23       THE COURT:  And that was a person that -- I know

24  you quoted from the wiretaps, where there was discussion

25  about the $50 -- that was the person who did a suicide            19:16:18

1  bombing?

2      MS. FEVE:  Yes, your Honor.  The individual who she

3  gave the most money to and to whom she gave the money, most

4  money, most regularly was this individual who she commonly

5  referred to as Uhud who from the newspaper and press whose          19:16:32

6  real name, as far as we know, is Abdisalan Hussein Ali.  And

7  he committed suicide in a suicide bombing.  That's what the

8  news media reported.

9      I cannot say the FBI has committed a forensic

10  examination and can tell you the name of the suicide bomber.    19:16:51

11  But individuals who knew Mr. Ali, who heard the recordings

12  posted on behalf of the suicide bomber, all seemed to believe

13  that he is Mr. Ali.

14      And Ms. Yusuf seems to believe it is Mr. Ali as

15  well because in her statement to Probation when she was           19:17:07

16  interviewed for the PSR she said her life "has no purpose

17  because the person I cared the most about is gone from this

18  earth," and this appeared to be a reference to Mr. Ali.

19      But Mr. Ali is not the only suicide bomber who she

20  knew of.  It's not as though it came as a surprise to her        19:17:22

21  that the men she knew from Minneapolis were going to fight

22  and ultimately kill themselves as well as other people.

23      And there was also a man, actually a young man,

24  it's hard to even call him a man, known as Little Bashir who

25  in 2008 blew himself up and in the wiretaps she repeatedly       19:17:39

1   That's not required for the guidelines enhancement.

2   We look at the agency's conduct and we agree that the

3   government has -- that the facts clearly support that, and we

4   agree to it as part of our plea agreement.

5   THE COURT:  Based upon the representations of both   19:23:21

6   counsel as to what's admissions in the plea agreement, the

7   court agrees that the adjusted offense level is a 35, based

8   on a 26 under 2M5.3(a), a plus 12 under 3A1.4, and a minus

9   three for accepting responsibility, and for 3A1.4 the

10  Criminal History Category is Category VI.   19:23:44

11  I think the jurors may have buzzed, so do you want

12  to answer the door.

13  (Note from jury.)

14  THE COURT:  Okay.  Let me just see the note.  Do

15  you want to call the parties.   19:24:19

16  THE CLERK:  Yes, sir.

17  THE COURT:  Now let me explore something else.

18  This involved about $1400; right?

19  MS. FEVE:  It involved more than that, your Honor.

20  What is agreed to in the plea agreement is 1450.   19:24:30

21  THE COURT:  Okay.  Plus the issue about trying to

22  recruit the other person.

23  MS. FEVE:  Yes, and she also -- she provided other

24  assistance as well.  She was willing to help them get a video

25  recorder.  She was going to try to help them get a laptop.   19:24:46

16

1        There were a series of things she was proactively

2    trying to do to be of use to further this cause that she

3    believed in.

4        THE COURT:  One thing I want to explore.  There is

5    no dispute that the guidelines are 180 months to 180 months          19:24:59

6    given the statutory maximum.

7        If this were a drug case we would measure the harm

8    based upon the type of drug and the quantity of drug.

9        If this were a fraud case or a money laundering

10   case we would measure the harm based upon the amount of money        19:25:16

11   involved.

12       What I would like to focus on, and no one really

13   focused on this in their papers, the statute and the

14   guidelines are open ended.  They, unlike money laundering or

15   fraud or robbery or any of those offenses that involve money,        19:25:36

16   there is no chart or increase based upon different levels of

17   monetary support.  And so should that be something that the

18   court should take into account?

19       So what I would like to discuss is that plus what

20   is the range of conduct that could be covered under the              19:25:57

21   guidelines here, and then how does her conduct fit within

22   that range?

23       MS. FEVE:  I'll try and address your first

24   question, and if I misunderstand it please cut me off and

25   redirect the conversation, your Honor.                               19:26:16

58

1    something on behalf of the jihadi beliefs that there will be

2    repercussions for her in the next life, if not now.

