**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**--------------------------------------------------------X**

**UNITED STATES OF AMERICA**


                    -against-                              **No. 12 Cr. 661 (JG)**

**ALI YASIN AHMED**

                         *Defendant.*

**--------------------------------------------------------X**


### MEMORANDUM IN AID OF SENTENCING
### ON BEHALF OF DEFENDANT ALI YASIN AHMED

Susan G. Kellman
Sarah Kunstler
Ezra Spilke

*Attorneys for Ali Yasin Ahmed*
25 Eighth Avenue
Brooklyn, NY 11217
(718) 783-8200
sgk@kellmanesq.com

### COURTESY COPY
### Original was electronically filed and assigned document number 330.
(Names of minor children were redacted from the public filing.)

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**UNITED STATES OF AMERICA**

         -against-                        **No. 12 Cr. 661 (JG)**

**ALI YASIN AHMED,**

                ***Defendant.***

-------------------------------------------------------X

## MEMORANDUM IN AID OF SENTENCING
## ON BEHALF OF DEFENDANT ALI YASIN AHMED

## INTRODUCTION

This memorandum is submitted on behalf of ALI YASIN AHMED in support of his prayer for a non-guidelines sentence. We respectfully submit that such a sentence is warranted based on Mr. Ahmed's history and characteristics, including Mr. Ahmed's conditions of confinement, as well as the nature and circumstances of the offense, and is "sufficient, but not greater than necessary," to comply with the purposes set forth in 18 U.S.C. § 3553(a).

## THE OFFENSE CONDUCT

On May 12, 2015 Mr. Ahmed entered a guilty plea to Count 1 of a five-count indictment, allocuting to his conduct. As Mr. Ahmed acknowledged before this Court, between December, 2008 and August, 2012, he agreed with others provide material support to al-Shabaab, which he knew to be a terrorist organization. He stands by his guilty plea.

## THE PLEA AGREEMENT

Mr. Ahmed pleaded guilty to conspiracy to provide material support to a foreign terrorist organization, in violation of 18 U.S.C. § 2339B(a)(1). This count carries a range of imprisonment from 0 to 15 years. The plea agreement assumes a guideline calculation driven beyond the statutory maximum by the Terrorism Enhancement set forth in Guidelines Section 3A1.4(b). This results in an advisory Guidelines sentencing range of 360 months to life. Because the statutory maximum sentence is 15 years, pursuant to 18 U.S.C. § 2339B(a), Mr. Ahmed's effective applicable advisory Guideline is 15 years. Nothing in the agreement precludes Mr. Ahmed from identifying potential grounds for departure under the Guidelines, or from presenting information to the Court relevant to sentencing under 18 U.S.C. §3553(a) that would justify a variance from the applicable Guideline sentence.

## MR. AHMED'S OBJECTIONS THE PRE-SENTENCE INVESTIGATION REPORT

Mr. Ahmed's individual objections are included here. Objections shared by all defednants are included in the defendants' joint sentencing submission.

**1.   Corrections to paragraphs describing the history and characteristics of the offense**

- ¶ 18: "Ahmed was also known as a dedicated fighter, and on at least one occasion refused to leave the front lines, embracing an enthusiastic approach to the potential of death as a martyr on behalf of al-Shabaab." This assertion is derived from the following testimony by ▮▮▮▮▮▮▮:





  (*See* Exhibit H, ▮▮▮▮▮▮▮3.) The government never asked ▮▮▮▮▮ As it stands, this vague hearsay testimony cannot be the basis for the assertion in paragraph 18 that Mr. Ahmed "embraced an enthusiastic approach to the potential as death as a martyr." We request that the sentence be stricken.

- ¶ 30: "As noted above, between December 2008 and August 2012, Ahmed served as a member of al-Shabaab in Somalia."

  For much of the period between September of 2010 and August 2012, Mr. Ahmed lived with his new wife and child in Mogadishu. We therefore ask that this paragraph be amended so that it is consistent with Count I of the indictment. ("In or about and between April 2008 and August 2012, both dates being approximate and inclusive…")

**2. Corrections to paragraphs describing Mr. Ahmed's history and characteristics**

- ¶ 77: "Gohro" should be Johro.

- ¶ 80: (1) This paragraph, collapses the history of the conflict between Somalia and Egypt. There may be other facts worthy of note, but what sticks out is that Ethiopia reinvaded in 2011 and 2012. As it stands, the paragraph seems to suggest that Ethiopia left Somalia in

2009 and never returned.  In point of fact, they never really left at all – just retreated to border regions. (This issue is addressed in greater detail in our joint submission.)

- ¶ 80: "Norsgo" should be Norsjo.

- ¶ 82: (1) "June" should be May. (2) "18-month courtship" should be 5-month courtship. (3) Mr. Ahmed's son's name is Yazid Ali Yasin, and his daughter's name was Faduma Ali Yasin.