3              And then finally, I don't disagree that she has

4    done kind things to help people, and that is certainly part

5    of the person that stands before the court and that the court    21:02:35

6    needs to consider.

7              But what is striking about the final excerpt, and I

8    will finish here with the court, is the way she embraces the

9    term "terrorists," not just as it was applied to these men,

10   but as she applies it to herself.  And in this she is    21:02:49

11   speaking to the friends, the sister of one of the fighters,

12   and they are talking -- they go through a long list of the

13   fighters they have known and which ones have died and which

14   ones are still there.

15             And the friend says at one point, "You weren't even    21:03:04

16   in it."

17             And Yusuf says, "No, I swear to God I was always in

18   it.  I always" --

19             And her friend says, "Yeah, you were always in it,

20   but not like you are now."    21:03:15

21             And Yusuf says, "No, I was always in it because

22   nobody" -- and her friend cuts her off.

23             And she says, "Now you are just a little American

24   terrorist."

25             And Yusuf says, "No.  Okay.  I was, because back --    21:03:25

1    okay.  Let me tell you something.  Back then they were not a

2    terrorist.  They were just freedom fighters."

3            And her friend just laughs.

4            And Yusuf continues, "And nobody, you know, was

5    divided.  Everyone was with it."                          21:03:37

6            And her friend says, "Dude, Cali," that's her

7    nickname.  Just to continue "except the Mujahidin people,"

8    which is a reference to a different clan.

9            And her friend continues, "You can say it however

10   you want.  They were terrorists," and she is talking about   21:03:53

11   her own brother and his group.

12           And Yusuf says, "Well, now they are."

13           And her friend laughs and she says, "But back then,

14   but what, what, what?  Just because America says they are

15   terrorist that makes them terrorist?"                     21:04:09

16           And Yusuf says, "Yeah, according to America."

17           And her friend says, "Yeah, according to America."

18           And Yusuf says, "Yeah, but according to me they are

19   freedom fighter."

20           And her friend says, "Hmm.  According to me they    21:04:17

21   are Mujahidin."

22           And Yusuf says, "That is just another way to put

23   it."

24           So she knew who these people were.  She knew what

25   they were fighting for.  She fervently believed in it.  It   21:04:28

1    was absolutely her right to believe in it.  It was just

2    completely out of bounds for her to send them money in

3    furtherance of it.

4         And given the consequences of what occurred, both

5    in terms of Ali blowing himself up and killing roughly a

6    dozen people in the process, and all of the other bloodshed

7    and mayhem and chaos that al-Shabaab has shown, we believe

8    this is an incredibly serious offense and that it is an

9    offense that is justly and rightly punished and sentenced

10   with a ten-year custodial sentence.

11        THE COURT:  Okay.  Thank you.

12        MR. REES:  Your Honor, just briefly, with respect

13   to Ali and the suicide bombing, she wasn't aware of that

14   until while she was in custody.  And when she learned about

15   that she was heartbroken, she was devastated.  And that I

16   think becomes clear in the probation report where she talks

17   about how she never wanted him to do anything like that.

18        So that's not something that she was even -- even

19   believed that he would ever, ever do.

20        I think the statements that the prosecutor talks

21   about stems from her own insecurity, her own immaturity, her

22   wanting to feel like a big shot, her wanting to feel like she

23   belonged.

24        And even the prosecutor and probation officer

25   acknowledges this.  And the prosecutor's memorandum at page

21:04:39

21:04:59

21:05:13

21:05:28

21:05:42

1

2

3

***CERTIFICATION***

4

5

6          I hereby certify that I am a duly appointed,

7    qualified and acting official court reporter for the United

8    States District Court; that the foregoing is a true and

9    correct transcript of the proceedings had in the

10   aforementioned cause; that said transcript is a true and

11   correct transcription of my stenographic notes; and that the

12   format used herein complies with the rules and requirements

13   of the United States Judicial Conference.

14

15   Dated:  January 5, 2012 at San Diego, California

16

17

18

19   _____

20

21   Barbara Harris, Official Reporter

22

23

24

25