- ¶ 83: (1) Like paragraph 80, above, this paragraph suggests that Ethiopia left Somalia in 2009 and never returned. (2) "The defendant stated that prior to his torture he observed and heard other inmates tortured." Ali heard and observed the torture of others both before and after his own torture – the torture of prisoners at the Djibouti facility was ongoing and occurred with regularity at all hours of the day and night.

- ¶ 84: Mr. Ahmed lost social phone privileges for a total of 3 months, not 8 months. Also, the irony of Mr. Ahmed's sanction for "possessing an unauthorized item (a disposal razor)" should not be overlooked.  MDC staff had given Mr. Ahmed the wrong medication, causing sleeplessness, light-headedness and intense pain, and leading Mr. Ahmed to attempt suicide with a razor. Instead of giving Mr. Ahmed the help he so clearly needed, the MDC sanctioned him further by reducing his access to commissary and phone contact with his family, thereby worsening the conditions that led him to attempt to end his life.

- ¶ 88: "he can only read a new book once (because the book is destroyed)" It's not that Mr. Ahmed can only read each book once – he can read the SAME book (and often does) as many times as he likes. It's just that he can't read any books that aren't brand new, and as result, has very limited access to books. Once he (or any other SAMS inmate) is done with a book, that book is destroyed and cannot be read by anyone else.

- ¶ 94: Mr. Ahmed does not speak Swahili.

- ¶ 97: "He left Sweden for Somalia in 2008; he reported no employment in Somalia, and was financially supported by his family." Mr. Ahmed was not supported by his family while in Somalia; he took his savings with him, and lived off the money he brought.

## THE APPROPRIATE SENTENCE

As will be set forth in further detail below, Ali Yasin Ahmed made the decision to travel to Somalia and join al-Shabaab because he felt a personal responsibility to come to the aid of his former countrymen and to fight for the future of his country. At no time did he intend to cause harm to the United States or its citizens.[1] That said, Mr. Ahmed recognizes that in joining al-Shabaab, which he knew to be a designated foreign terrorist organization, he made a grave error. Mr. Ahmed accepts full responsibility for his conduct.

Ali Yasin Ahmed and his co-defendants were arrested together on August 5, 2012, in Djibouti by men claiming to be Djiboutian law enforcement. He was physically and mentally tortured by his captors, and held in wretched conditions, without access to adequate food, water, or medical care, until November 14, 2012.[2] Between August and November 2012, Mr. Ahmed was questioned by individuals who presented themselves as representatives the United States, though his questioning by the Americans was always in the presence of his Djiboutian captors. Thereafter, Mr. Ahmed and his co-defendants were officially transferred to American custody and removed to the United States. From that point forward, Mr. Ahmed and his co-defendants have been held in solitary confinement, spending at least 23 hours per day alone in a small cell,

---

[1] *See* Exhibit A, Letter from Ali Yasin Ahmed, p. 4. ("My decision to join Al-Shabaab had nothing to do with America or what was happening in Iraq or Afghanistan. I never had any intention in the past, nor do I possess now any present intention to cause any harm to the United States now or in the future.")

[2] The government does not challenge Mr. Ahmed's report that he was subjected to torture while in Djibouti.

with virtually no human contact, and one hour of solitary "recreation" in yet another cage.  It is the physical transfer from his cell to the "recreation" cage and back again, that defines the parameters of Mr. Ahmed's daily human contact.

Given Mr. Ahmed's history and characteristics and the nature and circumstances of his involvement in the instant offense, we submit that a non-guidelines sentence is "sufficient, but not greater than necessary, to comply with the purposes" of the sentencing factors outlined in 18 U.S.C. 3553(a)(1).

## 1.  The History and Characteristics of the Defendant

Ali Yasin Ahmed is now 30 years old. He was born on January 1, 1985, in Kismayo, Somalia. His father, Yasin Ahmed, died from liver cancer five days after Mr. Ahmed's birth, leaving his mother, Fadumo Abdirahman, with eleven children. Mr. Ahmed spent his early childhood in Kismayo. In approximately 1991, when Mr. Ahmed was six years old, Mohamed Siad Barre, the military dictator and President of Somalia, was forced from power by a coalition of armed opposition groups. [3]  According to the CIA's World Factbook, "after the regime's collapse … Somalia descended into turmoil, factional fighting, and anarchy."[4]

---

[3] Barre was President of the Somali Democratic Republic from 1969-1991, coming to power after a successful military coup.

[4] See Central Intelligence Agency, "Somalia: Background". The World Factbook. Langley, Virginia: Central Intelligence Agency.  Available at: https://www.cia.gov/library/publications/the-world-factbook/geos/so.html

As Mr. Ahmed writes in his letter to the Court,

> Suddenly our life changed. A civil war that raged in the capitol was slowly but
> steadily spreading throughout our country. In Somalia, "clan" affiliation was an
> important part of one's identity. But my clan was not a part of the ruling structure
> that was growing in Somalia and so our mother was very scared for our safety.
> She told us that we must "hide" our clan identity to be safe. Soon there was no
> more happiness and people were fleeing to Kenya.

(Letter from Ali Yasin Ahmed, attached as Exhibit A, p.2.) Mr. Ahmed and his family were

among those who fled the country. Mr. Ahmed left with his older sister Shamsa, who was in her

twenties and married with children. Mr. Ahmed's mother stayed behind with his sister Fowzia

and his disabled brother Adam. About fleeing Somalia, Mr. Ahmed recalled leaving by boat,

"being crowded in a very small space", that "people were scared" and "there was yelling and

crying." Mr. Ahmed and his sister's family spent several months with distant relatives in Kenya

before moving temporarily to Uganda, and then finally arriving in Sweden as refugees. It would

be two years before Mr. Ahmed would be reunited with his mother.

In Sweden, Mr. Ahmed's family began with nothing – no money, no possessions, no

Swedish language skills or understanding of Swedish society or culture. Despite having lost

everything, Mr. Ahmed and his family were overjoyed to be safe and  together. Mr. Ahmed

writes, "Even though we lost everything in Somalia we were happy to have survived and start a

new life, far away from war." (Exhibit A, p.2.)  Mr. Ahmed remembers feeling welcomed in his

new country. He writes, "My life in Sweden was peaceful and happy. I made friends from

different nationalities and learned to play soccer." (*Id.*) Mr. Ahmed's older siblings also adjusted

well, learning the language and assimilating quickly, working as bus drivers, as cleaners for

office cleaning companies, and as school assistants and assistants for the disabled. After his

sisters married, they became homemakers and raised families. Mr. Ahmed's mother had a more

difficult time assimilating. Nearly 50 years old when she arrived in Sweden, it was a challenge

for her to learn Swedish, a language she has yet to master after more than twenty years in the

country. Further, she lacked a formal education and, without language skills, it was difficult for

her to find work. Since her arrival in Sweden in 1993, she has subsisted on public assistance and

with the support of her children.

Mr. Ahmed has always had a deep sense of familial and social responsibility. He writes,

> At home, we were taught to care for others and to have a wide view of family and
> community. My older siblings had children of their own and we took care of one
> another. My brother Adam is severely retarded and cannot care for himself, and
> we have always taken turns in caring for him. He is a beautiful person and has
> much to offer. I feel lucky to be his brother, because he has taught me to see past
> disability.

(Exhibit A, pp. 2-3.) Mr. Ahmed also took great pride in caring for his cousin, Mahamoud Jama,

who suffers from a form of muscular dystrophy. Mahamoud is his sister Shamsa's son, and was

in the same grade as Mr. Ahmed throughout school.  In his letter to the Court, Mr. Jama writes,

> … Ali is calm and kind person. He is also thoughtful and helpful; I know he
> helped me all the time because I am disabled. He used to help me with my
> clothing on my way to kindergarten. That would have taken me forever if I had
> done it on my own. We even slept with overalls ones so we could be there in time.

(Letter from Mahamoud Jama, attached as Exhibit D.) Similarly, Mr. Jama's sister, Aisha Jama,

notes how Mr. Ahmed cared for her disabled brother, writing, "Ali always took care of my older

brother, even when he was a child himself."   (Letter from Aisha Jama, attached as Exhibit C.)

Ms. Jama also recalls how Mr. Ahmed would drop everything when her mother needed a babysitter, staying home to cook dinner and watch cartoons with the younger children, cancelling his own plans and never complaining. (*Id*.)

In 2000, when Mr. Ahmed was 15 years old, he and two other friends came to the aid of an elderly robbery victim, subduing her would-be robber and holding him until the police came. At the end of the year, Mr. Ahmed and his friends were invited to a dinner hosted by the police chief of Stockholm as part of a group of civilians who received certificates acknowledging their service to their community.  Mr. Ahmed remembers how proud he felt, and how proud his mother was of him. Mr. Ahmed's mother, Ms. Abdirahman, recalls this instance of bravery and compassion in her letter of support, as does Mr. Ahmed's niece Aisha.[5] (*See* Exhibit C; Letter from Fadumo Abdirahman, attached as Exhibit B.) It was the first moment Mr. Ahmed recalls feeling truly Swedish – a full-fledged citizen of his adopted country. At the same time, Mr. Ahmed continued to celebrate and embrace his membership in the Swedish-Somali immigrant community.  The same year he was honored by the Stockholm police chief, Mr. Ahmed began attending seminars and dinners organized by the Nätverket för Ungdomars Framtid (The Network for Adolescent Future or "NUF"), an organization for Somali youth in Sweden.

In 2004, when Mr. Ahmed was 19 years old, he began actively volunteering with NUF. A letter we received from NUF Board members describes how Mr. Ahmed worked with the

---

[5] We just also received documentation from the Stockholm Police Department which we have attached as Exhibit I. We are in the process of having these documents translated, and will submit the translation with our reply submission.

organization "on different activities such as the after school tutoring and family summer camping" and took part in "night patrols in the North West area of Stockholm during the weekends and the public holidays, in order to improve the safety in the area and to minimise the anti-social behaviour."  (Letter from NUF Board Members, attached as Exhibit F.) They recall Mr. Ahmed as "polite, helpful and always happy", as well as a "hard working volunteer" who was "always willing to contribute more to the society." (*Id.*)

In her letter of support, Mr. Ahmed's mother also highlights his commitment to mentoring Somali-Swedish immigrant youth.

> He used to take the kids from the streets bring them together to help them with their education. He would advise them and was very loved by all his surroundings from family members, friends to teachers, acquaintances, and neighbors.

(Exhibit B.) He was also committed to the education of his young nieces. Aisha Jama recalls Mr. Ahmed teaching her math and helping with her reading. (*See* Exhibit C.) Both Aisha Jama and Hodan Jama recall that in 2006, when they were 13 and 14 years old, Mr. Ahmed was their chaperone when their family was in the process of moving to Egypt, going ahead with the children so they could begin the school year, and deferring a year of his own university studies to make things easier on his sister and her family. (*See* Exhibit C; Letter from Hodan Jama, attached as Exhibit E.)

Mr. Ahmed and his family, like the rest of the Somali-Swedish community in Stockholm, followed the political situation in Somalia. An uncle, and other relatives who had not fled Somalia, had been killed during the civil war while defending their homes. The family paid close

to attention to any news coming out of Somalia, and listened eagerly to the stories of recent refugees at their mosque. In August of 1996, Mr. Ahmed watched on television as Ethiopia invaded three towns in western Somalia, the first incursion by Ethiopian troops after the fall of the central Somali government.[6] The area invaded was considered a stronghold of the Islamic Union, a devoutly religious group comprised mostly of members of the Ogadeni clan, native to the region. According to the Islamic Union, more than 100 civilians were killed and thousands of Somali families fled from the attack. In his letter to the Court, Mr. Ahmed recalls how the invasion rocked the Somali-Swedish community:

> [W]hen we went to the mosque, everyone was crying and worried about family members back home. There was a feeling of desperation and hopelessness. Following this first Ethiopian invasion, I remember going to a demonstration at the Ethiopian embassy with my mother and siblings. They demanded human rights for our people. I remember that it felt like we were screaming into the wind.

(Exhibit A, p. 3.) To the Somali community in Sweden, the Ethiopians were perceived as butchers engaged in a naked land grab. The perception of the Swedish-Somali population of Ethiopia's motivations cannot be viewed in a vacuum; rather, it must be viewed in the context of the history between the two countries, which have been in conflict since at least the early 1900s. From the perspective of many Somalis, Ethiopia has long sought to exercise dominion and control over Somalia.

---

[6] http://www.nytimes.com/1996/08/10/world/ethiopian-army-attacks-3-towns-in-border-region-of-somalia.html

Ten years later, there was another Ethiopian incursion into Somalia. In 2006, when the invasion began, Mr. Ahmed was a 21-year-old student studying Arabic in Egypt, where many members of his family had relocated.[7] In his letter to the Court, Mr. Ahmed recalls,

> Ethiopia invaded Somalia again in 2006, and this time it was worse. They spread in many areas and there were mass killings and no one dared to hold them accountable for the violence they brought to my country. We watched accounts of the violence at home in horror. It went on for more than two years…People were dying and fleeing by the thousands.

(Exhibit A, p. 3.) Mr. Ahmed's perception of the conflict in Somalia is supported by Human Rights Watch. In mid-2006, prior to Ethiopia's invasion, the Islamic Court's Union (ICU), a movement based on a coalition of sharia courts, had rapidly risen to power. According to Human Rights Watch,

> The Islamic Courts were credited with bringing unprecedented stability to a city plagued by lawlessness and extreme violence. Speculation about whether early indicators of extreme and repressive action by the ICU would evolve into more moderate policy was cut short by the events that followed.
>
> The presence of some radical and militant Islamist elements within the ICU and their belligerent statements stoked fears within and outside the region. The ICU's dominance also threatened the Somali Transitional Federal Government (TFG), which had little international support and minimal popular legitimacy, particularly in Mogadishu. In December 2006 Somalia's historic rival Ethiopia intervened in Somalia in support of the TFG and with the backing of the United States government, and ousted the ICU in a matter of days. Although the campaign was conducted in the name of fighting international terrorism, Ethiopia's actions were rooted in its own regional and national security interests, namely a proxy war with

---

[7] As discussed above, Mr. Ahmed went to Egypt in 2006 as a chaperone for his nieces, Aisha and Hodan. He enrolled in Arabic-language classes while he was there.

Eritrea and concern over Ethiopian armed opposition movements supported by
Eritrea and the ICU. [8]

According to Human Rights Watch, "illegal means and methods of warfare" were "used

by all of the warring parties," resulting in "catastrophic toll on civilians in Mogadishu."[9]

The 2006 invasion hit close to home for Mr. Ahmed and his family; Mr. Ahmed's brother

Osman, an ICU supporter, was living in Mogadishu at the time.[10] Together with his pregnant

wife, Osman was among the thousands desperately trying to flee during the chaos and bloodshed

that followed. "In the confusion," Mr. Ahmed writes,

> Osman was arrested at the border between Kenya and Somalia. His arrest was one
> of many arrests, due to the fact that Kenya had difficulty distinguishing between
> insurgents and civilians. He spent over one month in custody in Ethiopia before
> Swedish officials brought him home to Sweden.

(Exhibit A, pp. 3-4.)

---

[8] *See Human Rights Watch, Shell Shocked: Civilians Under Siege in Mogadishu*, vol. 19,
no. 12(A), August 2007, (hereinafter "Shell Shocked") available at http://bit.ly/1HKOrAl
pp. 3-4, 27-42.

[9] *Id.*, p. 5. For more detail on the historic conflict between Ethiopia and Somalia, please see the
Defendants' Joint Sentencing Memorandum.

[10] The government has apparently represented to Probation that Osman was (or is) a
"high-ranking member of al-Shabaab" (See PSR, ¶¶ 12, 15, 122.) We object to this
characterization in the defendants' joint sentencing memorandum, as there is no evidence
that Osman was ever a member of al-Shabaab. After fleeing Somalia in 2006, Osman
returned to Somalia only once – in May or June of 2009 in an attempt to convince Mr.
Ahmed to return home to his family. This effort, which demonstrates how far-fetched the
government's representation is, is discussed in further detail below.

2. **The Nature and Circumstances of the Offense**

Mr. Ahmed's decision to travel to Somalia and join Al-Shabaab was precipitated by the

2006 Ethiopian invasion and the violence that followed. Mr. Ahmed writes candidly about his

decision in his letter to the Court:

> As the killing continued, I felt a growing obligation to go there and defend my
> people against Ethiopia. When I was 23, I went to Somalia to join the fight
> against the Ethiopian invaders. I didn't tell anyone, and left even my family in the
> dark. When Osman was arrested in 2006, I saw the toll it took on my family and
> how worried they were for his safety. They were angry with the Ethiopians for
> ravaging our country, but their response was charity, not armed resistance. From
> there my whole life was changed. I didn't have any plan, all I remember is that I
> was very angry.

(Exhibit A, p.4.)

According to Human Rights Watch, the Ethiopian invasion "ousted the ICU in a matter

of days."[11] With the disintegration of the ICU, insurgent groups represented the only opposition

to Ethiopian and TFG forces. This is consistent with Mr. Ahmed's experience. He writes,

> There was many groups resisting the Ethiopians in Somalia but all of them were
> based on clans or tribalism and I didn't belong to any of the tribal groups that
> were fighting. Al-Shabaab was the only unified force in Somalia and we believed
> that they could help us to defeat the invading forces – which now included other
> countries beside Ethiopia – like Burundi.

(Exhibit A, p.4.)

Mr. Ahmed fully and freely admits that he traveled to Somalia in December of 2008 and

joined Al-Shabaab, training with them and fighting against Ethiopian and TFG forces. In May or

---

[11] *Shell Shocked*, p. 4.

June of 2009, Mr. Ahmed's brother Osman travelled to Somalia in an effort to convince Mr.

Ahmed to return with him to Sweden. Osman successfully negotiated the return of his brother's

passport from al-Shabaab, and had almost convinced Mr. Ahmed to return with him, when Mr.

Ahmed had a change of heart. Some of Mr. Ahmed's friends in al-Shabaab[12]reminded him of

why he had come to Somalia. He believed, as they did, that by staying, he would have the

opportunity to help bring real change to the country. He also worried that he would be arrested in

Sweden upon his return. Osman left Somalia in July of 2009 without Mr. Ahmed. Before he left,

he gave Mr. Ahmed's passport to a friend who owned a store in Mogadishu for safekeeping. The

"friend" stole the passport and was arrested in Dubai in August of 2009 trying to pass himself off

as Mr. Ahmed.

     Mr. Ahmed was committed to fighting with al-Shabaab against the Ethiopians and the

TFG, which the Somalis viewed as a proxy for Ethiopia. However, the four years that Mr.

Ahmed spent in Somalia were not wholly devoted to armed struggle. In January of 2010, Mr.

Ahmed met his future wife, Qaali Ali, whom he married after a six-month courtship. He and his

wife lived together in Mogadishu, and in March of 2011, their son Yazid was born. Mr. Ahmed

describes becoming a husband and father as "one of the happiest times of my life." (Exhibit A, p

4.) Mr. Ahmed continues,

> Spending that first precious year with [Yazid] changed me and made me think
> about his future, about my family's future. At the same time, the fighting was
> intensifying and I worried for my wife and son. I dreamed of taking them back to

---

[12] This is not a reference to Mr. Ahmed's co-defendants in this case.

> Sweden with me, but I was afraid of being arrested there. My passport was stolen, and I had limited freedom of movement. I felt trapped.

(Exhibit A, pp. 4-5.) As the fighting intensified in and near Mogadishu, Mr. Ahmed feared for his family's future. When Qaali was seven or eight months pregnant with their second child[13], he left her and Yazid in the care of her family and clan, and began looking for a way to leave Somalia without a passport, hoping to send for his wife and children once he found a safer place for them to live.

### 3. Mr. Ahmed's Incarceration in Djibouti

On August 5, 2012, after paying smugglers to transport him to Djibouti, Mr. Ahmed was arrested in Djibouti along with his co-defendants. All told, Mr. Ahmed spent 103 days in Djiboutian custody under brutal and torturous conditions that no human being should have to endure.[14]

Mr. Ahmed describes his incarceration in Djibouti as follows:

> I was arrested in Djibouti and taken to what appeared to be a secret prison – we were taken there in blindfolds, and even after a few weeks, when the blindfolds were removed, we were never told the true identity of our captors or shown

---

[13] Mr. Ahmed's daughter Faduma was born during his confinement in Djibouti, and passed away from fever several months later. Mr. Ahmed learned of her death from counsel after he was transferred to the United States.

[14] The conditions of Mr. Ahmed's confinement, both in Djibouti and the United States are also addressed in the defendants' joint sentencing memorandum, which contains an analysis of these conditions under 18 U.S.C. § 3553(a) and as a factor that may warrant departure from the United States Sentencing Guidelines.

badges or identification. For more than three months I experienced a hell I never thought I would experience on this earth. I was placed in a small, unbearably hot cell, which I shared with five other men. When I came they took out the only mattress in the cell. We were forced to sleep on the floor and we used several large pieces of cardboard as a mattress.   I wore the same soiled t-shirt and underpants for the duration of my captivity. We were denied clothes, a toothbrush, toothpaste, soap, and even toilet paper.

I have never been so terrified and shaking in my life. In this place, they threatened to take away my manhood. They blindfolded me, slapped me, punched me, kicked me, and beat me with computer cables. At one point, computer cables were wrapped around my legs and I was hung upside down from the back of a door. I saw other men tortured, including one beaten mercilessly and threatened with rape, one who was raped with a 2-liter soda bottle and another who was beaten until he defecated on himself. Those memories follow me wherever I go. There was nothing in the cell for me to occupy my mind. I was not allowed to ask questions nor was I told why I was detained or how long I would be there. I worried that this is where I would die and nobody who loved me would know what had become of me.

(Exhibit A, pp. 5-6.)

Mr. Ahmed still lives with the trauma of his brutal incarceration and torture in

Djibouti. To this day, he has persistent nightmares about the hell-on-earth he

experienced.  In describing these nightmares, Mr. Ahmed writes,

Mostly it's about the men who tortured me in Djibouti. I see myself getting arrested by them and beaten to death. I wake up sweating and my heart beating strongly. Being there, lying on the floor in soiled clothes, in unbearable heat, vomiting after drinking toilet water, the only source of water available, listening to others get beaten and waiting for my turn, with no knowledge if I was ever going to leave that hell alive – all of that took something from me. I know now that part of me will always be trapped there.

(Exhibit A, p. 7.)

### 4.  Mr. Ahmed's Incarceration by the Bureau of Prisons

For over three years, since his arrival in the United States, Mr. Ahmed has been held in

solitary confinement in Special Housing Units in Bureau of Prisons institutions.[15] As addressed

in the defendants' joint sentencing memorandum, the mental imprint left by prolonged solitary

confinement is nearly identical to that left by physical torture. Indeed, in his letter to the Court,

Mr. Ahmed describes his experience in solitary confinement as a continuation of the torture he

experienced in Djibouti:

> In the United States I have experienced a different form of torture. For the past 3
> years I'm enduring continuous solitary confinement. I am confined to a cell with
> blacked out windows and a closed window flap that only opens from outside the
> cell and only opens when the staff needs to communicate with me. For 23 hour
> per day during the week, and 24 hours per day on weekends and holidays I am
> alone. The lights are left on 24 hours a day and we are living under an extreme
> dehumanizing lack of privacy and 24 hours under two-camera surveillance. My
> "recreation" is simple the ability to walk down the hallway to another indoor cage
> for one hour per day on Monday through Friday – if the guard feels like taking me
> to the cage – again, alone.  I have no television and reading materials are very
> limited.  Books that are sent to us have to be brand new ones. If they bring 6
> books and we are 10 inmates, four of us will have to wait for new books to be
> ordered. When anyone finishes a book, the staff has to destroy that book. Many
> times I find myself reading the same book again and again because there isn't any
> book available for months and then there is nothing for my mind to do –
> sometimes all of that nothing can make me crazy.  Many times my lawyers tell me
> that they send me books – but mostly I never get them and they are sent back to
> the companies, and every time it is for a different reason. I think that it may be
> hard for you, Judge, to imagine how excited I feel when I know that a book is on
> its way. I wait and wait. I tell myself to be calm, soon there will be something to

---

[15] Mr. Ahmed was brought to the United States on November 15, 2012. He was first incarcerated
at the Metropolitan Detention Center ("MDC") in Brooklyn, where he spent almost two years,
until his transfer to the Metropolitan Correctional Center ("MCC") in September of 2014.

occupy my mind. But then the book is sent back and I am terrified by the mental quiet.

I am completely segregated from all human contact other than my lawyers and my immediate family members, though I am only allowed to speak to them once a month for a few minutes. I haven't seen anyone from my family since my arrest. They have tried to apply for visa but were denied. The only time I have human contact is when I'm sitting in a court without restraints and I feel like a human. I don't write to my family anymore because of the long time it takes for my letters to reach them. And sometimes when I write, the letters never reach them.  This makes me feel so defeated.

(Exhibit A, pp. 6-7.)

Mr. Ahmed's conditions of confinement are even more punishing than that of the average

SHU inmate. Since April 19, 2013, or for more than two and a half of the past three years, Mr.

Ahmed has been held under Special Administrative Measures ("SAMS"), which have occasioned

further restrictions, notably, the requirement that a lieutenant be present every time the slot on

his door was opened for meals, or for every move outside of his cell, non-contact visits between

Mr. Ahmed and his counsel, sequestration from other SHU inmates, and a total prohibition on

communication with any other inmate.

In his letter to the Court, Mr. Ahmed acknowledges the effect that isolation has had on

his mind. "I am out of practice with thinking," he writes, "with communication." As a way of

protecting himself, Mr. Ahmed explains that it is sometimes easier to "turn off completely",

shutting off his thought processes so that he can endure the days, weeks, months and years of

nothingness he faces. Every day is a struggle in self-preservation and survival. He writes,

Here, I try to keep busy here to keep from going crazy. Some days, I work out in my cell until I am too tired to move. Other times, I force myself to sleep to make

the day go away until I get headache. I feel like I am an empty shell, I have lost so
much. I pick up a book to read but I can't concentrate or listen to the radio and I
don't remember anything from it.

(Exhibit A, p. 7.)  Stripped of virtually all human contact and communication and deprived of

sensory experience, Mr. Ahmed's narrowly circumscribed existence bears little resemblance to a

human life.

**Mr. Ahmed's Experience at MDC**

While Mr. Ahmed's conditions of confinement have been torturous at both the MDC and

the MCC, the conditions at MDC, where he spent the first two years of his confinement, were

appreciably worse. The MDC does not typically house SAMS inmates; thus was ill-equipped to

deal with the additional restrictions placed on Mr. Ahmed, who was told that he was the only

SAMS-designated inmate at the facility at that time. Because not even the slot on Mr. Ahmed's

door – his only connection to the outside world – could be opened unless a lieutenant was

present, Mr. Ahmed would frequently miss meals, miss his hour in a different cage known as

"recreation" or be left in the recreation cage for hours when there was no lieutenant available to

return him to his cell. These issues were magnified on weekends, when facility staffing is

reduced. On more than one weekend Mr. Ahmed complained to counsel that he had not been fed.

Further, while at MDC, Mr. Ahmed experienced great difficulty accessing necessary

medical care. After months of coughing uncontrollably, and numerous unheeded complaints of

illness, it was discovered that Mr. Ahmed had been suffering from untreated tuberculosis for

over a month, and possibly longer. This history is documented in BOP medical records, and

summarized below:

- At a sick call on **9/27/2013**, Mr. Ahmed complained of illness and weakness. ("28 y/o male with 1-week c/o HA, chills, body aches and generalized malaise. Inmate states he has been sleeping all day and unable to get out of bed due to weakness. Inmate also c/o abdominal pain s/p emesis after attempting to eat his meal. States he is unable to tolerate his regular diet.)The BOP concluded that he had influenza, and prescribed Acetominophen. (*See* Selected BOP Medical Records, attached as Exhibit G, pp. 1-3.)

- At a sick call on **10/11/2013**, Mr. Ahmed complained of continuing symptoms. ("Inmate seen last week for flu symptoms, which he states has resolved, but he is now experiencing a cough for the past few days. Inmate states with excessive coughing, he has had an episode or two of emesis (mainly watery). Inmate states he is willing to purchase what he needs from commissary to "feel better.") He was referred to follow up with commissary for cough syrup. (*See* Exhibit G, pp. 4-6.)

- At a sick call on **11/4/2013**, Mr. Ahmed complained of continuing symptoms. ("I/m with one-month c/o cough. Previously seen for a bout with the flu, but states he has had a cough since this time, which is occasionally productive. Denies fevers, chills, and hemoptysis. States he has episodes of emesis from the frequent coughing. Also states he purchased cough syrup from the commissary, but it has been ineffective.") (CITE.) At this point, more than a month after his symptoms began, it appears to have finally dawned on BOP medical staff that they don't have a chest xray on file for him, and that he might be suffering from tuberculosis. ("Inmate came in as John Doe 11/27/12, unable to locate initial CXR under that name.Ordering updated CXR now.")  (*See* Exhibit G, pp. 7-10.)

- On **11/5/13**, Mr. Ahmed was taken to the emergency room of Brooklyn Hospital Center where with TB and discharged the following day "due to request of security officers" at which point he was taken to Kingsbrook Jewish hospital. (*See* Exhibit G, pp. 11-20.) Mr. Ahmed spent three weeks at Kingsbrook before he was well enough to be discharged and returned to MDC on 11/26/13. (*See* Exhibit G, pp. 21-30.)

While his transfer to MCC did not lessen his isolation, Mr. Ahmed was relieved to be

moved to an actual SAMS unit, where he was one of a number of inmates subject to the same

restrictions and was no longer afraid of being forgotten and left to die, without food or necessary medical attention.

### 5.  Acceptance of Responsibility and Future Plans

Mr. Ahmed accepts full responsibility for his actions, and is committed to leading a law-abiding life. As he wrote in his letter to the Court,

> I will do everything I can to steer clear of any troubles in the future, or to violate the law, ever again. For whatever time I have left on this earth, I am choosing my wife, my child, my family, from whom I never want to be separated again.

(Exhibit A, p. 10.)

Mr. Ahmed misses his family and wishes to return to them as soon as humanly possible. His future goals are as follows:

> I want to finish my studies and become an accountant or an auditor. I always had a head for numbers. Now it is very hard for me to focus on things for any period of time. I pray that I will be able to re-train my brain to think as it once did and to respond as it used to. Most importantly I will do everything I can to be a good husband, father, son, brother, and uncle.

(Exhibit A, p. 9.) Mr. Ahmed would like to live an honorable life in the memory of his daughter and be a present father for his son. He writes,

> I would like to bring my wife and son to Sweden and to be there for my son Yazid. I never had a father in my life and I don't want my son to have the same experience. I want him to know he is loved, and that his father will be there for him in life to help him through life's struggles and share in life's celebrations. I wanted to do this also for Faduma, and it pains me that I will never have a chance to show her this love. I never want to endure the torture and isolation that I have endured. (Exhibit A, pp. 9-10.)

Page 23 of 25

<u>**CONCLUSION**</u>

Ali Yasin Ahmed was born in Somalia, an unstable country which erupted in civil war when he was a young child. Mr. Ahmed's family was forced to flee, leaving everything behind and starting over with nothing in Sweden. Mr. Ahmed grew to adulthood as a committed and caring member of his family, community, and adopted country. He loved Sweden, but never forgot where he came from, and watched in helpless horror as the people and country of his birth continued to suffer the ravages of war. However misguided, his decision to return to Somalia and join al-Shabaab was rooted in sense of responsibility and a desire to do something to help. Mr. Ahmed understands that what he did was against the law and is committed to never violating the law again. His goals are simple; to be a father to his son, a husband to his wife, and a support to his extended family and community.

Given the history and circumstances of this defendant, in particular, his reasons for joining al-Shabaab, the fact that he never had any intention to do any harm to the United States or its citizens, and the physical and mental torture he has experienced, we submit that a non-guidelines sentence of substantially less than the fifteen-year statutory maximum would be sufficient, but not greater than necessary, to meet the goals of sentencing.

Dated: Brooklyn, New York
      November 30, 2015

Respectfully submitted,

Susan G. Kellman
Sarah Kunstler
Ezra Spilke

*Attorneys for Ali Yasin Ahmed*
25 Eighth Avenue
Brooklyn, New York 11217
(718) 783-8200
kellmanesq@aol.com

cc:    AUSA Shreve Ariail
       AUSA Seth DuCharme
       AUSA Richard Tucker
       Annamartine Salick, DOJ
       USPO Jaime Turton

       Ali Yasin Ahmed